ATTACHMENT "O"

HISTORY OF CAPIT
IN OF

JULY 31, 1885 — **FIRST EXECUTION AT OHIO PENITENTIARY;**

APRIL 29, 1896 — LAST EXECUTION BY HANGING (A TOTAL OF 28 MEN PUT TO DEATH IN THE GALLOWS AT OHIO PENITENTIARY)

1897 — GALLOWS REPLACED BY THE ELECTRIC CHAIR

APRIL 21, 1897 — FIRST EXECUTION BY ELECTROCUTION (CHARLES JUSTICE, INVENTOR OF THE ELECTRIC CHAIR)

MARCH 15, 1963 — LAST EXECUTION IN OHIO (DONALD L. REINBOLT)

1972 — OHIO'S DEATH PENALTY DECLARED UNCONSTITUTIONAL

OCTOBER 19, 1981 — CAPITAL PUNISHMENT REINSTATED IN OHIO

OCTOBER 1993 — LETHAL INJECTION ADMITTED TO LAW AS ALTERNATIVE METHOD OF ELECTROCUTION (ORC 2949.22 & 2949.25)

EXHIBIT

31

# SOUTHERN OHIO CORRECTIONAL FACILITY
## EXECUTION PROCESS

There are currently 146 inmates (74 white; 72 black) on death row in Ohio. Upon exhaustion of all appeals and the issuance of a death warrant from the Ohio Supreme Court, the following execution process shall be initiated:

### One Week Prior

▸  The inmate chooses method of execution (ie., lethal injection or electrocution).

### Seventy-Two (72) Hours Prior

▸  Warden designates individuals permitted entry to the death house. Others enter only upon authorization of the Warden.

▸  Inmate is transferred, as arranged by SOCF and MANCI Wardens, to SOCF and is placed in the death house where he/she is monitored by at least two staff members.

▸  Personal property is inventoried and sealed. State clothing and a state radio is issued, as well as personal smoking and legal materials.

▸  The institution chaplain and staff psychologist are available to the inmate throughout the process. The inmate may ask for a minister or other visitor (if on his visit list).

▸  Procedures explained to the inmate and information gathered as to:

> choice of clothing (coveralls shirt/pants);
> witness requests (3);
> last meal;
> disposition of personal property;
> funeral arrangements;

▸  Collect phone calls are permitted to be made by the inmate.

## Day of Execution

▸ The inmate designates his/her last meal request.

▸ The last meal is served six hours prior to execution.

▸ If electrocution is the chosen method, the inmate's head and right leg are shaved four hours prior to execution.

▸ The inmate is given the opportunity to shower.

▸ Approximately fifteen minutes prior to execution, the inmate is moved to the execution, the inmate is moved to the execution chamber and placed in the electric chair or on the injection bed.

▸ Witnesses and media representatives are escorted into the witness room.

▸ Last statement is made by inmate.

▸ Electrocution consists of two phases of voltage for a 120-second duration (approx. 1800 volts, 10 second duration; then, approx. 300 volts, 110 second duration).

▸ Lethal injection consists of administering three drugs: sodium pentothal, pavulon and potassium chloride.

| STATE OF OHIO DEPARTMENT OF REHABILITATION AND CORRECTION S.O.C.F. | RELATED A.C.A. STANDARDS: N/A |
| --- | --- |
| | RELATED ADMINISTRATIVE REGULATIONS: 5120-9-12  &  5120-9-54 |
| POLICY & PROCEDURES | RELATED DR&C POLICY/AUDIT STANDARDS: DR&C: 001-09 |

| SOCF NUMBER:  W-05-94 | PAGE: 1  OF 10  PAGES |
| --- | --- |
| EFFECTIVE DATE:  April 8, 1994 | POLICY RESCINDED: |
| CHAPTER: ADMINISTRATION AND MANAGEMENT | SUBJECT: PRISONER EXECUTION |
| REVISION DATE: POSITION OF REVIEWER: | REVIEW DATE: |

I.   AUTHORITY:

The Ohio Revised Code, 5120.38, delegates to the Managing Officer the authority to manage and direct all inmates, personnel, volunteers, programs and activities connected with the institution.

II.   PURPOSE:

To designate staff responsibility and establish uniform guidelines for carrying out a sentence of death.

III.   APPLICABILITY:

To all individuals involved in administering a court imposed death sentence.

IV.   DEFINITIONS:  As used in this policy, the following will apply:

1)   Execution Team:  A team consisting of no less than ten (10) members, designated by the Warden.  This team assumes control of the prisoner no more than seventy - two hours  and no less then twenty - four hours prior to the scheduled execution and is responsible for the execution and post-execution procedures; to include preparing the equipment and the prisoner.

ATTACHMENT "P"

INITIALS: _____

| CHAPTER: | SUBJECT: |
|---|---|
| ADMINISTRATION AND MANAGEMENT | PRISONER EXECUTION |

| SDCF NUMBER: __W-05-94__ | PAGE: __2__ OF __10__ PAGES |

2)  **Critical Incident Debriefing Team:** A group selected by the Warden and the institutional chief psychologist. Executions have the potential for creating stress on the part of all persons involved. A psychological debriefing process is available via institutional clinical staff and others in the department to recognize stressors associated with executions and to work through them with affected staff as follows:

    a.  Worker's own experiences of the execution including reactions and perceptions.

    b.  Review any negative aspects and feelings.

    c.  Review any positive aspects and feelings.

    d.  Relationships — other workers and family.

    e.  Empathy (sharing) with others.

    f.  Disengagement from execution experience.

    g.  Integration of this experience into the professional work role for a positive future contribution to the overall team effort.

3)  **Stay:** A suspension or postponement of a legal execution.

4)  **Reprieve:** The postponement of an execution or a warrant for such a postponement.

5)  **Brine:** Water saturated with salt, used to soak the sponges that will be applied to the condemned prisoner's head and leg at the time of execution to ensure proper contact for the electric current.

V.  **POLICY:**

It is the policy of the Ohio Department of Rehabilitation and Corrections (SOUTHERN OHIO CORRECTIONAL FACILITY) to carry out the Death Penalty as directed by the sentencing court and in the method elected by the condemned in accordance with state statutes. Execution shall be effected on a Professional, Humane, Sensitive and Dignified Manner.

INITIALS: _____

| CHAPTER: | SUBJECT: |
|---|---|
| ADMINISTRATION AND MANAGEMENT | PRISONER EXECUTION |

| SOCF NUMBER: __W-05-94__ | PAGE: __3__ OF __10__ PAGES |
|---|---|

1. The Ohio Revised Code, 2949.22, provides both Electrocution and Lethal Injection as the forms of execution in Ohio. This section provides any person sentenced to Death the option to elect Lethal Injection instead of Electrocution as a form of Execution and limits the period for Electing Lethal Injection to one week prior to date of Execution. It establishes the responsibilities of the Director to designate a Penal Institution where Death Sentences shall be Executed and the Warden of the Institution or Deputy Warden of the Institution in his absence to be prepared to carry out an Execution on the Day designated by the Sentencing Judge or Court in the course of Appellate of Post Conviction proceedings.

2. The date of the execution will be designated by the courts. The execution will be under the direction of the Warden of the Southern Ohio Correctional Facility. Attendance at the execution will be specified in the Ohio Revised Code, 2949.25.

3. All Offenders Sentenced to Death By Court of Law will be Transported to a Reception Center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon Completion of the Reception process the Offender will immediately be Transferred to the designated Institution for either Male or Female Death Row Placements.

4. ELECTROCUTION: Form of Execution whereby a Current of Electricity of sufficient intensity to cause Death, Passes through the body of a Person Sentenced to Death.

5. LETHAL INJECTION: The Form of Execution whereby continuous intravenous Injection of a Lethal Drug or a series of Lethal Drugs of a sufficient dosage to cause Death.

6. The Condemned Inmate will remain on Death Row until Transferred to the Death House at the Southern Ohio Correctional Facility for Execution.

7. Upon receipt of a Court scheduled Execution, the Office of the Director, and the Wardens of the Institutions Housing the Death Row Inmate and the Southern Ohio Correctional Facility will be Notified.

8. In the event a Stay of Execution is granted after the Inmate has been Transferred to the Death House, the Condemned Inmate will be returned to Death Row.

VI.  PROCEDURES:
1. Thirty (30) Days Prior to the Scheduled Execution Date: The Warden will notify the Director by Memo with copies going to the Regional Director and Chief Counsel, along with the Assistant Director, APA , Scioto County Coroner, OSP (Portsmouth and Jackson).

INITIALS: ᴅᴄ

| CHAPTER: | SUBJECT: |
|---|---|
| ADMINISTRATION AND MANAGEMENT | PRISONER EXECUTION |

| SOCF NUMBER:  W-05-94 | PAGE:  4  OF  10  PAGES |

2. An increase in traffic and tourist, as will as demonstrations, both for and against the execution, can be expected. When deemed appropriate by the Department and the Ohio State Patrol, the contingency plan for crowd and traffic control will be implemented. The Ohio State Patrol, in conjunction with the Warden, will set aside areas for peaceful demonstrations and pickets. the Ohio State Patrol, in conjunction with SOCF staff, will have responsibility for maintaining security and order in all areas outside of the Institution.

3. A communication system between the Governor's Office and the execution chamber will be established.

   a. Primary communications will be via a telephone line opened directly to the Governors Office from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

   b. Secondary communications will be via Cellular Phone.

   c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

4. ONE WEEK PRIOR TO THE SCHEDULED DATE OF EXECUTION.  The Warden of the Institution Housing the Death Row Inmate will ensure that the Inmate is provided with a election of manner of Execution Form. A copy of the completed Form indicating either Electrocution or Lethal Injection as the elected form of Execution shall be forwarded to the Warden of the Southern Ohio Correctional Facility.

5. NO MORE THAN 72 HOURS AND NO LESS THAN 24 HOURS PRIOR TO THE SCHEDULED EXECUTION:

   A. The condemned prisoner will be removed from Death Row and housed in the Death House Wing at the Southern Ohio Correctional Facility. He will be constantly monitored by a member of the Execution Team. A log will be maintained on the condemned prisoner. This log should reflect any activity of the prisoner, i.e., visitors, movement, mood changes, meals served, time showered, etc. A minimum of three (3) team members of the watch team will be present at any time the prisoner is moved from his cell. The staff psychologist will interview the prisoner on a daily basis and submit a written daily report to the Warden. The transporting institution shall bring all inmate files direct to the Warden's office at S.O.C.F.

   B. The Warden will establish a line of communication with the Legal Staff of the Ohio Department of Rehabilitation and Correction and the Attorney General's Office. Key staff will be appraised of any significant legal changes.

   C.

INITIALS: _____

| CHAPTER: | SUBJECT: |
|---|---|
| ADMINISTRATION AND MANAGEMENT | PRISONER EXECUTION |

| SOCF NUMBER: ___W-05-54___ | PAGE: __5__ OF __10__ PAGES |
|---|---|

6. **THE FOLLOWING EVENTS WILL TAKE PLACE UPON ARRIVAL AT THE DEATH HOUSE.**

A. The Warden will notify the institution Execution Task Force.

B. The institution chaplains will be notified to make daily visits to the condemned prisoner.

C. The Deputy Warden of Programs will identify Security Personnel to Man Entrances, checkpoints and to assist the Ohio State Patrol.

D. The condemned Prisoner will be measured for clothing. Clothing will be equipped with velcro fasteners in lieu of metal ( if by Electrocution).

E. The execution team leader will interview the condemned prisoner and ascertain names of three (3) witnesses he wishes to have at the Execution.

F. The execution team chief will ensure that the prisoner's property is inventoried in front of the prisoner.

G. The condemned prisoner will be allowed daily visits with family, friends and private clergy, as approved b the Warden.

H. The Institution Electrician will thoroughly test all execution equipment. All communication equipment will also be tested. A record will be kept of test results, these test will take place daily until Execution.

I. Key personnel will be briefed by the Warden.

J. Medical staff will be identified/briefed by the Warden.

K. The condemned Prisoner will specify '. writing his/her request for Funeral arrangements. This information shall be conveyed to the Prisoner's Family or others, as appropriate, the Execution Team Leader will be responsible for securing this information.

L. The condemned Prisoner will specify who is to receive his Personal effects.

M. The Warden will receive updates from Security Personnel and the Ohio State Patrol on Crowd Control, Demonstrations, Pickets, Etc.

N. The Chief of Security will brief the Warden on the level of tension/increased anxiety within the Prison Population.

O. The Warden will relay any out of the ordinary activity to the South regional Director.

P. The Execution Team will continue to drill/rehearse.

INITIALS: _DC_

| CHAPTER:<br><br>ADMINISTRATION AND MANAGEMENT | SUBJECT:<br><br>PRISONER EXECUTION |
|---|---|
| SOCF NUMBER: __W-05-94__ | PAGE: __6__ OF __10__ PAGES |

Q. All electrical equipment, to include emergency power, will be tested by the chief electrician. The test will be documented.

R. Primary/secondary communication systems will be checked.

S. The execution team advisor will interview the prisoner to allow for the order of his/her last meal.

T. The prisoner will be allowed contact visit with a member of his/her family. The visit will be supervised by a member of the execution team.

U. The names of official witnesses/media witnesses will be supplied to the Warden. Witnesses will be outlined in the Ohio Revised Code (section 2949.25), attendance at execution.

ATTENDANCE AT THE EXECUTION:

A. The Warden or his Deputy, and such number of Correctional Officers as the Warden thinks necessary.

B. The Sheriff of the County in which the Prisoner was tried and convicted.

C. The Director of the Department of Rehabilitation and Correction, or his agent.

D. Physicians of the Penitentiary.

E. The Clergyman in attendance upon such Prisoner, and not more than three other persons, to be designated by such Prisoner, who are not confined in any State Institution.

F. The Director shall authorize at least one representative of a newspaper, at least one representative of a television station, and at least one representative of a radio station to be present at the execution of the sentence ~~under division (A) (7) of this section~~ in accordance w/DRC 2949.25 and DRC Execution Media Policy.

7. WITHIN TWELVE (12) HOURS PRIOR TO THE EXECUTION:

A. The Scioto County Coroner will prepare the Certificate of Death; Cause " Legal Execution by Electrocution or Lethal Injection ".

B. The Execution Team Leader confirms and coordinates the arrangements concerning the Disposition of the body of the deceased Prisoner.

C. A Security Meeting will be held by the Warden.

INITIALS: ___

| CHAPTER: | SUBJECT: |
|---|---|
| ADMINISTRATION AND MANAGEMENT | PRISONER EXECUTION |

| SDCF NUMBER:  W-05-94 | PAGE:  7  OF  10  PAGES |

8.  **APPROXIMATELY SIX (6) HOURS PRIOR TO THE EXECUTION:**

   A.  The Execution Team will prepare the Brine and Soak Sponges, if by Electrocution.

   B.  The Prisoner is served his/her last meal.

   C.  Upon Arrival the Execution chamber will be Restricted to the following:

   > (1)  Director and/or his designee(s);
   > (2)  Warden;
   > (3)  Chief Public Information Officer;
   > (4)  Institution Deputy Wardens;
   > (5)  Administrative Assistant to the Warden;
   > (6)  Chaplain;
   > (7)  Chief Electrician;
   > (8)  Scioto County Coroner;
   > (9)  Chief of Security;
   > (10) Maintenance Superintendent;
   > (11) Other persons as deemed necessary by the Warden.

9.  **APPROXIMATELY FOUR (4) HOURS PRIOR TO THE EXECUTION:**

   A.  If by Electrocution the Execution Team Leader will supervise the shaving of the condemned prisoner's head and Right leg.

   B.  The Prisoner will then be permitted to take a shower and dress in the appropriate clothing for the Execution.

10. **APPROXIMATELY THREE (3) HOURS PRIOR TO THE EXECUTION:**

   A.  The chief electrician will check all electrical circuits and power.

   B.  The primary/secondary communication systems will be checked.

   C.  The Warden will inspect/check the execution chamber and witness room.

11. **APPROXIMATELY TWO (2) HOURS PRIOR TO THE EXECUTION:**

   A.  Official witnesses to the execution will report to the Institution. However the victim's witness will report to the Portsmouth Highway Patrol Post for Transportation to the Institution.

INITIALS:

| CHAPTER: | SUBJECT: |
|---|---|
| ADMINISTRATION AND MANAGEMENT | PRISONER EXECUTION |

| SDCF NUMBER:  W-05-94 | PAGE:  8  OF  10  PAGES |
|---|---|

12. **APPROXIMATELY ONE (1) HOUR PRIOR TO THE EXECUTION:**

   A. Electrical check and communications check; same as hours three and two.

   B. The medical team will report to the death chamber to stand-by.

13. **APPROXIMATELY TEN (10) MINUTES PRIOR TO THE EXECUTION:**

   A. Establish phone communication with the Governor's Office. If there has been no stay or reprieve granted, this contact will be maintained until the execution has been carried out.

   B. The Scioto County Coroner will report to the Execution Chamber.

14. **THE FOLLOWING WILL OCCUR JUST PRIOR TO THE EXECUTION:**

   A. The DR&C Public Information Officer will be responsible for media witnesses from the holding area to the Witness Room. The SOCF Social Service Director will be responsible for escorting witness of the victim. The SOCF Chief of Security will be responsible for escorting all other witnesses.

   B. The Warden and execution team will escort the condemned prisoner to the execution chamber.

   C. The execution team will place the condemned prisoner in the chair or on the Lethal Injection Bed.

   D. If by Electrocution, the Execution Team will secure the back, arm, forearm, lap, chest and ankles. The Electrode will then be attached to the right leg by a member of the Execution Team.

   E. If by Lethal Injection, the condemned Prisoner will be placed on the bed and strapped down. Intravenous Injection Tubes will then be hooked up.

15. **EXECUTION:**

   A. The Warden will permit the condemned prisoner to make a last statement.

INITIALS: _____

| CHAPTER:<br><br>ADMINISTRATION AND MANAGEMENT | SUBJECT:<br><br>PRISONER EXECUTION |
|---|---|
| SDCF NUMBER: W-05-94 | PAGE: 09 OF 10 PAGES |

B. If by Electrocution, the Execution Team will place the sponges on the Condemned Prisoner's Head, secure the headset and attach the electrode to the headset. The Head Cover will then be placed on the Prisoner's Head.

C. The Warden will give signal to commence Execution Process.

D. The designated member of the execution team will then activate the execution cycle, Either by Electrocution or Lethal Injection.

E. Once the execution cycle is completed, after Five (5) minutes have elapsed, the Scioto County Coroner will examine the body and pronounce the prisoner dead.

F. The Warden will pronounce the time of death as indicated by the coroner and the witnesses removed.

16. POST-EXECUTION:

A. The Warden or his designee will notify the Director that the execution has been carried out.

B. The Scioto County Coroner will sign the death certificate.

C. The execution team will remove the deceased from the chair, Injection Bed, and place him/her on a guerney.

D. The body will then be turned over to the Scioto County Coroner for disposition, in accordance with the arrangements made three (3) days prior to execution at the Prisoner's request.

E. The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

F. An ambulance will be cleared through the sally-port by the Chief of Security.

INITIALS:

| CHAPTER: | SUBJECT: |
|---|---|
| ADMINISTRATION AND MANAGEMENT | PRISONER EXECUTION |

| SOCF NUMBER: __W-05-94__ | PAGE: __10__ OF __10__ PAGES |

Debriefing:

The Warden will ensure that stress trauma briefings are available for the execution team/staff participants within twenty-four (24) hours following the execution.

Interviews will be accomplished by the "institution critical incident debriefing team" established by the staff psychologist.

TERRY J. COLLINS
WARDEN

DATE: __7/8/94__

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

# ELECTION OF MANNER OF EXECUTION

Pursuant to OR&C 2949.22 (B) (1) any person sentenced to death may elect to be executed by lethal injection instead of by electrocution. The election shall be made no later than one week prior to the scheduled date of execution of the person, in writing and filed with the Department of Rehabilitation and Correction.

If a person sentenced to death does not timely file with the Department a written notice of election to be executed by lethal injection, the person's death sentence shall be executed by electrocution.

Accordingly, as a person sentenced to death under the laws of the State of Ohio, _____ number/name, and scheduled for execution on _____ date of execution, 19_____, you are requested to indicate your election below and return this form to the Warden of the Southern Ohio Correctional Facility by __7 days prior date__, 19_____.

☐   LETHAL INJECTION

☐   ELECTROCUTION

Neither a person's timely filing of a written notice of election under ORC #2949.22 (B) (1) nor a person's failure to file or timely file a written notice of election under that division shall affect or waive any right of appeal or postconviction relief that may be available under the laws of this state or the United States relative to the conviction for which the sentence of death was imposed upon the person or relative to the imposition or execution of that sentence of death.

_____          _____
Inmate Signature                                    Date

_____          _____
Witness                                                   Date

_____          _____
Witness                                                   Date

DRC2459 (3/94)

# ATTACHMENT "Q"

SENT Nov. 22. 1995; ( 2:20PM    5, O. C. F. 92 ; 1:15PM ;    REHAB. &CORRECTION→    No. 828589 P. 2/4029 3

MRA 9-28-92

**GENERAL REQUEST**

STATE OF OHIO
**CONTROLLING BOARD**
4th East Broad Street, 9th Floor
...mbus, Ohio 43266-0411

| Agency Request No. | Controlling Board No. |
|---|---|
| 116-93 | **785** |

| ~~Department of Rehabili-~~ tation and Correction | Agency Code DRC | Statutory Authority 127.16(B) | Fund Code GRF | Bill No. HB298 | Fiscal Year 93 |

DEPOSITION
EXHIBIT
Dowell 2
11/27-95 DR

**The Controlling Board is requested to authorize:**
☐ Waiver of competitive bidding
☐ Contract (purchase or lease)   ☐ Release of Capital Funds   ☐ Other

**The Director of OBM is requested to authorize:**
☐ Release of Capital Funds   ☐ Establishment of Petty Cash Fund   ☐ Increase of Petty Cash Fund

EXPLANATION OF REQUEST: (Use Continuation Sheet if Necessary)

The Department of Rehabilitation and Correction, requests a waiver of competitive bidding for Jay Wiechert Manufacturing of Fort Smith, Arkansas in the amount of $40,000 for the repair of electrical execution equipment at the Southern Ohio Correctional Facility. Repairs will include a complete control panel with a fused disconnect switch; a high voltage transformer; high voltage cables and body electrodes; a portable test box for checking equipment prior to use; supervision of the SOCF maintenance staff in repair and installation; final inspection of total system; engineering drawing, and test procedure; execution procedure, and chart recorder for voltage and current.

This equipment is approximately 70 years old and replacement parts are rare, if even available. Jay Wiechert Manufacturing comes strongly recommended by the Office of the Attorney General. This company has repaired or has constructed other electrical execution equipment in other states (Alabama, Virginia, Georgia and Texas).

| If Transfer Mark "X" | | APPROPRIATION LINE ITEM NAME | Appropriation Line Item Code | Transferred Amount | Previously Released |
|---|---|---|---|---|---|
| From | To | | | | |
| | | | | $ | |
| | | | | $ | |
| | | | | $ | |
| | | | Total Amount Requested for Waiver or Release | | |
| Use This Line When Approval for Waiver or Release is Requested | | Equipment | 201-300 | $40,000 | $ |

September 21, 1992
Date of Request

R A Wiechert DO
Director or Authorized Agent's printed

On the date of _____

In a meeting held on
The Controlling Board

SEP 28 1992

APPROVED
ABOVE REQUEST

Director of Budget and Management

President of Controlling Board

OBM 4004 (Rev. 9-88)
(Formerly CB-4)

Requesting Agency — Retain Pink Copy for File

2-1

SENT:Oct. 22. 1993; 3:20PM    S, D, C, F, 92 ; 1:16PM ;    REHAB. &CORRECTION⁻    No. 8295⁻99 P. 3/4⁻9/ 9

STATE OF OHIO
**CONTROLLING BOARD**
30 East Broad Street, 34th Floor
Columbus, Ohio 43266-0411
    to be used as a cover sheet of requests to the Board

**Continuation Sheet**

Page No. _2_

| Agency Name | Agency Request No. |
|---|---|
| Department of Rehabili-tation and Correction | 116-93 |

Explanation of Request (Continued)

State Purchasing has determined that given the time frame needed to repair such equipment and the rarity of electrical execution equipment in general that this item is not conducive to competitive bid.

The present electrical execution equipment in its current condition is unsafe for the staff to operate. It is imperative that this equipment function properly, should the time come to use it. Jay Weichert Manufacturing has been identified on CAS to be in compliance with section 3517.13 of the O.R.C.

Approved

_Gordon A. Lane_                                     9/23/92
Gordon A.  Lane, Chief of Budgets                    DATE

_David H. Blackburn_                                 7/23/92
David H. Blackburn, Chief, Division of Business Administration    DATE

_David L. Baker_                                     9/23/92
David L.  Baker, Deputy Director, Administration         DATE

Nov. 22 1995  2:23PM  S.O.C.F.

STATE OF OHIO

**PURCHASE ORDER**

P.O No./Dept. 183463 V 018593

| DOCUMENT TYPE | | | | DOC PAGE | 1 | BATCH PAGE | 1 |

PORD   BATCH ID: DRC08G295   Index No.   Control Bd. No. CB87B5   Release/Permit No.

| | | | Acc CD | Optional Entry | | Total Amount |
| 718454095 | | 01 | | | | $38,652.00 |

Vendor Name and Address

JAY WEICHERT MANUFACTURING
715 S 18TH
FT SMITH AK        72901

Vendor Contact Person/Phone No.   501 782-5587
Delivery Required (Date/ARO)  CONFIRMING
Terms  NET 30 DAYS

BILL TO:
SOUTHERN OH CORR. FACILITY
P.O. BOX 45699
LUCASVILLE, OH 45699-0001

SHIP TO:
F.O.B. Dest.
SAME
LUCASVILLE MINFORD ROAD
LUCASVILLE OH 45699-0001

| Item No | Quantity | Unit | Description and Specifications | Unit Price | Amount |
|---|---|---|---|---|---|
| 00 | 1 | JOB | 1000    54    0000<br>REPAIR OF ELECTRICAL EXECUTION EQUIPMENT AT THE SOUTHERN OHIO CORRECTIONAL FACILITY. REPAIRS WILL INCLUDE A COMPLETE CONTROL PANEL WITH A FUSED DISCONNECT SWITCH; A HIGH VOLTAGE TRANSFORMER; HIGH VOLTAGE CABLES AND BODY ELECTRODES; A PORTABLE TEST BOX FOR CHECKING EQUIPMENT PRIOR TO USE; SUPERVISION OF THE SOCF MAINTENANCE STAFF IN REPAIR AND INSTALLATION; FINAL INSPECTION OF TOTAL SYSTEM; ENGINEERING DRAWING, AND TEST PROCEDURE, EXECUTION PROCEDURE, AND CHART RECORDER FOR VOLTAGE AND CURRENT.<br><br>FOR:  DEATH HOUSE | 38652.000 | $38652.00 |

| LN | FND | ADRC | | | | | | | |
| ACTY | TRAN | AGY | SAC | SPRC | PROG | GRANT | PRJ | SUB MR | OBJ | SUB FY | FD | RPCT | LOC |
| | | | DOC # | LN | PF | DESCRIPTION | | +/- | LINE AMOUNT |
| 01 | GRF | 0418 | 21B2 | 184B | | | | 262 | 01 | | | OPER | $17,700.00 |

I hereby certify that there is a balance in the appropriation not otherwise obligated to pay the procurement obligations pursuant to which the obligation set above is to be made.

The Department of Administrative Services, State Purchasing, hereby authorizes use of the above contract for this purchase.

STEPHEN FRONISTA, Purchasing

We hereby certify that the goods or services specified above are hereby authorized and correct

Division or Institution Head

DISTRIBUTION
WHITE - Vendor
GREEN - Agency/DBM
CANARY - Agency
PINK - Agency
GOLDENROD - Agency

ADM 5325 (Rev. 7/83)

2-3

Nov. 22 1995 2:21PM S.O.C.F.                          NO. 6295  P. 5/10

| | | |
|---|---|---|
| DOCUMENT TYPE | STATE OF OHIO **PURCHASE ORDER** | PO No./Date 183463 Y 818593 |
| PO#97 BATCH ID: DRC086295 | DOC PAGE: 2 | BATCH PAGE: 2 |

| Service/Bid DIH | Expiration Date | Index No. | Control Sc. No. CB0785 | Requisit/Partial No. |
|---|---|---|---|---|

| PIN 718454895 | | Add CD 01 | Control Entry | +/− + | Total Amount $38,652 00 |

Vendor Name and Address
JAY WEICHERT MANUFACTURING
719 E 10TH
FT SMITH AK 7279

Vendor Contact Person/Phone No.     501 782-5587
Delivery Required Date/ARO  **CONFIRMING**
Terms  **NET 30 DAYS**

BILL TO:
SOUTHERN OH CORR FACILITY
P.O. BOX 45699
LUCASVILLE, OH 45699-0001

SHIP TO: F.O.B. Dest.
SAME
LUCASVILLE-MINFORD ROAD 1
LUCASVILLE OH 45699-0001

| Ln No. | Quantity | Unit | Description and Specifications | Unit Price | Amount |
|---|---|---|---|---|---|
| | LN FND ADRC ACTV TRAN AGY | SAC DOC # | SPRC PROG GRANT PRJ SUB MR OBJ LN PF DESCRIPTION | SUB FY FD RPCT LOC /− LINE-AMOUNT | |
| | 02 GRF 0415 | 2182 1848 | | 262 A1 | ORER 120,952.00 |

hereby certify that there is a balance in the appropriation not otherwise obligated to pay for percent of persons, pursuant to which the obligation occurred above it to be paid.

The Department of Administrative Services, State Purchasing "hereby authorized use of the above contract for this purchase.

We hereby certify that the goods or services speci fied above are received in full as specified

STEPHEN A LUFTKINS  Administrator of State Purchasing

ADM-0125 (Rev. 7/91)

7-4

Nov. 22. 1995   2:21PM   S. O. C. F.

## FACSIMILE COVER LETTER

DWH-OS-020

Please deliver the following pages to:

| Name | | | | Telephone No. |
|------|--|--|--|---------------|
| JAY WIECHERT MANUFACTURING | | | | 501-782-2178 |
| Location | | | | |
| Date 9/23/92 | Time | 11:06 PM | Total Number of Pages Including Cover Letter 7 | |
| From DAVID SEE, DEPUTY WARDEN OF OPERATIONS, S.O.C.F. (OHIO) | | | | |
| Sender's Name TAMI | | | TELEFAX - (614) 259-2894 VOICE - (614) 259-5544 | Telephone No. |

☒ "X" here if pages should be picked up immediately by the receiver. Otherwise it will be delivered at a regularly scheduled time before the end of the day.


JAY,

    Please be advised the "hard copies" are in the mail.


Thanks,

David See


*mailed to Jay*
*9/23/92*
*reg mail*

2-5

Nov. 22. 1995  2:21PM  S. O. C. F.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION
Reginald A. Wilkinson, DIRECTOR

SOUTHERN OHIO CORRECTIONAL FACILITY
P.O. Box 45699
Lucasville, Ohio 45699-0001

Arthur Tate, Jr., WARDEN

George V. Voinovich, GOVERNOR
Mike DeWine, LIEUTENANT GOVERNOR

September 23, 1992

Jay Wiechert Manufacturing
719 South 10th Street
Fort Smith, Arkansas 72901

Dear Mr. Jay Wiechert:

Please acknowledge this correspondence as a "Letter of Intent" for the Southern Ohio Correctional Facility to purchase from Jay Wiechert Manufacturing, electrical execution equipment as quoted on the September 18, 1992 facsimile transmittal with the price not to exceed forty thousand dollars ($40,000.00). We acknowledge exact price will be invoiced at completion of the project.

Jay Wiechert Manufacturing will provide:

A. Complete control panel with fused disconnect switch.
B. High voltage transformer.
C. High voltage cables and body electrodes.
D. Portable test box for checking equipment prior to use.
E. Supervision of installation.
F. Final inspection of total system.
G. Engineering drawing, test procedure execution procedure.
H. Chart Recorder for voltage and current.

Pursuant to State of Ohio purchase guidelines, the Southern Ohio Correctional Facility must receive spending authority from the Controlling Board for this out of state purchase. This purchase is scheduled to be heard on the September 28, 1992 Controlling Board Docket.

I have attached copies of the General Requisition which has been submitted to the Controlling Board. Actual purchase orders will be initiated after the Controlling Boards approval is received and then receipt of your invoice.

Sincerely,

Arthur Tate Jr., Warden

AT:tjk

cc: D. Baker, Deputy Director
    Project file
    file

2-6

Nov. 22. 1995   2:22PM   S. O. C. F.                                    No. 8285   P. 9/40

## JAY WIECHERT MANUFACTURING

SPECIAL MACHINES · TOOLS · FIXTURES
INDUSTRIAL CONTROL SYSTEMS
718 SOUTH 10TH
FORT SMITH, ARKANSAS 72901

JAY WIECHERT, Owner
PROFESSIONAL ENGINEER

Sept 18, 1992

Mr. David See
Deputy Warden
Depart. of Corrections
Lucasville, Ohio  45648

Dear Mr. David See:

Thank you for your inquiry concerning electrical execution equipment. The price will not exceed forty thousand dollars ($40,000.00). Exact price will be invoiced at completion of project.

We will provide:

A. Complete control panel with fused disconnect switch.
B. High voltage transformer.
C. High voltage cables and body electrodes.
D. Portable test box for checking equipment prior to use.
E. Supervision of installation.
F. Final inspection of total system.
G. Engineering drawing, test procedure execution procedure.
H. Chart Recorder for voltage and current.

We will build a temporary system for your execution scheduled 9-26-92 based on your verbal Purchase Order. Later, we will build a permanent system using components from the temporary system.

Thank you.

Sincerely Yours,

Jay Wiechert

2-7

Nov. 22. 1995    2:22PM    S. O. C. F.                                    No. 8285    P. 9/40

DOCUMENT
TYPE
**REQ**

ACTION CODE
☑ E - ENTER
☐ M - MODIFY
☐ X - CANCEL

**STATE OF OHIO**
**GENERAL REQUISITION**    DAVID SEE 1-259-4494

| AGT CODE | REQ NO | DATE | +/- | TOTA AMOUNT | | ADDITIONAL CODING SHEETS ATTACHED |
|---|---|---|---|---|---|---|
| DRC | 0418-18 | 9-18-92 | + | 40000 : 00 | ☐ | |

| LN # | FUND | SP AC | SAC | RESP CNTR PROG | GRANT | PROJ | SUB PROJ | MRJ | OBJ | SUB OBJ | PUT PER | RPT CAT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | GRF | 183A | 2182 | 0418 | | | | | 266 | 01 | | CUST |

| JOB | ACTV | DESCRIPTION | | | | | | | +/- | LINE AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| | | ELECTRICAL EXECUTION EQUIPMENT | | | | | | | + | |

| LN # | FUND | SP AC | SAC | RESP CNTR PROG | GRANT | PROJ | SUB PROJ | MRJ | OBJ | SUB OBJ | PUT PER | RPT CAT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02 | GRF | 183A | 2182 | 0418 | | | | | 266 | A1 | | CUST |

| JOB | ACTV | DESCRIPTION | | | | | | | +/- | LINE AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | SUPERVISION OF INSTALLATION | | | | | | | | |

BILL TO:
SOUTHERN OHIO CORRECTIONAL FACILITY
P.O. BOX 45699
LUCASVILLE, OHIO 45699-0001

DELIVER TO: OF DIFFERENT FROM BILL TO:
SOUTHERN OHIO CORRECTIONAL FACILITY
LUCASVILLE MINFORD ROAD
LUCASVILLE, OHIO 45699-0001

| ITEM | QUANTITY | UNIT | DESCRIPTION AND SPECIFICATIONS | EST COST |
|---|---|---|---|---|
| | | | 1000-56-0000 | 40,000.00 |
| 1. | 1 | JOB | ELECTRICAL EXECUTION EQUIPMENT AND INSTALLATION, NOT TO EXCEED $40,000.00. TO INCLUDE THE FOLLOWING: | |
| | 1 | EA | COMPLETE CONTROL PANEL WITH FUSED DISCONNECT SWITCH | |
| | 1 | EA | HIGH VOLTAGE TRANSFORMER | |
| | 1 | EA | HIGH VOLTAGE CABLES AND BODY ELECTRODES | |
| | 1 | EA | CHART RECORDER FOR VOLTAGE AND CURRENT | |
| | 1 | EA | PORTABLE TEST BOX FOR CHECKING EQUIPMENT PRIOR TO USE | |
| | 1 | EA | ENGINEERING DRAWING, TEST PROCEDURE, EXECUTION PROCEDURE | |
| | 1 | EA | SUPERVISION OF INSTALLATION | |

APPROVAL FOR PURCHASE

WE HEREBY CERTIFY THAT THE GOODS AND SERVICES ARE NECESSARY FOR OUR USE

*Arthur Tate* [signature]
DIVISION OR INSTITUTION HEAD

STATE PURCHASING                    AGENCY HEAD

DISTRIBUTION: WHITE—State Purchasing CANARY—Ordering Agency PINK—Agency File

2-8

Nov. 22, 1995  2:22PM  S. O. C. F.                                No. 8259  P. 10/40

STATE OF OHIO
PURCHASE ORDER/CONTRACT ENCUMBRANCE

## CONTINUATION SHEET

| AGENCY CODE | BX18X18 DRC |
|---|---|
| REQN NO | 0418-18 |

| NO | QUANTITY | UNIT | DESCRIPTION AND SPECIFICATIONS | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | 1 | EA | FINAL INSPECTION OF TOTAL SYSTEM | | |
| | | | **EXACT COST WILL BE DETERMINED AND INVOICED AT COMPLETION OF PROJECT. | | |
| | | | | | |
| | | | SUGGESTED VENDOR | | |
| | | | JAY WIECHERT MANUFACTURING | | |
| | | | 719 SOUTH 10TH | | |
| | | | FORT SMITH, ARKANSAS 72901 | | |

DISTRIBUTION: WHITE
BLUE:
GREEN:
CANARY:
PINK:
GOLDENROD:

VENDOR
PROCUREMENT
PURCHASING
STATE ACCOUNTING
AGENCY
AGENCY

STATE PURCHASING
264 S. FOURTH ST.
COLUMBUS, OHIO
43266-0001

ADM T-525
REV 8/94

2-9

Oct. 22. 1995  2:22PM  S. O. C. F.
.8C  FORM B-1

No. 8255  P. 11/40

# STATE OF OHIO

## DEPARTMENT OF REHABILITATION & CORRECTION

### EQUIPMENT JUSTIFICATION STATEMENT

THE FOLLOWING ITEMS OF EQUIPMENT ARE NECESSARY FOR THE OPERATION OF NEW OR EXISTING PROGRAMS WITHIN OUR INSTITUTION.    THE FOLLOWING INFORMATION IS PROVIDED TO JUSTIFY THE PURCHASE:

1. THIS EQUIPMENT IS  NEW   REPLACEMENT  (CROSS OUT ITEM NOT APPLICABLE).

2. IT IS TO BE PURCHASED FROM FUND_____ (11,08,09,10,ETC.)  GRANT NO._____

3. IF REPLACEMENT, HAVE SALVAGE FORMS BEEN PREPARED NO ?    IF NOT, WHAT IS TO BE DONE WITH THE OLD EQUIPMENT —

    It has not been determined, at this time, as to what will be done with the old equipment.

4. GENERAL STATEMENT AS TO NEED OF THIS EQUIPMENT:

    The present electrical execution equipment is unsafe to staff during operation and is obsolete. Also, electrical component repair parts and technical data are unavailable due the advanced age of the equipment.

5. INSTITUTION OR GRANT NAME: Southern Ohio Correctional Facility INST. #____

    INSTITUTION AUTHORIZATION:_____

        TITLE: Warden

6. DIV. OF BUS. ADM. AUTHORIZATION:_____

        DATE:_____

2-10

Oct. 22. 1995   2:22PM   S.O.C.F.                                          No. 6265   P. 12/16



## Authorization for Out of State Purchase

Buy Ohio Central N

TO: Office of the Buy Ohio Coordinator
364 South Fourth Street
Columbus, Ohio 43215

FROM:
SOUTHERN OHIO CORRECTIONAL FACILITY
P.O. BOX 45699
LUCASVILLE, OHIO 45699    Date 9-18-9

The attached requisition, purchase order or request is hereby submitted for acquisition from an out-of-state.
Under the guidelines of the "Buy Ohio" program, as stipulated in DAS Directive B3-47, the following justific
is presented for acquisition from an out-of-state vendor.

Why can't an Ohio product satisfy your requirements?
No qualified Ohio vendor could be found. (See attached letter from
Suellen Mohr, Assistant Attorney General, State of Ohio)

Ohio vendor acquisition cost(s).
None

Out-of-state vendor acquisition cost.
Acquisition will not exceed $40,000.00 (forty thousand dollars).

Please attach a complete description of the item.

☐ APPROVED
☐ DISAPPROVED

Authorized Signature
D-11

No. 8255  P. 13/40

P.2

Nov. 22. 1995  2:23PM  S.O.C.F.

SEP 16 '92 12:58 S O C F

## NONCOMPETITIVE BID CONTRACT STATEMENT FOR CALENDAR YEAR 1992

### PURSUANT TO ORC 3517.13 (I) and (J)

For the purposes of this statement, the "Governor" is Governor George V. Voinovich, Governor of the State of Ohio, and the "Governor's Campaign Committees" are the Voinovich for Governor Committee and the Voinovich-DeWine Committee.

on 2921.13 of the Revised Code provides that a statement made with purpose to ld a public official in performing his duties is a misdemeanor of the first

COMPLETE ONLY ONE OF THE SECTIONS, I, II, OR III, depending on which is appropriate, sign, date and return the statement to:

| PRINT NAME, ADDRESS, AND TAX ID NUMBER OF VENDOR IN SPACE BELOW | Agency Name | Southern Ohio Correctional Facility |
| | Agency Address | P.O. Box 45699 |
| | | Lucasville, Ohio  45699-0001 |

or Name     Jay Wiethert Manufacturing
or Address  718 South 10th
            Fort Smith, Arkansas 72901

ral Tax ID (EIN)  71 ∅ 454 895.   or Social Security NO.

ION I.  TO BE COMPLETED BY NOT-FOR-PROFIT CORPORATIONS AND GOVERNMENTAL ENTITIES.

ou are recognized by the IRS as a not-for-profit corporation or are a nmental entity just mark the appropriate designation below, verify the lot name, address and tax ID number above, sign, date and return the tement.

- NOT-FOR-PROFIT CORPORATION

- GOVERNMENTAL ENTITY

ION II.  TO BE COMPLETED BY INDIVIDUALS, SOLE PROPRIETORSHIPS, PARTNERSHIPS, INCORPORATED PROFESSIONAL ASSOCIATIONS, UNINCORPORATED ASSOCIATIONS, ESTATES AND TRUSTS.

aforenamed vendor is a (please mark appropriate designation):

| ____ SOLE PROPRIETORSHIP OR INDIVIDUAL | ____ TRUST |
| ____ INCORPORATED PROFESSIONAL ASSOCIATION | ____ ESTATE |
| ____ UNINCORPORATED ASSOCIATION | ____ PARTNERSHIP |

A principal for purposes of Section II includes a sole proprietor, an owner, a partner, shareholder, an administrator, an executor or trustee connected with the aforenamed vendor and their respective spouses.

EASE READ PARAGRAPHS (A) and (B) and mark the appropriate paragraph. If ragraph (B) is checked, a state agency is prohibited by Section 3517.13 of the vised Code from awarding a noncompetitively bid contract over $500.00 to the ndor during calendar year 1992.

(A) NO ONE PRINCIPAL of the aforenamed vendor made directly or indirectly contributions to the Governor or either of the Governor's campaign committees between January 1, 1990 and December 31, 1991 that totals in excess of $1000.00 per individual. This category includes also contributions to the Governor or either of the Governor's campaign committees.

(B) A PRINCIPAL(S) of the aforenamed vendor made directly or indirectly contributions to the Governor or either of the Governor's campaign committees between January 1, 1990 and December 31, 1991 that totaled in excess of $1000.00 per individual.

2-12

Nov. 22. 1995   2:23PM   S. D. G. F.                                No. 8255   P. 14/40

P. 3

SEP 16 '92 10:55 S D C F

ION III.   TO BE COMPLETED BY FOR-PROFIT CORPORATIONS AND BUSINESS TRUSTS.

The aforenamed vendor is a (please mark appropriate designation):

____ CORPORATION          ____ BUSINESS TRUST

A principal for purposes of Section III includes an individual or other entity owning more than 20% of the corporation or business trust for the entire period between January 1, 1990 and December 31, 1991 and the spouse of such person.

PLEASE READ PARAGRAPHS (A), (B) and (C) and mark the appropriate paragraph. If paragraph (C) is checked, a state agency is prohibited by Section 3517.13 of the Revised Code from awarding a non-competitively bid contract over $500.00 to the vendor during calendar year 1992.

____ (A)   NO INDIVIDUAL or entity owned more than 20% of the corporation or business trust between January 1, 1990 and December 31, 1991.

____ (B)   NO PRINCIPAL of the aforenamed vendor made directly or indirectly contributions to the Governor or either of the Governor's campaign committees between January 1, 1990 and December 31, 1991 that totaled in excess of $1000.00 per individual. This category includes zero contributions to the Governor or either of the Governor's campaign committees.

____ (C)   A PRINCIPAL(S) of the aforenamed vendor made directly or indirectly contributions to the Governor or either of the Governor's campaign committees between January 1, 1990 and December 31, 1991 that totaled in excess of $1000.00 per individual.

I do hereby state that I have legal authority to complete this statement on behalf of the aforenamed vendor and to the best of my knowledge and belief the answers herein are true.

Vendor Name   _Jay Wiechert MB_          Social Security No. _7/0 454 095_
                                          or Federal Tax ID (FEIN)

Signature   _Jay Wiechert_               Date   _9-18-92_

Print Name   _Jay Wiechert_              Print Title   _Owner & Manager_

Telephone Number   _501 782-5587_
                      (Area Code)

FAX 782-2178

PLEASE RETURN BOTH PAGES TO THE AGENCY NAME LISTED ON PAGE 1

5-13

Nov. 22. 1995   2:23PM   S, O, C, T,                    No. 8285   P. 15/40

STATE OF OHIO
**VENDOR MASTER INPUT DOCUMENT**

| ORG AGY | DOCUMENT NO. | DATE | VENDOR NO. | VENDOR TAX NO. | HB 200 |
|---|---|---|---|---|---|
| DR&C | SCO2436 | 9/21/92 | 716454895 | 716454895 | |

**VEN**
- ☒ E - ENTER
- ☐ M - MODIFY
- ☐ X - CANCEL

**VUE** ☐

| VENDOR NAME | | | | VEND TYPE | MINORITY VEND |
|---|---|---|---|---|---|
| JAY WEICHERT MANUFACTURING | | | | TI | |
| LIEN | ADDRESS CODE | | TELEPHONE | | LOCATION |
| ———— | 01 | | ( 501 ) 782-3587 | | |

VENDOR STREET ADDRESS
1. 719 SOUTH 19TH
2.

| CITY, STATE | | ZIP |
|---|---|---|
| FORT SMITH, ARKANSAS | | 72901 |

| TERM CONTRACT NUMBER | ACTIVATION DATE | EXPIRATION DATE | BID NUMBER |
|---|---|---|---|
| | | | |

| ORG AGY | DOCUMENT NO. | DATE | VENDOR NO. | VENDOR TAX NO. | HB 200 |
|---|---|---|---|---|---|
| | | | | | |

**VEN**
- ☐ E - ENTER
- ☐ M - MODIFY
- ☐ X - CANCEL

**VUE** ☐

| VENDOR NAME | | | | VEND TYPE | MINORITY VEND |
|---|---|---|---|---|---|
| | | | | | |
| LIEN | ADDRESS CODE | | TELEPHONE | | LOCATION |
| | | | ( ) | | |

VENDOR STREET ADDRESS
1.
2.

| CITY, STATE | | ZIP |
|---|---|---|
| | | |

| TERM CONTRACT NUMBER | ACTIVATION DATE | EXPIRATION DATE | BID NUMBER |
|---|---|---|---|
| | | | |

| ORG AGY | DOCUMENT NO. | DATE | VENDOR NO. | VENDOR TAX NO. | HB 200 |
|---|---|---|---|---|---|
| | | | | | |

**VEN**
- ☐ E - ENTER
- ☐ M - MODIFY
- ☐ X - CANCEL

**VUE** ☐

| VENDOR NAME | | | | VEND TYPE | MINORITY VEND |
|---|---|---|---|---|---|
| | | | | | |
| LIEN | ADDRESS CODE | | TELEPHONE | | LOCATION |
| | | | | | |

VENDOR STREET ADDRESS
1.
2.

| CITY, STATE | | ZIP |
|---|---|---|
| | | |

| TERM CONTRACT NUMBER | ACTIVATION DATE | EXPIRATION DATE | BID NUMBER |
|---|---|---|---|
| | | | |

_Jane Litchen_                    614-259-4494   9/21/92

REQUESTING AGENCY SIGNATURE          TELEPHONE          DATE          ENTERED          DATE

White - State Accounting / Canary-Agency (controlling copy) / Pink - Agency (suspense)

OBM 7214 (REV 6/88)

No. 8295   P. 16/40

Nov. 22 1995  2:24PM  S.O.C.T.



George V. Voinovich
GOVERNOR

Mike DeWine
LIEUTENANT GOVERNOR

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

Reginald A. Wilkinson, DIRECTOR

STRATFORD
SHIELDS
644-6441

1050 Freeway Drive, North
Columbus, Ohio 43229

September 10, 1992

TO:       Dave Baker, Deputy Director
          Administration

TEROUGE:  Reginald A. Wilkinson
          Director

FROM:     Philip W. Parker
          South Regional Director

SUBJECT:  Renovation of the Electric Chair

Recently our Department was made aware of an inmate's attempt to
stop all appeals of his execution. There is an execution date
set; however, our latest information is that he has now changed
his mind and filed an appeal. Nevertheless, this situation
necessitates that we examine our procedures and equipment for
the eventuality of an execution. A multi-agency task force is
working diligently to accomplish this task.

It is our best advice and opinion that our present equipment is
unsafe and inoperable (see attachments). The Attorney General's
Office has done extensive research on this project and has
concluded that Mr. Jay Wiechert from Arkansas is the only vendor
on record that has the proper credentials to upgrade our
electric chair. The only other known vendor has questionable
credentials as well as questionable ethics in th' matter.

The multi-agency committee which includes representatives from
our Central Office, Southern Ohio Correctional Facility, the
Ohio Highway Patrol, Attorney General's Office and the
Governor's Office has concluded that replacement is necessary
because of the electrical components deterioration and
unreliable condition. Replacement parts are obsolete and cannot
be obtained.

For the above reason, we are requesting immediate assistance to
begin the process of replacing the electrical components. It is
my understanding that the entire project will cost approximately
$30,000 and can be taken from monies set aside for electrical
capital projects.

Your assistance in this matter is greatly appreciated.

/dab

cc: Norm Sills, Greg Trout, Art Tate

Nov. 22. 1995   2:24PM   S. O. C. F.                                    No. 8955   P. 17/49

## JAY WIECHERT MANUFACTURING
SPECIAL MACHINES · TOOLS · FIXTURES
INDUSTRIAL CONTROL SYSTEMS
710 SOUTH 10TH
FORT SMITH, ARKANSAS 72901

JAY WIECHERT, Owner
PROFESSIONAL ENGINEER

Sept 1, 1992

Mr. David See
Deputy Warden
Depart. of Corrections
Lucasville, Ohio  45648

Dear Mr. David See:

Thank you for your inquiry concerning electrical execution equipment. The approximate price will be thirty thousand dollars ($30,000.00). Exact price will depend upon your particular design requirements.

We will provide:
A. Complete control panel with fused disconnect switch.
B. High voltage transformer.
C. High voltage cables and body electrodes.
D. Portable test box for checking equipment prior to use.
E. Supervision of installation.
F. Final inspection of total system.
G. Engineering drawing, test procedure, execution procedure.

I would be happy to visit your prison, examine your existing equipment, and provide a written proposal. The price for this service will depend on my expenses, but will not exceed one thousand dollars ($1,000.00).

Thank you.

Sincerely yours,

Jay Wiechert

S. O. C. F.
'92 SEP 1 PM 3 55
WAREHOUSE

2-16

Nov. 22. 1995  2:24PM  S.O.C.F.                    No. 8255  P. 18/40

# JESS HOWARD ELECTRIC COMPANY

## ENGINEERING & CONTRACTING

P.O. BOX 95 • 6630 TAYLOR RD. • BLACKLICK, OHIO 43004 • PHONE (614) 861-1300
"MEN - EQUIPMENT - KNOW HOW"

September 3, 1992

Southern Ohio Correctional Facility          VIA FAX ONLY: 1-259-2894
Lucasville-Milford Road
Lucasville, Ohio 45648

Attn: Nora McGinnis

Subject:   Southern Ohio Correctional Facility
           Inspection & Testing  of Electric Chair and  Associated
           Electric Equipment

Dear Mr. McGinnis:

After  inspection of the referenced  equipment I would like  to
offer the following:

First of all, the equipment is  so old and obsolete that no parts
or technical data is available from the manufacturers.

The voltage regulator has leaked oil and is below the sight glass
which indicates that the tank is deteriorated.

The main  transformer, P/T transformer  and oil switch  shows oil
leaks on the bushings and tanks, and the wire is deteriorated.

Even  though the  system could  be tested and  possibly operated,
because  of  the age  and  so many of  the operating parts  are
mechanical, I could not guarantee that it would not malfunction.

It is my  opinion that  it should be  replaced.  If  you wish  to
further test and make it operational, we would have to  work on a
time and material basis.

If you have any questions, please contact my office.

Sincerely,

JESS HOWARD ELECTRIC COMPANY

Richard J. Hickey
Vice President
kat
                                                    elechair.ltr

PRIMARY                 INDUSTRIAL          COMMERCIAL      RESIDENTIAL
TRANSFORMERS • SUBSTATIONS   MOTORS • COMPENSATORS    LIGHTING      THE LATEST WIRING
POLE LINE • CONSTRUCTION   RECTIFIERS • ALL OTHER   & WIRING      FOR MODERN LIVING
                         FACTORY EQUIPMENT

2-17

Nov. 22. 1995  a 2:24PM  HS, O. C. ELECTRIC CO                    No. 8225    P 19/43

# JESS HOWARD ELECTRIC COMPANY

## ENGINEERING & CONTRACTING

P.O. BOX 95 • 6630 TAYLOR RD. • BLACKLICK, OHIO 43004 • PHONE (614) 861-1300
"MEN • EQUIPMENT • KNOW HOW"

September 3, 1992

Southern Ohio Correctional Facility                VIA FAX ONLY: 1-259-2894
Lucasville-Milford Road
Lucasville, Ohio 45648

Attn: Nora McGinnis

Subject:  Southern Ohio Correctional Facility
          Inspection & Testing of Electric Chair and Associated
          Electric Equipment

Dear Mr. McGinnis:

After inspection of the referenced equipment I would like to
offer the following:

First of all, the equipment is so old and obsolete that no parts
or technical data is available from the manufacturers.

The voltage regulator has leaked oil and is below the sight glass
which indicates that the tank is deteriorated.

The main transformer, P/T transformer and oil switch shows oil
leaks on the bushings and tanks, and the wire is deteriorated.

Even though the system could be tested and possibly operated,
because of the age and so many of the operating parts are
mechanical, I could not guarantee that it would not malfunction.

It is my opinion that it should be replaced. If you wish to
further test and make it operational, we would have to work on a
time and material basis.

If you have any questions, please contact my office.

Sincerely,

JESS HOWARD ELECTRIC COMPANY

Richard J. Dickey
Vice President
kat

PRIMARY                 INDUSTRIAL          COMMERCIAL         elecbair.ltr
TRANSFORMERS • SUBSTATIONS   MOTORS • COMPENSATORS     LIGHTING          RESIDENTIAL
POLE LINE • CONSTRUCTION    RECTIFIERS • ALL OTHER     & WIRING        THE LATEST WIRING
                        FACTORY EQUIPMENT                             FOR MODERN LIVING

2-18

Nov. 22. 1995   2:25PM   S. O. C. F.                                    No. 8265   P. 20/40



**Attorney General**
**Lee Fisher**

September 4, 1992

Phillip Parker
Director of Southern Region
1050 Freeway Drive North
Columbus, Ohio 43229

Dear Phil:

I have attached the following:

1.    A letter "from" me detailing Jay Wiechert's qualifications to fix the electric chair and the lack of any other known qualified person to do the repairs.

2.    A letter from Jay Wiechert giving an approximate price for the modernization of the electric chair and what would be included in the estimated price.

3.    Copies of Jay Wiechert's engineering license and diplomas.

4.    A letter and resume from Dr. Michael Morse detailing his experience and cost per hour to inspect the electric chair. If we use someone other than Mr. Wiechert, I would suggest using Dr. Michael Morse to inspect the chair upon completion to determine its efficiency and capabilities. Dr. Morse would be necessary if we were to go to court to defend the efficiency and mechanics of the electric chair.

Mr. Wiechert told me that he has been able to make arrangements to prepare the chair for operation by September 19, 1992 if absolutely necessary. He would prefer to work on a more orderly schedule, but he has located the necessary parts and is ready to go if we need him.

2-19

Nov. 22. 1995    2:25PM    S. O. G. P.                          No. 6255    P. 21/40

I must let Mr. Wiechert know if we need his services and if so when we want him to come out and inspect the site. Please call me by 2:30pm today and let me know what the Department wants to do.

Sincerely,

Suzanne E. Mohr
Assistant Attorney General
614/644-7233

CC: Art Tate
    David See

Nov. 22, 1995  2:25PM  S.O.C.F.                    No. 8265  P. 22/40



**Attorney General
Lee Fisher**

# MEMORANDUM

TO:    PHIL PARKER

FROM:  SUELLEN MOHR
       Assistant Attorney General

RE:    THE QUALIFICATIONS OF JAY WIECHERT

DATE:  SEPTEMBER 4, 1992

I have contacted the Attorney General Offices in Alabama, Virginia, Georgia, and Texas. I have talked to the Warden of the Georgia prison where the executions are held. All of the above individuals named Jay Wiechert as the electrical engineer who updated or built their electric chairs. I spoke with the attorney general's office in Florida. They consulted with Wiechert on their chair's condition.

I contacted Jay Wiechert and obtained his credentials. He has built electric chairs for Arkansas, Alabama, and two for Georgia. He spoke with David See at SOCF and from that conversation submitted an estimated proposal to rebuild the electric chair. Mr. Wiechert believes he can complete the project by September 29, 1992 if necessary. He will use the maintenance staff at SOCF to help install the equipment.

No other qualified individual was named by any of the contacted offices as someone who specialized in the creation and maintenance of electric chairs. The only other individual named as someone to avoid was Fred Leutcher. Leutcher has been discredited in several federal courts and has testified against the state when the state has not accepted his bid to update its electric chair. No matter who is chosen, Leutcher should not be considered.

Nov. 22. 1995   2:25PM   S. O. C. T.

FFICE OF THE
ATTORNEY GENERAL
DON SIEGELMAN
ATTORNEY GENERAL
MONTGOMERY, ALABAMA 36130
(205) 242-7300



STATE OF ALABAMA

RECEIVED
OFFICE OF THE ATTORNEY GENERAL
FEDERAL LITIGATION SECTION

JUN 27 1990

# M E M O R A N D U M

TO:      All Capital Punishment States

FROM:    Ed Carnes
         Alabama Assistant Attorney General

RE:      "Execution Technology Expert"
         Fred Leuchter

DATE:    July 20, 1990

You should be aware of some facts concerning a self-styled
"execution technology" expert named Fred Leuchter from
Massachusetts.  Mr. Leuchter claims to have provided execution
technology advice, components, or systems to a large number of
st... s.  He has installed Tennessee's new electric chair
system, which has not been used yet.  At one time he was under
contract to provide a new electric chair system for Alabama,
but the status of that contract is now uncertain.

Leuchter appeared as a paid expert witness for the
petitioner, Judias V. Euendano, in a proceeding involving a
claim that Florida's electric chair, and particularly its
electrodes, were defective and that that defect is what caused
the much-publicized problem during the execution of Jesse
Tafero.  There was an evidentiary hearing, and Leuchter

2-22

testified at length.  During the testimony, it was established
that Leuchter: had a B.A. in history; had no engineering
degree or medical training; had never seen an execution; and
had never installed an electric chair or other execution system
that had actually been used.

At the conclusion of the evidentiary hearing, the federal
district court ruled in favor of Florida and rejected
Leuchter's testimony.  In doing so, the court found that
Leuchter had "misquoted the statements" contained in an
important affidavit; that he had "inaccurately surmised" a
crucial premise of his conclusion; and that the testimony the
petitioner had presented in general, and that of Leuchter in
particular, was "unreliable."  See footnotes 34 & 35 of the
attached copy of the relevant part of the Buenoano opinion.

Less than two weeks after he had testified against Florida
in the Buenoano case, Leuchter called my office in connection
with an attempt by the attorney for an Alabama death row
inmate, Wallace Norrell Thomas, to raise a claim involving
Alabama's electric chair.  That claim stemmed from a problem
that had occurred two executions back (the execution personnel
had plugged the cables into our electric chair in such a way
that it received no electricity the first time the switch was
thrown).  The problem had been permanently fixed, but Thomas'
attorney raised a claim concerning the reliability and efficacy
of our electric chair system, anyway.

Leuchter told us that he was under contract with the
Alabama Department of Corrections to install a completely new

electrocution system; that there was nothing fundamentally
wrong with the old system except that it was old; and that he
did not anticipate there would be any problem with the
scheduled execution of Thomas in the old chair. He said he had
told Thomas' attorney all that, and he volunteered to give us
an affidavit saying all that.

We got the affidavit from Leuchter (we paid $450.00 for his
time), a copy of which is attached, and we submitted it to the
federal district court in the Thomas proceeding. Fortunately,
we also presented the testimony of someone who was a highly
qualified electrical and biomedical engineer and who had
intensively inspected and tested our chair in anticipation of
the claim. We did not just rely on Leuchter's affidavit. All
went well at the evidentiary hearing, and the district court
ruled in our favor and denied a stay on July 10, 1990. The
Eleventh Circuit affirmed on July 11, 1990. The Supreme Court
denied certiorari and a stay on July 12, 1990.

At approximately 6:30 or 7:00 p.m. on July 12, 1990, less
than six hours before the scheduled execution, Thomas' attorney
filed in the Alabama Supreme Court a motion for stay of
execution. The sole ground of that motion was that Leuchter
had that day contacted Thomas' attorney and told him that
Leuchter had just learned: his contract to supply Alabama with
a new electric chair was being re-bid; he felt he had been
used; and, on second thought, Alabama's existing chair was old
and unreliable and might not work in the scheduled execution.
Leuchter signed an affidavit, a copy of which is attached,

3 : 2-24

supporting all the averments of that motion.  Leuchter's
(second) affidavit makes it clear that he contacted Thomas'
attorney after he had tried unsuccessfully to contact the
federal judge who had denied Thomas' petition upon
consideration of evidence which included Leuchter's first
affidavit.

Fortunately, the Alabama Supreme Court denied the
last-minute motion, and Thomas was executed on schedule a few
minutes past midnight on July 13, 1990.

Next came the events in Virginia, where a murderer named
Richard Boggs was scheduled to be executed on July 19, 1990.
On the day before the scheduled execution, Boggs filed a
federal habeas petition which included a claim that Virginia's
electric chair, which had never malfunctioned, might be
faulty.  The petition was supported by an affidavit by Fred
Leuchter.  In his affidavit, Leuchter opined that the Virginia
electric chair system, like the system in Florida, was
"obsolete in design," "prone to malfunction and failure," used
an "old and outmoded" control system, and, as a result, "there
is a real possibility that Virginia's chair will malfunction."
His affidavit also opined that the result of a malfunction
could be "a living, brain-dead, vegetable sitting in the
electric chair, the state having no means to complete the
execution."  A copy of Leuchter's Virginia affidavit is
attached.

On February 19, 1990, the federal district court denied
Boggs relief.  In doing so, the court noted that the Virginia

unorthodox.[1] He is very good at promoting himself and claims
that "our Modular Electrocution System [is] the only state of
the art system available today." He promotes himself as an
expert on and supplier of lethal injection equipment, also.
You may encounter problems with Leuchter in your state.

The common denominator of Leuchter's involvement in
Florida, Alabama, and Virginia is that he was called in to
consult on execution equipment by the corrections department of
each state, he quoted a price for replacing the system or
certain components of it, and he did not get a contract for the
business (or, in Alabama, he got one and then thought he had
lost it). In each instance, he then supplied testimony either

---

[1]Leuchter testified in the Florida proceedings and stated
in his Virginia affidavit that proper electric chair technique
required use of two leg electrodes. He has no medical
background and has never cited any scientific literature
supporting his opinion on that subject. Of the hundreds of
electrocution executions carried out in this country in the
past century, not one has involved use of two leg electrodes.
See generally, Bernstein, "A Grand Success," IEEE Spectrum,
10:58 (Feb. 1973) ("The electric chairs used are generally
similar to the first chair, except that a head electrode is
used in conjunction with a second electrode at the calf of one
leg.").

'In the Thomas proceeding in Alabama, we proved that all of
the post-Furman electrocution executions to date have been
carried out using one leg electrode. We did that by having our
electrical engineer call the wardens of the death row facility
in each state where there has been a post-Furman electrocution
execution. These states are: Alabama, Arkansas, Florida,
Georgia, Indiana, Louisiana, South Carolina, and Virginia.
See, NAACP Legal Defense and Education Fund, Inc., Death Row
U.S.A. (May 30, 1990), at 5-7 (listing executions since 1972);
Bureau of Justice Statistics, Bulletin, Capital Punishment 1988
(July 1989), at 5 (listing methods of executions by state).
All of these states reported that every electrocution had been
carried out with one leg electrode and no problem had ever been incurred
from the use of one leg electrode.

in person or by affidavit that the existing execution equipment
was old, unreliable, or defective and might malfunction during
the next scheduled execution.

What this means is that if Leuchter has consulted with your
corrections people and has offered to replace their execution
system or some component of it and has been turned down, you
had better prepare to meet his affidavit or testimony before
your next execution. Even if he has not consulted with your
corrections people, Leuchter may still appear against you. The
fact that he was contacted by the other side for use in three
states during the same month indicates how fast word about his
availability has spread among the anti-death penalty people.

The best way to prepare to rebut Leuchter's testimony that
your execution system is too old, is unreliable, or is
defective or outmoded in design, is to prepare in advance to
present expert testimony. If yours is an electric chair
system, have a bona fide electrical engineer inspect your
entire system and thoroughly test it, and if he makes any
suggestions, follow them. There a·· different subspeci·ties
of electrical engineers, and the best one to check out the
functioning and reliability of an electric chair system is a
power engineer who knows high voltage equipment. Another type
of electrical engineer who is very useful is a biomedical
engineer, which is an electrical engineer who specializes in
application of electricity to the human body (as in design of
devices to administer low current to treat spinal injuries, in
design of pacemakers, and so forth).

In our Alabama proceedings, we used a very good biomedical engineer who was also qualified and accepted as an expert in the functioning of electrical equipment. His name is Dr. Michael Morse, and he is in the process of moving from Auburn University in Alabama to San Diego, California.

If your method of execution is lethal injection, I do not know how Leuchter will be used against you, if he will be, nor do I know how you can prepare for it. What Virginia did in their case, and what might work regardless of the execution method, is to obtain in advance affidavits establishing that the system has been successfully used and has never failed.

If you need any additional information about the events in Florida, call Carolyn Snurkowski or Richard Martell (904-488-0600), or Marjene Roper (904-238-4950). If you need any additional information about the events in Alabama, call John Gibbs or me (205-242-7408). If you need any additional information about the events in Virginia, call Jerry Sloanaker (804-786-2071). Let us know if Leuchter shows up in your state.

EC/elu

1329v

2-29

No. 8265   F. 31/40

Nov. 22. 1995   2:27PM   S. D. C. F.

## JUSTICE

# The Executioner's Handyman

## The engineer of death may not be an engineer

substance. "If the chemicals are not purchased in California due to Prop 128, they'll go elsewhere, like Japan, and ozone depletion will be the same," says Katy Wolf, who researched CFC substitutes for the Rand Corp. The Prop 128 authors argue that the significance of the CFC reform is less in affecting the ozone layer than in proving that a diversified economy can live without the chemicals. They may be right. Chemists have come up with substitutes for ozone destroyers, ranging from an orange-peel-based solvent that cleans circuit boards to a water-based air conditioner that replaces the CFC units of today. The U.S. Environmental Protection Agency says that eliminating CFCs would cost less than the estimate given two years ago for merely halving them.

Electric arm Big Green also requires cuts in emissions of carbon dioxide ($CO_2$), a gas responsible for the greenhouse effect. The efforts in California would lower world $CO_2$ output by less than 5 percent but might become a model for the nation. Until now the Bush administration has resisted efforts to limit $CO_2$, while several Western European countries have pushed ahead with ambitious programs of cutbacks.

Cars alone account for 45 percent of California's $CO_2$ output. And the only way to sharply reduce driving, critics charge, is to higher gasoline taxes, perhaps as much as 50 cents more per gallon. But even without Prop 128, the rules of the road are changing drastically. One regional air-quality board has ordered more car pools through forced ride-sharing organized by employers, and a state agency has mandated that, by 2003, one out of 10 new cars sold in California be electric. Such rules would cut $CO_2$ more than 10 percent.

For the rest of the $CO_2$ savings, backers of Big Green look to electric utilities, which account for 15 percent of California's $CO_2$ output. They pin their hopes on energy efficiency, which could slash electricity use 0 percent. If that's not enough, utilities might have to switch from coal and oil, big urban belchers, to natural gas, nuclear or renewable energy sources. As a result, predicts a Pacific Gas and Electric analysis, electric bills would increase by as much as 60 percent by the year 2010.

Is this any way to save the planet? So far, California's voters seem to think so. Although pollsters found support for the initiative dipping soon after Iraq's invasion of Kuwait, recent surveys indicate that it might squeak through. If Big Green takes off, the state will become a test case—the planet be saved at an affordable price—and a proving ground for just about anything environmentalists pray for en route to saving the Amazon. Not even California has the hubris to tackle that one.

SHARON BEGLEY with
JOHN TALIAFERRO in Los Angeles



*Under attack: Leuchter with tools of his trade*

It's little wonder that Fred A. Leuchter Jr., proud businessman and intrepid historian, is a controversial fellow. The president and chief engineer of Fred A. Leuchter Associates, Inc. he sets up electric chairs, lethal-injection dispensers and other execution hardware for states with the death penalty, such inventive efforts don't exactly endear him to civil-rights activists (or, presumably, some of his suburban Boston neighbors). Leuchter is also author of a 1988 paper purporting to prove that the Nazis didn't use gas chambers to exterminate Jews at Auschwitz, Birkenau and Majdanek concentration camps; that conclusion doesn't sit too well with those who witnessed the Holocaust.

Now some of his enemies are getting even. Next week Leuchter is scheduled to be arraigned in Middlesex County on charges of practicing engineering without a license. It's not that capital clients are unhappy with his machines. Rather, it's a group of Holocaust survivors who complained to Massachusetts authorities that Leuchter was passing himself off as a scientist in order to legitimate his revisionist views of World War II.

If convicted, he faces up to three months in prison and a $500 fine, but Leuchter has bigger problems: his livelihood is dying. Notwithstanding what wardens may think when they discover their execution handyman could be unlicensed, states are already raising questions about Leuchter's business practices. In July, an Alabama assistant attorney general wrote a memo to colleagues in other states alleging that Leuchter was running a death-row shakedown scheme: if a state didn't purchase Leuchter's services, he would testify at the last minute for the condemned man that the state's death chamber might malfunction. (Leuchter denies any intent to twist arms.) In August, Illinois officials decided not to use Leuchter to train ushers for the state's first execution in 28 years. And he hasn't received many calls since.

Leuchter receives visitors in his simple home filled with stuffed animals (the fussy, not taxidermied, kind). He says he's being persecuted because of his Holocaust views. He plans to plead not guilty, arguing that the Massachusetts licensing requirement pertains to persons who design buildings and that the law doesn't apply to him anyway because his work is done out of state. Leuchter, 47, has only a B.A. in history and has never taken an engineering-licensing test.

The state licensing board acknowledges it began an investigation after receiving a letter from Shelly Shapiro, director of Holocaust Survivors & Friends in Pursuit of Justice. When the licensing board found no record of Leuchter in their files, they wrote him twice. He ignored the letters because "I did not believe the engineering board would move on something so stupid." Of Shapiro's group and the Anti-Defamation League of B'nai B'rith, Leuchter says, "They are doing exactly what they felt their enemies did to them." The ultimate revisionist comparison: Auschwitz wasn't a death camp, merely a merciless administrative board.

DAVID A. KAPLAN with
LAURA E. PRUSOFF in

Nov. 22 1995   2:38PM   S. D. C. T.                    NO. 6255   P. 32/43

# JAY WIECHERT MANUFACTURING
### SPECIAL MACHINES · TOOLS · FIXTURES
### INDUSTRIAL CONTROL SYSTEMS
### 715 SOUTH 10TH
### FORT SMITH, ARKANSAS 77901

JAY WIECHERT, Owner
PROFESSIONAL ENGINEER

July 24, 1992

Ms. Suellen Mohr
Attorneys General Office
26TH Floor
30 East Broad St.
Columbus, Ohio  43266-0410

Dear Ms. Suellen Mohr:

Thank you for calling concerning Execution Equipment.
I have enclosed a resume as requested.

Our company designs and fabricates automation equipment for
manufacturers.

We have furnished five execution systems to date.

I look forward to working with you on this project.

Sincerely yours,

Jay Wiechert

2-31

Nov. 22. 1995   2:28PM   S.O.C.F.                          No. 8255   P. 33/40

# JAY WIECHERT MANUFACTURING

SPECIAL MACHINES · TOOLS · FIXTURES
INDUSTRIAL CONTROL SYSTEMS
719 SOUTH 20TH
FORT SMITH, ARKANSAS 72901

JAY WIECHERT, Owner
PROFESSIONAL ENGINEER

Sept 1, 1992

Mr. David See
Deputy Warden
Depart. of Corrections
Lucasville, Ohio  45648

Dear Mr. David See:

Thank you for your inquiry concerning electrical execution equipment. The approximate price will be thirty thousand dollars ($30,000.00). Exact price will depend upon your particular design requirements.

We will provide:  A. Complete control panel with fused
                     disconnect switch.
                 B. High voltage transformer.
                 C. High voltage cables and body electrodes.
                 D. Portable test box for checking equipment
                     prior to use.
                 E. Supervision of installation.
                 F. Final inspection of total system.
                 G. Engineering drawing, test procedure,
                     execution procedure.

I would be happy to visit your prison, examine your existing equipment, and provide a written proposal. The price for this service will depend on my expenses, but will not exceed one thousand dollars ($1,000.00).

Thank you.

Sincerely yours,

Jay Wiechert

2-32

Nov. 22. 1995    2:25PM    S. O. C. S.                    No. 8286    P. 34/40

# KANSAS STATE UNIVERSITY

OF AGRICULTURE AND APPLIED SCIENCE

UPON RECOMMENDATION OF THE FACULTY HAS CONFERRED UPON

Jay Allen Wirchert

THE DEGREE OF

Bachelor of Science

In Electrical Engineering

WITH ALL THE RIGHTS AND PRIVILEGES PERTAINING THERETO

GIVEN AT MANHATTAN, IN THE STATE OF KANSAS

THIS SIXTH DAY OF JUNE, NINETEEN HUNDRED AND SIXTY-FIVE

STATE BOARD OF REGENTS

*James W. McCain* — PRESIDENT

DEAN

# KANSAS STATE UNIVERSITY

OF AGRICULTURE AND APPLIED SCIENCE

UPON RECOMMENDATION OF THE FACULTY HAS CONFERRED UPON

Jay Allen Wirchert

THE DEGREE OF

Master of Science

WITH ALL THE RIGHTS AND PRIVILEGES PERTAINING THERETO

GIVEN AT MANHATTAN, IN THE STATE OF KANSAS

THIS TWENTY-SIXTH DAY OF JANUARY, NINETEEN HUNDRED AND SIXTY-EIGHT

STATE BOARD OF REGENTS

*John S. Pluckett* — CHAIRMAN

*James W. McCain* — PRESIDENT

2-33

Nov. 22. 1995    2:29PM    S. O. C. F.

No. 8265    P. 35/46

Arkansas State Board of Registration

for

Professional Engineers

and

Land Surveyors

State of

Arkansas



This is to Certify that

Jay Wiechert

having submitted acceptable evidence of his qualifications and experience has been duly registered as a

Professional Engineer

and is hereby authorized to practice engineering in the State of Arkansas in accordance with provisions of State Laws governing such practice.

In testimony Whereof, this Certificate No. 3731 has been issued and seal affixed this 29th day of July, 1974.

2-34

Fev. 22. 1995   2:29PM   S.D.C.T.                              No. 6285   P. 38/46

Michael S. Morse, Ph.D.
P.O. Box 710402
San Diego, CA 92171-0402
(619) 277-9135
(619) 987-2397 cellular

August 27, 1992

Sue Ellen Mohr
Ohio Attorney General's Office
30 E. Broad Street
26th Floor
Columbus, OH 43266-0410

Dear Ms. Mohr.

Enclosed is a copy of my current C.V.  In the past, I have consulted with Alabama, Florida, Louisiana, and Virginia with regard to the operation and function of their electrocution systems.  On three occasions, I have been qualified to testify as to the effects of electricity on the human body during a legal electrocution.  I have also reviewed and commented on the procedure and the professionality of the execution teams.  Over the past two years, I have interviewed DOC personnel in all electrocution states and have a familiarity with the procedures followed.

When evaluating a states electrocution system, I follow a fairly simple procedure.  I test all of the equipment to establish reliability and repeatability.  I verify that the system produces adequate current and voltage to assure as humane an electrocution as is possible.  I examine the equipment and electrodes looking for apparent weaknesses in the system.  I also interview all parties involved in the electrocution and comment on their preparation, performance, and professionality.  Finally, I make recommendations to reduce the risk of error and also to minimize the risk of equipment malfunction.  My goal throughout is to maximize the humanity with which the law is carried out while identifying risks and liabilities.

The fee for my services is $150.00 per hour plus all reasonable expenses.  I would prefer to receive a retainer equal to estimated expenses prior to beginning my work.

As I can be of service, please feel free to contact me at your convenience.

Sincerely,

Michael S. Morse, Ph.D.

RECEIVED
ATTORNEY GENERAL'S OFFICE
AUG 31 1992
CRIMINAL JUSTICE SECTION

2-35

**Michael S. Morse, Ph.D.**
P.O. Box 710402
San Diego, CA 92171-0402
(619) 987-2397 / (619) 277-9135
(Prepared: February, 1992)

**EXPERTISE**

Electric shock injury, biomedical device failure (electromechanical), human factors engineering, failure at the human-machine interface.

**EXPERIENCE**

- Development of electrostimulation assist devices for the spinally injured.
- Consultation in several electric shock injury cases.
- Consultation in medical device (electro-mechanical) failure cases
- Evaluation of labeling on medical devices.
- Studied level of conscious sensation (pain) associated with electric shock.

**COURT EXP.**

U.S. District Court (Mobile): Qualified as both a Biomedical and Electrical Engineering expert. Permitted to testify as to the effects (physiology and pain) of electricity on the human body.

U.S. District Court (Orlando): Qualified as a Biomedical engineer and as an expert in "Electrical Technology." Permitted to testify to the effects of electricity on the human body.

U.S. District Court (New Orleans): Qualified and permitted to testify to the effects of electricity on the human body.

Federal Court (Portland): Testified regarding electrical failure and resultant injury from electrical connector.

**DEPOSITIONS**

- Medical device failure (electropapillotome).
- Electric shock injury from an improperly wired vacuum pump.
- Accuracy of an IVAC infusion pump

**POSITIONS HELD**

Assistant Professor, Electrical Engineering, University of San Diego, (September 1990 - present).

Assistant Professor, Electrical Engineering, Auburn University, Auburn, AL. (September 1987 - September 1990).
- Awarded NSF initiation grant and IEEE initiation grant (declined IEEE funding to accept NSF funding). Developed algorithms to recognize speech from myoelectric signals. Also developed a multichannel electric stimulation system to assist individuals with spinal injuries.
- Courses taught: Computer design, computer architecture, biomedical inst.

Michael S. Morse
P. O. Box 710402
San Diego, CA 92171
(619) 987-2399 / (619) 277-9135
(PAGE 2)

Senior Engineer, General Dynamics, Electronics Division, San Diego,
CA. (October 1985 - June 1987).
- Developed image processing algorithm to assist with aircraft recognition.
- Graphical programming and signal processing tool

Lecturer, Electrical Engineering, San Diego State University. (January
1987 - May 1987).
    Course taught: Digital computer design.

Teaching Assistant, Electrical Engineering, Clemson University. (May
1984 - May 1985).
    Courses taught: Digital Signal Processing, Microprocessor programming.

EDUCATION

Ph.D. in Engineering, Clemson University, Clemson, SC, 1985.
Developed instrumentation to measure and process bioelectric signals for the
purpose of recognizing speech form signals secondary to speech.

M.S. in Biomedical Engineering, Tulane University, New Orleans,
LA, 1982.
    Analyzed force characteristics of muscles coupled by a stimulation technique
    termed Selective Electroblock

B.S. in Biomedical Engineering, Tulane University, New Orleans,
LA, 1981.
    Emphasis placed on electrical engineering, bioelectronics, bioinstrumentation
    and computer applications in medicine.

HONORS

HKN -- Electrical Engineering Honor Society, 1990.
Sigma Xi -- Research Honor Society, 1986.
Tau Beta Pi -- Eng'... ring Honor Society, 1981.
Phi Beta Kappa -- Clemson University, 1983.

PATENTS

Electrostimulatory device to aid the spinally injured.
(Received: August 1991)

PUBLICATIONS    See attached list.

2-37

Nov. 22. 1995    2:30PM    S.O.C.R.                          No. 8225   P. 39/46

## Papers and Publications
## Michael S. Morse

Hodel, A.S., M.S. Morse, S.H. Day, "Recognition of Speech From Time-Domain Myoelectric Signal Parameters," Submitted to: Journal of Computers in Biology and Medicine

M.S. Morse, Y.N. Gopalan, M. Wright, "Speech Recognition Using Myoelectric Signals With Neural Networks" IEEE Engineering In Medicine and Biology Conference, Orlando, FL, November, 1991.

M.S. Morse, S.H. Day, J. May, "Time Domain Analysis of the Myoelectric Signal Secondary to Speech," IEEE Engineering In Medicine and Biology Conference, Philadelphia, PA, November, 1990.

M.S. Morse, "Human Factors: Liabilities and Realities Faced by the Biomedical Engineer" National Forum -- The Phi Kappa Phi Journal, 1989.

M.S. Morse, S.H. Day, "Use of Myoelectric Signals to Recognize Speech" IEEE Engineering in Medicine and Biology Conference, Seattle, November, 1989.

S.H. Day, M.S. Morse, "Recognition of Speech Utilizing the MES from Neck Muscles -- An Update" Eighth Annual Southern Biomedical Engineering Conference, Richmond, VA, Oct., 1989.

B.L. Trull, M.S. Morse, C. Ellis, R. Williams, S.H. Day, R. Mathis, "Microaccelerometers for Biomedical Applications" Eighth Annual Southern Biomedical Engineering Conference, Richmond, VA, Oct., 1989.

S. Green, M.S. Morse, "Signal Processing Software for Analyzing Speech and Parallel Myoelectric Signals" Eighth Annual Southern Biomedical Engineering Conference, Richmond, VA, Oct., 1989.

M.S. Morse, T.A. Roppel, A. Cilia, M. Wixson, J. Walker, "Multichannel Computer Controlled Stimulation System To Assist The Spinally Injured" IEEE Engineering in Medicine and Biology Conference, New Orleans, Nov 4-7, 1988.

S. Hartzog, M.S. Morse, B. Trull, C. Alegra, P. Harris, "Recognition of Speech From Signals Secondary to Speech" IEEE Engineering in Medicine and Biology Conference, New Orleans, Nov 4-7, 1988.

K. Reeves, M. Morse, T. Roppel, J. Walker, "Local Area Network Protocol to Download Biosignals From Multiple Amplifier Sights over a Single Medium" IEEE Engineering in Medicine and Biology Conference, New Orleans, Nov 4-7, 1988.

7-28

Nov. 22 1995  2:30PM  S.G.G.F.

No. 0265  P. 40/40

T. Roppel, M. Morse, "A Multichannel Digital Biosignal Acquisition System Using Hybrid Microelectronics" IEEE Engineering in Medicine and Biology Conference, New Orleans, Nov 4-7, 1988.

B. Scroggins, R. Scopp, J. Walker, M.S. Morse, "FES Controlled Ambulation With Surface Electrodes and No Orthotics" IEEE Engineering in Medicine and Biology Conference, New Orleans, Nov 4-7, 1988.

J. Walker, S. Amoils, B. Scroggins, M. Morse, "Are Paralyzed People Really Paralyzed?  Probably not according to EMG analysis" IEEE Engineering in Medicine and Biology Conference, New Orleans, Nov 4-7, 1988.

I. Anderson, E. Parkinson, B. Scroggins, M. Morse, "FES For Joint Stabilization During Stance Phase of Locomotion in Spinal Cord Injured" IEEE Engineering in Medicine and Biology Conference, New Orleans, Nov 4-7, 1988.

D. Gwaltney, M. Morse, T. Roppel, J. Walker, M. Wixson, "Development of a Multichannel Computer Controlled Stimulator To Assist the Spinally Injured" Seventh Annual Biomedical Engineering Conference, Greenville, SC, Oct. 27-30, 1988.

M. Morse, S. Hartsog, M. Clark, C. Alegra, C. Riett, B. Trull, "Speech Recognition from Signals Secondary to Speech" Seventh Annual Biomedical Engineering Conference, Greenville, SC, Oct. 27-30, 1988.

M. Morse, E. O'Brien, "Research Summary of a Scheme to Ascertain the Availability of Speech Information in the Myoelectric Signals of Neck and Head Muscles Using Surface Electrodes" Journal of COMPUTERS IN BIOLOGY AND MEDICINE, Volume 16, Number 6, 1986.

M. Morse, "Preliminary Design and Implementation of a Scheme to Recognize Speech from Myoelectric Inputs Using Maximum Likelihood Pattern Recognition" ANNALS OF BIOMEDICAL ENGINEERING (dissertation abstracts), Volume 14, 1986.

M. Morse, "Development and Testing of a Computer Regulated, Hand Controlled, Quasi-Real-Time Vocal Prosthesis" IEEE Southeastcon, Raleigh, NC, Mar.  31 - Apr.  3, 1985.

M. Solomonow, M. Morse, R. Scopp, "Time Response of Isometric Muscle Force During Recruitment" IEEE Frontiers of Engineering in Health Care, 1983.

M. Solomonow, R. Scopp, M. Morse, "Recruitment Based Neuroprostheses with Myoelectric Feedback" 36th Annual Conference of Engineering in Medicine and Biology (ACEMB), 1983.

2-39



**RICHARD F. CELESTE**
**GOVERNOR**

**OHIO DEPARTMENT OF REHABILITATION AND CORRECTION**

SOUTHERN OHIO CORRECTIONAL FACILITY
P.O. Box 45699
Lucasville, Ohio 45699-0001



DEPOSITION
EXHIBIT
Daniel 3
11-27-95 LDR

October 6, 1988

Mr. Joseph T. Deters
Hamilton County Clerk of Courts
Court House
1000 Main Street
Cincinnati, Ohio    45202

Re: COLEMAN, Alton
SOCF # 205-901
Your Case Nos. B-842559
and B-843548

Dear Mr. Deters:

This is to inform you that Alton Coleman was transferred from the United States Penitentiary in Marion, Illinois to this facility on October 5, 1988. He has been housed in our cell block K-4 and classified as death row.

This will also advise you of our receipt of Death Warrants from Hamilton County Common Pleas Court specifying execution dates for Mr. Coleman of September 4, 1985 and November 18, 1985. We are presently awaiting receipt of current, valid Stays of Execution for Mr. Coleman in both of the captioned cases.

It is a matter of utmost urgency that you send me certified copies of every Stay of Execution or Journal Entry affecting Mr. Coleman's death sentence status as soon as they are filed in your office.

Cordially yours,

SOUTHERN OHIO CORRECTIONAL FACILITY

*Wallace E. Stein*

Wallace E. Stein
Chief Record Clerk

WES/s

2-1



RICHARD F. CELESTE
GOVERNOR

**OHIO DEPARTMENT OF REHABILITATION AND CORRECTION**

SOUTHERN OHIO CORRECTIONAL FACILITY
P.O. Box 45699
Lucasville, Ohio 45699-0001

October 6, 1988

Ms. Patricia R. Jones
Staff Attorney
Governor's Suite
State House
Columbus, Ohio   43266-0601

Re: COLEMAN, Alton
SOCF # 205-901

Dear Ms. Jones:

This is to inform you that Alton Coleman was transferred from the United States Penitentiary in Marion, Illinois to this facility on October 5, 1988. He has been housed in our cell block K-4 and classified as death row.

This will also advise you of our receipt of Death Warrants from Hamilton County Common Pleas Court specifying execution dates for Mr. Coleman of September 4, 1985 and November 18, 1985. We have been advised that Stays of Execution are in effect on both of these dates and that certified copies of both of them are enroute to us by mail. We will advise you of their details as soon as we receive them.

Cordially yours,

SOUTHERN OHIO CORRECTIONAL FACILITY

Wallace E. Stein
Wallace E. Stein
Chief Record Clerk

WES/s

SOUTHER. OHIO CORRECTIONAL FACILITY

DATE     October 5, 1988

TO:     THOSE CONCERNED

FROM:     OFFICE OF THE SUPERINTENDENT

SUBJECT:     TRANSFERS IN FROM: OUT-OF-STATE TRANSFER FROM MARION ILLINOIS
TO THE SOUTHERN OHIO CORRECTIONAL FACILITY
WEDNESDAY - OCTOBER 5, 1988

205 901   COLEMAN, Alton

TO BE HOUSED IN DEATH ROW

NOTE:   SOCF TO TRANSPORT

thorization for transfer of the above named inmate(s) from the     U.S. PENITENTIARY

MARION ILLINOIS             to the SOUTHERN OHIO CORRECTIONAL FACILITY has been

ceived on this date from the Bureau of Classification & Statistics.  Authorization

r clearance into this facility is hereby given.  Transfer will occur on  WEDNESDAY,

OCTOBER 5, 1988

SOUTHERN OHIO CORRECTIONAL FACILITY

SUPERINTENDENT

| | | |
|---|---|---|
| TLM:tdh | | |
| Chief of Security | A-Building | Social Services |
| Record Office | Visiting Office | Mail Office |
| Captains Office | Inmate Personnel | Property Room |
| Control Center #1 | Identification | J-Block Security |
| Max Control Unit Supv. | Programs Deputy | T.I.E. Deputy |
| | | File  Unit FOUR. |
| | | (UNIT SEVEN -DR) |

/Su-7331  (Rev. 9/4/87)

9-3



**RICHARD F. CELESTE**
**GOVERNOR**

## OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

SOUTHERN OHIO CORRECTIONAL FACILITY
P.O. Box 45699
Lucasville, Ohio  45699-0001

October 14, 1988

Mr. Jerry Williford
Warden
United States Penitentiary
Marion, Illinois   62959

Re: COLEMAN, Alton
SOCF # 205-901
Your Reg. No. 93135-024

Dear Mr. Williford:

In compliance with a request from Mr. William Breitfelder of the United States Marshals Service in Cincinnati, Ohio, we have made a notation in our files on Alton Coleman to notify you immediately of any change in the State of Ohio sentence status of Alton Coleman who is presently confined at this facility.

Mr. Coleman is currently under two separate death sentences from Hamilton County Common Pleas Court in Cincinnati, Ohio.  We will notify you promptly in the event that those sentences should be modified to life imprisonment.

Cordially yours,

SOUTHERN OHIO CORRECTIONAL FACILITY

*Wallace E. Stein*

Wallace E. Stein
Chief Record Clerk

WES/s

205-901

State of Ohio
Department of Rehabilitation and Correction
ADMISSION CENTER  S.O.C.F.

| (RIOR) INSTITUTION RECORD | #1 | #2 |
|---|---|---|
| (Include prior institution for the current offense, if offender transferred.) | | |
| DATE ADMITTED   XXXXXXXXX | 07/02/74 | XXXXXXXX 01/07/85 |
| RECEIVING INSTITUTION NAME | Menard Correctional Cnt. Menard, Ill. | U.S.P. Marion, Ill. |
| INSTITUTION(S) TRANSFERRED TO: | ORW, OSR, LEBCI, OP/CMC, LOCI, MCI, CCI, SOCF, | ORW, OSR, LEBCI, OP/CMC, SOCF, LOCF, MCI, CCI, |
| CHARGE | Robbery, Rape; Kidnp. | Kidnapping |
| SENTENCE | 2-6 Years | 20 Years |
| SERIAL NUMBER | IL079015E | Reg. No. 93135-024 |
| SUB CONV. CLASS 1. | | |
| CLASS 2. | | |
| TYPE OF DISCHARGE/INSTITUTION | Not Recorded / | Detainer P/U to Ohio |
| DATE OF FINAL RELEASE | Not Listed   / | None  / TOT  OHIO  10/05/88 |
| SUCCESSFUL ESCAPE (Dates, Where) | | |
| ESCAPE ATTEMPTS (Dates. Where) | | MCC  Chicago, Ill. (Dates unspecified) |
| JUVENILE COMMITMENTS (Dates, Where)  Unknown | | |

| ARREST SUMMARY | NO. OF FELONS | MISDEMEANORS | JUVENILE CONVICTIONS |
|---|---|---|---|
| | 6 | | |
| OHIO | ILL. | | |
| OTHER | 3) IND. | | |
| | N.C. | | |
| TOTAL | | | |

Recorder  O.E. McGRAW                        Date  10 / 06 / 88

COLEMAN,  Alton          205-901       M       B
NAME                     SERIAL NUMBER   SEX     RACE      SUBJECT        PAGE



**RICHARD F. CELESTE**
**GOVERNOR**

**OHIO DEPARTMENT OF REHABILITATION AND CORRECTION**

7050 Freeway Drive, North, Suite 403
Columbus, Ohio 43229

August 31, 1988

G. L. Henman, Warden
U. S. Penitentiary
Marion, Ill.  62959

Dear Warden Henman:

Pursuant to your letter of July 29, 1988, I hereby approve the transfer of Alton Coleman from the Federal Bureau of Prisons to the Ohio Department of Rehabilitation and Correction for concurrent service of his State and Federal sentences. Please consider this a formal request on behalf of the Department for return of Mr. Coleman to the State of Ohio.

Mr. Coleman will be housed on death row at the Southern Ohio Correctional Facility in Lucasville, Ohio. Please contact me when arrangements have been made for the transfer. Due to the seriousness of Mr. Coleman's crimes and to insure his safe return to Ohio, the Superintendent of the Southern Ohio Correctional Facility will personally transport Mr. Coleman back to the State of Ohio.

I appreciate your assistance in this matter. If you need any further information please contact me.

Sincerely,

George W. Wilson
Director

RECEIVED
NOV ? 1993
S.O.C.F.
RECORD OFFICE

GWW/rkp
CC:  Terry Morris, Superintendent
     Arthur M. Ney, Jr., Hamilton County Prosecutor
     Leonard Kirschner, Chief Prosecutor



**U.S. Department . Justice**

**Federal Bureau of Prisons**

**U.S. Penitentiary**

Marion, IL 62959

September 20, 1988                                              SEP 26 1988

Mr. George W. Wilson
Ohio Department of Rehabilitation and Correction
1050 Freeway Drive, North, Suite 403
Columbus, Ohio  43229

RE:  Correspondence of August 31, 1988

Dear Mr. Wilson:

Thank you for your correspondence of August 31, 1988 regarding the transfer of
inmate COLEMAN, Alton, Federal Register Number:  93135-024 to the Ohio
Department of Rehabilitation and Corrections for service of his State and
Federal sentences.  We are reviewing Coleman's present status and will contact
you with transfer arrangements at a later date.

At this time, I am returning three copies of your correspondence which were
inadvertently forwarded to G.L. Henman.

Sincerely,

L.K. Morrison
Inmate Systems Manager

RECEIVED

NOV 9 1993

S.O.C.F.
RECORD OFFICE

2-9

RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

85 JUN 24 A9: 14

UNITED STATES OF AMERICA,          $

          Plaintiff,          $          Case No. CR 3-84-062

          vs.          $

ALTON COLEMAN,          $          O R D E R
DEBRA DENISE BROWN,          $

          Defendants.          $

- - - - - - - - - - - - -

    It having come to this Court's attention that, as of
June 25, 1985, all sentences against Defendants Coleman and
Brown will have been imposed in Hamilton County, Ohio,

    IT IS HEREBY ORDERED that the Defendants Coleman and
Brown be returned to Federal Custody and be transported from
Hamilton County, Ohio, by the United States Marshal to the
appropriate Federal Facility on or shortly after July 1,
1985.

    IT IS FURTHERMORE ORDERED, over objection, that the
request of Hamilton County, Ohio, to reserve the right to
request that custody of Defendants Coleman and Brown be
returned to the State of Ohio for execution of sentence at
some future date be granted.

                               WALTER H. RICE
                         United States District Judge

I certify that this is a
true and correct copy of the
original filed in my office
on June 21, 19__.
KENNETH J. MURPHY, CLERK
BY: _____
    Deputy Clerk

DATE: June 21, 1985

2-10

| Institution |
|---|
| OSP MARION |
| Date |
| 10-04-1988 |

**RELEASE AUTHORIZATION**

**RELEASE OF THIS INDIVIDUAL IS AUTHORIZED:**

| Number | Name | Release Date | Method |
|---|---|---|---|
| 93135-024 | Coleman, Alton | 10-05-1988 | Concurrent Service 326 |

| Detainer: YES ☐ NO ☐ | Certified By: *Larry K. Morrison* |
|---|---|
| Custody will be taken by: Terry Morris and C. Tackett, Southern Ohio Corr. Facility | Larry K. Morrison |
| | Title: InMate Systems Manager |

(thumbprint)

(photo)

**RELEASE ACTION**

| Identified By: | Released By: |
|---|---|
| Funds Paid By: N/A | Date of Release: 10-05-1988 | Time of Release: 8:30 am |

| RECEIPT OF AGENT TAKING CUSTODY |
|---|
| Received the above named prisoner, together with personal property and funds in the amount of $ N/A |

| Date Signature | Title: Superintendent |
|---|---|
| | Location: SOCF Ohio |

Southern Ohio Correctional Facility   Full term 02-21-2002
Lucasville, OH 45699

White - Receiving & Discharge File in Judgment & Commitment File
Green - Case Management, Central File (Section B)
Canary - Control Room
Pink - Hospital
Goldenrod - Transporting Officer

Record Form 87
April, 1975

FPI LOM 1-83 10.4PES 2334-97

2-11

SF-ADMIN 71
Rev. October 1980

# MEDICAL RECORD OF FEDERAL PRISONER IN TRANSIT

I. Name: **COLEMAN, ALTON**    No. **93135-024**

Departed From: **USP. MARION, IL 62959**    On: **OCT 5, 1988**
Name of Institution    Date

III. Destination **STATE OF OHIO**
Name of Institution

VI. Reason for Transfer: **NON MEDICAL**    PHOTOGRAPH

V. Major Diagnosis: **SEE BELOW**

VI. Medication for Care Enroute: **NONE**

VII. Special Instructions: **ROUTINE**

VIII. Work Classification:
(X) Regular  ( ) Food Service Qualified    ( ) Restrictions (explain) _____

Recreation Classification:
(X) Regular
( ) Restrictions (explain) _____

Housing
(X) Regular
( ) Other _____

TERRY L. FINNEGAN, HSA
Certifying Medical Staff Member

---

## PROGRESS NOTES ENROUTE

| Date | Time | Institution | Symptoms, Findings, Medications, Treatment, Orders, etc. |
|------|------|-------------|----------------------------------------------------------|
|      |      |             | MAJOR DIAGNOSIS:<br><br>1. PROBABLE MIXED PERSONALITY DISORDER WITH ANTI-SOCIAL, NARCISSISTIC, AND OBSESSIVE FEATURES.<br><br>2. UNDESCENDED RIGHT TESTICLE |

ORIGINAL - Transporting Officer
PINK COPY - To be placed in Unit Health Record, top page in position one
BLUE COPY - To be retained at the Transferring Institution as Backup

INSTRUCTIONS: Original, shall be delivered to Officer in Charge of shipment, who will carry them on a clip board for ready reference and turn them over to the receiving medical personnel at holdover institutions, where they shall serve in lieu of other medical forms. Carbon copy to be packed with prisoner's individual medical file. Bus Drivers will pick up originals from medical department at each holdover institution when shipment is ready to proceed and eventually deliver them to the medical staff at receiving institution. Enter all medical transactions enroute, adding additional sheets, or other reports as necessary.

7-12

RECEIVED
UNITED STATES MARSHAL

05 JUN 24 A 9: 14

SOUTHERN OHIO

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

Case No. CR 3-84-062

ALTON COLEMAN,
DEBRA DENISE BROWN,

Defendants.

It having come to this Court's attention that, as of June 25, 1985, all sentences against Defendants Coleman and Brown will have been imposed in Hamilton County, Ohio,

IT IS HEREBY ORDERED that the Defendants Coleman and Brown be returned to Federal Custody and be transported from Hamilton County, Ohio, by the United States Marshal to the appropriate Federal Facility on or shortly after July 1, 1985.

IT IS FURTHERMORE ORDERED, over objection, that the request of Hamilton County, Ohio, to reserve the right to request that custody of Defendants Coleman and Brown be returned to the State of Ohio for execution of sentence at some future date be granted.

WALTER H. RICE
United States District Judge

I certify that this is a true and correct copy of the original filed in my Office on June 21, 1985.
KENNETH J. MURPHY, CLERK
BY: Nancy Fulk
Deputy Clerk

DATE: June 21, 1985

U.S. Department of Justice
Federal Bureau of Prisons

In-Transit Inform

| INSTITUTION the United States Penitentiary, Marion, Illinois | DATE October 3, 1988 |
|---|---|
| NAME (Last,First,Middle) COLEMAN, Alton | REGISTER NUMBER 93135-024 |

**CUSTODY/SECURITY PRECAUTIONS:**

Max **6**____ In_____ Out_____ Community_____    YCA: Yes____ No **X**

Escape History: Yes____ No **X**    If yes, may require special housing.

If Yes, Describe when, what circumstances.
Information received indicated the Coleman had bed sheets tied together in an apparent attempt to escape from MCC Chicago.

Violence/Assault History: Yes **X**____ No____

If yes, Describe when, what circumstances.

Instant Offense-Kidnapping          DEATH PENALTY from the State of
1974 Armed Robbery, Kidnapping, Rape    Ohio for Murder
1976 Battery

List any non-routine security needs:
This individual is extremely DANGEROUS and violent. Use MAXIMUM restraints at all times during movement.

**CENTRAL INMATE MONITORING CASE INFORMATION**

YES **X** If yes, ASSIGNMENT Separation, Broad Publicity

No____

If SEPARATION, list Name and Reg. No. of separatees. Check SENTRY for locations:

Benbow, John    38153-066    Harris, Thomas    40255-061 ← *none of these three men are in Ohio State Prison custody*
Bracey, Larry    02573-045

REMARKS (Include any social history or other pertinent information which might be useful to the transporting officer or prisoner holding facility.):
This individual committed a string of murders, beatings, and robberies across six midwestern states during 1984. Coleman has pending death penalty sentences in Illinois, Ohio, and Indiana. He is considered extremely dangerous and has nothing to lose. He is considered to be an extreme escape risk because of this. Extreme caution and vigilance should be exercised during transportation.

| NEAREST RELATIVE OF INMATE Terri Coleman, Sister | CITY AND STATE OF RELATIVE Waukegan, Illinois |
|---|---|

*Scott Klinzing*                Title: Case Manager        Date: October 3, 1988
(Prepared by)

Transporting Officer _____ _____
                              (Name)                              (Agency)

INSTRUCTIONS: Copies of this form, BP-5.1, and BP-Admin-71 must be furnished to the officer in charge of shipment, for his/her enroute. Additionally, the officer in charge must leave a copy at each holding institution. The information on this form is provided for the purpose of determining necessary care, custody and control of the inmate, and is not intended to establish constraints inconsistent with the policy or rules of the transporting officer or prisoner holding facility.

White = Original

Citation     Found Document   Rank 1 of 1   Database
7/19/96 CINC-ENQ B02                  CINC-ENQ
7/19/96 Cin. Enquirer B02
1996 WL 2250758

The Cincinnati Enquirer
Copyright 1996

Friday, July 19, 1996

Metro

AROUND THE TRISTATE News Tips:

 Call 24 hours a day to reach our recorded News Tip Hot Line: 768-8602. If it's urgent, press zero when the recording begins, and you will be connected with an editor between 8:30 a.m. and midnight.

 OHIO

 Ceremony promotes police

 The Cincinnati Police Division honored its own Thursday in a promotion ceremony for five officers and five employees.

 Three officers have become sergeants: Glenn Cox of Delhi Township, Robert Liston of North Bend and Carolyn Williams of Winton Hills.

 Two officers - Charles Dukes of Springfield Township and John Morgan of Anderson Township - were promoted to specialist.

 Other promotions include: Mary Deonier to supervising clerk, Terri Cipriani to clerk typist III, Linda Huhn to clerk typist III, Carla Smoot to operator dispatcher and Larry Arnold to assistant operator dispatcher.

 Director search funded

 The Hamilton County Community Health Board on Thursday approved spending up to $45,000 to conduct a search for a new executive director. The former director, Mary Fleming, left in June amid an investigation by state and county officials into the board's spending. The investigation continues.

 Child left in store

 DELHI TOWNSHIP

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

EXHIBIT

32

7/19/96 CINC-ENQ B02

It started as a shoplifting case when employees at a Thriftway in Delhi Township spotted a couple leaving the store without paying for shrimp, cigarettes and videotapes about 5:30 p.m. Wednesday.

But the pair left a 5-year-old behind.

The child's mother, Carrie Offutt, 26, of the 2500 block of Talbott Avenue in Westwood, returned 30 minutes later to pick up her son. She is charged with robbery and child endangering.

Mom adds to charges

A Cumminsville mother who was being interviewed by police Wednesday for allegedly abusing her daughter faces more charges after an alleged outburst in which police say she threw a chair into a wall in an interview room.

Stacey Whitby, 27, of the 1900 block of Millvale Court is charged with child endangering and criminal damaging.

Police say she burned her 6-year-old daughter on the lower back five times with a cigarette. At her arraignment Thursday in Hamilton County Municipal Court, Ms. Whitby pleaded no contest to the criminal damaging charge, saying, "I just kicked the chair because I'm being charged with something I didn't do."

Children found in filth

A 26-year-old West End mother faces criminal charges after authorities found her children living in filthy conditions.

Police went into Patricia Price's York Street apartment Wednesday on a domestic violence warrant accusing her of spraying Mace into the face of Robert Carter Jr.

Inside, police found five children, ages 9 months to 7 years, in a mice- and roach-ridden apartment with no electricity, and water leaking from the bathroom.

The trash-filled apartment had maggots and mice droppings in pans on the stove, an open steel-blade fan on the floor near toddlers and open stairs to the basement, police said. They also recovered marijuana from Ms. Price's bedroom.

Ms. Price is charged with domestic violence, drug abuse and five counts of child endangering. She pleaded not guilty at her arraignment Thursday in Hamilton County Municipal Court, claiming she was trying to relocate to a shelter.

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

7/19/96 CINC-ENQ B02

Noise test rescheduled

A side-by-side comparison of community and airport noise monitors that was scheduled for this weekend has been postponed. The comparison was intended to explain why the community monitor is picking up higher airplane noise levels over western Hamilton County.

County Commissioner John Dowlin said the test will probably take place in early August at a cost of about $9,000 - a fee for a specialist to analyze the results.

Talks with 2nd planner

Disappointed with the price of urban planner Cooper, Robertson & Partners, Hamilton County and Cincinnati have opened negotiations with a second firm to advise on stadium sites. The firm is Toronto-based Berridge, Lewinberg, Greenberg, Dark, Gabor Limited.

County Administrator David Krings said Cooper, Robertson "wanted a ton of money" for a study that was supposed to be capped at $200,000. The firm is reconsidering, though, and Mr. Krings said city and county staffs are negotiating with both.

INDIANA

80-minute execution

MICHIGAN CITY

Prison officials learned two months ago that death row inmate Tommie Smith had unusually small veins that might be a problem with administering a lethal injection.

With Mr. Smith strapped to a gurney, refusing sedation and awaiting execution, prison technicians struggled for 15 minutes early Thursday before a medical doctor stepped in to insert a needle into an artery.

The doctor, who was not identified, needed 25 minutes more to complete the insertion.

Mr. Smith, 42, condemned in the slaying of a police officer, was pronounced dead at 1:23 a.m., nearly 80 minutes after the procedure began and almost twice as long as an estimate offered by Indiana State Prison officials who later said the estimate was mistaken.

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

7/19/96 CINC-ENQ B02

TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT DISPLAYABLE

 The Associated Press Mark Davis; Caption: Rafting down the avenue: Gabe Stok, 16, rafts down 85th Avenue near his home in Shererville, Ind., after 5 inches of rain caused flash flooding in north-central Indiana on Thursday.

---- INDEX REFERENCES ----

KEY WORDS:           POLICE; LOCAL; CHILDREN; ROBBERY; CHILDREN; ABUSE; AIRPORTS LOCAL; NOISE; REDS; BENGALS; EXECUTION

EDITION:           EAST

Word Count: 787
7/19/96 CINC-ENQ B02
END OF DOCUMENT

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

Citation                    Found Document        Rank 1 of 1         Database
7/25/96 CINC-ENQ C07                                                  CINC-ENQ
7/25/96 Cin. Enquirer C07
1996 WL 2251548

The Cincinnati Enquirer
Copyright 1996

Thursday, July 25, 1996

Metro

## Lawyer assails injection as cruel Killer's execution took over an hour
The Associated Press

The lethal injection execution of Tommie Smith was "cruel and unusual punishment" and a brutish end to the convicted killer's life, an appeals lawyer says.

"The fact that they did it in a sterile white operating room makes it no less barbaric than electrocution or beheading him or whatever the hell else they want to do," defense attorney Mark Earnest said this week.

Mr. Smith was convicted of murdering an Indianapolis police officer in 1980 and was executed July 18 at the state prison in Michigan City. He was buried Tuesday afternoon in Marion with about 100 friends and relatives in attendance.

Mr. Earnest says he is considering unspecified legal action after witnessing at least five unsuccessful attempts to inject deadly chemicals into Mr. Smith's body.

Mr. Earnest obtained permission from Mr. Smith's family to photograph the wounds on Mr. Smith's body caused by what he described as "repulsive" medical procedures.

He said he intends to turn over the photographs to colleagues in Indianapolis and Chicago who specialize in constitutional law. Mr. Earnest said he hopes the execution will help people see that "the death penalty in any form is cruel and unusual."

Those procedures included cutting back the skin on his chest in an effort to insert a needle into an artery, and similar failed attempts to inject Mr. Smith's neck and groin area.

The execution began at 12:04 a.m. Mr. Smith was pronounced dead at 1:23 a.m.

Madison County Prosecutor Rodney Cummings, who was not involved in the case, said the complications in Mr. Smith's

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

EXHIBIT

33

7/25/96 CINC-ENQ C07

execution were unfortunate, but he defended lethal injections.

"They're probably still more humane than electrocution," he said, referring to the state's previous method of execution.

Many of those at the funeral said Mr. Smith had found God during his 15 years on death row.

---- INDEX REFERENCES ----

KEY WORDS:          EXECUTION

EDITION:            TRIS

Word Count: 301
7/25/96 CINC-ENQ C07
END OF DOCUMENT

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

ME 83-88
3/15/88
9:00 A.M.

POSTMORTEM EXAMINATION
OF THE BODY OF
WILLIE JASPER DARDEN, JR.

The body is that of a well developed well nourished middle aged Black man measuring 71" in length. It is fully clad in a white short sleeve shirt, black trousers, undershorts and white socks. Right trouser leg is rolled up past the knee to reveal an incompletely circumferential rectangular burn measuring 6 x 7 1/2". The shaven scalp is the site of a 6 x 7" burn ring with a 2" width. Both burns are quite similar with focal skin slippage, dark brown to black discoloration and increased firmness in underlying and surrounding tissues. No other recent injuries are seen on front or back of body. The oral cavity is free of trauma or obstruction. Scalp, calvarium and base of skull are intact. There is a slight gray brown discoloration of the dura mater overlying the cerebral convexities. The underlying brain is firm, warmer than remaining body tissues and weighs 1225 g. Cerebral hemispheres are symmetrical and have a normal gyral configuration. Arteries of the circle of Willis are normally distributed and free of notable congenital anomaly. Multiple cuts through brain and upper cervical spinal cord reveal no other abnormalities. Oral cavity is free of trauma or obstruction. The neck organ block is free of trauma or obstruction. Thyroid has symmetrical lobes of normal size. The thoracic cage is intact. The pleural, pericardial and peritoneal spaces are free of exudate, blood or adhesion. The heart weighs 500 g. Epicardial surface is smooth and glistening with a moderate subepicar

EXHIBIT
34

1

WILLIE DARDEN                                    ME 83-88

fat deposit. Coronary arteries are normally distributed and have a moderate degree of arteriosclerotic narrowing (30 - 50%) in proximal courses of their distribution. Distally, all three vessels are adequately patent. Myocardium is homogeneous red-brown without evidence of recent or remote infarct. Valves and endocardial surfaces are unremarkable. The aorta has only slight arteriosclerosis throughout its length and vessels originating therefrom are adequately patent in proximal courses of their distribution. The right and left lungs weigh 460 and 440 g. respectively. There is a moderate anthracotic pigment deposit in visceral pleural and centrilobular sectioned surfaces. The lung parenchyma is uniformly congested with moderate increase in firm-ness and decrease in crepitance and blood oozes from sectioned lung surfaces. No antemortem diseases or injuries are identified in either lung or in mediastinal structures. The esophagus is unremarkable. Stomach contains about 2 oz of cloudy tan fluid. The gastric mucosa is unremarkable. Small bowel is unremarkable. The vermiform appendix is present. The large bowel is unremark-able. The liver weighs 2000 g. Capsular surface is smooth and glistening, sectioned surface is uniform red-brown without ac-centuation of nodular pattern or nutmeg pattern. Hepatic paren-chyma has a normal firm consistency. The gall bladder contains several ml. of golden-brown bile. The extrahepatic biliary tree is patent. The spleen weighs 100 g. Capsule is wrinkled and gray, sectioned surface is red-purple. Splenic parenchyma has a normal firm consistency. Right and left adrenal glands are unre-markable. The combined weight of right and left kidneys is 330

2

ME 83-88

g. Cortical surfaces are smooth. Cortices and medullae have normal thicknesses and are clearly demarcated. The renal vessels, pelvocalyceal systems and ureters are unremarkable. Urinary bladder contains about an ounce of straw colored urine. The prostate is mildly enlarged and .as a multi-nodular translucent tan sectioned surface. Internal genitalia are normal male. The musculoskeletal system is intact.

## AUTOPSY FINDINGS

1. ANNULAR BURN OF FRONTOPARIETAL SCALP AND RECTANGULAR BURN OF RIGHT LEG AT KNEE LEVEL.

2. PULMONARY CONGESTION.

3. CORONARY ARTERIOSCLEROSIS, MODERATE.

4. MYOCARDIAL HYPERTROPHY (HEART WEIGHT 500 G.).

5. NODULAR HYPERPLASIA OF PROSTATE.

PROBABLE CAUSE OF DEATH: ELECTROCUTION.

WILLIAM F. HAMILTON, M.D.

WFH/all(K)

3

OFFICE OF THE MEDICAL EXAMINER
815 S.W. Fourth Avenue, Suite Two — *ME-8735*
Gainesville, Florida 32601-6292

## BODY DIAGRAM



BURN
ANNULUS

1" WELL HEALED LINEAR SCAR

SUD
450/440
2500/150
(w 530
1225

GUNSHOT
ENTRY
SUD
6 X 7½

Decedent's Height ___71___ inches

Name ___Willie Darden___

Examined By _____

BODY DIAGRAM—HEAD



Right

Left

Burn
Marcus
6" × 7"

# Laboratory Report

.tient: DARDEN WILLIE                846                    202091018 0

Doctor : WILLIAM HAMILTON  M.D.- M.E. WILLIAM HAMILTON  M.D.- M.E. REC 03/15/88
Hosp # : ME-83-88                        EIGHTH DICT. MEDICAL EXAMINE REP 04/18/88 9:16A
Room # :        LAB #.8              815 S.W. 4TH AVENUE        RTE
SPC TYP: MIXED                           GAINSVILLE FL 32601
Age/Sex: 54/M          COLL : 03/15/88 3:38PM

COMPREHENSIVE TOX STUDIES                     THRESHOLD LIMITS
     AN EXTENSIVE TOXICOLOGICAL STUDY WAS PERFORMED BY
     MULTIPLE METHODS ON MULTIPLE SAMPLES WITH THE
     RESULTS AS LISTED:
METHAQUALONE                    Negative        300 NG/ML
COCAINE (BENZOYLECGONINE)       Negative        300 NG/ML
THC (CANNABINOIDS)              POSITIVE        100 NG/ML
     POSITIVE IN THE URINE
     NEGATIVE IN THE BLOOD
SYMPATHOMIMETIC AMINES          Negative        300 NG/ML
BARBITURATES                    Negative        300 NG/ML
BENZODIAZEPINES                 Negative        300 NG/ML
OPIATES                         Negative        300 NG/ML
PROPOXYPHENE                    Negative        300 NG/ML
 .ADONE                         Negative        300 NG/ML
 ENCYCLIDINE                    Negative         75 NG/ML
MEPROBAMATE                     Negative
PHENOTHIAZINES                  Negative
ETHYLCHLORVYNAL (PLACIDYL)      Negative
GLUTETHIMIDE                    Negative
BLOOD VOLATILES                 Negative
SALICYLATES                     Negative
ACETAMINOPHEN                   Negative
SYNTHETIC NARCOTICS             Negative
ANTIDEPRESSANTS                 Negative
ANTIHISTAMINE                   Negative
     FINAL REPORT OF TOXICOLOGY SCREEN.
     CERTIFYING SCIENTIST_____

-------------------------------------------------------------------
CANNABINOIDS #0960           ( )
     TEST BY NMS.  CDC #37-1046
     RESULTS, DELTA 9 CARBOXY THC (MAJOR THC - MARIHUANA - METABOLITE):
          46 NANOGRAMS/ML URINE

     ** ABOVE TEST FROM PATHOLOGISTS' SERVICE P.A., TUCKER, GA. **
-------------------------------------------------------------------



DOCTORS &
PHYSICIANS
LABORATORY

ME :28-90
5/4.90
8:45 A.M.

## POSTMORTEM EXAMINATION
## OF THE BODY OF
## JESSE JOSEPH TAFERO

The body is that of a well developed well nourished slender adult white man measuring 70" in length and appearing the stated age of 43 years. It is clad in a long sleeve light blue shirt, navy blue trousers and a white sock is present on the right foot. The left foot is bare. An identification label is attached to the great toe of the left foot. The scalp has been shaven and there is a 5 x 4" zone of burnt skin on the top of the head extending from right superior parietal, to right and left frontal and left temporal regions of scalp. A second burn is present on the posterior aspect of the right leg. The leg burn is incompletely circumferential, extending over a 4 1/2" length of the leg and about the circumference for a distance of 7 1/2". In addition to burn injuries, there are superficial small blunt force injuries including two small knuckle lacerations on 4th and 5th digits of right hand, two ovoid scrapes of skin on the posterior aspect of the right leg slightly above the knee and an irregularly polygonal 5/8" x 3/8" mark on the left cheek with a parchment-like consistency. Eyebrows and eyelashes are singed. A faint linear imprint extends across a 8" length of the face including the lower portion of the right cheek, upper lip and lower portion of the left cheek. Two short linear imprints are noted on the anterior aspect of the right leg above the ankle. A small skin tag is noted on the medial aspect of the left buttock. No other recent or remote injuries are noted on external.

1

EXHIBIT
35

JESSE JOSEPH TAFERO                                    ME 226-49

examination of front or back of the body. The oral cavity is free of trauma or obstruction. Scalp burn extends full thickness. Skull cap and base are intact. No heat epidural hematoma are identified. Brain weighs 1310 g. Cerebral hemispheres are symmetrical and have normal gyral configurations. The meningeal vessels are congested. Arteries of the circle of Willis are normally distributed and free of notable congenital anomaly or atheromatous deposit. Multiple cuts through brain and upper cervical spinal cord reveal no other abnormalities. Each organ block is free of trauma or destruction. The thyroid is symmetrical lobed of normal size. Pleural, pericardial and peritoneal spaces are free of blood exudate or adhesion. The heart weighs 340 g. The epicardial surface is smooth and glistening. Coronary arteries are normally distributed and widely patent. The myocardium is homogeneous red-brown. Valves and endocardial surfaces are unremarkable. Cardiac chambers and great vessels ar filled with unclotted blood. Right and left lungs weigh 420 and 425 g. respectively. There is a modest anthracotic pigment deposit on visceral pleural and sectioned lung surfaces. Lung parenchyma is uniformly and mildly increased in firmness and decreased in crepitance and blood oozes from sectioned parenchyma. No tumors, granulomata or foci of consolidation or foci of emphysematous destruction. Mediastinal lymph nodes are mildly anthracotic but otherwise unremarkable. The esophagus is unremarkable. The stomach contains about 2 oz. of sticky mucoid fluid. The remainder of the alimentary canal is unremarkable. The vermiform appendix is present. The large

JESSE JOSEPH TAFERO                                    . ME 226-89

bowel is unremarkable. The liver weighs 1760 g.  The capsular surfaces are smooth and glistening. Sectioned surface is uniform red-brown.  Hepatic parenchyma has a normal firm consistency. The gallbladder contains several ml. of golden-brown bile.  The extrahepatic biliary tree is patent.  The pancreas is unremarkable. The spleen weighs 170 g. The capsular surface is wrinkled and gray. Sectioned surface is uniform dark red-purple. Splenic parenchyma has a normal firm consistency. Right and left adrenal glands are unremarkable. Right and left kidneys have a combined weight of 260 g.  Cortical surfaces are smooth. Cortices and medullae have normal thicknesses and are clearly demarcated. Renal vessels, pelvocalyceal systems and ureters are unremarkable.  Urinary bladder is contracted containing less than an ounce of straw colored urine. The prostate is unremarkable. Musculoskeletal system is intact.

## AUTOPSY FINDINGS

1. ELECTRICAL BURNS OF SHAVEN SCALP AND RIGHT LEG.

2. SMALL LACERATIONS ON FOURTH AND FIFTH DIGITS OF RIGHT HAND. SUPERFICIAL SCRAPES ON POSTERIOR ASPECT OF RIGHT LEG AND IRREGULAR IMPRINT ON LEFT CHEEK.

3. STRAP MARKS ON FACE AND RIGHT LEG.

4. PULMONARY CONGESTION.

PROBABLE CAUSE OF DEATH:  ELECTROCUTION.

WILLIAM F. HAMILTON, M.D.

WFH:all(X)

3



OFFICE OF THE MEDICAL EXAMINER

ME-126-90

224 S.W. 5 STREET

GAINESVILLE, FLORIDA 32601

BODY DIAGRAM

OFFICE OF THE MEDICAL EXAMINER     ME-126-50
226 S.W. 2 Street
GAINESVILLE, FLORIDA 32601

BODY DIAGRAM—HEAD



Decedent's Name     JESSIE TAFERO

# Laboratory Report

NAME: TAPERO    JESSIE                         #44  #03712324
DOCTOR: HAMILTON              HAMILTON,WILLIAM M.D. - M.E. REC 03/08/93
DATE # :                      EIGHTH DIST. MEDICAL EXAMINE REC 03/15/93 #1070
TECH # :          LAB # : ME-126-93   224 S.W. 5TH STREET       AGE :
SPC TYPE: MIXED                        GAINESVILLE FL 32601
AGE/SEX: 43/M      COLL : 03/04/93 1603

| Test | Result | Normal |
|------|--------|--------|
| COMPREHENSIVE TOX STUDIES | | THRESHOLD LIMITS |
| AN EXTENSIVE TOXICOLOGICAL STUDY WAS PERFORMED BY | | |
| MULTIPLE METHODS ON MULTIPLE SAMPLES WITH THE | | |
| RESULTS AS LISTED: | | |
| PERFORMED ON POSTMORTEM BLOOD AND URINE | | |
| METHAQUALONE | Negative | 300 NG/ML |
| COCAINE (BENZOYLECGONINE) | Negative | 300 NG/ML |
| -D (CANNABINOIDS) | Negative | 100 NG/ML |
| AMPHETAMINES | Negative | 1000 NG/ML |
| BARBITURATES | Negative | 300 NG/ML |
| BENZODIAZEPINES | Negative | 300 NG/ML |
| OPIATES | Negative | 300 NG/ML |
| PROPOXYPHENE | Negative | 300 NG/ML |
| -CODINE | Negative | 100 NG/ML |
| MEPERIDINE | Negative | 25 NG/ML |
| ... PHENOTHIAZINES | Negative | |
| ALCOHOL,OTHER VOLATILES | Negative | |
| SALICYLATES | Negative | |
| ACETAMINOPHEN | Negative | |
| SYNTHETIC NARCOTICS | Negative | |
| ANTIDEPRESSANTS | Negative | |
| ANTIHISTAMINE | Negative | |
| ANTIPSYCHOTICS | Negative | |
| ANTICONVULSANTS | Negative | |
| OTHER | Negative | |

FINAL REPORT OF TOXICOLOGY SCREEN.
CERTIFYING SCIENTIST_____

DOCTORS &
PHYSICIANS
LABORATORY

ME 20-89
1/24/89
8:38 A.M.

### POSTMORTEM EXAMINATION
### OF THE BODY OF
### THEODORE ROBERT BUNDY

The body is that of a well developed well nourished slender white man measuring 71" in length and appearing the stated age of 42 years.  It is clad in long sleeve blue shirt, navy blue trousers with the right leg rolled up to knee level and white boxer shorts.  Tissues are warm and there is no discernible rigidity in major muscle groups of arms or left leg.  There is rigidity of muscles above and below the right knee.  Lividity of faint violaceous hue is noted on posterior surfaces of the body. There is a burn ring encircling the top of the shaven head and a rectangular burn on the back of the right leg extending from skin of popliteal fossa to lower calf.  Incompletely circumferential linear imprints about 2" wide are noted on front and sides of right and left ankles.  A faint horizontally oriented broad linear imprint extends across mouth, chin and both jaw regions of the face.  Burn ring of the scalp has maximal cross sectional diameters of 6 1/2 x 5 1/2".  The ring has a width of 1 to 1 1/2 with multiple foci of skin slippage associated with faint yellow tan discoloration and a hyperemic rim.  Rivulets of salted deposits extend down the parieto-occipital regions of the head, terminating at a level with the inferior tip of the ear lobe. The burn on the posterior aspect of the right leg is roughly rectangular in shape measuring 7 x 8".  Multiple foci of skin slippage in the burnt zone are associated with zones of firm yellow-tan skin and a hyperemic burn border.  Calvarium and skull

EXHIBIT
36

1

base   are intact.  A faint red-brown discoloration of about 1 x 3/4" to 2 x 1 1/2" is noted centrally in dura overlying the cerebral hemispheres.  A distinct heat epidural hematoma is not identified.  The brain weighs 1600 g.  Cerebral hemispheres are symmetrical with slight narrowing of sulci and flattening of gyri.  The brain tissues are not appreciably warmer than other internal organs.  Multiple coronal cuts through brain and upper cervical spinal cord reveal no other abnormalities. The arteries of the circle of Willis are normally distributed and free of notable congenital anomaly or atheromatous deposit.  The neck organ block is free of trauma or obstruction.  The thyroid has symmetrical lobes of normal size.  The pericardial, pleural and peritoneal spaces are free of fluid, blood or adhesion.  The heart weighs 400 g.  Epicardial surface is smooth and glistening. The coronary arteries are normally distributed and adequately patent.  A focal 30 narrowing of arterial lumen is noted proximally in the anterior descending branch of the left coronary artery.  The myocardium is homogeneous red-brown without evidence of recent . remote infarct.  Valves and endocardial surfaces are unremarkable.  The great vessels entering and leaving the heart are unremarkable.  The right and left lungs weigh 310 and 275 g. respectively.  Lung substance is uniformly crepitant and light pink.  No antemortem injuries or disease processes are identified in either lung or mediastinal structures.  Esophagus is unremarkable.  Stomach contains about an ounce of sticky clear fluid. Gastric mucosa is unremarkable.  Small bowel is unremarkable. Vermiform appendix is present. Large bowel is unremarkable.  The

2

liver weighs 1540 g. The capsular surface is smooth and glisten-
ing, sectioned surface is uniform red-brown. The hepatic paren-
chyma has a normal firm consistency. Gallbladder contains
several ml. of golden-brown bile. The Extrahepatic biliary tree
is patent. The pancreas is unremarkable. Spleen weighs 180 g.
Capsular surface has a few small hyaline thickenings. Sectioned
splenic substance is uniform red-brown with a normal firm con-
sistency. Right and left adrenal glands are unremarkable. The
combined weight of the kidneys is 325 g Cortical surfaces are
smooth. Cortices and medullae have normal thicknesses are clear-
ly demarcated. Renal vessels, pelvocalyceal systems and ureters
are unremarkable. Urinary bladder contains 12 oz. of straw
colored urine. The prostate is unremarkable. The musculo-
skeletal system is intact.

## AUTOPSY FINDINGS

1. ELECTRICAL BURN ANNULUS OF SCALP.
2. RECTANGULAR BURN OF CALF REGION, RIGHT LEG.
3. LINEAR IMPRINTS (STRAP MARKS) ON LOWER FACE AND ANKLES.

PROBABLE CAUSE OF DEATH: ELECTROCUTION.

WILLIAM F. HAMILTON, M.D.

WFH/alj(P)

OFFICE OF THE MEDICAL EXAMINER
224 S.W. 5 STREET
GAINESVILLE, FLORIDA 32601
BODY DIAGRAM

ME-20-89



Decedent's Height _____ inches

Name _Theodore Brady_

Examined By _____  Date _____

ME-20-89

OFFICE OF THE MEDICAL EXAMINER
226 S.W. 5 STREET
GAINESVILLE, FLORIDA 32601

BODY DIAGRAM—HEAD



Front

Back

Decedent's Name

OFFICE OF THE MEDICAL EXAMINER
224 S.W. 5 Street
GAINESVILLE, FLORIDA 32601

BODY DIAGRAM—HEAD

*ME-20-89*

Decedent's Name _____
Examined

# Laboratory Report

**Patient: BUNDY,THEODORE**          **#46**                    **#03078693 0**

Doctor : HAMILTON,WILLIAM  M.D.- M.E. HAMILTON,WILLIAM  M.D.- M.E. REC 01/24/89
Hosp # : ME2089                         EIGHTH DICT. MEDICAL EXAMINE REP 01/26/89 2:48P
Room # :          LAB # :               224 S.W. 9TH STREET              RTE UNK
SPC TYPE: MIXED                         GAINSVILLE FL 32601
Age/Sex: /M          COLL : 01/24/89 2:04 PM

| COMPREHENSIVE TOX STUDIES | | THRESHOLD LIMITS |
|---|---|---|
| AN EXTENSIVE TOXICOLOGICAL STUDY WAS PERFORMED BY | | |
| MULTIPLE METHODS ON MULTIPLE SAMPLES WITH THE | | |
| RESULTS AS LISTED: | | |
| METHADUALONE | Negative | 300 NG/ML |
| COCAINE (BENZOYLECGONINE) | Negative | 300 NG/ML |
| THC (CANNABINOIDS) | Negative | 100 NG/ML |
| SYMPATHOMIMETIC AMINES | Negative | 1000 NG/ML |
| BARBITURATES | Negative | 300 NG/ML |
| BENZODIAZEPINES | Negative | 300 NG/ML |
| OPIATES | Negative | 300 NG/ML |
| PROPOXYPHENE | Negative | 300 NG/ML |
| METHADONE | Negative | 300 NG/ML |
| PHENCYCLIDINE | Negative | 25 NG/ML |
| MEPROBAMATE | Negative | |
| PHENOTHIAZINES | Negative | |
| ETHYLCHLORVYNAL (PLACIDYL) | Negative | |
| GLUTETHIMIDE | Negative | |
| BLOOD VOLATILES | Negative | |
| SALICYLATES | Negative | |
| ACETAMINOPHEN | Negative | |
| SYNTHETIC NARCOTICS | Negative | |
| ANTIDEPRESSANTS | Negative | |
| ANTIHISTAMINE | Negative | |
| OTHER | Negative | |

        FINAL REPORT OF TOXICOLOGY SCREEN.
        CERTIFYING SCIENTIST

Reviewed
1 FEB 89
Wht


DOCTORS &
PHYSICIANS
LABORATORY

ME 344-88
11/8-88
9:00 A.M.

## POSTMORTEM EXAMINATION
## OF THE BODY OF
## JEFFERY JOSEPH DAUGHERTY

The body is that of a mildly obese young adult white man measuring 71" in length. It is clad in a long sleeve white shirt, black pin striped trousers and 1 white sock on the right foot. The left foot is unshod and a manila identification label is attached to the great toe. The right trouser leg is rolled up beyond knee level and the left trouser leg is rolled up to mid-calf. a string encircling the neck has two paper rectangles attached. on the appears the following legend "Whoever dies wearing this scapular shall not suffer eternal fire." The second paper pendant has a drawing of Madonna and child with a Priest or a Monk-like figure with the underlying legend "Our Lady of Mt. Carmel." On the left forearm there is a tattoo of a rose with surrounding leaves, scroll and the name Debra. On posterior aspect of the right leg centered at knee level there is a 5 x 5" rectangular burn with yellow-brown central discoloration, focally erythematous rim and a parchment-like consistency. Skin slippage is focally present in this region. On the top of the head there is a burn ring annulus of 7" diameter. The width of the ring is 2". Toward the center of the annulus the scalp is dark brown to tan quite firm with notable skin slippage. Toward the outer margins of the burn ring scalp is reddish-pink. Pronounced lividity of violaceous hue is present on the posterior dependent surfaces of the body. rigidity is well established in all major muscle groups and the body is cool to the touch. No other

1

EXHIBIT 37

JEFFERY JOSEPH DAUGHERTY                                    ME 344-88

significant recent or remote injuries are noted on external
surfaces of the body. The abdominal fat pad has a 5.5 cm. (about
2") thickness. The pericardial, pleural and peritoneal spaces
are free of blood, exudate or adhesion. The heart weighs 450 g.
The epicardial surface is smooth and glistening. The coronary
arteries are normally distributed and generally widely patent.
There is however a focal 90% narrowing by firm yellow-white
atheromatous material in the proximal portion of the anterior
descending branch of the left coronary artery. Left main
arterial trunk and circumflex branches are widely patent as is
the right coronary artery. The myocardium is homogeneous red-
brown without evidence of recent or remote infarct. The cardiac
chambers are distended by clotted and unclotted blood. The
valves and endocardial surfaces are unremarkable. Great vessels
entering and leaving the heart are unremarkable. Right and left
lungs weigh 510 and 490 g. respectively. There is notable
posterior hypostasis. Lung substance is uniformly and moderately
increased in firmness and decreased in crepitance. Blood oozes
from congested sectioned surfaces. No antemortem disease
processes or injuries are identified in lungs or in mediastinal
structures. The esophagus is unremarkable. The stomach contains
about 6 oz. of tan to brown liquid. Alimentary mucosa is
autolyzed. The vermiform appendix is present. The large bowel
contains a moderate quantity of pasty green-brown stool. The
liver weighs 3575 g. Capsular and sectioned surfaces are pale
reddish-tan and hepatic parenchyma crumbles easily with manual
compression. The gallbladder contains several ml. of golden-

2

JEFFERY JOSEPH DAUGHERTY                        ME 344-88

brown bile. The extrahepatic biliary tree is patent. The pancreas has a moderate fatty ingrowth. Sectioned surfaces are autolyzed but otherwise unremarkable. The spleen weighs 210 g. The capsular surface is wrinkled and gray, sectioned surface is dark red-purple and slightly softer than usual. The right and left adrenal glands are mildly autolyzed but otherwise unremarkable. The right and left kidneys have a combined weight of 325 g. The cortical surfaces are smooth. Cortices and medullae have normal thicknesses and are clearly demarcated. Renal vessels, pelvocalyceal systems and ureters are unremarkable. Urinary bladder contains about 2 oz. of straw colored urine. The prostate is unremarkable. The musculoskeletal system is intact. Burn ring of scalp has been previously described. Calvarium and skull base are intact. The dura overlying cerebral convexities is focally discolored light tan to brown. No distinct dural hematoma is identified. The brain weighs 1400 g. The cerebral hemispheres are symmetrical and have normal gyral configurations. Arteries of the circle of Willis are normally distributed and free of notable congenital anomaly or atheromatous deposit. Multiple cuts through brain and upper cervical spinal cord reveal no other abnormalities.

JEFFERY JOSEPH DAUGHERTY                              ME 344-88

## AUTOPSY FINDINGS

1.  BURN RING OF SHAVEN SCALP.

2.  RECTANGULAR BURN ON SKIN OF POPLITEAL FOSSA.

3.  PULMONARY CONGESTION.

4.  FOCAL CORONARY ARTERIOSCLEROSIS. WITH MARKED NARROWING OF
    ANTERIOR DESCENDING BRANCH OF LEFT CORONARY ARTERY.

5.  OBESITY. MILD.

6.  FATTY LIVER.


PROBABLE CAUSE OF DEATH: ELECTROCUTION.


WILLIAM F. HAMILTON. M.D.

WFH/ald(o)



OFFICE OF THE MEDICAL EXAMINER
815 S.W. Fourth Avenue, Suite Two
Gainesville, Florida  32601-6298

ME-344-88

BODY DIAGRAM

Front          Back

Decedent's Height ___ 7' ___ inches

Name _____

Examined _____



OFFICE OF THE MEDICAL EXAMINER
224 S.W. 5 Street
GAINESVILLE, FLORIDA 32601

BODY DIAGRAM—HEAD

Decedent's Name

# Laboratory Report

**Patient:** DAUGHERTY,JEFFERY          846                    #02805818 0

**Doctor :** HAMILTON                   WILLIAM HAMILTON M.D.- M.E. REC 11/08/88
**Hosp # :** ME-344-88                  EIGHTH DICT. MEDICAL EXAMINE REP 11/09/88 1:55P
**Room # :**          _LAB # :          815 S.W. 4TH AVENUE          RTE UNK
**SPC TYP:** MIXED                      GAINSVILLE FL 32601
**Age/Sex:** 33/M          **COLL :** 11/08/88 6:48 PM

| COMPREHENSIVE TOX STUDIES | | THRESHOLD LIMITS |
|---|---|---|
| AN EXTENSIVE TOXICOLOGICAL STUDY WAS PERFORMED BY | | |
| MULTIPLE METHODS ON MULTIPLE SAMPLES WITH THE | | |
| RESULTS AS LISTED: | | |
| METHAQUALONE | -Negative | 300 NG/ML |
| COCAINE (BENZOYLECGONINE) | Negative | 300 NG/ML |
| THC (CANNABINOIDS) | Negative | 100 NG/ML |
| SYMPATHOMIMETIC AMINES | Negative | 1000 NG/ML |
| BARBITURATES | Negative | 300 NG/ML |
| BENZODIAZEPINES | Negative | 300 NG/ML |
| OPIATES | Negative | 300 NG/ML |
| PROPOXYPHENE | Negative | 300 NG/ML |
| METHADONE | Negative | 25 NG/ML |
| PHENCYCLIDINE | Negative | |
| MEPROBAMATE | Negative | |
| PHENOTHIAZINES | Negative | |
| ETHYLCHLORVYNAL (PLACIDYL) | Negative | |
| GLUTETHIMIDE | Negative | |
| BLOOD VOLATILES | Negative | |
| SALICYLATES | Negative | |
| ACETAMINOPHEN | Negative | |
| SYNTHETIC NARCOTICS | Negative | |
| ANTIDEPRESSANTS | POSITIVE | |
| POSITIVE AMITRIPTYLINE AND NORTRIPTYLINE IN THE BLOOD | | |
| ANTIHISTAMINE | Negative | |
| OTHER | Negative | |

FINAL REPORT OF TOXICOLOGY SCREEN.
CERTIFYING SCIENTIST_____



WI 99-86
5/21/86
9:10 A.M.

POSTMORTEM EXAMINATION

OF THE BODY OF

PTRALT JOHN MICHAEL STRAIGHT

The body is that of a slender adult white man measuring 71" in length. It
is clad in short sleeve white shirt, boxer shorts and one white sock which is
present on the left foot. A manilla identification label is attached to the
great toe of the right foot. An additional white sock is received with the body
but not on the right foot. Postmortem rigidity of marked intensity is present
in major muscle groups. The body is quite cool. Lividity is well established,
violaceous and posteriorly distributed. Tattoos adorn right and left forearms
and left side of neck. Tattoos are reproduced in a diagram accompanying this
report. A few irregular small scars are noted on forearms and an obliquely ori-
ented linear scar 3" in length is seen in the skin of the right lower abdominal
quadrant. Scalp is clean shaven. A burn ring with maximal diameters of 7 and
1/2" completely encircles the top of the head. The width of the burn ring
averages 2". Elongate rivulets of salty deposits extend down right and left
sides of face from the inferior margins of the thermal annulus. An incompletely
circumferential burn centered over popliteal fossa extends over an 8" length of
the right leg. A 10" partial circumference of the leg is involved in the burnt
zone. Tissues involved in scalp and leg burns are quite firm, gray-brown and
have associated peripheral skin slippage and erythema. Dura immediately under-
lying the scalp burn ring has a 3 X 3" zone of extradural blood accumulat
a thin layer of 1 to 2 mm. thickness. Leptomeningeal vessels are congest
brain weighs 1475 g. Cerebral hemispheres are symmetrical and have normal
configurations. The arteries of the circle of Willis are normally distrib
and widely patent. No berry aneurysms or arteriovenous malformations are

EXHIBIT
38

identified in brain vessels. Multiple cuts through brain and upper cervical
spinal cord reveal no other abnormalities. Oral cavity and neck organ block are
free of trauma or obstruction. Thyroid has symmetrical lobes of normal size.
Pleural, pericardial and peritoneal spaces are free of accumulations of blood,
fluid or adhesion. Heart weighs 350 g. Coronary arteries are normally distri-
buted and widely patent. Epicardial surface is smooth and glistening. Myocard-
ium is homogeneous red-brown and has a normal firm consistency. Valves and endo-
cardial surfaces are unremarkable. Cardiac chambers are filled with clotted and
unclotted blood. Great vessels entering and leaving the heart are normally dis-
tributed. Right and left lungs weigh 920 and 700 g. respectively. There is mar-
ked posterior hypostasis in both lungs. Lung substance is uniformly and moder-
ately increased in firmness and decreased in crepitance. Sectioned surfaces cor-
sanguineous pink fluid. Tracheobronchial tree is unremarkable. No tumors, gran-
ulomata or foci of consolidation are encountered in either lung. Esophagus is
unremarkable. Stomach contains about 2 oz. of tan to brown liquid and finely
divided food particles. Gastric mucosa is unremarkable. Small bowel is unre-
markable. Vermiform appendix is absent. Large bowel contains pasty green-
brown stool. The liver weighs 1830 g. Capsular surface is smooth and glisten-
ing, sectioned surface is red-brown without accentuation of nodular pattern or
nutmeg pattern. Hepatic parenchyma has a normal firm consistency. Gallbladder
contains several ml. of golden-brown bile. The extrahepatic biliary tree is
patent. Lymph nodes of the porta hepatis are enlarged and have pale tan sec-
tioned surfaces. The pancreas is unremarkable. The spleen weighs 260 g. Its
capsular surface is smooth and gray, sectioned surface is dark red-purple.
Spleen has a normal firm consistency. Right and left adrenal glands are unre-
markable. Combined weight of right and left kidneys is 300 g. Cortical sur-
faces are smooth. Cortices and medullae have normal thicknesses and are clearly
demarcated. Renal vessels, pelvocaliceal systems and ureters are unremarkable.

DONALD STRAIGHT                     -3-                      ME 99-86

Urinary bladder contains 3 oz. of straw colored urine.  Prostate is mildly en-
larged and has a nodular sectioned surface.  Internal genitalia are normal male.
Musculoskeletal system is intact.

## AUTOPSY FINDINGS

1. THERMAL BURN AREA(S) OF TOP OF HEAD AND INCOMPLETELY CIRCUMFERENTIAL BURN OF
   RIGHT LEG.

2. PULMONARY CONGESTION AND EDEMA.

3. SURGICAL ABSENCE OF VERMIFORM APPENDIX, FENCED.

PROBABLE CAUSE OF DEATH: ELECTROCUTION.

WILLIAM F. HAMILTON, M.D.

WFH/ell



OFFICE OF THE MEDICAL EXAMINER
815 S.W. Fourth Avenue, Suite Two
Gainesville, Florida  32601-6298

ME 99-86

BODY DIAGRAM

## BODY DIAGRAM—HEAD



# SmithKline Bio-Science Laboratories

**● SmithKline Beckman service**

TAMPA   MIAMI

| | | |
|---|---|---|
| ACCT NO.  3707 | LAB NO | PAGE |
| MEDICAL EXAMINER | DATE COLLECTED  05/21/96 | MEA,99-06 |
| DISTRICT 40 SUITE 2 | TIME COLLECTED | AGE 42  SEX M |
| 915 S W 4TH AVENUE | DATE ENTERED  06/02/96 | STRAIGHT, RONALD |
| GAINESVILLE, FL  32601 | DATE REPORTED | |
| ATTN: WILLIAM F. HAMILTON M.D. | REPORT STATUS  FINAL | MD, URINE |
| AREA      ROUTE | **COMMENTS** | |

REQUESTED TESTS: QUAL DRUG PROFILE

| TEST | RESULT | OUT OF RANGE (OR INTERPRETATION) | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| QUAL DRUG PROFILE | | | | |
| SPECIMEN(S) TESTED | URINE, BLOOD | | | |

FOLLOWING DRUGS AMONG THOSE FOR WHICH FOLLOWING SUBSTANCES...
```
ACETAMINOPHEN          GLUTETHIMIDE              PROPOXYPHENE(DARVON)*
BARBITURATES           MEPROBAMATE              QUININE/QUINIDINE
ANTICONVULSANTS        MEPROBAMATE              SALICYLATES
CARBAMAZEPINE          METHADONE                STRYCHNINE
BARBITURATES           METHAQUALONE             TRICYCLIC ANTI-
BENZODIAZEPINES        NARCOTIC                   DEPRESSANTS*
OPIATES                VOLATILES & ALCOHOLS
COCAINE                ANTICHOLINERGIC (PCP)    (ACETONE, ETHANOL,
ETHCHLORVYNOL          PHENOTHIAZINES*           ISOPROPANOL, METHANOL)
MEPROBAMATE            OXAZEPAM (SILAPINE)
```
* METABOLITES USUALLY IDENTIFIED.  PARENT DRUGS NORMALLY
  PRESENT FOR A RANGE OF SEVERAL MEDICATIONS.

```
URINE: FOR  MEPERIDINE
                          NICOTINE
BLOOD:  NO VOLATILES DETECTED
```

REFERENCE RANGES ARE ADJUSTED FOR AGE(*)/SEX(*) ASTERISKS.  IF AGE
OR SEX IS NOT GIVEN, ADULT MALE NORMAL RANGES ARE PRINTED.

ME 114-89
5/4/89
1:00 P.M.

### POSTMORTEM EXAMINATION
### OF THE BODY OF
### AUBREY ADAMS

The body is that of a well developed well nourished young adult white man measuring 69" in length. It is clad in white boxer style undershorts and white socks. No identification label is attached to the body. Rigidity of moderate degree is present in major muscle groups and lividity of violaceous hue is well established on posterior dependent surfaces of the body. An obliquely oriented 4" linear scar is noted in the skin of the right lower abdominal quadrant. No other old injuries are noted on the body. A rubber band 1 1/4" in width encircles the right leg above the ankle. There are two electrical burns on the body including a circular burn ring on the top of the head and a rectangular burn on the back of the right leg at knee level. Hair has been completely shaven from the scalp. The burn at the top of the head is round with a 6" diameter and has a uniform 1/2" width. Within the ring, scalp has a dark grayish-purple appearance whereas the ring is firm, finely gray or tan and has focal skin slippage. Skin immediately external to the ring is hyperemic red to purple. Burn to the back of the leg is centered on the right popliteal fossa and extends over a 4 1/2" length of the leg and about an 8" portion of the legs circumference at knee level. There is focal skin slippage, increased firmness, gray-tan discoloration and a reddish-purple surrounding skin. No other recent or remote injuries are noted on external surfaces of front or back of body. The oral cavity is free of trauma or

1.

EXHIBIT
39

obstruction.   The scalp, calvarium and skull base are intact.
There is an elongate 4 X 1 1/2" zone of dark red-brown
discoloration to the dura mater overlying the sagittal sinus and
immediately beneath the center of the scalp burn ring.  The brain
weighs 1475 g.  Cerebral hemispheres are symmetrical and have
normal gyral configurations.  There is slight congestion of
leptomeningeal vessels over cerebral convexities.  Arteries of
the circle of Willis are normally distributed and free of notable
congenital anomaly.  Multiple cuts through brain and upper
cervical spinal cord reveal no other abnormalities.  The neck
organ block is free of trauma or obstruction.  The thyroid has
symmetrical lobes of normal size.  Pleural, pericardial and
peritoneal spaces are free of significant accumulations of fluid,
exudate or adhesion.  The heart weighs 435 g.  The epicardial
surfaces are smooth and glistening.  The coronary arteries are
normally distributed and widely patent.  The myocardium is
homogeneous red-brown.  Valves and endocardial surfaces are
unremarkable.  The cardiac chambers are distended by unclotted
blood.  Great vessels entering and leaving the heart are
unremarkable.  The right and left lungs weigh 510 and 450 g.
respectively.  Lung substance is uniformly and mildly increased
in firmness and decreased in crepitance.  Sectioned surfaces are
purple-pink without foci of consolidation, tumors or granulomata.
Mediastinal lymph nodes are unremarkable.  The esophagus is
unremarkable.  The stomach contains 30 oz. of well masticated tan
foodstuffs.   Alimentary mucosa is mildly autolyzed.  The
vermiform appendix is present.  The large bowel is unremarkable.

The liver weighs 2240 g. Capsular surface is smooth and glistening. Sectioned surface uniform red-brown. Hepatic parenchyma has a normal firm consistency. Gallbladder contains several ml. of golden-brown bile. The extrahepatic biliary tree is patent. The pancreas is unremarkable. The spleen weighs 250 g. Capsular surface is wrinkled and grey. Sectioned surface is uniform red-brown. Splenic parenchyma has a normal firm consistency. Right and left adrenal glands are unremarkable. The right and left kidneys have a combined weight of 400 g. The cortical surfaces are smooth with incidental fetal lobulations. Cortices and medullae have normal thicknesses and are clearly demarcated. Renal vessels, pelvocalyceal systems and ureters are unremarkable. The urinary bladder contains about 4 oz. of straw colored urine. The prostate is unremarkable. The musculoskeletal system is intact.

### AUTOPSY FINDINGS

1. BURN RING ON SHAVEN SCALP.

2. RECTANGULAR BURN TO BACK OF RIGHT LEG.

3. PULMONARY CONGESTION.

PROBABLE CAUSE OF DEATH: ELECTROCUTION.

WILLIAM F. HAMILTON, M.D.

WFH/all(R)

3



GAINESVILLE, FLORIDA 32601
BODY DIAGRAM

Front                    Back

430
570/450
2240/250
CW 400
1475

Decedent's
Height _____ inches

Name _____
Examined _____ Date _____
By

OFFICE OF THE MEDICAL EXAMINER

815 S.W. 4th Avenue, Suite #2
Gainesville, Florida 32601-6298

ME-114.51

**BODY DIAGRAM—HEAD**



Front

Back

OFFICE OF THE MEDICAL EXAMINER    ME· 114-89
224 S.W. 5 Street
GAINESVILLE, FLORIDA 32601

BODY DIAGRAM—HEAD



Right

Burn Ring-5"Dia
1½"wide

Left

Decedent's Name  Aubrey Adams
Examined


# Laboratory Report

**846**                                                      **203527318 0**

tient: ADAMS, AUBREY

tor : HAMILTON, WILLIAM  M.D.- M.E. HAMILTON, WILLIAM  M.D.- M.E. REC 05/04/89
Hosp # : ME-114-89                        EIGHTH DICT. MEDICAL EXAMINE REP 05/05/89 1:56P
Room # :          LAB # :                 224 S.W. 5TH STREET          RTE 1
SPC TYP: MIXED                            GAINSVILLE FL 32601
Age/Sex: 31/M        COLL : 05/04/89 100PM          Result                    Normal

COMPREHENSIVE TOX STUDIES                                THRESHOLD LIMITS
        AN EXTENSIVE TOXICOLOGICAL STUDY WAS PERFORMED BY
        MULTIPLE METHODS ON MULTIPLE SAMPLES WITH THE
        RESULTS AS LISTED:

| | Result | Threshold |
|---|---|---|
| METHAQUALONE | Negative | 300 NG/ML |
| COCAINE (BENZOYLECGONINE) | Negative | 300 NG/ML |
| THC (CANNABINOIDS) | Negative | 100 NG/ML |
| AMPHETAMINES | Negative | 1000 NG/ML |
| BARBITURATES | Negative | 300 NG/ML |
| BENZODIAZEPINES | Negative | 300 NG/ML |
| OPIATES | Negative | 300 NG/ML |
| PROPOXYPHENE | Negative | 300 NG/ML |
| METHADONE | Negative | 300 NG/ML |
| PHENCYCLIDINE | Negative | 25 NG/ML |
| MEPROBAMATE | Negative | |
| PHENOTHIAZINES | Negative | |
| ETHCHLORVYNAL (PLACIDYL) | Negative | |
| METHIMIDE | Negative | |
| ODD VOLATILES | Negative | |
| SALICYLATES | Negative | |
| ACETAMINOPHEN | Negative | |
| SYNTHETIC NARCOTICS | Negative | |
| ANTIDEPRESSANTS | Negative | |
| ANTIHISTAMINE | Negative | |
| OTHER | Negative | |

        FINAL REPORT OF TOXICOLOGY SCREEN
        CERTIFYING SCIENTIST_____

DOCTORS &
PHYSICIANS
LABORATORY