**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JESSE COWANS,**

       **Petitioner,**

                                **Case No. 1:00-cv-618**

    **-v-**                            **JUDGE EDMUND A. SARGUS, JR.**

                                     **Magistrate Judge Mark R. Abel**

**MARGARET BAGLEY, Warden,**

       **Respondent.**

**<u>OPINION AND ORDER</u>**

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action pursuant to 28 U.S.C. § 2254. Petitioner filed his original habeas petition on July 31, 2000 (Doc. # 5) and an amended petition on May 3, 2001 (Doc. # 15). Petitioner amended his petition again on June 12, 2002, to add a claim that he had inadvertently omitted. (Doc. # 45.) Finally, on September 9, 2005, this Court issued an Opinion and Order permitting petitioner to amend his petition to add recently-exhausted claims of ineffective assistance of appellate counsel. (Doc. # 72.)

On September 30, 2002, this Court issued an Opinion and Order granting in part and denying in part respondent's motion to dismiss procedurally defaulted claims. (Doc. # 49.) Specifically, this Court dismissed as procedurally defaulted grounds 2(c), 2(f), 2(g), 6, and 11. Subsequently, in a March 26, 2003 opinion and order denying petitioner's motion to conduct additional discovery, this Court granted respondent's motion to dismiss ground 10 as procedurally defaulted. (Doc. # 56.) On September 12, 2006, the Court issued an Opinion and Order granting petitioner's motion for reconsideration of its procedural default order as to grounds 2(c), 2(f), 2(g), and 6, specifically to consider whether recently-exhausted claims of

appellate counsel ineffectiveness constitute cause and prejudice to excuse the default of those claims.  (Doc. # 84.)  Thus, the Court will revisit those procedural default determinations in the instant order.

The Court permitted limited factual development, first issuing an order on April 18, 2001 granting petitioner's motion for funds under the criminal justice act to conduct DNA testing, (Doc. # 14), and then issuing an order on December 6, 2001 granting petitioner's motion for additional funds to complete the DNA testing (Doc. # 29).  Petitioner filed a report summarizing the results of the testing on April 2, 2002.  (Doc. # 37.)  On September 30, 2002, this Court issued an Opinion and Order granting petitioner's motion to conduct certain discovery.  (Doc. # 48.)  On March 26, 2003, however, the Court issued an Opinion and Order denying petitioner's request to conduct additional discovery.  (Doc. # 56.)  And on September 26, 2003, the Court issued an Opinion and Order denying petitioner's motion for an evidentiary hearing.  (Doc. # 60.)

This case is now ripe for a final decision on the merits of those claims that are properly before the Court:  grounds 1, 2(a), 2(b), 2(d), 2(e), 2(h), 2(I), 2(j), 2(k), 3, 4, 5, 7, 8, 9, 12, 13, and 14.  Additionally, as noted above, the Court will revisit its procedural default determinations as to grounds 2(c), 2(f), 2(g), and 6.

## I.  Factual and Procedural History

The details of this capital murder and aggravated robbery are set forth in numerous state court opinions, including the Ohio Supreme Court's published opinion in *State v. Cowans*, 87 Ohio St. 3d 68 (1999):

> Jessie J. Cowans, appellant, was convicted of the aggravated murder of Clara Swart and sentenced to death.

Mrs. Swart, a sixty-nine-year-old widow, lived alone in a rural section of Clermont County.  One day in July 1996, when her son, Timothy, was taking some items to the side of the road to be picked up as trash, Cowans drove up and asked if he could take a glider-type swing that Timothy had placed by the road.  Timothy agreed and helped him load the swing onto his truck.

On Wednesday, August 28, 1996, Mrs. Swart's neighbor Mildred Kilgore went to Mrs. Swart's house.  Kilgore found Mrs. Swart standing outside talking to a man who looked like Cowans.  When Kilgore approached, Mrs. Swart told the man that she was leaving with her friend, and he left.  After he had gone, Mrs. Swart and Kilgore went inside, and Mrs. Swart said, "Oh, I'm scared. *** He made me so nervous. *** He scared me so bad."  Kilgore asked, "Who was it, Clara?"  Mrs. Swart replied, "It was the man who came and got the chair [sic] off the garbage a few weeks ago."

At 8:00 a.m. on Thursday, August 29, a Clermont County Senior Services bus arrived at Mrs. Swart's house to pick her up.  When Mrs. Swart did not respond to the sound of the driver's horn, the driver went to the door and knocked.  She heard some noise inside the house, but Mrs. Swart did not answer the door; nor did Mrs. Swart answer her telephone when the Senior Services office called.  Mrs. Swart's son came to visit her later in the day and found her body.

Mrs. Swart had been strangled with a purse strap, which was still around her neck.  An electrical cord had been tied around her neck and to the handle of the refrigerator, and her hands had been tied with a telephone cord.  She was still wearing her wedding ring and earrings.  Officers found a palm print on a plastic bag covering a blender in Mrs. Swart's kitchen.

After talking to Kilgore, sheriff's investigators began to consider Cowans a suspect.  Investigators discovered that Cowans was on parole, so they called his parole officer, Sandra Higgins, to help them obtain Cowans's fingerprints.

The investigators believed that they lacked enough evidence to obtain a search warrant for Cowans's house.  However, Higgins decided to search it herself in order to determine whether Cowans had violated his parole.  Two deputies helped her.  Once of the deputies testified that he found an Emmett Kelly clown figurine in the closet of Cowans's bedroom.  The figurine was later identified as belonging to Mrs. Swart.  Subsequently, the deputies obtained Mrs. Cowans's permission to continue searching.  In the closet, they found a small wooden car.

While searching a wooded area behind Cowans's house, a deputy found other items taken from Mrs. Swart's house, including a wooden jewelry box.  The

3

little wooden car found in Cowans's house appeared to have been broken off the lid of that box.

On the afternoon of September 2, Deputy Sheriff Jim DeCamp used a T-shirt belonging to Cowans to scent a bloodhound at Mrs. Swart's residence. Once scented, the dog appeared to track the scent from Mrs. Swart's backyard, over a fence, and for a short distance into a wooded area. The dog then lost the scent. After being rescented with the shirt, the dog appeared to follow it to the vicinity of a fallen tree where the handler was told that other deputies had found Mrs. Swart's personal property. At this location, which was near the back end of Cowans's property line, the dog was pulled off the scent. Again the dog was rescented and it continued to Cowans's Chevrolet Blazer, which was parked at his house.

Mamie Trammel, one of Cowans's neighbors, testified that she had a conversation with Cowans two days after the murder. Trammel testified that when she asked Cowans if he had heard about the murder, he said, "Yeah, isn't that terrible *** to hang a lady by the refrigerator with her hands behind her back." This detail had not been made public by the sheriff's department.

Cowans was arrested on September 2. Deputy Sheriff Robert Evans drove him to the Clermont County Jail on a route that led past Mrs. Swart's house. Evans slowed down as he passed the house, as he later testified, "just to see what Mr. Cowans would do." Staring at the house, Cowans began to talk about the case. He complained that, as an "ex-con," he was being "singled out." Evans testified that Cowans said he had heard on the news that Mrs. Swart "was hung" and had later heard that she was strangled – information that had not been made public. Cowans also said "that he had been there [at Mrs. Swart's house] on one occasion *** for the purpose of picking up a swing."

While confined in jail, Cowans discussed the charges against him with a fellow inmate, Marvin A. Napier. He told Napier at first that "he had chased some kids out of his backyard" and they "threw [some items] down on the ground. And he *** went through some stuff and left what he didn't want and took what he did want."

Napier testified that Cowans later admitted to killing and robbing Mrs. Swart and gave details consistent with the facts of the case. For example, Napier testified that Cowans said he had found Mrs. Swart in the bathroom and "jerked [her] up off the toilet." This was consistent with the fact that investigators found urine in the toilet bowl. Napier also testified that Cowans said he had tied Mrs. Swart with the phone cord, strangled her with a purse strap, and "ransacked" the house; also, that an "old people's bus" arrived while he was there, and "[t]hey knocked on the door."

4

Napier further testified that Cowans said he left Mrs. Swart's house and walked home through the woods, that he went through the stolen property as he went, and that he left most of it in the woods as "junk" but brought home "[s]ome clown figurines" and some jewelry. Cowans allegedly told Napier "that he wished he'd have took the earrings and the wedding band off the lady's finger."

Cowans was indicted on four counts of aggravated murder. Count One alleged murder with prior calculation and design under R.C. 2903.01(A). Counts Two through Four alleged felony-murder under R.C. 2903.01(B). Each count carried four death specifications: one under R.C. 2929.04(A)(5), alleging that Cowans had a prior murder conviction, and three felony-murder specifications under R.C. 2929.04(A)(7). Other counts charged kidnapping under R.C. 2905.01(A)(2) (to facilitate commission of felony), kidnapping under R.C. 2905.01(A)(3) (with purpose to terrorize or inflict serious physical harm), aggravated robbery, and aggravated burglary.

Cowans was convicted of all counts and specifications. (The prior-conviction specification was tried to the court pursuant to R.C. 2929.022.) After the verdict of guilty was announced, Cowans continued to profess his innocence and refused to attend or participate in the sentencing phase. He refused to present mitigating evidence and asked that the witnesses who were prepared to testify in mitigation also refuse to cooperate. The jury recommended the death sentence, and the trial judge imposed it.

*State v. Cowans, supra*, 87 Ohio St. 3d at 68-71.

Petitioner Cowans was indicted by the Clermont County Grand Jury on September 11, 1996. At that time, attorneys R. Daniel Hannon and Timothy Smith were appointed to represent him. On November 21, 1996, petitioner notified the trial court that he wanted his attorneys to withdraw from the case and new counsel to be appointed. The trial court acquiesced and appointed Attorneys Bruce Wallace and Michael Kelly.

In February, 1997, one month before his trial was scheduled to begin, petitioner notified the trial court that he wanted his attorneys to withdraw and new counsel to be appointed. Petitioner was of the view that his attorneys believed that he was guilty and wanted petitioner to lie. The trial court denied petitioner's motion and petitioner was removed from the courtroom

5

after becoming disruptive.  Subsequently, counsel for petitioner, at his express request, asked to withdraw and for new counsel to be appointed.  That motion came for a hearing on February 28, 1997, during which counsel explained that they had had disputes with petitioner concerning certain evidence and theories for how to deal with that evidence and petitioner insisted that he could not work with his attorneys.  The trial court denied counsel's request to withdraw.

On March 6, 1997, counsel filed another motion to withdraw and for appointment of new counsel, explaining that they had had disputes with petitioner concerning certain evidence, that petitioner had refused to speak to them, and that the lack of communication was especially complicating their efforts to deal with the recently-revealed evidence that petitioner had allegedly made incriminating statements to a jailhouse informant.  The trial court never held a hearing and it does not appear that the trial court ever ruled on that motion.

The culpability phase of the trial commenced on March 25, 1997.  The jury began its deliberations on March 31, 1997 and was sequestered during the entirety of those deliberations. On April 1, 1997, petitioner was convicted as charged.  As the verdicts were being read, petitioner interrupted and asked to leave the proceedings.  He was taken to a room where he could view the proceedings via closed circuit television, but he subsequently overturned the television monitor.

Following the verdicts, jurors were sent home for several days prior to the commencement of the sentencing phase.  Petitioner had elected to try before the trial court, not the jury, the specification that he had previously been convicted of murder.  The trial court heard evidence, during which petitioner was intermittently absent due to his disruptive behavior, and ultimately found petitioner guilty of the specification.

The sentencing phase of the trial began on April 11, 1997. At that time, counsel for petitioner expressly stated that they wanted neither a presentence investigation report nor a psychological evaluation. Further, petitioner instructed his attorneys to present no mitigation evidence and his friends and family members not to cooperate with his attorneys. After the State proffered evidence and defense counsel explained why they would not be presenting evidence, the jury listened to opening statements, closing arguments, and the trial court's jury instructions. The jury recommended that petitioner be sentenced to death and, on April 16, 1997, the trial court accepted the jury's recommendation and sentenced petitioner to death.

Represented by new counsel, petitioner appealed as of right to the Supreme Court of Ohio. On October 20, 1999, the Ohio Supreme Court issued a decision affirming the judgment against petitioner. *State v. Cowans, supra*, 87 Ohio St. 3d 68. Chief Justice Moyer wrote a dissenting opinion in which he expressed his belief that the court should have applied to petitioner's case the rule set forth in *State v. Ashworth*, 85 Ohio St. 3d 56 (1999), requiring the trial court to determine on the record, when a capital defendant evinces a desire to waive mitigation evidence, that the defendant's waiver is knowing and voluntary, and that the defendant is competent to effect the waiver. *Cowans, supra* 87 Ohio St. 3d at 89-97 (Moyer, C.J., dissenting). The United States Supreme Court denied certiorari on May 1, 2000.

During the time that he was litigating his direct appeal, petitioner also pursued postconviction relief in the state courts. Represented by the Ohio Public Defender's Office, petitioner filed a postconviction action in the trial court, which action the trial court denied on September 21, 1998. The Ohio Court of Appeals for the Twelfth Appellate District issued a decision affirming the trial court's judgment denying the postconviction action on September 7,

1999.  The Ohio Supreme Court issued an entry on January 16, 2000 declining to accept jurisdiction over petitioner's appeal, thereby letting stand the decisions of the court of appeals and trial court below.

During the pendency of these habeas corpus proceedings, petitioner, again represented by the Ohio Public Defender's Office, filed in the Ohio Supreme Court on January 23, 2004, an Application for Delayed Reopening of his direct appeal -- the procedure in Ohio for raising claims of ineffective assistance of appellate counsel.  The Ohio Supreme Court issued an entry on August 4, 2004 denying the application without opinion.

## II. Standards for Habeas Review

The provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective prior to the filing of the instant petition, apply to this case.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Under the AEDPA, a federal court shall not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's review of claimed factual errors.

Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent "when the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent[]" or "when the

state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases."

*Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406-07 (2000)).  A state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of the Petitioner's case.

*Coyle*, 260 F.3d at 699.  A federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  *Id.*

Rather, a state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes."  *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  In this regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that a Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.

### III.  Petitioner's Claims

This case is now ripe for a final decision on the merits of those claims that are properly before the Court:  grounds:  grounds 1, 2(a), 2(b), 2(d), 2(e), 2(h), 2(i), 2(j), 2(k), 3, 4, 5, 7, 8, 9, 12, 13, and 14.  Additionally, as noted above, the Court will revisit its procedural default

determinations as to grounds 2(c), 2(f), 2(g), and 6.

> **First Ground for Relief**: **Petitioner was denied the equal protection and due process of the laws when the Ohio Supreme Court failed to afford petitioner the benefit of the rule in _State v. Ashworth_, 85 Ohio St. 3d 56, 706 N.E.2d 1231 (1999).**

In his first ground for relief, petitioner argues that his Fourteenth Amendment rights to equal protection and due process were violated when the Ohio Supreme Court failed to apply its decision in _State v. Ashworth_, 85 Ohio St. 3d 56 (1999) to petitioner's case, which was pending on direct review at the time _Ashworth_ was decided.  In _Ashworth_, the Ohio Supreme Court recognized that "[w]hile Crim.R. 11 addresses what must be done when a person charged with aggravated murder pleads guilty, there is no corollary procedure for the waiver of mitigation." _Id_. at 61.  The Ohio Supreme Court went on to state:

> We now hold that in a capital case, when a defendant wishes to waive the presentation of _all_ mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary.  The trial court must decide whether the defendant is competent and whether the defendant understands his or her rights both in the plea process and in the sentencing proceedings.  (Citations omitted).  The trial court must inform the defendant of the right to present mitigating evidence and explain what mitigating evidence is.  The court must then inquire of the defendant, and make a determination on the record, whether the defendant understands the importance of mitigating evidence, the use of such evidence to offset the aggravating circumstances, and the effect of failing to present that evidence.  After being assured that the defendant understands these concepts, the court must inquire whether the defendant desires to waive the right to present mitigating evidence, and, finally, the court must make findings of fact as to the defendant's understanding and waiver of rights.  (Citation omitted).

_Id_. at 62.

The Ohio Supreme Court also made clear that absent a request by counsel or other indicia of incompetence, "[w]e are not holding that a competency evaluation must be done in every case in which a defendant chooses to waive the presentation of mitigating evidence."  _Id_. (citing _State_

10

*v. Tyler*, 50 Ohio St. 3d 24, 29 (1990).)  The Ohio Supreme Court further held that when a defendant seeks to waive the presentation of all mitigating evidence, and his competency is brought into issue, the following standard is to be used for determining competency:

> A defendant is mentally competent to forgo the presentation of mitigating evidence in the penalty phase of a capital case if he has the mental capacity to understand the choice between life and death and to make a knowing and intelligent decision not to pursue the presentation of evidence.  The defendant must fully comprehend the ramifications of his decision, and must possess the ability to reason logically, *i.e.*, to choose the means that relate logically to his ends.

*Ashworth*, 85 Ohio St. 3d at 69.

The Ohio Supreme Court decided *Ashworth* on March 24, 1999, nearly a year after Petitioner Cowans had filed his merit brief to the Ohio Supreme Court and approximately four months after petitioner's oral argument before the Ohio Supreme Court.  The Ohio Supreme Court decided petitioner's appeal on October 20, 1999, seven months after it had decided *Ashworth*.

Petitioner's eighth proposition of law on direct appeal challenged, in part, the failure of the trial court to determine whether petitioner's waiver of the right to present mitigating evidence was knowing and voluntary.  Although petitioner had not expressly raised the issue of the applicability of *Ashworth*, the Ohio Supreme Court of its own volition took note of its holding in *Ashworth* that any waiver of the right to present mitigating evidence had to be knowing and voluntary and that the trial court was required to conduct an inquiry of the defendant on the record.  The court then proceeded to set forth what, pursuant to *Ashworth*, the record must affirmatively demonstrate when a defendant seeks to forgo the presentation of mitigating evidence.  *Cowans*, 87 Ohio St. 3d at 85.  Concluding that "the procedures used in

11

this case to advise Cowans of the potential consequences of his decision were substantially similar to those adopted in *Ashworth*[,]" the Ohio Supreme Court nevertheless conceded that "the trial court failed to address all six *Ashworth* requirements in its colloquy with Cowans." *Id.* at 86. Specifically, the Ohio Supreme Court found that the record demonstrated neither an explanation by the trial court to petitioner of what mitigating evidence was nor a finding that petitioner both fully understood the ramifications of failing to present mitigating evidence and desired to waive his rights. *Id.*

The Ohio Supreme Court concluded, however, that "[w]hile this procedure fell short of that established in *Ashworth*, we hold that our ruling in *Ashworth* is prospective only. We cannot hold the trial court accountable for not following a procedure that was not established or even foreshadowed, when the case was tried." *Id.* The court went on to explain:

> We are not holding today that substantial compliance is enough to satisfy the requirements of *Ashworth*; however, the trial court here, like the trial court in *Ashworth*, did engage the defendant in a colloquy concerning the waiver of mitigation, even though no guidelines were in place when Cowans was tried. Given the content of the trial court's colloquy, there is nothing to indicate that Cowans did not knowingly and voluntarily relinquish his right to present mitigating evidence. Since the decision in *Ashworth* is prospective only, the failure to comply with *all* of the procedural requirements set forth in *Ashworth* is not error in this case.

> To sum up: Cowans's desire to waive mitigation did not automatically require a competency hearing, nor did the record create a doubt as to his competence such as to require a competency hearing; the record indicates that Cowans's waiver was knowing and voluntary; and, although the specific procedural requirements of *State v. Ashworth* were not complied with in full, they are prospective only and hence do not apply here. Accordingly, Cowans's eighth proposition of law is overruled.

*Cowans*, 87 Ohio St. 3d at 86.

Petitioner argues herein that *Ashworth* created a bright line rule to be applied in capital

cases where the defendant seeks to waive presentation of all mitigating evidence and that the Ohio Supreme Court erred in not applying *Ashworth* to his own case, which was still pending on direct appeal. The Ohio Supreme Court's holding in his own case that *Ashworth* was to be given only prospective application and failing to apply it to criminal cases pending on direct review, petitioner argues, "violates basic norms of constitutional adjudication." (First Amended Petition, Doc. # 15, at ¶ 5.) Characterizing the Ohio Supreme Court's failure to apply *Ashworth* to his own case as "[s]elective application of new rules[,]" petitioner argues that he was denied his rights to due process and equal protection embodied in the Fourteenth Amendment. (*Id*. at ¶ 8.)

Respondent offers several arguments against granting relief on petitioner's first ground. "Initially," respondent argues, "it should be noted that this argument only involves state law, and as such, fails to state a cognizable claim in habeas corpus." (Return of Writ, Doc. # 36, at 28.)

The crux of respondent's opposition, however, is that the United States Supreme Court decision of *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), requiring new rules for the conduct of criminal prosecutions to be applied retroactively to all cases pending on direct review or not yet final, applies only to newly declared constitutional rules, not to "every state-declared *common law* rule." (Doc. # 36, at 29.) Respondent argues that because the *Ashworth* decision had nothing to do with the constitutionality of Ohio's criminal procedure, the Ohio Supreme Court was not required to apply it to petitioner's case. (Doc. # 36, at 29 (discussing *Mason v. Duckworth*, 74 F.3d 815 (7th Cir. 1996).) Respondent further argues that the principles of *Griffith v. Kentucky* do not mandate retroactive application of *Ashworth* to petitioner's case because *Ashworth* enunciated a new state-declared common law rule, rather than establishing new constitutional rule. (Doc. # 36, at 30.)

13

A related argument advanced by respondent against granting relief on petitioner's claim is that notwithstanding what the Ohio Supreme Court mandated in *Ashworth*, trial courts are not constitutionally required under applicable federal law to conduct a record colloquy with a defendant who seeks to waive his right to a jury trial. Respondent reasons from that jurisprudence that *Ashworth* simply established a state procedural rule to ensure a knowing and voluntary waiver of the right to present mitigation, which does not rise to a constitutional magnitude sufficient to require retroactive application to cases pending on direct review pursuant to *Griffith v. Kentucky*.

Respondent goes on to argue at length that, contrary to petitioner's assertions, the record demonstrates both that petitioner was competent to waive his right to present mitigating evidence and that petitioner made a knowing, intelligent, and voluntary waiver of that right. (Doc. # 36, at 31-36.) In so arguing, respondent appears to concede without equivocation that, "[t]he Eighth Amendment guarantees the right to present mitigating evidence of a sentence." (Doc. # 36, at 31 (citations omitted).) Respondent argues that petitioner failed to point to any actual indica of incompetence in the trial record that would have alerted either the trial court or his own defense attorneys to question his competency, asserting that petitioner's decision not to participate in the presentation of mitigating evidence and to instruct any potential witnesses not to cooperate do not, without more, demonstrate incompetence. (Doc. #36, at 34.) Respondent further argues that petitioner fails to provide evidence that he did not knowingly and intelligently waive his right to present mitigating evidence. Specifically, respondent asserts that it is reasonable to infer from the fact that defense counsel were prepared to go forth with a mitigation case that petitioner was informed, during that process, of what constituted mitigation evidence, and that the totality of the

14

circumstances demonstrates that petitioner understood the ramifications for waiving his right to present mitigation evidence--namely, that the jury was likely to recommend the death penalty. (Doc. # 36, at 35.)

Respondent's final argument is that "because there is no clearly established case directly on point, this court may not grant habeas relief on this claim under the 'new rule' doctrine of *Teague v. Lane*, 489 U.S. 288, 297-98 (1989)."  (Doc. # 36, at 35.)  In support, respondent cites *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999) (*per curiam*), in which the United States Supreme Court overruled a decision by the United States Court of Appeals for the Ninth Circuit holding that Eighth Amendment protections may not be waived, stating that such a holding would create and apply a new procedural rule in violation of *Teague*.  (Doc. # 36, at 36.)

In his traverse, petitioner takes issue with respondent's argument that the determination of whether the rule created in *Ashworth* should apply retroactively to cases pending on direct review turns on whether it was a "rule of constitutional procedure" or a "state-declared common law rule."  (Traverse, Doc. # 42, at 6 (quoting Return of Writ, Doc. # 36, at 30-33).)  Petitioner dismisses respondent's position, arguing that "the distinction between a constitutional right and the procedure used to prevent the violation of the right is surely a distinction without a difference."  (Doc. # 42, at 6.)  In so arguing, petitioner emphasizes that the right to present mitigating evidence is a constitutional right and that even respondent admits the same.  (*Id.*)  Petitioner reasons that any waiver of the right to present mitigating evidence must be knowing, intelligent, and voluntary, and that even assuming the Constitution does not require a *particular* procedure, it nevertheless requires *some* procedure to ensure that any waiver thereof comports with due process.  (*Id.* at 6-7.)  Petitioner goes on to argue:

15

> Prior to *Ashworth*, Ohio courts had *no procedure* to ensure a voluntary waiver of the right to present evidence in mitigation of a sentence. *Ashworth* established the *minimum* inquiry that must be present in the record in order for the courts to determine whether the waiver was knowing, intelligent and voluntary. To this extent then, the *Ashworth* rule is of "constitutional magnitude." (Emphasis in original.)

(Doc. # 42, at 7.) Petitioner argues that even if this Court were to conclude that the *Ashworth* rule is not of constitutional magnitude, this Court would still be required to determine whether petitioner's waiver of his right to present mitigating evidence comported with due process. The record, according to petitioner, does not support such a finding.

Part and parcel to any determination whether his waiver comported with due process, according to petitioner, is a determination whether he was competent to voluntarily relinquish his rights. (Doc. # 42, at 9.) In this regard, petitioner argues that he can prevail on both a claim of procedural competency, because the record established a *bona fide* doubt regarding his competence to stand trial into which the trial court failed to inquire, and a claim of substantive competency, because he "probably was not competent" to voluntarily waive his right to present mitigating evidence. (Doc. # 42, at 11.) Germane to both inquiries, according to petitioner, is the wealth of indicia in the record sufficient to alert a reasonable judge that petitioner's competency was in doubt. Citing at length facts set forth in Chief Justice Moyer's dissenting opinion, (Doc. # 42, at 12-13, 14-18), petitioner argues flatly that "[d]ue process is violated where a hearing is not held despite the presence of evidence creating doubt regarding a Defendant's competence." (Doc. # 42, at 14.) Chief Justice Moyer's dissenting opinion included observations that petitioner's disruptive behavior could have been a rationally-based, but misguided, protest against the criminal proceedings against him or the result of instability, and that petitioner's outbursts demonstrated an inability to control his behavior that also might

16

have stemmed from a mental disorder.  (Doc. #42, at 14.)  Chief Justice Moyer also emphasized incidents in the record demonstrating petitioner's "unreasonable belief, approaching paranoia," that everyone involved in the proceedings against him--from his defense attorneys and the prosecutors, to the trial court and the jury, to the female law enforcement officer who controlled the stun belt that he was compelled to wear--was working against him.  (Doc. # 42, at 14-18.) Petitioner argues that, because the trial court failed to conduct a hearing in the face of the wealth of indicia calling petitioner's mental state into question, its competency determination is not entitled to a presumption of correctness.  (Doc. # 42, at 19.)

Petitioner concludes by arguing that the record is either silent or equivocal on all of the factors identified in *Ashworth* as being critical to the determination of competency and voluntariness and that this Court may not presume a knowing, intelligent, and voluntary waiver based on such a record.  (Doc. # 42, at 20-22.)  Specifically, petitioner insists (1) that the trial court engaged not in a colloquy with petitioner, but in an argument in seeking to control petitioner's behavior; (2) that petitioner was never advised on the record about this right to present mitigating evidence; (3) that the trial court never explained to petitioner what mitigating evidence was; (4) that the trial court never inquired into petitioner's understanding of mitigating evidence, of its role in offsetting aggravating circumstances, or of the effect of failing to present it; and (5) that the trial court never made findings of fact that petitioner understood and waived his rights.  (Doc. # 42, at 21-22.)

In a reply to petitioner's traverse, respondent not only reiterates her initial arguments against granting relief on petitioner's first ground, but also assails as "somewhat misguided" petitioner's "continued reliance" on Chief Justice Moyer's dissent in support of his claim that his

waiver was invalid.  (Doc. # 43, at 4.)  Respondent asserts that the record reviewed in its entirety, as opposed to the several, isolated outbursts by petitioner that Chief Justice Moyer discussed at length in his dissent, fails to support petitioner's assertion that his waiver was not knowing, intelligent, and voluntary.  Specifically, respondent asserts that it is fair to presume that, through defense counsel's process of preparing witnesses for mitigation, petitioner was informed about the nature and content of mitigating evidence.  Respondent further asserts that the trial court clearly informed petitioner that his refusal to present any mitigating evidence would almost surely result in the jury imposing a death sentence.  Thus, according to respondent, petitioner has not established that he was unaware of the consequences of waiving the presentation of mitigating evidence.

In determining whether the Ohio Supreme Court's decision denying petitioner's claim on direct appeal that he did not competently execute a knowing, intelligent, and voluntary waiver of his right to present mitigating evidence, this Court must address the following issues:  (1) whether the Ohio Supreme Court erred in failing to apply its *Ashworth* decision to petitioner's case and, if so, whether the error warrants habeas corpus relief; (2) whether petitioner's waiver of his right to present mitigating evidence comported with Due Process; and (3) whether petitioner was competent to execute a valid waiver of his right to present mitigating evidence.

### A.    The Ohio Supreme Court's Failure to Apply *Ashworth*

The initial query before the Court is whether the Ohio Supreme Court was obligated to apply *Ashworth* retroactively to petitioner's case, which was pending on direct appeal at the time the Ohio Supreme Court decided *Ashworth*.  In *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), the United States Supreme Court held that "a new rule for the conduct of criminal prosecutions is

to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." Ohio law on retroactivity appears to fall in line with *Griffith*. *See, e.g., State v. Reynolds*, 79 Ohio St. 3d 158, 162 (1997) (declining, in the interest of finality, to apply new decision retroactively to case on collateral review); *State v. Hill*, 160 Ohio App. 3d 324, 334 (Ohio App. 8 Dist. 2005) (applying *Crawford* Confrontation Clause case to state criminal case pending on direct appeal at the time *Crawford* was announced); *State v. Jenkins*, 42 Ohio App. 3d 97, 101 (Ohio App. 8 Dist. 1987) (following *Griffith* in declining to apply new decision to state case on collateral review).

*Griffith* itself did not define what constitutes a "new rule for the conduct of criminal prosecutions" sufficient to require retroactive application. But it left some clues. For one thing, the Supreme Court began its discussion by setting forth the history of its retroactivity jurisprudence as to "*constitutional* rules of criminal procedure." *Griffith*, 479 U.S. at 320 (emphasis added). Further, the Supreme Court held in *Griffith* that its decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), which required a prosecutor to articulate a neutral, fact-based justification for use of a peremptory challenge during *voir dire* which limited or eliminated a racial group, was to be applied retroactively to all cases pending on direct review or not yet final. Accordingly, many courts, state and federal, have concluded that *Griffith*'s holding applies only to new *constitutional* rules for the conduct of criminal prosecutions, and not to rules involving or based upon state law or procedural rules distinct from or broader than the underlying constitutional rights they were designed to protect. In answering the question before it--namely, whether the Ohio Supreme Court violated Petitioner Cowans's rights to Due Process and Equal

19

Protection when it failed to apply its *Ashworth* decision to his case--the Court finds it helpful to examine a number of those decisions.

When the Ohio Supreme Court declined to apply its *Ashworth* decision to petitioner's case on direct appeal, it did not cite any retroactivity cases or discuss any retroactivity principles. Rather, it stated that, "[w]e cannot hold the trial court accountable for not following a procedure that was not established, or even foreshadowed, when the case was tried." *Cowans*, 87 Ohio St. 3d at 86. Most of the state court decisions that this Court has reviewed, in which the state courts addressed the issue squarely, concluded that *Griffith v. Kentucky* does not govern a state court's retroactivity analysis as to state supreme court decisions announcing new rules not based on the federal constitution.

At issue in *Taylor v. State*, 10 S.W.3d 673 (Tex. Crim. App. 2000), was whether the abolition of the juvenile exception to the accomplice witness rule, announced in the decision of *Blake v. State*, 971 S.W.2d 451 (Tex. Crim. App. 1998), should apply retroactively to cases not yet final on direct review. Texas's highest court answered that query in the negative, explaining:

> The Supreme Court's retroactivity analysis for federal constitutional errors is binding upon the states when federal constitutional errors are involved. (Citation omitted). Conversely, *Griffith* and *Teague* do not bind the states on the retroactivity of new rules under state laws.

*Taylor*, 10 S.W.2d at 679.

*People v. Sexton*, 458 Mich. 43, 580 N.W.2d 404 (1998), involved three cases consolidated to address the issue of whether to apply retroactively to cases on direct review the Michigan Supreme Court's *People v. Bender*, 452 Mich. 594, 551 N.W.2d 71 (1996), decision requiring police to inform a suspect when retained counsel is available for consultation. The *Bender* decision itself stated that the rule was not required by the state constitution and

20

announced that, just as the Supreme Court of the United States had done in *Miranda v. Arizona*, it was creating a prophylactic rule.  In ultimately deciding to use a three-part analysis, rather than *Griffith*, for determining whether to give its *Bender* decision retroactive effect to cases pending on direct review, the Michigan Supreme Court concluded, "*Griffith* is not applicable to the cases at bar because it applies only to rules of criminal procedure that are grounded on the United States Constitution."  *Sexton*, 452 Mich. at 54, 580 N.W.2d at 410.

In *Cooper v. State*, 889 P.2d 293 (Okl. Cr. 1996), *rev'd on other grounds*, 517 U.S. 348 (1996), the defendant challenged the fact that the trial court had given a standard instruction on inferences able to be drawn from a defendant's flight.  In so challenging, the defendant sought the benefit of retroactive application to his case the *Mitchell v. State*, 876 P.2d 682 (Okl. Cr. 1994), decision, in which Oklahoma's high court had decided that such instructions were improper where the defendant had not explained his departure.  The court rejected the defendant's reliance on *Griffith v. Kentucky*, stating:

> *Griffith* and the retroactivity principle is indeed applicable in all questions concerning federal questions.  However, the Supreme Court has never held we must apply the same standard to holdings by this Court dealing with issues of state law."

*Cooper*, 889 P.2d at 308.

In *Farbotnik v. State*, 850 P.2d 594 (Wyo. 1993), the defendant sought retroactive application to his case on direct review of the Wyoming Supreme Court's *Bearpaw v. State*, 803 P.2d 70 (1990), decision announcing the requirements for a complete record necessary for direct appeal.  The Wyoming Supreme Court framed the issue before it as follows:

> The effective debate is whether *Bearpaw* articulates a constitutional right with respect to a complete record in a criminal case or whether, on the other hand, *Bearpaw* represents the exercise of this court's supervisory power.  Retrospective

21

> application normally would be associated with a constitutional proposition, but a prospective application is generally indicated for rules arising out of the court's supervisory power except for those rules that are intended to substantially improve the fact finding at trial.

*Farbotnik*, 850 P.2d at 597.  After concluding that the defendant's record complied with federal due process mandates and rejecting the defendant's attempt to inject constitutional principles into its *Bearpaw* decision, the court elected to follow the three-part analysis set forth in *Stovall v. Denno*, 388 U.S. 293 (1967), for determining whether to give *Bearpaw* retroactive effect to cases pending on direct appeal.  In using that analysis, rather than *Griffith*, the court explained:

> The application of *Griffith* is limited, however, to new rules of criminal procedure that "(1) are binding on the federal courts pursuant to the Supreme Court's supervisory powers in the federal system, or (2) are binding on state and federal courts as a matter of federal constitutional law."  *People v. Carrera*, 49 Cal.3d 291, 261 Cal.Rprt. 348, 369-70, 777 P.2d 121, 142 (1989); *People v. Murtishaw*, 48 Cal.3d 1001, 258 Cal.Rptr. 821, 773 P.2d 172 (Cal. 1989).  If neither of those conditions pertains, a state court is free to define the limits of prospective or retroactive application of any precedent because the constitution of the United States is silent on that issue.  (Citations omitted).

*Farbotnik*, 850 F.2d at 602.

The issue before New York's highest court in *People v. Mitchell*, 80 N.Y.2d 519 (1992), was whether to apply to the defendant's case on direct appeal its *People v. Antommarchi*, 80 N.Y.2d 247 (1992), decision, decided the same day, concerning the right of a defendant to be present for certain voir dire questioning.  The court concluded that *Griffith* was not controlling because, "[i]f no Federal constitutional principles are involved, however, the question of retroactivity is one of State law."  *Mitchell*, 80 N.Y.2d at 526.  The court went on to conclude that it had decided *Antommarchi* as a matter of state law because the basis of the decision was found in New York's criminal procedural law.  In so concluding, the court explained: "[a]lthough the statute has underlying due process concerns, its protective scope is broader than

22

the constitutional rights it encompasses." *Id*. (citations omitted).

In *State v. Royer*, 436 N.W.2d 637 (Iowa 1989), the defendant urged the Iowa Supreme Court to apply retroactively to his case on direct appeal its *State v. Jeffries*, 430 N.W.2d 728 (Iowa 1988) decision regarding the standard trial courts were to follow when deciding whether to give a lesser included offenses instruction. The state urged the court to use a three-part analysis for determining whether *Jeffries* should be applied. The Iowa Supreme Court applied *Jeffries* to the defendant's case, but not because it felt obligated by *Griffith v. Kentucky* to do so, explaining: "Although we are not required to follow the *Griffith* case because lesser-included offenses do not infringe on a constitutional right, the reasoning adopted therein is applicable to this situation." *Royer*, 436 N.W.2d at 640 n.2.

The question before the California Supreme Court in *People v. Carrera*, 49 Cal.3d 291 (1989), was whether to apply retroactively to the defendant's case on direct appeal its *De Lancie v. Superior Court*, 31 Cal.3d 865 (1982), decision recognizing a statutory right of privacy for pretrial detainees. The California Supreme Court had held in *Donaldson v. Superior Court*, 35 Cal.3d 24 (1985), that its *De Lancie* decision was inapplicable to antecedent conduct, but that was before the United States Supreme Court issued its *Griffith v. Kentucky* decision. Looking at the issue in light of *Griffith*, the California Supreme Court concluded:

> We are not compelled to follow *Griffith*, as it specifies only the rule of retroactivity that the Supreme Court has decreed for those new rules of criminal procedure it announces that (1) are binding on the federal courts pursuant to the Supreme Court's supervisory powers in the federal system, or (2) are binding on state and federal courts as a matter of federal constitutional law. That is, nothing in *Griffith* purports to establish a new rule of retroactivity for rules of criminal procedure founded on state constitutional or statutory law. (Citation omitted).

*Carrera*, 49 Cal.3d at 326-27.

23

In *Commonwealth v. Waters*, 400 Mass. 1006, 511 N.E.2d 356 (1987), the Massachusetts Supreme Court considered whether *Griffith v. Kentucky* required it to apply to the defendant's case its *Commonwealth v. Allen*,, 395 Mass. 448, 480 N.E.2d 630 (1985), decision requiring a judicial determination of the voluntariness of a defendant's statements whenever the issue is raised. The court declined, explaining as follows:

> From our reading of *Griffith*, we conclude that this holding is ancillary to the constitutional rule of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and is not based on equal protection or due process grounds. Accordingly, *Griffith* does not require this court to give retroactive application to rules that are not based on the Federal Constitution.

*Waters*, 400 Mass. at 1007, 511 N.E.2d at 357.

In *Farthing v. Commonwealth*, No. 2002-CA-002283-MR, 2004 WL 758337 (Ky. App. Apr. 9, 2004), the Kentucky Court of Appeals declined to apply retroactively a Kentucky Supreme Court decision, *Kotila v. Commonwealth*, 114 S.W.3d 226 (Ky. 2003), interpreting a Kentucky statute setting forth the essential elements for a conviction for complicity to manufacture methamphetamine. Although the appellate court appeared to base its decision primarily on the defendant's failure to preserve his insufficiency-of-the-evidence claim for appeal, stating, "[a] new decision should not be applied retroactively unless the issue was properly preserved for appellate review," 2004 WL 758337 at * 7, the appellate court also rejected the defendant's *Griffith v. Kentucky* argument, stating, "Farthing's reliance on *Griffith* is misplaced, however, as *Griffith* applies only to rules of criminal procedure that are grounded on the United States Constitution." *Id.* at n.45 (citations omitted).

By way of contrast, in *Smith v. State*, 598 So.2d 1063 (Fla. 1992), the Florida Supreme Court appeared not to distinguish between constitutional and non-constitutional rules in

24

determining that *Griffith v. Kentucky* required retroactive application of any new rules of criminal procedure to cases not yet final on direct review.  At issue was whether to give retroactive effect to the Florida Supreme Court's *Pope v. State*, 561 So.2d 554 (Fla. 1990), decision, in which that court held that when an appellate court reverses a departure sentence because of the absence of written reasons for the departure, the court must remand the case for resentencing with no possibility of departure from the guidelines.  The Florida Supreme Court decided to apply *Pope* to the defendant's case, explaining:

> Thus, we hold that any decision of this Court announcing a new rule of law, or merely applying an established rule of law to a new or different factual situation, must be given retrospective application by the courts of this state in every case pending on direct review of not yet final.

*Smith*, 598 So.2d at 1066.  In so holding, the Florida Supreme Court qualified that the claim at issue had to have been preserved for appellate review.

In *Murtishaw v. Woodford*, 255 F.3d 926 (9th Cir. 2001), the petitioner argued that he was entitled to habeas corpus relief based on the failure of the California Supreme Court to apply to his case on direct appeal its *People v. Flannel*, 25 Cal.3d 668 (1979), decision.  In *Flannel*, the California Supreme Court held that an honest though unreasonable belief of the need for self-defense is sufficient to negate the existence of malice and that the trial court must instruct the jury as much when the evidence warrants it.  The California Supreme Court had declined to apply *Flannel* to Murtishaw's case, holding that *Griffith* applied only to rules based on the federal Constitution or upon the federal supervisory power, and that "[w]e need not extend this analysis to rules of criminal procedure derived solely from state law."  *People v. Murtishaw*, 48 Cal.3d 1001, 1013 (1989).  The Court of Appeals for the Ninth Circuit agreed with the California Supreme Court's analysis, explaining:

> *Griffith* requires retroactive application only of "new constitutional rules of criminal procedure," *Griffith*, 479 U.S. at 322, 107 S.Ct. 708.  It does not require retroactive application of every new state-declared common law.  Murtishaw argues that *Flannel* was implicitly based on constitutional principles because it contained overtones of due process.  The *Flannel* court, however did not cite to the federal or state Constitution in reaching its decision that trial courts must give *sua sponte* instructions of the unreasonable self-defense theory.  (Citation omitted).  Furthermore, in *Murtishaw II*, the California Supreme Court expressly held that the *Flannel* rule was based on state common law, not on the Federal Constitution.  (Citation omitted).  Murtishaw cannot cite to any authority indicating that the federal constitution requires a *sua sponte* instruction on the imperfect self-defense theory.

*Murtishaw v. Woodford*, 255 F.3d at 956.

United States ex rel. Franklin v. Gilmore*, 993 F. Supp. 1162 (N.D. Ill. 1998), involved a habeas corpus action challenging the failure of the Illinois Supreme Court to apply retroactively to petitioner's case on direct appeal a new Illinois Supreme Court decision, *People v. Gacho*, 122 Ill. 2d 221 (1988), requiring the trial court to instruct the jury in any case where the defendant was convicted of two or more murders that a natural life sentence was mandatory if the jury did not impose the death penalty.  Citing *Griffith v. Kentucky*, the petitioner argued that the state courts had erred in not applying its *Gacho* decision to his case in violation of his rights under the Fourteenth Amendment.  The District Court for the Northern District of Illinois rejected the petitioner's argument because *Griffith* was limited in its scope "to new rules of federal constitutional magnitude."  *United States ex rel. Franklin*, 993 F. Supp. at 1178 (citation omitted).  Noting that another Illinois Supreme Court decision had construed the right to a natural life instruction as a statutory right rather than a constitutional right, the district court explained that, "[s]tate courts are entitled to refuse to apply new state court decisions retroactively, and the Supreme Court has 'reemphasize[d] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" *Id*. (quoting

26

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

 *Mason v. Duckworth*, 74 F.3d 815 (7th Cir. 1996), involved a habeas corpus action in which the petitioner had challenged his conviction based on the failure of Indiana's highest court to apply to his case on direct appeal its *Modesitt v. State*, 578 N.E.2d 649 (Ind. 1991), decision. *Modesitt* overruled a previous decision and adopted Fed. R. Evid. 801(d)(1)(A), which added a requirement for admissibility of certain out-of-court statements. *Modesitt* expressly stated that it was to be applied only prospectively. The Court of Appeals for the Seventh Circuit rejected the petitioner's argument, based on *Griffith v. Kentucky*, that *Modesitt* should have been applied retroactively to his case on direct appeal, explaining, "[a]s Judge McKinney in the district court noted, however, there is an 'explicit caveat' to the holding: *Griffith* only applies to new rules of federal constitutional magnitude." *Mason*, 74 F.3d at 818. Determining that *Modesitt*'s overruling of the previous controlling decision had nothing to do with the constitutionality of that decision and everything about curbing abuse and harmonizing Indiana's evidentiary rules with those of other jurisdictions, the Seventh Circuit concluded that, "[t]his change in the rules of evidence is simply not one of constitutional proportions, and for that reason *Griffith* does not apply." *Id*. at 819.

 In *Lackey v. Scott*, 28 F.3d 486 (5th Cir. 1994), the habeas corpus petitioner argued that the state's highest court had violated his constitutional rights by failing to apply retroactively to his case on direct appeal a new state decision, *State v. Geesa*, 820 S.W. 2d 154 (Tex. Crim. App. 1991), requiring a definition of the term "reasonable doubt" in jury instructions in criminal trials. The Texas Court of Criminal Appeals also ruled in *Geesa* that the decision would apply only prospectively. The petitioner argued that *Geesa* was based on federal constitutional law and that,

accordingly, *Griffith v. Kentucky* required that it be given retroactive application to cases not yet final on direct appeal.  The Fifth Circuit rejected the petitioner's argument, holding that, "[c]ontrary to Lackey's assertions, the rule announced in *Geesa* was not required by the federal constitution or law.  (Citations omitted).  Thus, the federal retroactive principles discussed in *Griffith* have no bearing on the state's application of its new rule.  (Citation omitted)." *Lackey*, 28 F.3d at 491.  The Fifth Circuit also rejected the petitioner's argument that the failure to give *Geesa* retroactive application under *Griffith* principles violated his Equal Protection rights, reasoning that the petitioner had failed to attempt to demonstrate that the state had no rational basis for giving *Geesa* only prospective effect.

In *Diggs v. Owens*, 833 F.2d 439 (3rd Cir. 1987), the petitioner argued that he was entitled to habeas corpus relief because he had been tried for first degree murder and kidnapping in Pennsylvania in violation of several articles of the Interstate Agreement on Detainers Act (IADA).  The petitioner's claim was largely based on *United States v. Mauro*, 436 U.S. 340, 349 (1978), wherein the Supreme Court held, with qualifications, that a writ of habeas corpus *ad prosequendum* was not a detainer for purposes of the IADA.  However, the Third Circuit had held in *United States v. Williams*, 615 F.2d 585, 592-93 (3rd Cir. 1980), that *Mauro* was not to be applied retroactively.  The petitioner argued that *Griffith v. Kentucky* required that *Mauro* be applied retroactively to his case.  The Third Circuit rejected his argument, explaining:

> *Griffith*, however, was concerned with the retroactive application of the constraints on a prosecutor in jury selection established in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986), and thus dealt with constitutionally mandated procedures.  * * * Accordingly, we hold that *Griffith* should be confined to constitutional rules of criminal procedure and thus does not require retroactive application of new procedural decisions not constitutionally grounded.

> There is no reason to apply the *Griffith* constitutional retroactivity holding

28

> here as the IADA is "nothing more that a set of procedural rules" and remains
> distinct from the rights it was fashioned to serve.

*Diggs*, 833 F.3d at 442 (quoting *United States v. Palmer*, 574 F.2d 164, 167 (3rd Cir. 1978)).

The weight of authority persuades this Court that the Ohio Supreme Court was required to apply its *Ashworth* decision to Petitioner Cowans's case on direct appeal *only* if it can be said that the *Ashworth* decision was constitutionally mandated. The parties appear to agree. Respondent argues that the *Ashworth* rule announced by the Ohio Supreme Court is merely a state-declared common law rule that does not deserve or require retroactive application under *Griffith*. Petitioner, on the other hand, argues that the *Ashworth* rule is of constitutional magnitude because it establishes procedures to ensure that any waiver by a capital defendant of the fundamental right to present mitigation evidence is entered knowingly, intelligently, and voluntarily.

The Court begins its analysis by examining what the *Ashworth* court itself stated about the rule it was creating, and, more specifically, whether the *Ashworth* court regarded the rule as a constitutionally mandated rule or something less. Noting that it had never addressed a situation in which a defendant convicted of death-eligible aggravated murder sought to waive the presentation of all mitigation evidence, the *Ashworth* court began its analysis referencing only state criminal law: "While Crim. R. 11 addresses what must be done when a person charged with aggravated murder pleads guilty, there is no corollary procedure for the waiver of mitigation." *Ashworth*, 85 Ohio St. 3d at 61. In prefacing the rule it was about to create, the court neither cited the federal or state constitution, nor discussed constitutional principles: "In this case the procedures followed by the trial court ensured that Ashworth made a knowing and voluntary waiver of his presentation of mitigating evidence. These procedures provide a foundation for

29

guidelines to assist trial courts in dealing with a situation such as the one presented here." *Id*. at

62.  The absence of any reference to the constitution or constitutional principles infers that

*Griffith v. Kentucky* does not require that retroactive effect be given to the rule for cases pending

on direct review.  *See Murtishaw v. Woodford, supra*, 255 F.3d at 956 (noting that the decision

creating the new rule at issue failed to discuss or cite the federal or state constitution and that the

petitioner could not cite to any authority indicating that the federal constitution required a *sua*

*sponte* instruction on the imperfect self-defense theory).

Requirements of an on-the-record determination that a waiver is knowing and voluntary

historically are reserved for waivers of fundamental constitutional rights.  The *Ashworth* court

did not shy away from that terminology: "We now hold that in a capital case, when a defendant

wishes to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry

of the defendant on the record to determine whether the waiver is knowing and voluntary."

*Ashworth*, 85 Ohio St. 3d at 62.

That said, the United States Supreme Court recently used language suggesting that the

right to present mitigating evidence is not so fundamental as to require any waiver thereof to be

knowing, intelligent, and voluntary.  In *Schriro v. Landrigan*, 127 S.Ct. 1933 (2007), the

Supreme Court held that the district court did not abuse its discretion in refusing to hold an

evidentiary hearing on the petitioner's claim of ineffective assistance of counsel stemming from

counsel's failure to investigate and present mitigating evidence because the petitioner had

interfered with counsel's investigation and presentation.  Regarding the Ninth Circuit's

determination that the record did not indicate that the petitioner's decision not to present

mitigating evidence was "informed and knowing," the Supreme Court remarked, "We have never

imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." *Landrigan*, 127 S.Ct. at 1942 (citing *Iowa v. Tovar*, 541 U.S. 77, 88 (2004)).  The Supreme Court later stated, "we have never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." *Id*. at 1943.

This Court is aware of at least two district courts that have relied upon that remark to deny relief on a claim that the petitioner's waiver of mitigation evidence was not knowing and voluntary.  Before the district court in *Van Adams v. Schriro*, No. CV-04-1359-PHX-MHM, 2007 WL 1539326 (D. Ariz. May 22, 2007) was a motion for reconsideration of, among other things, that court's decision denying as procedurally barred the petitioner's second claim for relief, in which the petitioner had argued that his waiver of the presentation of mitigation evidence was not knowing or voluntary because his counsel had not performed an adequate investigation and because the trial court had not engaged the petitioner in an adequate waiver colloquy.  The district court not only adhered to its determination that the claim was procedurally barred, but also remarked that the claim was without merit, explaining:

> In addition, based upon the Supreme Court's statement in *Landrigan* that "[w]e have never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence," 2007 WL 1387923 at * 9, it is clear that Claim 2 is without merit.  Because there is no Supreme Court precedent requiring a knowing and informed waiver of mitigation evidence, Petitioner's assertion in Claim 2 that his waiver was uninformed and involuntary cannot provide a basis for relief.

*Van Adams*, 2007 WL 1539326 at * 2.

In *Lambert v. Beard*, Civil Action No. 02-9034, 2007 WL 2173390 (E.D. Pa. Jul. 24, 2007), the district court squarely based its rejection of the petitioner's claim that his waiver of the right to present mitigation evidence was not knowing, intelligent, and voluntary on the

31

Supreme Court's *Landrigan* decision.  Rejecting the petitioner's argument that the trial court's

colloquy regarding his waiver consisted only of superficial questions followed by monosyllabic

responses, the district court explained:

> Recently, in *Schriro v. Landrigan*, --- U.S. ---, 127 S.Ct. 1933, 167
> L.Ed.2d 836 (2007), the Supreme Court observed that it has never "imposed an
> 'informed and knowing' requirement upon a defendant's decision not to introduce
> [mitigating] evidence" or "required a specific colloquy to ensure that a defendant
> knowingly and intelligently refused to present mitigating evidence."  *Id*. at 1942-
> 43.  In light of *Landrigan*, Petitioner's claim fails under AEDPA, which permits a
> federal court to grant habeas relief only if the state courts unreasonably applied
> "clearly established Federal law, as *determined by the Supreme Court of the
> United States*."  28 U.S.C. § 2254(d)(1) (emphasis added).

*Lambert v. Beard*, 2007 WL 2173390, at * 49.

This Court takes from the Supreme Court's remark in *Landrigan* and the results in *Van*

*Adams* and *Lambert*, as well as from the numerous state and federal decisions declining to apply

retroactively new state court decisions to cases pending on direct appeal, that the Ohio Supreme

Court's *Ashworth* decision establishing the procedure for trial courts to follow when faced with a

death-eligible defendant who seeks to waive the presentation of all mitigation evidence did not

emanate from the federal Constitution sufficient to have required its retroactive application to

Petitioner Cowans's case on direct appeal pursuant to *Griffith v. Kentucky*.  The Ohio Supreme

Court in *Ashworth* announced the procedure as a corollary to Ohio R. Crim. P. 11(c)(3)

governing the acceptance of a guilty plea to a capital offense and did not cite the state or federal

constitution or discuss constitutional principles in announcing the procedure.  The Court agrees

with petitioner that there are due process and equal protection undertones to the *Ashworth* rule,

but that is true of virtually any rule of criminal procedure and, without more, seems insufficient

to require retroactive application under *Griffith v. Kentucky.  See, e.g., People v. Mitchell, supra,*

80 N.Y.2d at 526 (rejecting defendant's argument for retroactive application of a decision interpreting a statute concerning the right to be present during voir dire questioning because "[a]lthough the statute has underlying due process concerns, its protective scope is broader than the constitutional rights in encompasses"); *Murtishaw v. Woodford, supra*, 255 F.3d at 956 (rejecting argument seeking retroactive application of state decision containing "overtones of due process"); *Diggs v. Owens*, 833 F.2d at 442 (stating that procedural rules set forth in Interstate Agreement on Detainers Act were distinct from the rights the IADA was designed to protect) ; *but see United States v. Lopez-Pena, supra*, 912 F.2d at 1545 ("We cannot think, however, that criminal defendants whose cases are still pending on direct review should be any less entitled to claim the protection of important substantive statutes than of rights found in the Constitution").

For the foregoing reasons, the Court cannot find that the Ohio Supreme Court's failure to apply its *Ashworth* decision to Petitioner Cowans's case unreasonably applied or contravened clearly established Supreme Court precedent.  *See, e.g. Guzman v. Greene*, 425 F. Supp. 2d 298, 317 (E.D.N.Y. 2006) ("Since there is no Supreme Court holding addressing the issue of whether the states must retroactively apply a new criminal rule of state law, it cannot be concluded under AEDPA that the Appellate Division's rejection of Guzman's insufficiency of the evidence claim was contrary to clearly established Supreme Court precedent." (citation omitted)).  But the inquiry, in determining whether the Ohio Supreme Court's decision denying petitioner's claim that he did not competently execute a knowing, intelligent, and voluntary waiver of the right to present mitigating evidence, does not end here.

**B.    The Validity of Petitioner's Waiver of Mitigation**

As noted above, the Ohio Supreme Court also concluded on direct appeal that petitioner's waiver of the right to present mitigation evidence was knowing, intelligent, and voluntary. *Cowans*, 87 Ohio St. 3d at 85-86.  The Ohio Supreme Court found that the record established that the trial court had engaged in communications with petitioner over a two-day period, during which the trial court apprised petitioner of his right to present testimony and make a statement and that his attorneys had prepared to present witnesses, inquired of petitioner why he did not wish to present any mitigation, and explained to petitioner that if he presented no mitigation the jury would likely recommend death.  The Ohio Supreme Court then concluded, "[g]iven the content of the trial court's colloquy, there is nothing to indicate that Cowans did not knowingly and voluntarily relinquish his right to present mitigating evidence.  *Cowans*, 87 Ohio St. 3d at 86.  For the reasons that follow, the Court is not persuaded that the Ohio Supreme Court's conclusion contravened or unreasonably applied clearly established federal law, or involved an unreasonable determination of the facts.  Thus, in addition to concluding that there was no constitutional error in the failure of the Ohio Supreme Court to apply its *Ashworth* decision to petitioner's case on direct appeal, the Court further concludes that the record is sufficient to demonstrate that petitioner's waiver of the right to present mitigating evidence--whatever the scope and constitutional magnitude of that right--was knowing, intelligent, and voluntary and that petitioner was competent to waive the right.

The Court notes initially, however, that case law is less than certain whether a waiver of the right to present mitigation evidence is subject to the heightened waiver standard set forth in *Johnson v. Zerbst*, 304 U.S. 458 (1938).  In *Singleton v. Lockhart*, 962 F.2d 1315 (8th Cir. 1992), the Eighth Circuit appeared to apply the heightened *Zerbst* standard to the petitioner's waiver of

34

the presentation of mitigating evidence. The petitioner in *Singleton* challenged, among other things, the failure of his counsel to present mitigating evidence, though the petitioner had instructed him not to, as well as the district court's determination that the petitioner's waiver of the presentation of mitigation evidence had been knowing, intelligent, and voluntary. The petitioner's counsel provided extensive testimony during an evidentiary hearing concerning the circumstances surrounding the petitioner's decision not to present mitigation evidence. Citing cases that recognized a defendant's right to make a competent waiver of the right to pursue further appellate relief from a death sentence, the Eighth Circuit concluded, "If a defendant may be found competent to waive the right of appellate review of a death sentence, we see no reason why a defendant may not also be found competent to waive the right to present mitigating evidence that might forestall the imposition of such a sentence in the first instance." *Singleton*, 962 F.2d at 1322. Concluding mostly from trial counsel's habeas testimony that petitioner had been fully and completely advised of his right to present mitigation evidence before making a knowing and intelligent decision not to, the Eighth Circuit went on to find that "there is no question but that Singleton was not laboring under any mental disability that would call into question his competence to knowingly and intelligently waive his right to present mitigating evidence." *Id*; *see also Snell v. Lockhart*, 14 F.3d 1289 (8th Cir. 1994) (rejecting the petitioner's challenge of the district court's determination that he had made a knowing and intelligent waiver of the presentation of mitigating evidence).

The Tenth Circuit took a different view in *Brecheen v. Reynolds*, 41 F.3d 1343 (10th Cir. 1994). Addressing the petitioner's claim of ineffective assistance of counsel for failing to introduce certain mitigating evidence that petitioner had instructed his counsel not to present, the

Tenth Circuit stated:

> In short, the question as to the propriety of introducing additional mitigating evidence in this case is not a fundamental right subject to the *Zerbst* waiver standard, but rather, fits squarely into the category of rights that are nonfundamental and that are not reviewed for compliance with the heightened waiver standard.

*Id*. at 1368.  *See also Wallace v. Ward*, 191 F.3d 1235, 1247 (10th Cir. 1999) ("Although the decision to introduce mitigating evidence is a nonfundamental right which is waivable by the defense attorney on the defendant's behalf, petitioner here actually waived investigation and presentation of mitigating evidence himself after conferring with counsel.")

The Ohio Supreme Court took a similar view in *State v. Keith*, 79 Ohio St. 3d 514 (1997). There, the defendant sought to contest his waiver at trial of the presentation of mitigating evidence.  (A psychological report and presentence investigation report were submitted.)  He also argued that the trial court committed grave error when it failed to inquire whether he knowingly, intelligently, and voluntarily waived the presentation of mitigating evidence, likening the right to other fundamental rights that must be waived by the defendant personally. The Ohio Supreme Court disagreed, holding, "[w]e, too, find that the ultimate decision to introduce additional mitigating evidence is not a fundamental right which needs to be personally waived by the defendant."  *Id*. at 530.  *Cf. State v. Woods*, 143 Wash. 2d 561, 609-610, 23 P.3d 1046, 1073-74 (Wash. 2001) (holding that trial court need not conduct colloquy to determine, and may assume from defendant's conduct, that waiver of right to present mitigating evidence is knowing, intelligent, and voluntary).  As noted above, the United States Supreme Court recently remarked, regarding a defendant's waiver of the presentation of mitigation evidence, "We have never imposed an 'informed and knowing' requirement upon a defendant's decision not to

introduce evidence." *Schriro v. Landrigan, supra*, 127 S.Ct. at 1942 (citing *Iowa v. Tovar*, 541 U.S. 77, 88 (2004)).

This Court need not resolve the issue of whether the right to present mitigating evidence is a fundamental constitutional right because this Court is of the view that the record demonstrates a knowing, intelligent, and voluntary waiver on petitioner's part of his right to present mitigating evidence. It is well established that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970); *see also Colorado v. Spring*, 479 U.S. 564, 573 (1987); *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In *Moran v. Burbine*, the Supreme Court clarified that:

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran*, 475 U.S. at 421. The determination of whether a waiver was knowing, intelligent, and voluntary is to be made by assessing the totality of the circumstances. *Id.*; *see also Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004).

To be voluntary, a waiver must be the product of the defendant's free will, without indicia of untoward government coercion, overreaching, or deception. To be clear, therefore, free will overborne by an impairment of the defendant's mental state, without the presence of government coercion or overreaching, is insufficient to establish that his waiver was not "voluntary." *See, e.g., Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986). To determine

whether a waiver was knowing and intelligent, the Court must take into account the particular

facts and circumstances surrounding the waiver, including the defendant's background,

experience, conduct, age, and capacity to understand the rights he seeks to waive. *Fare v.*

*Michael C.*, 442 U.S. 707, 725 (1979); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Machacek*

*v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000). It is not necessary that the defendant know and

understand every conceivable consequence of his waiver. *Colorado v. Spring*, 479 U.S. 564, 574

(1987); *Oregon v. Elstad*, 470 U.S. 298, 316-17 (1985). I need only be clear from the record

that the defendant possesses an awareness of the nature of the right and the consequences of his

decision to abandon it. *Moran, supra*, 475 U.S. at 421.

In the context of waivers of the right to present mitigating evidence, those courts that

have applied the *Zerbst* standard in determining the validity of the waiver typically require a

showing that the defendant was advised of the nature, role, and importance of mitigation

evidence, of his right to present such evidence, and of the consequences of his failure to present

such evidence. *See, e.g., Hawkins v. Mullin*, 291 F.3d 658, 682 (10th Cir. 2002) (Lucero, J.,

concurring); *Thomas v. Beard*, 388 F. Supp. 2d 489, 513-14 (E.D. Pa. 2005); *Shafer v. Bowersox*,

168 F. Supp. 2d 1055, 1087 (E.D. Mo. 2001). Some courts have also placed an emphasis, in

determining the validity of a waiver of mitigation, on whether or to what extent defense counsel

investigated potential mitigating evidence and advised the defendant accordingly. *Hawkins,*

*supra*, 291 F.3d at 682; *Thomas, supra*, 388 F. Supp. 2d at 513-14; *cf. Coleman v. Mitchell,*

*supra*, 268 F.3d at 449-50. Most courts that have addressed this issue have indicated that a

knowing, intelligent, and voluntary waiver of the right to present mitigating evidence may be

found from a variety or combination of factors, such as the conduct, experience, and education of

the accused *on* the record and representations by defense counsel of what took place *off* the record. *See, e.g., Snell v. Lockhart*, 14 F.3d 1289, 1302-03 (8th Cir. 1994) (finding valid waiver of presentation of mitigation evidence, in spite of "rather brief" colloquy between trial court and defendant, based on fact that the defendant had previously gone through a capital murder trial and "obviously" understood what mitigation evidence was and fact that defense counsel testified during habeas proceeding about his mitigation discussions with defendant).

The following facts are relevant to this Court's determination that petitioner made a knowing, intelligent, and voluntary waiver of his right to present mitigating evidence. The record demonstrates that petitioner first evinced an inclination to waive the presentation of mitigation evidence on April 1, 1997, just as the jury's verdicts finding him guilty as charged were being read. At that point, petitioner became disruptive, by any definition of that word, interrupting the reading of the verdicts and directing obscenity-laced challenges toward the jurors to "look [him] in the eye." (Tr. Vol. V, Exh. 49, at 2491-94.) After defense counsel quickly intervened, petitioner was removed from the courtroom at his insistence. (*Id.* at 2494.) The trial court cautioned the jury not to be prejudiced or otherwise influenced by petitioner's conduct. Shortly after petitioner was removed from the courtroom and placed in a basement holding cell equipped with a closed-circuit TV to enable him to witness the courtroom proceedings, deputies informed the trial court that petitioner had endeavored to disable the closed-circuit TV and defense counsel informed the trial court that petitioner refused to return to the courtroom to waive, on the record, his right to be present at the subsequent hearing to try before just the trial court the specification involving petitioner's prior murder conviction. (*Id.* at 2518-20.)

Petitioner did in fact return to the courtroom later that day, after the trial court dismissed the jury so that it could conduct a bench hearing to determine the prior-murder-conviction specification.  (Tr. Vol. V, Exh. 49, at 2522-23.)  Before the hearing could begin, petitioner's defense attorneys announced that, despite their discussing the matter at considerable length with him, petitioner had expressed to them that he no longer wished to be present in the courtroom for any further proceedings--not the evidentiary hearing to determine the prior-murder-conviction specification, not the mitigation hearing, and not sentencing.  (*Id*. at 2523.)  One of petitioner's defense attorneys, Mr. Kelly, continued:

> His reasoning as expressed to me, on the mitigation phase, is that it is inherently biased because the jury that's already found him guilty of 20 counts, that would be biased against him when it came to any mitigation.
>
> And therefore, he doesn't choose to participate in that phase of it.  And also, since he has stated he believes that the process by which the recommendation of the jury is obtained and given to the Court is biased, that he does not wish to participate in the sentencing.

(*Id*. at 2523-24.)

The following exchange between the trial court and petitioner then ensued:

> THE COURT:     Have your attorneys adequately and correctly expressed your desires, Mr. Cowans?
>
> THE DEFENDANT:     Yes.
>
> THE COURT:     You do not wish to be present for this hearing [on the prior-murder-conviction specification]?
>
> THE DEFENDANT:     I don't want to be a part of none of this kangaroo shit.
>
> THE COURT:     All right.  Sir, then at this point in time, we'll have him removed from the courtroom.
>
> THE DEFENDANT:     Removed from the courthouse, don't put me down in no damn basement.

40

During the brief discussion that followed, the trial court reminded petitioner more than once that he had a right to hear what was going on, only to be interrupted by petitioner announcing that he did not want to be a part of, or present for, any further proceedings, and announcing even more emphatically that he did not wish to be placed in the basement holding cell. (*Id*. at 2525-27.) At one point, petitioner directed his tirade toward the prosecution, after the prosecution expressed its concern about the ramifications "eight years down the road" if petitioner were not somehow present for the specification hearing and in a position to communicate with his counsel. The trial court decided to send petitioner to the courthouse holding cell over petitioner's objections and kept him there for the short duration of the evidentiary hearing on the prior-murder-conviction specification, in spite of once being advised by defense counsel that petitioner had demanded that the sound be turned down on the closed-circuit TV, had turned his back to the TV, and was laying on the floor with three deputies restraining him. Following the conclusion of the short hearing, petitioner was returned to the county jail.

Nearly two weeks later, court reconvened as scheduled on April 10, 1997 for petitioner's mitigation hearing. The trial court explained, out of the presence of the jury, that the court had been advised the previous night that although the defense would not be prepared to present its two expert witnesses--mitigation specialist James Crates and mitigation psychologist Dr. Jeffrey Smalldon--as planned, they would need to put something on the record. (*Id*. at 2.)[1] Defense counsel Mr. Wallace then explained as follows:

---

[1]     The transcript of the proceedings that occurred on April 10, 1997 is included in this Court's copy of the record under Exhibit 49 of Transcript Volume V. Although the transcript of the proceedings that occurred on April 1, 1997, also under Exhibit 49 of Transcript Volume V, concludes with page 2542, when the transcript of the proceedings that occurred on April 10, 1997 resumes, it begins not with page 2543, but with page 1.

Mr. Cowans after discussions with Mr. Kelly and myself on several occasions including again this morning immediately before coming into court has now decided to specifically direct us that he wishes no evidence or no testimony presented by way of mitigation on his behalf at the hearing. He has further directed us and I advised the Court would be inquiring as to this, that he would also be waiving his right to make an unsworn statement on his behalf at the mitigation hearing.

For the record, and I think Mr. Cowans would concur in this, Mr. Cowans has not arrived at this decision lightly. He has also by his efforts and that's what led to the cancellation of the jury to be called in today, has prevented the mitigation specialist and defense counsel from gathering much of the information as normally we receive by his specific direction to family and friends to immediately cease cooperation with Mr. Crates, Dr. Smalldon, Mr. Kelly, and myself so as not to enable us to present mitigation testimony in evidence against his wishes.

(*Id.* at 3-4.)

The trial court then addressed petitioner, and the following exchange took place:

THE COURT: Mr. Cowans, you heard what your attorney has stated to me. First of all, it is my understanding you do not with to present any evidence in mitigation, sir?

THE DEFENDANT: Yes, sir.

THE COURT: It is also my understanding that you instructed the witnesses not to---

THE DEFENDANT: Yes, sir.

THE COURT: ---assist and participate with the experts that are going to testify?

THE DEFENDANT: Yes.

THE COURT: Do you mind telling me why, Mr. Cowans, you do not wish to proceed in a mitigation hearing?

THE DEFENDANT: I feel that it would be biased. I feel that I can't get a fair shake out of a jury that found me guilty on something I didn't do.

THE COURT: You understand, Mr. Cowans, that if you do not offer any

evidence in mitigation the jury will probably come but to one decision and that is the death penalty?

THE DEFENDANT:     That's the decision they're gonna come to anyway.

THE COURT:     You understand further, sir, that your attorney---

THE DEFENDANT:     Yes, I understand it all, sir.

THE COURT:     You know your attorneys have prepared for the mitigation hearing by---

THE DEFENDANT:     And under my direction I don't want no mitigation hearing.

THE COURT:     You understand they do have witnesses that they are ready to put on though?

THE DEFENDANT:     No, no, witnesses, nothing.

THE COURT:     All right.  But you do understand they are available?

THE DEFENDANT:     Yes, I do, I understand that.

THE COURT:     It's my understanding that tomorrow we will bring the jury in. Mr. Cowans, it's my understanding you want to be present or do you want to be present during that?

(*Id*. at 4-6.)  Petitioner thereafter agreed that he would be present at the hearing, rather than be placed again in the basement holding cell.  (*Id*. at 6.)  Petitioner also affirmatively elected to appear in prison garb and shackles, after the trial court clearly explained to him that he had a right to appear in civilian clothes and without shackles.  (*Id*.)  Thereafter, petitioner elected to leave for the remainder of the proceedings that day, during which defense counsel confirmed that Mr. Crates and Dr. Smalldon would be present and available the following day to testify if necessary and that they (defense counsel) had been advised yet again by petitioner that he did not wish to make a sworn or unsworn statement.  (*Id*. at 8-14.)  Finally, defense counsel indicated

43

that they had not yet decided whether they would proffer what mitigation evidence they had

prepared and planned to offer.  (*Id*. at 18-19.)

Court reconvened the following day, April 11, 1997, as planned.  With jurors present but

not in the courtroom, the trial court confirmed with petitioner again that petitioner understood his

right to be present in civilian clothes, rather than the prison garb and shackles that he was

wearing.  (Tr. Vol. V, Exh. 50, at 25.)  Defense counsel Mr. Wallace then stated:

> Your Honor, we have discussed again with Jessie this morning, Mr. Kelly
> and myself along with Mr. Crates and Dr. Smalldon have met with Jessie again
> this morning to again discuss the decision put on the record yesterday.  It is again
> our understanding that even after further consideration and discussion Mr.
> Cowans does not wish us to present any evidence or testimony in mitigation in
> this matter.  It is further our understanding that after discussion and being advised
> about the possible consequences Mr. Cowans does not wish to make any
> statement to the Court, to the jury either sworn or unsworn on his behalf at any
> time during the remainder of these proceedings.
>
> For the record Mr. Cowans is aware that Dr. Jeff Smalldon, is in fact,
> present, is here in the courtroom, has testimony prepared and is prepared to go
> forward immediately should Mr. Cowans have changed his mind overnight---
>
> THE DEFENDANT:     (Shaking head.)
>
> MR. WALLACE:     ---or this morning and is prepared to offer testimony which
> would be in mitigation in this matter.  This has been, again, discussed with Mr.
> Cowans, it has been discussed with him the nature of the proposed testimony, he
> is aware of that and despite all of these facts he is still specifically directing Mr.
> Kelly and myself not to offer any testimony or evidence on his behalf today.
>
> THE DEFENDANT:     (Nodding head.)
>
> THE COURT:     You understand--that is a correct statement, Mr.---
>
> THE DEFENDANT:     Yes, sir.
>
> THE COURT:     ---Cowans?
>
> THE DEFENDANT:     Yes, sir.

> THE COURT:    You understand you have the right to present testimony?
>
> THE DEFENDANT:    Yes.
>
> THE COURT:    And you decided not to; is that correct, sir?
>
> THE DEFENDANT:    Yes, sir.
>
> THE COURT:    In addition to that you have the right to make a statement on your behalf to the jury either under oath or not under oath.
>
> THE DEFENDANT:    (Shaking head.)  No.
>
> THE COURT:    If it's not under oath it's not subject to cross-examination, you understand that?
>
> THE DEFENDANT:    Yes, I do understand that.
>
> THE COURT:    You do not wish to make a statement to the jury, sir?
>
> THE DEFENDANT:    No, sir.

(*Id*. at 26-27.)

Defense counsel then answered, in response to a question by the trial court, that they had intended to offer (in addition to testimony by Dr. Smalldon and Mr. Crates) testimony from some of petitioner's family members, previous foster parents, and other individuals from petitioner's teen-age and formative years.  (*Id*. at 28.)  Following a proffer by the prosecution of evidence it had planned to offer during the mitigation hearing, defense counsel announced that they would not be making a proffer of the evidence that they had planned to introduce, though they reserved the right to do so later.  (*Id*. at 31-32.)

Once the jurors were seated for the commencement of the mitigation hearing and the prosecution delivered its opening statements, defense attorney Mr. Wallace made the following opening statement:

This is something that's going to be very difficult for you, it is going to be very difficult for us.  It's going to be even more difficult than you expect because of what I'm about to tell you.

We have a client, Jessie Cowans, who is a human being who has a right to make his own decisions.  Jessie has elected at this point in time to direct us as his attorneys to present no evidence and no testimony here today on his behalf.  That was not our plan as you know from voir dire and as we've discussed this throughout we sincerely hoped we didn't get to this part of the proceeding.  We may or may not agree with the decision that Jessie has made but Jessie has made his decision, he has asked us to relay that to you.

Jessie disagrees with your verdict in the first phase and that's no surprise.  We believe in our hearts that we gave you our sincere evaluation of what we believe the evidence to be in the trial phase and you made your decision, we don't have to agree with that, but we accept that, we understand that, that's your role in these proceedings, you performed your role.

Once the prosecution rests their case today which will be very brief we will present nothing on Jessie's behalf and at his request and then you perform your role in accordance with the Judge's instructions.

(*Id*. at 37-38.)  The prosecution, by way of presenting its case, introduced all of the evidence from the first phase and gave closing and rebuttal arguments.  Defense counsel, as promised, presented no evidence and made no final arguments, (though defense counsel did raise some objections, out of the hearing of the jury, to parts of the prosecution's closing arguments).  After the trial court gave its instructions, the jury retired to deliberate at 10:26 a.m. and returned with a verdict recommending death at 1:50 p.m.  (*Id*. at 73-75.)

After careful consideration of the relevant case law and the facts set forth above, (and assuming for purposes of this discussion that waiver of the right to present mitigating evidence should be subjected to the heightened *Zerbst* standard), this Court is satisfied that Petitioner Cowans made a knowing, intelligent, and voluntary waiver of his right to present mitigating evidence.  The totality of the circumstances, as reflected in the record, demonstrates that

46

petitioner elected to waive his right to present mitigating evidence with sufficient awareness of his right to present mitigating evidence; of the nature, role, and importance of mitigation evidence; and of the probable consequences of his failure to present mitigating evidence. Counsel stated, prior to the bench hearing on the prior-murder-conviction specification, that they had discussed at length with petitioner the matter of his refusal to participate in, among other things, the mitigation hearing. (Tr. Vol. V, Exh. 49, at 2523.) Counsel stated again, the day that the mitigation hearing was scheduled to begin, that they had had discussions on numerous occasions with petitioner concerning his decision not to allow the presentation of any mitigating evidence. (Tr. Vol. V, Exh. 49, at 3-4.) Prior to the commencement of the mitigation hearing, counsel stated again that they, along with Mr. Crates and Dr. Smalldon, had had more discussions with petitioner concerning his decision to waive the presentation of mitigating evidence, during which they advised him of the likely consequences of his decision and of the nature of the evidence and testimony they were poised to present at the mitigation hearing. (Tr. Vol. V, Exh. 50, at 26-27.) Finally, counsel confirmed the evidence that they had intended to present. (*Id*. at 28.) It is reasonable to presume from counsel's representations that they had discussed with petitioner at length and on numerous occasions the nature and role of mitigating evidence.

Another factor militating in favor of a finding that petitioner's waiver was knowing, intelligent, and voluntary was petitioner's resolve. A clear statement of petitioner's reason for waiving his right to present mitigation evidence--(namely, that petitioner felt that a jury that had convicted him in the first phase of the trial would be biased against him in the mitigation phase of the trial)--was expressed, on the record, not only by counsel, prior to the commencement of

47

the prior-murder-conviction specification hearing (Tr. Vol. V, Exh. 49, at 2523-24), but subsequently by petitioner in his own words on the day that his mitigation hearing was to begin (Tr. Vol. V, Exh. 49, at 4). And although petitioner had engaged in angry and disruptive behavior during other portions of his trial, he was clear when he explained, in response to a question by the trial court, that he felt that a mitigation hearing would be biased and that he could not "get a fair shake" from a jury that convicted him of crimes he had not committed. (*Id.*) The record permits a reasonable inference that petitioner was firm in his decision, given that he had for weeks, in spite of numerous conversations with counsel, not only refused to budge from his decision to waive mitigation but also actively thwarted the efforts of his defense team to gather information from his (petitioner's) relatives, friends, and other acquaintances. (Tr. Vol. V, Exh. 49, at 3-4.)

The trial court explained, on the record, and petitioner confirmed that he understood, on the record, the likely consequences of his refusal to present mitigating evidence--namely, that the jury was likely to recommend death. (Tr. Vol. V, Exh. 49, at 4-5.) Petitioner confirmed, on the record, that he understood that his attorneys were prepared to offer mitigation evidence in the event that he changed his mind. (Tr. Vol. V, Exh. 49, at 4-5.) Petitioner confirmed, on the record, that he understood that he had the right to present mitigating evidence. (Tr. Vol. V, Exh. 50, at 26-27.) Petitioner affirmed and reaffirmed, on the record, his desire not to present any mitigating evidence. (Tr. Vol. V, Exh. 49, at 4-5; Tr. Vol. V, Exh. 50, at 27.) Further, in assessing from the totality of the circumstances whether petitioner's waiver of his right to present mitigating evidence was made with sufficient awareness of the nature of the right and the consequences for abandoning it, the Court takes into consideration that petitioner had experience

with the criminal justice system; petitioner had served time in prison for murder and was on parole from that judgment at the time he was arrested and tried for the murder of Mrs. Swart.

The record further reflects that his waiver was voluntary, in the sense that it was the product of a free, deliberate choice rather than intimidation, coercion, or deception. In this regard, the Court rejects as unsupported by case law any argument that petitioner was "coerced" or "intimidated" into waiving his right to present mitigation evidence by a sense of hopelessness borne of a system that, in his mind, was inherently biased by employing the same jury to first determine whether they defendant is guilty of death-eligible murder and to then determine whether the defendant should receive the death penalty. Government overreaching is a necessary component of any finding that a waiver was not voluntary. *Cf. Colorado v. Connelly*, 479 U.S. 157, 170 (1986); *Oregon v. Elstad*, 470 U.S. 298, 305 (1985); *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005); *United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000).

The totality of the circumstances demonstrates to this Court that petitioner's decision to waive mitigation was knowing, intelligent, and voluntary. That being so, this Court can find nothing erroneous, much less unreasonable, about the Ohio Supreme Court's decision on direct appeal rejecting petitioner's claim that his decision to waive mitigation was not knowing, intelligent, and voluntary.

### C. Petitioner's Competency to Waive Mitigation

As noted above, the Ohio Supreme Court also concluded on direct appeal that petitioner was competent to waive his right to present mitigating evidence. *Cowans*, 87 Ohio St. 3d at 81-85. Rejecting petitioner's proposition that a competency hearing must be conducted whenever a capital defendant seeks to waive mitigation, the Ohio Supreme Court went on to conclude, after

49

giving considerable deference to the trial court's observations and conclusions, that although

petitioner was at times uncooperative and disruptive, petitioner's behavior did not inherently

raise questions concerning his capacity to understand the difference between life and death, to

fully comprehend the ramifications of his decision, or to reason logically.  For the reasons that

follow, the Court is not persuaded that the Ohio Supreme Court's conclusion contravened or

unreasonably applied clearly established federal law, or involved an unreasonable determination

of the facts.

In some situations, the determination of whether a defendant knowingly, intelligently,

and voluntarily waives his constitutional rights also requires a determination of whether he is

competent to do so.  Generally speaking, a "competency" inquiry focuses on a defendant's

*capacity* for understanding the nature of his rights and consequences of his actions, while a

"waiver" inquiry addresses whether or to what extent a defendant *actually* understood the nature

of his rights and the consequences of his decision.  *See Godinez v. Moran*, 509 U.S. 389, 400

n.12 (1993).  A defendant is competent to stand trial if he has "sufficient present ability to

consult with his lawyer with a reasonable degree of rational understanding" and has "a rational

as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362

U.S. 402, 402 (1960); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975).  The Supreme

Court held in *Godinez v. Moran*, that the *Dusky/Drope* standard for determining whether a

defendant is competent to stand trial or plead guilty is the same standard for determining whether

a defendant is competent to waive other constitutional rights, such as the right to counsel.

Determining whether a defendant is competent to waive the presentation of mitigation

evidence is similar to determining whether a death-sentenced prisoner is competent to abandon

50

efforts to appeal his death sentence, which guidelines were set forth by the United States

Supreme Court in *Rees v. Peyton,* 384 U.S. 312, 314 (1966), and endorsed by the Court of

Appeals for the Sixth Circuit. *See West v. Bell*, 242 F.3d 338, 341-43 (6th Cir. 2001); *Harper v.

Parker*, 177 F.3d 567, 571-73 (6th Cir. 1999); *Franklin v. Francis*, 144 F.3d 429, 432-33 (6th

Cir. 1998). The Supreme Court stated in *Rees* that the trial court must determine "whether [the

petitioner] has capacity to appreciate his position and make a rational choice with respect to

continuing or abandoning further litigation or on the other hand whether he is suffering from a

mental disease, disorder, or defect which may substantially affect his capacity in the premises."

*Rees, supra*, 383 U.S. at 314. The Ohio Supreme Court adopted the same standard for

competency to abandon appeals in *State v. Berry*, 74 Ohio St. 3d 1504 (1996), and then tailored

it for competency to waive the presentation of mitigation evidence in *Ashworth*:

> A defendant is mentally competent to forgo the presentation of mitigating
> evidence in the penalty phase of a capital case if he has the mental capacity to
> understand the choice between life and death and to make a knowing and
> intelligent decision not to pursue the presentation of evidence. The defendant
> must fully comprehend the ramifications of his decision, and must possess the
> ability to reason logically, *i.e.*, to choose the means that relate logically to his
> ends.

*Ashworth*, 85 Ohio St. 3d at 69.[2]

The United States Supreme Court also reminded in *Godinez v. Moran*, that a competency

determination is necessary only when a court has reason to doubt the defendant's competence.

509 U.S. at 402 n.13; *see also State v. Ashworth, supra*, 85 Ohio St. 3d at 62 ("absent a request

by counsel, or any indicia of incompetence, a competency evaluation is not required"). Evincing

---

[2] The Court cites *Ashworth* not to suggest that the Ohio Supreme Court did apply or should have
applied *Ashworth* to Petitioner Cowans's case on appeal, but only because *Ashworth* sets forth a concise statement of
the standard for determining competency to forgo challenges to a death sentence that the Ohio Supreme Court had
already adopted.

a decision to waive the presentation of mitigating evidence, (and thereby to invite a death sentence), does not by itself call the defendant's competency into question.  Rather, a trial court must conduct a hearing or determine a defendant's competency, even in the absence of a request by the defendant's counsel, if the defendant displays indicia of incompetence or has a history of mental instability sufficient to create a bona fide doubt as to the defendant's competency to stand trial, plead guilty, or waive other fundamental constitutional rights.  *See Pate v. Smith*, 637 F.2d 1068 (6th Cir. 1981) (citing *Pate v. Robinson*, 383 U.S. 375, 385-86 (1966), and *Drope v. Mississippi*, 420 U.S. 162, 172-73 (1975)); *see also Williams v. Bordenkircher*, 696 F.2d 464, (6th Cir. 1983).  Determining whether a bona fide doubt exists is no easy task, as the Supreme Court explained in *Drope*:

> The import of our decision in Pate v. Robinson is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial all are relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient.  There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.

*Drope*, 420 U.S. at 180.

Applying these principles to the facts at hand, the Court concludes that petitioner was competent to make a knowing, intelligent, and voluntary waiver of his right to present mitigating evidence and that the trial court did not err in failing to conduct a hearing to determine petitioner's competency.  The Court is satisfied that the record demonstrates that petitioner possessed the mental capacity to understand the choice between life and death, to make a knowing and voluntary decision not to present mitigating evidence, to fully comprehend the

ramifications of his decision, and to reason logically.  The only evidence of incompetency to which petitioner points are the angry and disruptive outbursts in which he engaged at several points during his trial proceedings and indications of his paranoia that everyone--from the trial court and prosecutors to the deputies and his own defense attorneys--was out to get him.  But close scrutiny of those matters in the full context of petitioner's trial  proceedings reveals that they fall short of either establishing that petitioner was incompetent or constituting indicia sufficient to provide a bona fide reason to question petitioner's competency.

Further, the record contains no evidence of a significant history of mental health problems on petitioner's part.  In an affidavit prepared by Dr. Jeffrey Smalldon in May 1998 recounting his evaluation of petitioner in preparation for petitioner's mitigation hearing, Dr. Smalldon opined that petitioner suffered from, at most, a history of alcohol dependence and polysubstance abuse, as well as an Antisocial Personality Disorder stemming from his abusive and chaotic upbringing.  (Doc. # 85-5.)  Even the March 1998 mental health evaluation completed by Dr. Kristin E. Haskins and submitted during petitioner's postconviction proceedings falls short of establishing that he was incompetent either at the time that he waived the presentation of mitigating evidence or at the time that Dr. Haskins evaluated him.  Neither defense counsel, nor the prosecution, nor the trial court--those people in the best position to observe petitioner's disruptive behavior in context and demeanor throughout the trial proceedings--ever expressed any doubts about petitioner's competency.

It is true that at several points throughout the trial proceedings, petitioner engaged in angry and disruptive behavior.  But disruptive behavior alone, especially when prompted by anger at certain aspects of the proceedings against him as opposed to mental disease or defect, is

insufficient to establish a defendant's incompetency or even necessarily raise questions as to his competency. *See, e.g., Sweezy v. Garrison*, 554 F. Supp. 481, 491 (D.C.N.C. 1982) (finding that petitioner's frequent disruptions of proceedings and brusque behavior toward trial court, witnesses, jury, and his defense counsel demonstrated that he felt "railroaded, which is probably a frequent feeling of persons charged with a crime.") As did the district court in *Sweezy*, this Court concludes that Petitioner Cowans's occasional outbursts of disruptive behavior are "more explainable in terms of an angry, hostile personality rather than in terms of incompetence." *Id*. at 485.

Petitioner responded disruptively in court at several different points during his trial proceedings, over a span of nearly five months. The first time that petitioner acted out his pique was during a motions hearing in November 1996, only a few months after he was indicted. Just as the trial court was asking petitioner whether he had been served with the new indictment, petitioner answered that he had and then said, "May I please say some words?" (Tr. Vol. I, Exh. 30, at 3.) After the trial court cautioned him that he did not have to speak during any of the trial proceedings and that anything he said could be used against him, petitioner stated that he understood and that he wanted new counsel. The trial court agreed with petitioner's request to appoint new counsel, but when petitioner gleaned from the remarks that the trial court planned to appoint counsel from the same office as petitioner's previous counsel (the public defender's office), petitioner interrupted: "That is just like hanging me, Your Honor, you might as well hang me." (*Id*. at 6.) Petitioner explained that he felt that his previous attorneys had been pressuring him to plead guilty and that if the trial court appointed attorneys from the same office, then his previous counsel would "still be running the show behind the scenes." (*Id*.) The trial court said

it would take the matter under advisement and the proceedings concluded without further incident.

The trial court thereafter appointed Michael Kelly and Bruce Wallace to represent petitioner and it does not appear that petitioner had a problem with that.  However, several months later, during hardship interviews with prospective jurors on February 19, 1997, petitioner acted out his pique a second time.  As the trial court was explaining the purpose of the hearing, petitioner interrupted and asked if he could speak.  (Tr. Vol. I, Exh. 36, at 5.)  The trial court assured him that he would be given a chance to speak as soon as the trial court was finished with its introductory remarks.  The trial court also reminded petitioner that he had a right to be present at that and all proceedings, so long as he was not disruptive.  Then, the trial court invited petitioner to speak:

> THE DEFENDANT:    First of all, I would like new counsel.  My attorneys and I had a disagreement.  I want new counsel.  Secondly, Your Honor, I would like to be at all hearings, but there seems to be a problem with me and Ms. Zenni.  They made me sign a thing about wearing that belt that says if I do any overt action, if I raise my voice or what have you, that she can push that button.  I feel I can't wear no belt like that.  I sent a letter to the county jail.  I asked them if they can find somebody other than Ms. Zenni because she seems to have a personal problem with me.  Also, I would like to have new counsel.

> THE COURT:    As far as new counsel, let's address that first.  Can you tell me the reason you want a new attorney?

> THE DEFENDANT:    I am not sure that is right, Your Honor.

> THE COURT:    At this point in time you don't get, as just a matter of course, new counsel just because you wish to have new attorneys, since this is the second time around.  The first attorneys were excellent attorneys.  These attorneys are excellent attorneys as far as handling death cases, their experience.  Unless you give me some adequate reason, I have no other choice then [sic] certainly to deny your request.

> THE DEFENDANT:    They want --- they feel I am guilty, you know.  I feel they

55

can't represent me to best of their ability because they feel I am guilty.

THE COURT:    Well, you understand, of course, that an attorney's duty is to represent his client regardless of personal feelings.  In fact, that is one of the main training modes in law school as well as his profession.  Regardless of how they or he or anyone of them feel, it is what kind of representation thy are going to be giving you.

THE DEFENDANT:    Your Honor, I seem to be fighting for my life here.  You are expecting me to keep these men as my attorneys?  I'm sorry.  I don't know nothing about the law but I know that is against my constitution.

THE COURT:    All right.  Let me say this, Mr. Cowans, unless you give me adequate reason and cause other than the fact you don't agree with them and don't like them at this point in time---

THE DEFENDANT:    It is not about liking them.  They are wanting me to plead guilty and lie when I -- you know, if I lie now and it comes out later then I am guilty.

THE COURT:    Do either of you wish to be heard at this point?

MR. KELLY:    I have to get permission from Mr. Cowans.  I don't want to violate any attorney client privilege.  May I discuss briefly some of our conversations without saying anything specifically you said, Jessie?

THE COURT:    Mr. Cowans?

THE DEFENDANT:    I have nothing to say to this man, Your Honor.

THE COURT:    Well, if you are not going to cooperate with your attorney at this point in time you give me no choice, Mr. Cowans, I am going to have to go forward and keep these counsel on board.

(Tr. Vol. I, Exh. 35, at 5-8.)

Defense counsel proceeded to explain that they had had disagreements with petitioner concerning certain evidence and theories, but insisted that they had never encouraged him to lie or plead guilty.  The trial court then stated that it was of the view that defense counsel had been diligently representing petitioner and that, without more, it could not replace them with a new set

56

of attorneys.  At that point, petitioner stood as if to leave, prompting the following exchange:

> THE COURT:    Have a seat for a minute, sir, until I finish.  If you don't wish to be in the courtroom when all these proceedings take place, Mr. Cowans, you have the right to leave this courtroom and be somewhere else.  There are two ways I can have you situated.  You can either remain back in jail or you can be in another room and we will have two-way communication so that you can see what is going on, as well as hear what is going on.  And that choice is yours, sir.  The three alternatives are to be here, do not disrupt, two, to be in another room, or three to be back in the jail.

> THE DEFENDANT:    I would like new counsel, Your Honor.

> THE COURT:    That is going to be denied, sir.  With that in mind, what alternatives do you want to work with?

> THE DEFENDANT:    I would like new counsel.

> THE COURT:    All right.  Do you wish to remain here at this time, sir?

> THE DEFENDANT:    I would like new counsel, sir.

> THE COURT:    I take it then that means no, sir.  Do you wish to remain in the jail while---

> THE DEFENDANT:    I would like new counsel, sir.

> THE COURT:    I take it that means no also.  You give me no choice, Mr. Cowans, if you cannot indicate to me---

> THE DEFENDANT:    I gave you a choice, sir.  I would like new counsel.

> THE COURT:    Are you going to assure me you are not going to be disruptive?

> THE DEFENDANT:    I would like new counsel, sir.

> THE COURT:    If you are not going to answer my question, I take it you are going to be disruptive.

> THE DEFENDANT:    I would like new counsel.

> THE COURT:    All right.  I would ask that you please leave.  I have given you a chance to listen to what is going [on].  If you want to listen to what is going on, we will have you placed in a special room.  Until you voice that to either me or to

your attorneys or to the jail personnel, I will take it you do not wish to be present. Anything further you want to place on the record?

THE DEFENDANT:    I would like new counsel.

(Tr. Vol. I, Exh. 35, at 9-11.)  At that point, petitioner left the courtroom, the potential jurors were escorted in for a continuation of the hearing on juror hardship excuses, and the trial court explained, among other things, that petitioner had chosen not to be present and that jurors were not to consider his absence for any purpose.

Later that day, as the hardship-excuses hearing continued with a new panel of potential jurors, Mr. Wallace approached the bench to inform the trial court and prosecutors that co-counsel Mr. Kelly was on the telephone with petitioner.  (Tr. Vol. I, Exh. 35, at 62.)  After the trial court dismissed the prospective jurors, Mr. Kelly entered and explained that petitioner had relayed to him a demand that he and Mr. Wallace file a motion to withdraw as his attorneys. Explaining that they felt obligated to follow petitioner's wishes, Mr. Kelly advised the trial court that they would be filing a memorandum.  When the trial court responded that it would hold a hearing as soon as possible on the matter, Mr. Kelly confirmed that petitioner wanted to be present at that and all future proceedings.  The trial court then continued with the hearing on juror hardship excuses, without petitioner present.

Petitioner's third episode of disruptive behavior took place one week later, on February 28, 1997, when the trial court conducted a hearing on defense counsel's motion to withdraw. The trial court began by advising petitioner that he had the right to be present at all proceedings and to consult with his attorneys, so long as he did not become disruptive, to which petitioner responded, "Stating the fact I want new counsel is not disrupting."  (Tr. Vol. I, Exh. 36, at 3.) After a brief back-and-forth between petitioner and the trial court about why petitioner had been

58

removed from the courtroom the previous week, the trial court clarified that defense counsel had

filed a motion to withdraw, pursuant to petitioner's request, and that petitioner had also filed his

own motion for new counsel, though neither the prosecution nor the trial court had received a

copy of that *pro se* motion.  Defense counsel proceeded to explain, consistent with their motion,

that they had had a disagreement with petitioner at the jail while discussing certain evidence and

theories for how to handle that evidence, and that petitioner thereafter, on several occasions,

refused to speak to them when they went to the jail to discuss the case with him.  The trial court

then invited petitioner to speak:

> THE DEFENDANT:    I need new counsel.  We are not getting along.  Do not want me to say something.  I keep hearing all of this, if I say something, it won't be used against me.  Prosecution is sitting right there.
>
> Your Honor, it comes up about a palm print.  I'm not talking about the time I got disruptive and loud and told them I wanted new counsel.  I'm talking about times before that when Mr. Kelly would come over to the jail by himself and sit out there and talk to me about that palm print.
>
> Your Honor, I feel that I cannot get along with this counsel.  And I'm asking the Court, may I please have new counsel?  That's all I can say.

(Tr. Vol. I, Exh. 36, at 7-8.)

The trial court then asked the prosecution if they had anything to offer, to which Mr.

Breyer replied, "Judge, I can't help but think about the boy who cried, 'Wolf.'" (*Id*. at 8.)  Mr.

Breyer went on to express reservations about appointing new counsel for such nebulous reasons

and concerns that petitioner was going to continue to insist on new attorneys "like a round-

robbin tournament."  (*Id*.)  Petitioner then interrupted:

> THE DEFENDANT:    It's obvious I'm guilty to you, man.
>
> MR. BREYER:    ---I haven't heard anything to indicate they're not doing what they're obligated to do.

THE DEFENDANT:    Well, you'd like for them---

THE COURT:    Excuse me one moment, Mr. Cowans.  Give him a chance to speak and I'll give you a chance to speak.  Okay?  This is the way we do things, Mr. Cowans.  Please.

THE DEFENDANT:    Yes, sir.

MR. BREYER:    I think an inability to communicate between counsel and Defendant is a serious problem.  But when it's a one-sided refusal to communicate, I don't see that as something the Court should step into and rectify.

THE COURT:    Mr. Cowans?

THE DEFENDANT:    Your Honor, prosecution is going to say stuff like that. They would rather me keep counsel that ain't going to be able to represent me to their fullest, because that would be in their benefit.

(*Id*. at 8-9.)

Explaining that it continued to be of the view that defense counsel were competent, conscientious, and were obviously working diligently to represent petitioner, the trial court announced that it would be keeping defense counsel on.  The trial court encouraged petitioner to try to overcome his differences with them and to try to communicate, cooperate, and work with them "because they are your best chance."  (*Id*.)  Petitioner responded:

THE DEFENDANT:    What do I do now, Your Honor?  I don't want that.

THE COURT:    I'm sorry you don't, sir.

THE DEFENDANT:    I don't want that.  You people have gotten me charged with four counts of murder.  I'm trying to fight for my life.  You are going to tell me you are not going to give me counsel---

THE COURT:    Yes, sir.

THE DEFENDANT:    ---that I do not agree with, that would get along with me? I don't want somebody that's going to tell me I'm guilty.  You understand?  I don't want that.  Now, I'm asking you for new counsel.  You keep telling me no. You have to give me new counsel.  I'm fighting for my life, sir.  Now, if you

don't want to give me new counsel, what's my next step?  I don't want this man as my counsel.  What's my next step, Your Honor?

THE COURT:     That's up to you, Mr. Cowans.  At this point in time, that's your attorney at this stage.

THE DEFENDANT:     What do I do now, sir?

THE COURT:     That's up to you at this point, sir.

THE DEFENDANT:     That's why I'm asking you, because I don't have an attorney I can aks that.  What do I do now, sir?

THE COURT:     You are entitled to either cooperate with these people and work with them to the best of your ability and their ability, so they can defend you in an adequate manner---

THE DEFENDANT:     You're wrong, Your Honor.

THE COURT:     That's entirely up to you, sir.

THE DEFENDANT:     You're wrong.  You are going against my constitutional rights.  My rights say I'm allowed efficient counsel.  You're not giving me efficient counsel, sir.  You might think he's doing good, they might think he's doing good, because you are the Judge, that's the prosecution.  Me, as the Defendant, I'm telling you the man ain't representing me to the fullest.

THE COURT:     This is what it's going to be at this point, Mr. Cowans.

THE DEFENDANT:     What am I supposed to do now?  You are talking about having a trial without me?  You know, come on, man.  That's bull.  That's bull.

THE COURT:     You better sit here and you better cooperate with your attorneys.

THE DEFENDANT:     I'm not going to cooperate with this man.

THE COURT:     You've got two choices.

THE DEFENDANT:     I've done stated that to you, sir.  I want new counsel.  I know my rights.  I want new counsel.

THE COURT:     Denied.

THE DEFENDANT:     Well, I want a new Judge, then.

61

THE COURT:     You certainly have the right to file---

THE DEFENDANT:     You are going to sit there and deny me something.  And I'm sitting here telling you I don't want this man as my counsel.  That's bullshit, man.

THE COURT:     You are entitled, sir, to---

THE DEFENDANT:     Don't tell me no.  Shut up, man.  You are the problem, any damn way.

THE COURT:     Mr. Cowans, let me advise you, again, sir, that you have the right to sit here and participate in this trial.

THE DEFENDANT:     Participate how?  Participate in hanging me?

THE COURT:     I just told you, Mr. Cowans.

THE DEFENDANT:     You find that funny, mother fucker.  Fuck you, punk.

THE COURT:     Mr. Cowans, keep it up and you are leaving this Courtroom.  Do you understand that, sir?

THE DEFENDANT:     The man is going to laugh at me.

THE COURT:     Did I just tell you before, not too long ago---

THE DEFENDANT:     The man is going to laugh at me.

THE COURT:     ---you are leaving this courtroom if you continue this?

THE DEFENDANT:     The man is going to laugh at me.

THE COURT:     If he laughs, sir, so what?  So what if he laughs at you?

THE DEFENDANT:     So, now, I see what it's really about.

THE COURT:     At this point in time, sir, he shouldn't be laughing at you.  But the point of the matter is, you are not to react this way.

THE DEFENDANT:     Why not?  I'm fighting for my life, man.

THE COURT:     You are going to leave this Courtroom if you keep it up, Mr. Cowans.

THE DEFENDANT:    I want the Judge to tell me what I'm supposed to do now to get new counsel.  I want new counsel.  I don't want this man as my counsel.

THE COURT:    Mr. Cowans, at this point in time, I'm indicating that this is the counsel that you are going to have to work with, sir.

THE DEFENDANT:    So, what do we do now during trial?  I don't want this man as my counsel.  I don't want this man representing me in anything.  Now, what?

THE COURT:    Do you wish to represent yourself, Mr. Cowans?

THE DEFENDANT:    How?  I don't know shit about law.  How?

THE COURT:    Then, I suggest you cooperate.

THE DEFENDANT:    Cooperate with a man that's trying to down me?  Come on, Your Honor.

THE COURT:    You have Mr. Wallace, also, Mr. Cowans.

THE DEFENDANT:    Yeah, okay.  I see what this is about.

THE COURT:    Anything else?

THE DEFENDANT:    Yeah.  I feel that you might as well be in their pocket.  Are they paying you to down me or something?  Is the prosecution paying you, Your Honor?

THE COURT:    Anything else?

THE DEFENDANT:    Must be.

THE COURT:    Do you have anything else you want to add about this motion, sir, before we leave?

THE DEFENDANT:    I would like new counsel.

THE COURT:    Once again, denied.  Submit an entry accordingly.  Mr. Cowans, again, I can advise you, you should consult with your counsel.

THE DEFENDANT:    I would like new counsel.

THE COURT:    This case is going on trial March 17th, sir.  Anything further?

THE DEFENDANT:     I would like new counsel.

THE COURT:     Folks?  Mr. Kelly?

MR. KELLY:     Yes, sir.

THE COURT:     Anything further, sir?

MR. KELLY:     Not unless Mr. Cowans---

THE DEFENDANT:     Tell that man you don't want to be my counsel, man.
You know what the hell you said to me over at the jail.  Tell that man.

MR. KELLY:     I advised Mr. Cowans, if he didn't want us to be his counsel--it
wasn't at the jail, it was on the phone--that it would be difficult to represent him.
However, I did not tell him I would file a motion for us to withdraw.  I told him I
would file the motion he requested---

THE DEFENDANT:     You know what you said.

MR. KELLY:     ---which says that the Court appoint new counsel.

THE COURT:     Again, Mr. Cowans, I would advise you---

THE DEFENDANT:     You know what you said, man.

THE COURT:     ---to work with Mr. Kelly.  Mr. Kelly, work with Mr. Cowans.
If you can cooperate, it's in your best interest, sir.  Mr. Breyer?

(Tr. Vol. I, Exh. 36, at 10-15.)  Mr. Breyer stated that he would prepare an entry and the hearing

concluded.

Trial then commenced on March 17, 1997, as scheduled.  The record contains no

indication that petitioner engaged in any further disruptive behavior, in or out of court, or had

any difficulty working with his attorneys, for the duration of his trial.  That changed on April 1,

1997, the day that the culpability phase of his trial concluded, as the verdicts were being read.

Before the trial court could finish reading the verdict forms for the specifications to the

aggravated murder charge set forth in count two, petitioner interrupted:

64

THE DEFENDANT:     Look me in the mother fucking eye.

THE COURT:     ---moving then on to specification three to count two---

THE DEFENDANT:     Don't peek at me.

(Tr. Vol. V, Exh. 49, at 2491.)  The trial court continued reading the verdict forms until, while

the trial court was reading the verdict form for specification three to count three, defense counsel

interrupted:

MR. KELLY:     Your Honor, can we interrupt the reading, please?  May I
approach the bench?

THE COURT:     Yes.

THE DEFENDANT:     Get me the fuck out of here, man.  Get me out of here.
Not one of you mother fuckers can look me in the eye.  You all pieces of shit.
(UNREPORTED SIDE BAR)

THE COURT:     Ladies and gentlemen, would you please retire to the juryroom
for a few minutes, and then we'll continue on.

(The jury returned to the juryroom.)

THE DEFENDANT:     Get me the fuck out of here.  Get me out of here, man.
I'm trying to be cool.  I've been asking to get out of here.  Get me out of here.
Get me out this fucking courtroom.

THE COURT:     Mr. Cowans, it's my understanding, you do not wish to remain
in the courtroom; is that correct, sir?

THE DEFENDANT:     Get me the fuck out of here.

THE COURT:     Do you not wish to remain in the courtroom during the
sentence, sir--or the announcement of the verdict, sir?

THE DEFENDANT:     Are you going to get me out of here, man?  I'm asking to
get the fuck out this courtroom.

(Tr. Vol. V, Exh. 49, at 2494-95.)

The trial court had petitioner removed from the courtroom and placed in a basement

65

holding cell equipped with a closed-circuit TV broadcasting the proceedings, whereafter the jury returned to the courtroom and the trial court finished reading the verdicts.  At the conclusion of the reading of the verdicts, the trial court advised the jurors not to allow themselves to be prejudiced against petitioner because of his actions.  (*Id*. at 2502-03.)  While the trial court was polling the alternate jurors, out of the presence of the jury, a deputy advised the court that petitioner had disabled the closed-circuit TV and was requesting to return to the jail.  (*Id*. at 2503.)  The trial court construed petitioner's actions as a constructive waiver of his right to be present for or view the proceedings and directed the deputies to return petitioner to the jail.  (*Id*. at 2509.)

After the trial court finished polling the alternate jurors concerning whether they agreed with the jury's verdicts, the trial court decided to have petitioner brought back to the courthouse for the bench hearing on the specification charging that petitioner had a prior murder conviction. Mr. Wallace then advised the trial court:

> MR. WALLACE:    Your Honor, I visited Mr. Cowans at the jail just moments ago.  He was very cooperative with me and was willing to discuss the matter with me.  However, he made it clear that he did not wish to be returned to the court house or the courtroom at this time for this hearing, or for any future hearings or proceedings in this case.

(*Id*. at 2519.)  When the trial court announced its decision to have petitioner brought back to the court house in any event, "so he doesn't lose any confrontational rights," (*Id*. at 2520), Mr. Wallace stated that he thought he might be able to convince petitioner to make an on-the-record waiver of his right to be present.

Petitioner was brought back to the court room.  But before the trial court began the evidentiary hearing to determine petitioner's prior-murder-conviction specification, Mr. Kelly

stated that petitioner no longer wished to be present in the courtroom for any proceedings--not the evidentiary hearing, not the mitigation hearing, not sentencing.  The trial court engaged petitioner in a brief colloquy--(which this Court set forth verbatim above in determining that petitioner's waiver to present mitigation evidence was knowing, intelligent, and voluntary)--during which petitioner answered the trial court's questions, confirming that counsel had accurately expressed his wishes and that he did not wish to be in the court room for any further proceedings.  When it became evident that the trial court intended to place petitioner in the basement holding cell, he became agitated and somewhat disruptive, at times directing obscenity-laced comments at the trial court and the prosecution.  Despite petitioner's protestations, the trial court had him placed in the basement holding cell for the duration of the short evidentiary hearing, despite being advised by defense counsel at the outset of the evidentiary hearing that petitioner was demanding that the sound on the TV be turned down, turning his back to the TV, and laying on the floor being restrained by three deputies.  (Tr. Vol. V, Exh. 49, at 2529.)  The trial court commenced with the evidentiary hearing, after which petitioner was returned to the jail.

As explained more fully earlier in this decision, when court reconvened on April 10, 1997 for petitioner's mitigation hearing, defense counsel stated on the record that petitioner had directed them not to present any evidence on his behalf at the mitigation hearing and had further directed relatives, friends, and other acquaintances not to cooperate with the defense team in gathering any mitigation information.  (Tr. Vol. V, Exh. 49, at 3-4.)  The trial court engaged petitioner in a brief colloquy--(which this Court set forth verbatim above in determining that petitioner's waiver to present mitigation evidence was knowing, intelligent, and voluntary)--

during which petitioner calmly and responsively answered the trial court's questions, confirming

that his counsel had accurately expressed his wishes, that he did not wish any mitigating

evidence to be presented on his behalf, and that he would agree to be present the following day

when the jury was brought in rather than be placed in the basement holding cell.  (*Id*. at 4-6.)

The following day, when court reconvened for the commencement of petitioner's

mitigation hearing, petitioner confirmed yet again, both through counsel and through his own

answers to the trial court's questions, that he did not wish to appear in civilian clothes or to have

any mitigation evidence presented on his behalf.  Petitioner remained in the courtroom for the

entirety of the mitigation hearing--which consisted of only opening statements and closing

arguments by the prosecution, a brief statement by defense counsel explaining that petitioner

wished no mitigation evidence to be presented, the readmission of evidence from the first phase,

and the trial court's instructions to the jury--and never engaged in any disruptive behavior, save

trying to appear to be asleep during portions of the opening statements and closing arguments

(Tr. Vol. V, Exh. 50, at 48.)  When the jury returned after a few hours of deliberations with a

verdict recommending death, petitioner engaged in no disruptive behavior.

Finally, when petitioner appeared in court the following week for formal sentencing, he

engaged in no disruptive behavior, (beyond inviting the victim's son, during his victim impact

statement, to look him (petitioner) in the eye).  (*Id*. at 88.)

The Court is not persuaded that the episodes of disruptive behavior set forth above

demonstrate or suggest that petitioner was incompetent to waive his right to present mitigation

evidence or even that the disruptive behavior was sufficient to raise doubts as to petitioner's

competency such that the trial court should have been prompted to conduct a hearing to

determine petitioner's competency. Competency, in the context of a waiver of the right to present mitigating evidence, requires the Court to determine whether petitioner had the mental capacity to understand the choice between life and death and to make a knowing and intelligent decision not to pursue the presentation of evidence, to fully comprehend the ramifications of his decision, and to reason logically, *i.e.*, to choose the means that relate logically to his ends. It may be argued in this case that petitioner, in choosing to forgo the presentation of mitigating evidence, did not choose means that related logically to his ends, which obviously were to achieve acquittal and exoneration. But it bears reminding that the test is whether the petitioner possessed the *capacity* to reason logically by choosing means that related logically to his ends, not whether the petitioner *actually* employed means that related logically to his ends.

As the district court in *Sweezy v. Garrison* reasoned, the petitioner's episodes of disruptive behavior "definitely evidence[d] a rational as well as factual understanding of the proceedings ... because virtually all were closely related to either the outcome of the case or the procedures involved, *i.e.*, getting a jury, using witnesses, protesting testimony and verdict, getting a lawyer replaced, and protesting the judge's action." *Sweezy*, 554 F. Supp. at 492 (citation omitted). In that case, one of the claims raised by petitioner was that he had been incompetent to stand trial, as evidenced by his prior history of mental health problems, his aversion to taking his medications, and his frequent episodes of disruptive behavior during his trial. After dismissing petitioner's assertions about his history of mental health problems and aversion to taking medication, the district court found, as noted above, that petitioner's disruptive behavior in court "is more explainable in terms of an angry, hostile personality rather than in terms of incompetence." *Id.* at 485. The district court recounted petitioner's episodes of

disruptive behavior in detail, which included but were not limited to, being abrasive and brusque to the trial judge, often refusing to answer his questions; requesting that his attorneys be replaced; requesting black lawyers; asserting that the prosecution was lying; referring to the trial judge as a hypocrite and referring to the court as a "Kangaroo Court;" and cursing during the reading of the verdict. In concluding that petitioner's in-court behavior actually reflected a rational and factual understanding of the proceedings, rather than incompetence, the district court went on to explain:

> Therefore, while petitioner's actions and remarks have been characterized by him as irrational, that word is appropriate only to the extent it describes actions by petitioner which were not in his best interest. However, rationality from a standpoint of competence is not determined by foolishness or wisdom, and, for this additional reason, the events on which petitioner relies to establish his incompetency at the time of trial and the duties on counsel are not probative on the point.

*Id.*

Similarly, in the instant case, petitioner's episodes may have been inappropriate and not in his best interests; but they actually evidenced a rational and factual understanding of the proceedings, as opposed to incompetence, in the sense that they "were closely related to either the outcome of the case or the procedures involved[.]" *Sweezy*, 554 F. Supp. at 492. Petitioner fought for new attorneys who would in turn fight for him when he thought that his assigned attorneys believed him to be guilty and were urging him to accept a plea bargain. (Tr. Vol. I, Exh. 30, at 3-7; Tr. Vol. I, Exh. 35, at 7; Tr. Vol. I, Exh. 36, at 9.) He clearly had some back-and-forth with his attorneys on how to deal with certain evidence, such as the presence of his palm print in the victim's home. (Tr. Vol. I, Exh. 36, at 7-8.) He obviously understood that he had a constitutional right to counsel. (Tr. Vol. I, Exh. 36, at 10.) He was reluctant to discuss in

70

front of the prosecution, or in open court for fear that it would be used against him, the nature of the disagreements that had precipitated his request for new counsel.  (Tr. Vol. I, Exh. 36, at 7-8.)

Chief Justice Moyer of the Ohio Supreme Court concluded in dissent that petitioner's waiver of his right to introduce mitigation evidence, combined with petitioner's conduct both before and during trial, should have required the trial judge to order a competency evaluation. Although this Court is of the same view, the fact is that a reviewing court in a habeas proceeding is not authorized to simply second-guess the state court.  The majority opinion cannot be said to be either a decision that was contrary to clearly established federal law or a decision that involved an unreasonable determination of the facts presented.

The Court also takes into consideration that, although petitioner's episodes of disruptive behavior were often inappropriate and not in his best interests--albeit, not irrational from the standpoint of competence--the record contains numerous instances demonstrating that petitioner was not only oriented to the proceedings, but also capable of conducting himself appropriately and reasoning logically.  *Sweezy, supra*, 554 F. Supp. at 492  For instance, notwithstanding his angry outbursts following the trial court's denial of his motion to replace his second set of attorneys, petitioner proceeded to conduct himself appropriately throughout the duration of the culpability phase of his trial, never once acting out or behaving disruptively until the rendition of the verdicts. Additionally, once petitioner had determined to forgo the presentation of any mitigating evidence, he nonetheless elected to appear in the courtroom with his attorneys for his mitigation hearing to avoid the alternative of being placed in the basement holding cell, for he had demonstrated on several occasions that he was loathe to be placed in that cell.  (Tr. Vol. V, Exh. 49, at 4-6.)

71

Additional factors to take into consideration are, as noted above, the apparent absence of any prior history of mental health problems on petitioner's part. Similarly, neither defense counsel, nor the trial court, nor the prosecution--those people in the best position to observe the incidents set forth above in their context and petitioner's demeanor and behavior throughout the trial--suggested that they had any questions as to petitioner's competency.

Moreover, even the most recent mental health evaluation, performed by Dr. Kristen Haskins in 1998 in connection with petitioner's state postconviction proceedings, stops short of positing with any degree of certainty that petitioner was incompetent when he waived his right to present mitigating evidence. Dr. Haskins's affidavit recounts a personal, family, and developmental history for petitioner that was horrific. She appeared to diagnose petitioner with "a severe personality pattern disturbance" (App. Vol. IV, at 303) and "a significant substance abuse problem" (*Id*. at 305). She suggested that what she had learned from petitioner and his family may have been only the "tip of the iceberg." (*Id*. at 307.) Still, Dr. Haskins concluded only that "[d]escriptions of his loss of control and outbursts in the court room and his refusal of mitigation suggest his coping resources had been so severely depleted by the stress of the trial and that he was possibly psychologically decompensated to the point that he was unable to competently proceed." (App. Vol. IV, at 307.) This falls short, in this Court's view, of evidence that petitioner was suffering from a mental disease, disorder, or defect that may have substantially affected his capacity to appreciate his position and making an informed decision not to present mitigating evidence.[3] Petitioner has not demonstrated that he was incompetent when he waived his right to present mitigation evidence or that the trial court erred when it failed

---

[3]     The conclusions reached by Dr. Jeffrey Smalldon prior to petitioner's mitigation hearing similarly fall short of establishing that petitioner was incompetent. (Doc. # 85-5.)

to *sua sponte* conduct a competency hearing.

The Court reaches the following conclusions regarding petitioner's first ground for relief. Petitioner argued that the Ohio Supreme Court erred in not applying its *Ashworth* decision to his case on direct appeal. The Ohio Supreme Court rejected that argument and this Court concludes that the decision in that regard did not contravene or unreasonably apply controlling Supreme Court precedent. Petitioner argued that his waiver of the right to present mitigation evidence was not knowing, intelligent, and voluntary. The Ohio Supreme Court rejected that argument and this Court concludes that the decision in that regard did not contravene or unreasonably apply controlling Supreme Court precedent or involve an unreasonable determination of the facts based on the evidence presented. Finally, petitioner argued that he was not competent to make a knowing, intelligent, and voluntary waiver of the right to present mitigating evidence, and that the trial court erred when it failed to *sua sponte* conduct a hearing on petitioner's competency. The Ohio Supreme Court rejected that argument on direct appeal and the state courts further rejected it in postconviction. This Court concludes that those decisions did not contravene or unreasonably apply controlling Supreme Court precedent or involve an unreasonable determination of the facts based on the evidence presented. Accordingly, the Court **DENIES** petitioner's first ground for relief as meritless.

### D. Certificate of Appealability

An appeal from the denial of a habeas corpus action may not proceed unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1). To warrant a certificate of appealability, a petitioner must make a substantial showing that he was denied a constitutional right. 28 U.S.C. § 2253(c)(2); *see also Barefoot v. Estelle*, 463 U.S. 880 (1983);

*Lyons v. Ohio Adult Parole Authority, et al.*, 105 F.3d 1063 (6th Cir. 1997).  He need not demonstrate that he will prevail on the merits; he needs only to demonstrate that the issues he seeks to appeal are deserving of further proceedings or are reasonably debatable among jurists of reason.  *Barefoot*, 463 U.S. at 893 n.4.  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy 28 U.S.C. § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This analysis should also be applied when the Court has denied a claim on procedural grounds.  *Id.* at 483; *see also Porterfield v. Bell*, 258 F.3d 484, 486 (6th Cir. 2001).  When the Court dismisses a claim on procedural grounds, a certificate of appealability is warranted when petitioner demonstrates (1) that jurists of reason would find it debatable whether the petition states a valid claim and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484.

This issue was central to petitioner's trial and this Court's resolution of the issue is central to this habeas proceeding.  This claim not only is fact-intensive but also implicates numerous fundamental rights.  That being so, the Court is more than satisfied that reasonable jurists could find its decision debatable or wrong and accordingly certifies ground one for appeal.

**<u>Second Ground for Relief</u>: Petitioner was denied the effective assistance of counsel in violation of the U.S. Constitution Amendments VI and XIV.**

In his second ground for relief, petitioner raises eleven allegations of ineffective assistance of trial counsel.  (Doc. # 15, at ¶¶ 9-23.)  The Court will consider each allegation in turn.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard for demonstrating a claim of ineffective assistance of counsel is composed of two parts:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Scrutiny of defense counsel's performance must be "highly deferential." *Id*. at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. To establish the second prong of the *Strickland* test, prejudice, a Petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that Petitioner has failed to satisfy one prong, it need not consider the other. *Id*. at 697.

**Ground 2(a): Failure to Present Mitigating Evidence.**

Petitioner argues in ground two, sub-part (a) that counsel performed deficiently and to his prejudice by failing to present any mitigating evidence. (Doc. # 15, at ¶¶ 12-13.) Petitioner argues that, even assuming the decision whether to present mitigating evidence is a mere tactical choice left to the discretion of counsel--a point of law that petitioner disputes--no such tactical

justification existed in the instant case for counsel's failure to present the substantial mitigation evidence that could and should have been presented.

Relying on the Ohio Supreme Court's rejection of petitioner's claim, respondent argues that defense counsel's acquiescence in the refusal to present mitigation evidence did not constitute ineffective assistance of counsel.  (Doc. # 36, at 39-44.)  Respondent argues that petitioner's decision to refuse to present mitigation evidence was knowing and informed. Respondent also argues that, although ABA guidelines suggest that counsel should have presented mitigation evidence over petitioner's express wishes to the contrary, those guidelines are not dispositive for determining whether counsel's performance was adequate.  In that regard, respondent argues not only that it can be problematic to put on a mitigation case when a client professes his innocence, but also that there can be legitimate strategic reasons to forgo the presentation of character or background evidence.  Given that petitioner continued to profess his innocence even after he was convicted as charged and then steadfastly refused to allow mitigation evidence to be presented, respondent argues, the failure to present mitigating evidence was attributable not to lack of preparation or effort on counsel's part, but to petitioner's knowing and informed decision.

Petitioner responds in his traverse by arguing that respondent ignores record evidence of petitioner's insistence on new counsel and exhibitions of "what can only be described as fits of paranoia[,]" record evidence that petitioner's decision to waive mitigation was not informed and voluntary, and record evidence that petitioner was not competent to waive his rights.  (Doc. # 42, at 23.)  Petitioner goes on to argue that, given the consistent emphasis by the Supreme Court of the need for the sentencer to consider and weigh any evidence favoring a sentence less than

death, federal courts have recognized that defense counsel has a duty to make reasonable investigations or to make a reasonable tactical decision that makes such investigations unnecessary. From that premise, petitioner reasons that, "[i]nherent in the concept of the duty to make a reasonable investigation is the underlying concept of actually presenting the mitigation evidence one discovers in a manner that allows the jury to give effect to such evidence." (Doc. # 42, at 24.)

A central theme of the arguments set forth in petitioner's traverse is that, where counsel knows of significant mitigating facts, counsel has duty to conduct a defense-oriented and privileged investigation of the facts, which duty exists despite any apparent desire on the part of the defendant-client to not introduce this evidence to the sentencer. In this regard, petitioner argues that American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1.c (1989) states that investigation for the preparation of the sentencing phase should be conducted regardless of an assertion by the client that mitigation is not to be offered. Petitioner further argues that any instruction by the defendant-client not to present mitigation evidence, to be valid, must be an informed instruction made <u>after</u> counsel conducts a reasonable mitigation investigation and presents various strategies to the defendant.

Another central theme of the arguments presented by petitioner is that although counsel may not necessarily render ineffective assistance by following his client's wishes to forgo the presentation of mitigating evidence, that is so only if the client was competent. And significant doubts exist as to petitioner's competency, especially in light of the fact that petitioner not once expressed a desire to die. Petitioner argues that, given Ohio's statutory sentencing scheme and the jury instructions that were given in this case, petitioner's failure to present any mitigating

77

evidence guaranteed that the jury would return a death sentence. This, according to petitioner, was tantamount to suicide, though petitioner at no time expressed a desire to die. Petitioner argues that *Comer v. Stewart*, 215 F.3d 910 (9th Cir. 2000) recognized that the Model Rules of Professional Conduct "trump" pursuing a client's desired course of action when there is some question that the client might be suffering from a disability preventing him from making binding legal decisions.

Another factor establishing deficient performance on the part of defense counsel, petitioner argues, is that there exists evidence suggesting that counsel failed even to attempt to dissuade petitioner from his decision to forgo the presentation of mitigating evidence. Petitioner further suggests that defense counsel's poor relationship with petitioner caused or contributed to that failure on counsel's part. Petitioner argues that counsel has a duty to attempt to convince his client to abandon a course of action that will lead to the client's destruction and to inform him that his chosen course of action will not result in his desired outcome.

Finally, petitioner argues that, even assuming that the right to present mitigation evidence is a non-fundamental right which is left to the sound discretion of defense counsel, counsel in this case had no tactical reason to forgo the presentation of mitigation, especially in view of the fact that they had questioned numerous potential jurors during *voir dire* about possible mitigating factors.[4] Petitioner argues that his express wishes to not present mitigation were a factor to be considered in assessing, but were not dispositive of, whether counsel performed deficiently in failing to present mitigating evidence, especially where, as here, petitioner never

---

[4] Petitioner argues that there is a split in authority as to whether the right to present mitigating evidence is a fundamental right belonging to the death-eligible defendant or a non-fundamental right left to the sound discretion of defense counsel. To that extent that the Ohio Supreme Court's decisions have followed the latter course, petitioner disagrees.

expressed a wish to die.

The Ohio Supreme Court rejected petitioner's claim, holding that, "[l]ike other courts, we have rejected the notion that an attorney renders ineffective assistance by declining, in deference to a client's desires, to present mitigation. *Cowans*, 87 Ohio St. 3d at 81 (citing *State v. Tyler*, 50 Ohio St. 3d 24, 27-29 (1990); *State v. Keith*, 79 Ohio St. 3d 514, 536-37 (1997); *State v. Koedatich*, 112 N.J. 225, 332-35 (1988); and *Kirksey v. State*, 112 Nev. 980, 995-96 (1996).) For the reasons that follow, this Court cannot disagree with, much less find unreasonable, that holding.

Petitioner takes issue with respondent's argument that petitioner's decision not to present mitigating evidence was informed and knowing. (Doc. # 42, at 23.) But this Court has determined after careful consideration of the record and relevant case law that it was. Petitioner insists in this regard that there is record evidence that his decision not to present mitigating evidence was not informed or voluntary. (Doc. # 42, at 23.) This Court has considered and rejected that argument. Petitioner also argues that there is record evidence that he was not competent to waive his rights. (Doc. # 42, at 23.) This Court has considered and rejected that argument, too. Given this Court's previous determinations, as well as controlling case law, petitioner's claim that his attorneys were ineffective for failing to present mitigation evidence, even though that "failure" was in acquiescence to petitioner's express wishes, is belied by the record and foreclosed by controlling precedent.

It is well settled that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Carter v. Bell*, 218 F.3d 581, 600 (6th Cir. 2000). The importance of competent

representation during the penalty phase of a capital trial cannot be understated, especially with respect to the duty to investigate, because, as a practical matter, all that stands between a defendant who has been convicted of capital murder and a death sentence is whatever mitigation evidence he can muster. *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999).

> Under the Ohio statute, a capital defendant found guilty of a death specification has to present some mitigating evidence in order to avoid the death penalty. If a jury has nothing to weigh against the aggravating circumstance, it almost certainly must find that the aggravating circumstance outweighs the (nonexistent) mitigating circumstances, and recommend death.

*Id*. at 426. *See also Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (incorporating the 2003 American Bar Association ("ABA") Guidelines regarding competent representation in capital cases); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (discussing the duty to investigate mitigating evidence and incorporating the 1989 ABA Guidelines regarding competent representation in capital cases). Thus, the Sixth Circuit has not hesitated to hold that "failure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing *can* constitute ineffective assistance of counsel under the Sixth Amendment." *Martin v. Mitchell*, 280 F.3d 594, 612 (6th Cir. 2002) (citing *Carter v. Bell, supra*, 218 F.3d at 600, and *Skaggs v. Parker*, 235 F.3d 261, 271 (6th Cir. 2000)).

Notwithstanding what the foregoing authority establishes about an attorney's duty to conduct a thorough investigation into all reasonably available mitigating evidence, the fact remains that counsel does not render ineffective assistance by complying with his client's express wishes not to present mitigating evidence. The Supreme Court recently addressed, for the first time, a situation in which a death-sentenced individual not only elected not to present mitigating evidence, but also actively prevented his attorney from presenting any mitigating

evidence.  *Schriro v. Landrigan*, 127 S.Ct. 1933, 1941 (2007) held definitively that a death-eligible defendant who instructed his attorney not to present mitigating evidence could not establish that he was prejudiced by counsel's resulting failure to present mitigating evidence.

Even prior to *Schriro*, there was no shortage of federal cases rejecting claims of ineffective assistance for the failure to present mitigating evidence where that "failure" stemmed from the petitioners' express instructions not to present mitigating evidence.  *See, e.g., Jeffries v. Blodgett*, 5 F.3d 1180, 1197-98 (9th Cir. 1993); *Shelton v. Carroll*, 464 F.3d 423, 439-40 (3rd Cir. 2006).  Immediately following *Schriro*, courts continued to reject such claims.  *See e.g., Taylor v. Horn*, 504 F.3d 416, 455-56 (3rd Cir. 2007); *Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007).  The Sixth Circuit has held, with respect to counsel's acquiescence to the petitioner's instructions forbidding or limiting the presentation of mitigating evidence, that counsel does not render ineffective assistance by acquiescing to his client's wishes.  *See Keith v. Mitchell*, 455 F.3d 662, 672 (6th Cir. 2006) (finding no ineffective assistance for pursuing strategy knowingly directed by the defendant); *Wickline v. Mitchell*, 319 F.3d 813, 820-21 (6th Cir. 2003) (finding no deficient performance for pursuing mitigation strategy emphasizing that victim facilitated murder, given defendant's refusal to talk to psychologist or probation officer or to involve family).

In short, petitioner will not be heard to complain that his attorneys performed unreasonably and to his prejudice by failing to present mitigating evidence when petitioner not directed them not to present any evidence but also instructed his family and friends not to cooperate with defense counsel or their mitigation experts.  Petitioner has not established a constitutional violation, much less that the Ohio Supreme Court's decision contravened or

unreasonably applied federal law.  *See, e.g., Henness v. Bagley*, No. 2:01-cv-043, 2007 WL

3284930, at * 20 (S.D. Ohio Oct. 31, 2007) (holding that the Ohio Supreme Court's decision

rejecting trial counsel ineffectiveness claim could not have contravened or unreasonably applied

controlling federal law, "[g]iven *Schriro*'s acknowledgment that the United States Supreme

Court had never addressed a situation in which the client interfered with counsel's efforts to

present mitigation evidence[.]")

        Beyond the foregoing, this Court is compelled to respond to certain aspects of

petitioner's argument.  First, petitioner's precise claim is that his defense counsel performed

deficiently and to his prejudice by failing to present mitigation evidence.  Any suggestion by

petitioner, however, that defense counsel failed even to investigate possible mitigating evidence

or prepare for the sentencing phase is belied by not only the record but also petitioner's own

arguments.  The record reveals that in December 1996, counsel filed not only a motion for funds

to employ a mitigation psychologist, but also multiple motions requesting certain jury

instructions on specific mitigating factors.  (J.A. Vol. I, Exh. 8, at 67-69.)  The transcript of voir

dire is littered with questions from defense counsel to prospective jurors concerning specific

mitigating evidence that counsel might explore, such as testimony by mitigation specialists and

psychologists and evidence concerning the abuse, neglect, and lack of moral guidance that

petitioner received during childhood.  (Tr. Vol. II, Exh. 39, at 303, 303-04; Tr. Vol. II, Exh. 40,

at 427-28, 428-29.)  Petitioner himself points out in his arguments that his attorneys had asked

prospective jurors about certain mitigating evidence that counsel might present.  (Doc. # 42, at

28-29.)  Finally, as discussed more fully above in connection with petitioner's first ground for

relief, counsel were prepared to present testimony by mitigation specialist James Crates,

psychologist Dr. Jeffrey Smalldon, and several of petitioner's relatives and acquaintances. (Tr. Vol V, Exh. 50, at 28.) Similarly, any suggestion by petitioner that his defense counsel failed even to attempt to dissuade him from forgoing mitigation is finds little support in the record. Counsel stated on the record more than once that they had had numerous, lengthy conversations with petitioner in an attempt to dissuade him waiving mitigation. (Tr. Vol. V, Exh. 49, at 2523, 3-4; Exh. 50, at 26-27.)

For the foregoing reasons, the Court **DENIES** sub-part (a) of petitioner's second ground for relief as without merit.

**Ground 2(b): Failure to Request Competency Evaluation.**

Petitioner argues in ground two, sub-part (b) that his counsel performed deficiently and to his prejudice when they failed, upon petitioner's wish to waive mitigation and in connection with his disruptive behavior, to request that he be evaluated for his competency. (Doc. # 15, at ¶ 14.)

Respondent argues that petitioner's claim not only was procedurally defaulted but also is without merit.[5] (Doc. # 36, at 44-49.) With respect to the latter argument, respondent relies on the appellate court's decision rejecting petitioner's claim in postconviction. There, the appellate court concluded that the record did not suggest that petitioner may have been legally incompetent when he waived mitigation and that the affidavit of Dr. Kristen Haskins, "while replete with the particulars of appellant's 'severe personality pattern disturbance,' does not provide any credible evidence that appellant was legally incompetent during the penalty phase of his trial." (Doc. # 36, at 44-45 (quoting Exhibit 26, at 259-260).) Citing the standard set forth in

---

[5] This Court rejected respondent's procedural default argument in its September 30, 2002 Opinion and Order, concluding that petitioner had properly raised the claim in his state postconviction proceedings because the claim relied on and was supported by evidence outside the record.

*Dusky v. United States*, 362 U.S. 402, 402 (1960), respondent argues that the record supports the trial court's finding during trial that petitioner was competent.  Respondent also argues that petitioner's competence at the time of his trial is fairly supported by the record and is therefore entitled to a presumption of correctness.  Respondent goes on to set forth the colloquies in which the trial court engaged petitioner on April 10, 1997 and April 11, 1997, as well as representations made by petitioner's defense counsel about their discussions with petitioner, as record evidence that petitioner possessed the mental capacity to under the choice he was making and the ramifications of his decision.  Respondent thus argues that the decisions of the Ohio Supreme Court and Court of Appeals were not clearly contrary to established federal law and did not involve an unreasonable determination of the facts in light of the evidence presented.  Respondent concludes that "[g]iven Cowans' apparent understanding, trial counsel cannot be said to have been ineffective at trial for failing to request a competency evaluation at the time of Cowans' waiver of mitigation."  (Doc. # 36, at 49.)

Petitioner's argues in his traverse that respondent, in asserting that the record fairly supports a finding that petitioner was competent, ignores significant parts of the record, as well as Chief Justice Moyer's dissent, suggesting the opposite.  (Doc. # 42, at 32-25.)  Citing the standards for competency set forth in *Dusky*, *Pate*, and *Drope*, petitioner points out that the same record supporting the Ohio Supreme Court's decision finding, (and respondent's argument), that petitioner was competent also supports Chief Justice Moyer's observations questioning petitioner's competency.  Petitioner points to such factors as his repeated requests for new counsel, his refusals to speak to his defense counsel, and his exhibitions of far-reaching paranoia. Petitioner argues that there is a dispute as to whether the evidence and inferences drawn

therefrom concerning his competency, and the failure to determine his competency, support a determination that he was denied effective assistance of counsel, a fair trial, and a reliable sentencing hearing.  He also argues that it was objectively unreasonable for the Ohio Supreme Court to find that he was competent.

On direct appeal, the Ohio Supreme Court did not squarely address the claim that petitioner's trial attorneys were ineffective for failing to request a competency evaluation.  But the Ohio Supreme Court did address petitioner's competency and the failure of the trial court to order a competency hearing *sua sponte*, holding:

> The defendant's behavior here did not inherently raise questions concerning his capacity to understand the difference between life and death, to fully comprehend the ramifications of his decision, or to reason logically. Moreover, the trial judge, based on his observations of this defendant, and having the defendant's displays of temper in mind, found that these displays resulted from pique, not mental instability.  Thus, in order to find error, we would have to second-guess the express factual determination of the trial judge.  This we decline to do.  We therefore find that the trial court was not required to order a competency hearing *sua sponte*.

*Cowans*, 87 Ohio St. 3d at 85.

Petitioner squarely raised during his state postconviction proceedings the claim that his attorneys were ineffective for failing to request a competency evaluation.  The last state court to issue a reasoned decision on the claim, the appellate court in postconviction, rejected the claim as follows:

> As we stated in the fourth claim for relief, we do not find the record suggests appellant may have been legally incompetent when he waived mitigation.  Dr. Haskins' affidavit, while replete with the particulars of appellant's "severe personality pattern disturbance," does not provide any credible evidence that appellant was legally incompetent during the penalty phase of his trial.

(J.A. Vol. V, Exh. 26, at 260.)

This Court is not persuaded that either the appellate court's decision rejecting petitioner's ineffective assistance claim, or the Ohio Supreme Court's decision finding that he was competent, contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts in light of the evidence that was presented. Initially, the Court notes that a state court's determination of competency is a factual finding that is entitled to the presumption of correctness in habeas corpus and can be rebutted only by clear and convincing evidence. *See, e.g., Mackey v. Dutton*, 217 F.3d 399, 413 (6th Cir. 2000). Further, it is not possible to demonstrate prejudice from trial counsel's failure to request a competency determination where the state courts make a finding of competency that is a reasonable determination of the facts and fairly supported by the record, *Doughty v. Grayson*, 397 F. Supp. 2d 867, 882 (E.D. Mich. 2005), or where there is insufficient evidence establishing that the defendant was actually incompetent, *Bair v. Phillips*, 106 F. Supp. 2d 934, 941 (E.D. Mich. 2000) (citing *Blanco v. Singletary*, 943 F.2d 1477, 1507 (11th Cir. 1991) and *Hernandez v. United States*, 839 F. Supp. 140, 143 (E.D.N.Y. 1993)).

The Ohio Supreme Court found on direct appeal that petitioner was competent, and the state appellate court further determined in postconviction that petitioner was competent and that neither the trial court nor trial counsel violated a duty owed to petitioner by failing to insist on a competency hearing.  This Court, after careful review of the record and relevant case law, does not conclude that these findings and determinations are unreasonable.  Neither petitioner's episodes of disruptive behavior, nor petitioner's decision to waive mitigation, nor even the findings and conclusions set forth by Dr. Kristen Haskins and Dr. Jeffrey Smalldon in their postconviction affidavits either establishes petitioner's incompetence or creates a bona fide

doubt as to petitioner's competence sufficient that a reasonable attorney would have been alerted to request a competency hearing.  Thus, for the reasons discussed more fully in connection with petitioner's first ground for relief, this Court concludes that petitioner cannot demonstrate that his trial attorneys were ineffective for failing to request a competency evaluation.  That being so, this Court cannot find that the state court decisions rejecting this claim contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts in light of the evidence that was presented.

Accordingly, the Court **DENIES** as without merit sub-part (b) of petitioner's second ground for relief.

### **Ground 2 (c)**: Failure to Insure that Waiver Was Voluntary.

Petitioner argues in ground two, sub-part (c) that his attorneys were ineffective for failing to insure that his waiver of the right to present mitigating evidence was voluntary.  (Doc. # 15, at ¶ 15.)  The Court concluded in its September 30, 2002 *Opinion and Order* that ground two, sub-part (c) was procedurally defaulted.  In its September 12, 2006 *Opinion and Order*, however, the Court agreed to revisit that procedural default determination, specifically to determine whether petitioner could establish ineffective assistance of appellate counsel as cause and prejudice sufficient to excuse the default of ground two, sub-part (c).  The Court begins by setting forth ground two, sub-part (c).

As noted above, petitioner argues in sub-part (c) of this second ground for relief that his trial attorneys performed deficiently and to his prejudice by failing to insure that his "purported waiver" of the right to present mitigating evidence was knowing, intelligent, and voluntary. (Doc. # 15, at ¶ 15.)  Specifically, petitioner argues that his attorneys should have either

requested the trial court to engage in a recorded colloquy with petitioner or engaged petitioner in such a colloquy themselves.

In her return of writ, respondent reiterates that petitioner's claim is barred by procedural default but also argues that it is without merit.  (Doc. # 36, at 49-50.)  Respondent notes that the right to present mitigating evidence may be waived so long as the waiver is knowing, intelligent, and voluntary.  Respondent recites well-settled law that a waiver is voluntary if made with a full awareness of consequences and if not induced by threats, misrepresentations, or other improper conduct, and that a waiver is knowing and intelligent if made with a full awareness of the nature and consequences of the decision.  Under these standards, according to respondent, petitioner's waiver of his right to present mitigating evidence was knowing, intelligent, and voluntary, meaning that his defense counsel were not ineffective for failing to insure that it was. Respondent points out, as previously set forth, that the trial court engaged petitioner in a colloquy regarding his desire to waive all mitigation during which the trial court explained petitioner's rights during mitigation, informed petitioner that his attorneys had prepared witnesses, inquired why petitioner did not want to be present for or participate in any presentation of mitigation, and warned him that waiving mitigation would probably result in a death sentence.  Respondent further points out that defense counsel also had multiple discussions with petitioner about mitigation, but that petitioner steadfastly refused to allow them to present any mitigating evidence.  Respondent argues that the trial court's colloquy, counsel's discussions with petitioner, and the fact that petitioner did not make his decision lightly all demonstrate that petitioner understood the implications of his actions and was fully aware of the consequences of his decision.  Respondent also argues that petitioner cannot point to any threats,

88

misrepresentations, or other improper conduct by the trial court, prosecution, or his defense attorneys that induced him to waive mitigation. Because petitioner's decision to waive mitigation was voluntary, respondent argues, "[t]rial counsel clearly was not ineffective in this regard." (Doc. # 36, at 50.)

Petitioner argues in his traverse that "[t]he parties disagree on what the actual record shows." (Doc. # 42, at 35.) Petitioner argues that respondent, in asserting that petitioner was fully informed of his right to present mitigating evidence and that the record demonstrates a knowing, intelligent, and voluntary waiver by petitioner of that right, "ignores the Ohio Supreme Court's majority decision pointing out that 'there was no explanation of what mitigating evidence is, and no finding on the record that Cowans fully understood the ramifications of failing to present mitigating evidence or desired to waive his rights.'" (Doc. # 42, at 36 (quoting *Cowans*, 87 Ohio St. 3d at 86).) Petitioner goes on to argue that although the Ohio Supreme Court found no problem with these deficiencies, United States Supreme Court precedent requires this Court to find that the Ohio Supreme Court's decision was objectively unreasonable.

The essence of petitioner's arguments is that, contrary to what respondent asserts, the record in this case does not support a finding under the *Zerbst* waiver that petitioner understood what mitigating evidence was, what mitigating evidence was available in this case, or the ramifications of failing to present mitigating evidence, or that petitioner desired to waive those rights. (Doc. # 42, at 35-39.) Thus, petitioner argues, there can be no finding that his waiver was voluntary. Petitioner argues that counsel's failure to insure that petitioner understood the foregoing constituted deficient performance, especially where petitioner had a low IQ, where petitioner had serious mental health issues, and where trial counsel had been unsuccessful

89

establishing a trusting relationship with petitioner.  In the latter regard, petitioner asserts that the record shows his repeated expressions of distrust for counsel, his periodic refusals to meet with counsel, his repeated refusals to follow counsel's advice, and a complete failure by counsel to attempt to dissuade petitioner from waiving mitigation. Petitioner argues that the foregoing, combined with the fact that at no time did he express a desire to die, demonstrates that counsel were ineffective for failing to insure that he understood that his decision would result in just that--a death sentence.

The Ohio courts did not squarely address the claim that petitioner's trial attorneys were ineffective for failing to insure that his waiver of mitigation was knowing, intelligent, and voluntary because petitioner did not squarely present that claim to the state courts.  As noted throughout this decision, however, the Ohio Supreme Court did conclude that petitioner was competent to waive his rights and that petitioner's waiver of the right to present mitigating evidence was knowing, intelligent, and voluntary.  *Cowans*, 87 Ohio St. 3d at 81-86.  Further, the Ohio Court of Appeals in postconviction made findings that because the record did not suggest that petitioner may have been legally incompetent, trial counsel were entitled to respect his wishes to waive all mitigation and that defense counsel attempted to convince petitioner of the folly of his actions.  (J.A. Vol. V, Exh. 26, at 257, 260.)  Any factual findings made by the state courts are entitled to a presumption of correctness on habeas corpus review, refutable only by clear and convincing evidence.  *See, e.g., Mackey v. Dutton, supra*, 217 F.3d at 413.

Specifically, this Court has already determined, after an exhaustive examination of the record and relevant case law, that the conclusion of the state courts that petitioner's waiver of the right to present mitigating evidence was knowing, intelligent, and voluntary was not

90

unreasonable.  Thus, petitioner cannot demonstrate that petitioner's trial attorneys performed deficiently or to his prejudice in this regard.  Because, for the reasons discussed more fully in connection with petitioner's first ground for relief, this Court concludes that the arguments set forth in ground two, sub-part (c) are without merit, the Court further concludes that appellate counsel did not perform deficiently or to petitioner's prejudice in failing to raise this claim on direct appeal.  That being so, the Court abides by its September 30, 2002 *Opinion and Order* finding that this claim was procedurally defaulted.

Sub-part (c) of petitioner's second ground for relief is **DENIED** as procedurally defaulted and without merit.

### Ground 2 (d): Failure to request independent counsel to present mitigation.

Petitioner argues in sub-part (d) of his second ground for relief that counsel in this case should have sought appointment of independent counsel or *amicus curiae* to present mitigating evidence even if their client was competent and voluntarily waived the right to present mitigating evidence.  Petitioner reasons simply that "[d]efense counsel are never required to assist their client in committing suicide."  (Doc. # 15, at ¶ 16.)

Respondent argues that this claim is wholly without merit and should be denied.  (Doc. # 36, at 51-52.)  Respondent points out that petitioner raised this claim in postconviction and that the state trial court and court of appeals denied it on the merits.  Seizing upon the appellate court's decision rejecting the claim, respondent argues herein that petitioner has failed to demonstrate that his waiver of mitigation was somehow related to an alleged breakdown in the attorney-client relationship.  Respondent also contends that there is no reason to believe that petitioner would have allowed independent counsel to present mitigation evidence.  As

91

respondent points out, "Cowans' refusal to allow the presentation of mitigation evidence was not based upon dissatisfaction with his trial counsel, but rather dissatisfaction with the guilty verdict returned by the jury."  (Doc. # 36, at 52.)

In his traverse, petitioner combines with his argument that counsel failed to request independent counsel to present the mitigation evidence that they could not present his argument from sub-part (e) that counsel failed to proffer mitigation evidence.  (Doc. # 42, at 39-47.) Petitioner asserts that respondent's arguments ignore record evidence of a breakdown in the attorney-client relationship that neither the trial court nor Ohio Supreme Court considered. Petitioner goes on to recount in detail the facts surrounding first, his request in November 1996 for the replacement of his original attorneys, which resulted in attorneys Michael Kelly and Bruce Wallace being appointed, and second, petitioner's multiple attempts in February 1997, a month before his trial was scheduled to begin, to replace Mr. Kelly and Mr. Wallace with new counsel.  Petitioner focuses in particular on the final motion that Mr. Kelly and Mr. Wallace filed on March 6, 1997, after the trial court had twice before refused petitioner's requests to replace them, wherein counsel explained that they had had disputes with petitioner about certain evidence and methods for dealing with it, and that new evidence had emerged concerning a jailhouse informant with which it was impossible to deal because petitioner would not speak to counsel.  Petitioner focuses on that motion because, as this Court also noted, it does not appear that the trial court ever ruled on that motion.  Petitioner argues the trial court's statement in its sentencing decision that after it denied the February 19, 1997 motion for new counsel, petitioner resumed communication with counsel, is belied by the record because of the March 6 motion that was never ruled upon.  Petitioner argues that the Ohio Supreme Court also ignored the

March 6, 1997 motion that was never ruled upon when it found no error in the trial court's refusal to request new counsel.

Petitioner goes on to argue that trial counsel suffered from an irreconcilable conflict between their obligation on one hand as adversaries to ensure the integrity of the proceedings, including the penalty proceeding, and their obligation on the other hand to proceed in accordance with their client's wishes. Petitioner argues that counsel should have notified the trial court about that conflict and requested independent counsel to present the mitigation evidence that they could not present. In so arguing, petitioner reasons that absent full disclosure of mitigating factors, the penalty determination is invalid because no weighing process took place. Quoting significant portions of Dr. Kristen Haskins' postconviction affidavit, petitioner concludes by setting forth the myriad of mitigation evidence that the jury never heard, due to counsel's failure to request independent counsel.

Petitioner presented this ineffective assistance claim in postconviction. The last state court to issue a reasoned decision on it, the Ohio Court of Appeals, rejected the claim on the merits as follows:

> In the fourth claim for relief, appellant argues that his trial counsel was ineffective by failing to request that the trial court appoint an independent counsel to present mitigating evidence after appellate refused to allow his trial counsel to present mitigating evidence. Appellant claims that, by refusing to allow his trial counsel to present mitigating evidence in the penalty phase, the attorney-client relationship had broken down. The evidence dehors the record appellant provides is the affidavit of Kristen E. Haskins, Psy.D, whose private practice specializes in clinical and forensic psychology. In paragraph sixteen of her affidavit, Haskins states:
>
> > Once [appellant] was found guilty with death penalty specifications, [appellant] refused to have any mitigation presented in his case. This refusal was deeply rooted in his severe personality pattern disturbance and the fact that his defense team

93

had not been able to establish a sufficient relationship to weather through his mistrust, poor coping skills, and underlying anger and hostility.  Descriptions of his loss of control and outbursts in the court room and his refusal of mitigation suggest his coping resources had been so severely depleted by the stress of the trial and that he was possibly psychologically decompensated to the point that he was unable to competently proceed.

We find nothing in this statement, beyond speculation, to suggest that appellant was legally incompetent to waive the presentation of mitigation. Moreover, the fact, by itself, that appellant refused mitigation does not suggest the attorney-client relationship had broken down.  Finally, the Supreme Court of Ohio has found that there is no constitutional requirement that a defendant present mitigating evidence in the penalty phase.  <u>Ashworth</u>, 85 Ohio St. 3d at 63-66.

(J.A. Vol. V, Exh. 26, at 258-59.)

It also bears mentioning, in connection with this precise claim of ineffective assistance, that the trial court found in its sentencing opinion that "After denial [of petitioner's February 1997 motions for appointment of new counsel] Defendant resumed communication with his counsel."  (J.A.Vol. III, Exh. 11, at 33.)  Further, the Ohio Supreme Court on direct appeal denied petitioner's claim that the trial court had erred in denying the motions to withdraw that defense counsel had filed at petitioner's behest.  *Cowans*, 87 Ohio St. 3d at 72-74.  In so doing, the Ohio Supreme Court found that "the record indicates that this temporary lack of communication did not continue after the motion to withdraw was denied[,]" and then proceeded to cite several examples from the record demonstrating that petitioner was communicating with, and following the advice of, his defense counsel.  *Id*. at 73-74.

Petitioner has not demonstrated, and the Court is not otherwise persuaded, that the appellate court's decision rejecting this claim contravened or unreasonably applied clearly established Supreme Court precedent.  Nor is the Court persuaded that any of the state courts' decisions implicating this claim involved an unreasonable determination of the facts in light of

94

the evidence. Counsel did not perform deficiently because counsel violated no duty owed to either petitioner or the trial court in failing to request independent counsel for the purpose of presenting the mitigation evidence that they themselves were forbidden by petitioner to present. This Court has already determined that petitioner's waiver of mitigation was valid and that, accordingly, counsel were not ineffective for abiding by wishes. Presenting mitigation evidence or securing independent counsel to present that evidence, would have violated their client's express wishes. Counsel have no obligation to violate a client's wishes. *See e.g., Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007) ("Neither the Supreme Court nor this court has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions not to present evidence."); *see also Strickland v. Lee*, 471 F. Supp. 2d 557, 600 (W.D.N.C. 2007) (noting that an attempt by counsel to introduce the mitigation they had found would have violated restrictions set by the defendant and possibly provided a ground for claim of ineffective assistance). Thus, counsel fully satisfied their duty to their client. The only other "duty" that could have required counsel to seek independent counsel is if there were a statutory or constitutional requirement that mitigation evidence must be presented even over the defendant' objection. This Court, in its discussion of petitioner's sixth ground for relief below, has determined that no such requirement exists, Thus, counsel violated no duty and did not perform deficiently in failing to request independent counsel to present mitigating evidence.

Petitioner attempts to circumvent this obvious conclusion by suggesting that counsel had a duty to request independent counsel because an irreconcilable conflict prevented them functioning as adversaries for petitioner and ensuring the integrity of the sentencing proceedings. Specifically, petitioner appears to suggest that counsel had a duty to request independent counsel

because of two irreconcilable conflicts: (1) the conflict between their obligation as adversaries to ensure the integrity of the proceedings, including the penalty phase, and their obligation to proceed at petitioner's direction; and (2) the breakdown in communication between petitioner and counsel. Neither argument is availing. First, notwithstanding the conflict that counsel may have experienced between their duty to follow petitioner's wishes and their duty to ensure the integrity of the penalty phase by presenting all available mitigating evidence, this Court has already concluded that counsel does not perform deficiently by following a client's express and valid decision not to present evidence.

Further, the record does not demonstrate that there was a complete or total breakdown in communication between petitioner and his defense counsel. As noted above, the trial court found its sentencing opinion that after its denial of the February 1997 motion by petitioner for new counsel and motion by defense counsel to withdraw, petitioner resumed communications with his defense attorneys. (J.A. Vol. III, Exh. 11, at 33.) The Ohio Supreme Court made a similar finding on direct appeal. *Cowans*, 87 Ohio St. 3d at 73-74. That factual finding is entitled to a presumption of correctness, unless rebutted by clear and convincing evidence. Petitioner argues that the trial court and Ohio Supreme Court ignored record evidence--namely, a March 6, 1997 motion by defense counsel to withdraw, citing petitioner's refusal to communicate with them, on which the trial court never ruled. An unresolved motion by defense counsel to withdraw, citing their lack of communication with petitioner at that time, falls short of clear and convincing evidence to rebut the factual findings by the trial court and Ohio Supreme Court that petitioner had resumed communication with defense counsel. This is especially true in light of examples from the record demonstrating that petitioner had communicated with and

followed the advice of counsel.  *Cowans*, 87 Ohio St. 3d at 73-74.  Thus, the record does not support a finding that there was a total breakdown in communication between petitioner and defense counsel that might have imposed on counsel a duty to request independent counsel to present mitigating evidence.

Moreover, petitioner cannot demonstrate that he was prejudiced by defense counsel's failure to request independent counsel because petitioner simply has not shown that his decision to waive mitigation stemmed from, resulted in, or was related at all to a breakdown in the attorney-client relationship.  The Court agrees with respondent that it is clear from the record that petitioner's refusal to present mitigation stemmed not from dissatisfaction with counsel but from dissatisfaction with guilty verdict.  It is not reasonable to presume from the record that petitioner would have agreed to let independent counsel present mitigation evidence or permitted his family and friends to cooperate with new counsel.  That being so, petitioner cannot demonstrate that, but for counsel's failure to request independent counsel to present mitigating evidence, there is a reasonable probability that the outcome of the penalty phase would have been different.

Regarding petitioner's argument that that there is no support for respondent's assertion that petitioner actually prevented counsel from collecting mitigation evidence, it is actually petitioner who is in error on this point.  On April 10, 1997, when the mitigation hearing was scheduled to begin, defense counsel Mr. Wallace explained quite unambiguously:

> He has also by his efforts and that's what led to the cancellation of the jury to be called in today, has prevented the mitigation specialist and defense Counsel from gathering much of the information as normally we receive by his specific direction to family and friends to immediately cease cooperation with Mr. Crates, Dr. Smalldon, Mr. Kelly and myself so as not to enable us to present mitigation testimony in evidence against his wishes.

>I believe Mr. Cowans will confirm that is what he has done.  That is the
>reason we had to advise the Court we could not proceed today because the
>witnesses we had hoped to call today are now refusing to both cooperate and to
>come and testify at the request of Mr. Cowans."

(Tr. Vol. V, Exh. 49, at 3-4.)  Petitioner then confirmed the same on the record.  (*Id*. at 4.)  It

stands to reason, of course, that counsel, Mr. Crates, or Dr. Smalldon had managed to collect

some mitigation information and evidence prior to petitioner's decision to direct his family and

friends not to cooperate or testify.  And nothing about petitioner's directive to his family and

friends would have prohibited the defense team from gathering records or conducting other

investigation.  But in light of the foregoing representation by defense counsel, petitioner will not

be heard to assert that there is no support in the record for respondent's assertion that he had

prevented counsel from collecting mitigation evidence.  The foregoing constitutes unambiguous

support for a finding that, once he had decided to waive all mitigation, petitioner did in fact

direct his family and friends not to cooperate with the defense team and not to testify.

In sum, the appellate court's decision rejecting petitioner's claim that his attorneys were

ineffective for failing to request independent counsel to present mitigating evidence did not

contravene or unreasonably apply clearly established Supreme Court precedent.  Moreover, in

connection with this claim, none of the state courts made factual findings that were unreasonable

in light of the evidence.

The Court accordingly **DENIES** ground two, sub-part (d) as meritless.

**Ground 2(e): Counsel's failure to proffer mitigating evidence.**

Petitioner argues in sub-part (e) of his second ground for relief that even if he was

competent and voluntarily waived the right to present mitigation, and even if counsel had no

duty to request independent counsel to present mitigation, counsel were obligated to proffer

mitigation evidence.  (Doc. # 15, at ¶ 17.)  Petitioner argues that no justification exists for their failure to do so.

Quoting the appellate court's decision rejecting this claim in postconviction, respondent urges this Court to reject the claim, too.  (Doc. # 36, at 53-54.)  Respondent points out that counsel engaged in repeated efforts to persuade petitioner to permit the presentation of mitigating evidence.  Respondent further points out that counsel had planned to call psychologist Dr. Jeffrey Smalldon, mitigation specialist/investigator James Crates, and various family members and other individuals, but that petitioner hampered counsel's efforts to fully develop their mitigation evidence by instructing his family members and friends not to cooperate with the defense team or testify at the penalty hearing.  Respondent reasons that any mitigation that counsel might have proffered would have been incomplete at best and unsupported speculation at worst.  Respondent concludes by asserting there is no reason to believe that the result of petitioner's trial or direct appeal would have been different had counsel proffered what mitigation evidence they had.

As noted above, in his traverse, petitioner combines with his argument that counsel failed to request independent counsel to present the mitigation evidence that they could not present his argument from sub-part (e) that counsel failed to proffer mitigation evidence.  (Doc. # 42, at 39-47.)  In addition to arguing that a break-down in the attorney-client relationship resulted in, or was at least related to, petitioner's purported waiver of his right to present mitigating evidence--and argument that does not, in this Court's view, impact directly petitioner's argument that his counsel were ineffective for failing to proffer mitigation evidence--petitioner argues that had counsel proffered mitigation evidence, valuable information supporting a sentence less than

death would have been presented or made part of the record. Petitioner goes on to quote certain findings about petitioner's childhood, background, and possible personality disorders set forth in Dr. Haskins postconviction affidavit. Petitioner concludes by arguing that proffering even incomplete mitigation is more acceptable than not proffering any mitigation at all.

As respondent remarked, petitioner presented this claim to the state courts during his postconviction proceedings, where the state courts rejected it on the merits. The last state court to issue a reasoned decision on the claim, the state appellate court, held:

> In his sixth claim for relief, appellant argues that his trial counsel was ineffective by failing to proffer the result of a psychological examination of appellant given by Jeffrey L. Smalldon, Ph.D. We have reviewed Dr. Smalldon's affidavit. The affidavit contains numerous examples of potentially mitigating evidence as well as Dr. Smalldon's medical conclusion that appellant's refusal to present mitigation may be related to his personality disorder. The affidavit does not state that appellant was legally incompetent to waive mitigation in the penalty phase. We do not believe the Smalldon affidavit reaches the threshold standard of cogency which would justify an evidentiary hearing on this claim.

(J.A. Vol. V, Exh. 26, at 260.)

This claim does not warrant habeas relief because the state appellate court's decision rejecting this claim did not contravene or unreasonably apply clearly established Supreme Court precedent and did not involve an unreasonable determination of the facts in light of the evidence that was presented. In short, petitioner has not cited, and this Court is not aware of, any Supreme Court case holding that trial counsel have a duty to proffer evidence that their client specifically instructs them not to present. Further, in the instant case, even assuming the better practice would have been for defense counsel to have proffered whatever mitigation evidence they had found or developed--for it always desirable to have as complete a record as possible--the fact remains that petitioner cannot demonstrate that he was prejudiced by counsel's failure to do so in

100

this case.

This Court has already determined that petitioner was competent to waive mitigation and that petitioner's waiver of mitigation was knowing, intelligent, and voluntary. This Court has also determined that counsel were not ineffective for following petitioner's wishes. In light of the determination that petitioner entered a valid waiver of mitigation and that counsel were not ineffective in connection with petitioner's decision, to demonstrate prejudice from counsel's failure to proffer the mitigation evidence that they were forbidden to present, petitioner would have to show a reasonable probability that the outcome of his trial or appeal would have been different had counsel proffered mitigation evidence. This petitioner cannot show. To be clear, this Court has reviewed the mitigation evidence that was available to petitioner, such as affidavits from family members about his horrific upbringing and affidavits from Dr. Smalldon and Dr. Haskins about possible personality disorder(s) and other issues concerning petitioner's emotional and mental development, and the evidence is compelling. There is no reason to conclude that, had counsel proffered mitigation evidence, either the trial court or the Ohio Supreme Court on direct appeal--after both had determined that petitioner's waiver of mitigation was valid--would have declined to impose or uphold his death sentence.

In sum, petitioner has not demonstrated that counsel performed unreasonably or to his prejudice by failing to proffer the mitigation evidence that petitioner forbade them to present. The appellate court's decision rejecting this claim did not contravene or unreasonably apply clearly established Supreme Court precedent or involve an unreasonable determination of the facts.

Thus, this Court **DENIES** sub-part (e) of petitioner's second ground for relief as without

merit.

**<u>Ground 2(f)</u>: Failure to investigate blood type and other biological evidence.**

Petitioner argues that although blood and other biological evidence were collected from the crime scene, and although biological samples were also collected from him, no evidence was presented at trial either including or excluding him as the source of the blood or other biological evidence that was recovered from the crime scene. (Doc. # 15, at ¶ 18.) Petitioner appears to argue, therefore, that trial counsel performed unreasonably and to his prejudice by failing to investigate and present evidence excluding him as the source.

The Court concluded in its September 30, 2002 *Opinion and Order* that ground two, sub-part (f) was procedurally defaulted. In its September 12, 2006 *Opinion and Order*, however, the Court agreed to revisit that procedural default determination, specifically to determine whether petitioner could establish ineffective assistance of appellate counsel as cause and prejudice sufficient to excuse the default of ground two, sub-part (f).

Respondent argues that even assuming this claim were not procedurally defaulted, due to petitioner's failure to support it in postconviction with any evidence, the claim is completely without merit. (Doc. # 36, at 54-56.) The essence of respondent's argument is that DNA testing that this Court permitted petitioner to conduct on untested genetic material collected during the investigation and on six purported cut-outs from the victim's robe does not appear to exclude petitioner as the source of blood stains on the shirt he was wearing at the time he was arrested or the victim as the source of blood stains on her own robe. Thus, according to respondent, it cannot be said that counsel were ineffective for failing to present test results that did not help petitioner's defense in any way.

102

Petitioner argues that, contrary to respondent's characterization, the results of the testing in this case (Doc. # 37) corroborate petitioner's claim that he was not at the crime scene, especially in light of his presentation of alibi evidence, and reasonably suggest that some other male or female was responsible for the murder of Clara Swart.  (Doc. # 42, at 51-54.)  Petitioner asserts that the laboratory concluded that petitioner could be eliminated as the source of blood from the kitchen floor, from the victim's house coat, and from the victim's nightgown.  This, petitioner argues, corroborates his claim that he was not at the crime scene.  Petitioner asserts that the laboratory also concluded that a sample of DNA from the victim's house coat contained a mix of male and female blood, that petitioner was eliminated as a source of the male blood, and that the victim was unlikely to be the contributor of the female blood.  This, according to petitioner, permits a reasonable inference that some other male or female was responsible for the murder of Clara Swart.  Petitioner argues that in view of the fact that the case against him was almost entirely circumstantial, that he always maintained his innocence and presented alibi evidence, and that there was physical evidence that did not link petitioner to the scene and reasonably linked someone else to the scene, it was unreasonable and prejudicial for counsel not to have investigated and presented such evidence.

In a reply to petitioner's traverse, respondent argues that "a review of the blood tests conducted at the time of the murder as well as recent genetic test results fails to support [petitioner]'s ineffective assistance of counsel claim in any meaningful way."  (Doc. # 43, at 10.)  Specifically, respondent asserts that testing at the time of the murder revealed that blood on the victim's clothing and blood from the kitchen floor was consistent with having originated from the victim and not from petitioner, and that recent genetic testing merely confirms that.  This

would not have assisted petitioner's defense then or advance his cause now, according to respondent, because there was never any evidence presented at trial demonstrating that petitioner was cut or otherwise bled at the murder scene. The victim in this case was killed by strangulation. Similarly, respondent argues, the "low level sample of unbalanced, unidentified DNA, which appears to be a mixture of female and male DNA" on the victim's house coat would not have assisted petitioner's defense because although the laboratory concluded that the victim was unlikely to be a contributor the female DNA, the laboratory did not outright eliminate the victim as a contributor. Respondent argues that the probative value of such evidence is further diminished by the fact that nothing is known about when the sample was deposited on the house coat or how long the victim had been in possession of the house coat. Finally, respondent argues that in light of the fact that petitioner was convicted not upon the basis of any biological evidence, but upon the basis of a palm print matching his own found at the scene, of the discovery of the victim's personal property in petitioner's bedroom and at the edge of his property, and dog tracking evidence following petitioner's scent from the victim's home to petitioner's trailer, none of the biological evidence to which petitioner points now establishes that counsel performed unreasonably or to petitioner's prejudice in failing to investigate and present the evidence at trial. Respondent argues that the evidence simply would not have assisted petitioner's defense in any meaningful way. (Doc. # 43, at 10-12.)

As noted, the state courts did not reach the merits of petitioner's claim because they dismissed it on procedural grounds. Specifically, the state courts held that because petitioner had submitted no evidence outside the trial record to support the claim, he violated Ohio's *res judicata* doctrine by raising the claim in postconviction instead of on direct appeal. This Court

104

agreed, rejecting petitioner's argument that the only reason he failed to submit evidence outside the record was because the state courts had denied his requests for funds to employ experts and/or conduct tests. Also as noted above, the Court agreed in its September 12, 2006 *Opinion and Order* to revisit that procedural default determination in order to determine whether petitioner could establish ineffective assistance of appellate counsel as cause and prejudice sufficient to excuse the default of ground two, sub-part (f). The Court now answers that inquiry in the negative.

To be clear, this Court concluded that petitioner defaulted this claim not necessarily because he raised it in postconviction instead of on direct appeal, but because he raised it in postconviction *without* submitting any evidence outside the trial record to support it. This claim, by its very nature and as evidenced by the parties' arguments herein, relies heavily if not completely on evidence outside the trial record. That being so, appellate counsel cannot be said to have been ineffective for failing to raise on direct appeal, where review is confined to the trial record, a claim that relied on evidence outside the trial record. *See State v. Burke*, 97 Ohio St. 3d 55, 57 (2002) ("Clearly, declining to raise claims without record support cannot constitute ineffective assistance of appellate counsel.") (citing *State v. Hill*, 90 Ohio St. 3d 571, 573 (2001).) For that reason, this Court is constrained to conclude, independent of the merits of this claim, that appellate counsel ineffectiveness cannot possibly constitute cause and prejudice sufficient to excuse the default of this claim.

This Court further finds that for the same reasons petitioner was not entitled to discovery on this claim, petitioner would not be entitled to relief on this trial counsel ineffectiveness claim. As the Court explained in its order finding that petitioner could demonstrate good cause for

additional discovery on the blood and DNA evidence (Doc. # 56, at 9-10), there has never been a definitive link between DNA or biological evidence at the murder scene and the perpetrator of the murder of Clara Swart. No evidence suggested and no argument was ever made that Mrs. Swart's assailant was cut, that the assailant bled, or that the assailant otherwise left biological evidence at the scene of the murder, other than a palm print on an appliance cover in the kitchen. Thus, proof that the unidentified DNA on Mrs. Swart's housecoat belonged to someone other than petitioner would not amount to a "truly persuasive demonstration"that petitioner was not the perpetrator of the murder. It would not exonerate petitioner at all. *Cf. Watkins v. Miller*, 92 F.Supp.2d 824, 837-39 (S.D. Indiana 2000)(discussing, (not in the context of discovery), difference between DNA evidence that "suggests the possibility" of another perpetrator and DNA evidence proving conclusively that someone other than the defendant raped the victim at the time of her death). The most the additional DNA testing could show is that someone other than petitioner or Mrs. Swart had left blood or other biological material on Mrs. Swart's housecoat, and, as respondent points out, there is no evidence regarding how old the DNA stain was on the housecoat, how long Mrs. Swart was possession of the housecoat, or whether the housecoat was previously owned by someone else. Thus, the Court is not persuaded that trial counsel performed deficiently or to petitioner's prejudice in failing to challenge this blood evidence--evidence that was so ancillary to the prosecution's case against petitioner.

In any event, for the foregoing reasons, the Court abides by its September 30, 2002 *Opinion and Order* finding that this claim was procedurally defaulted. Sub-part (f) of petitioner's second ground for relief is **DENIED** as procedurally defaulted and without merit.

**Ground 2(g): Failure to challenge finger/palm print identification.**

106

Petitioner argues that his attorneys were ineffective for failing to effectively challenge finger/palm print evidence that was introduced at trial. (Doc. # 15, at ¶ 19.) The Court concluded in its September 30, 2002 *Opinion and Order* that ground two, sub-part (g) was procedurally defaulted. In its September 12, 2006 *Opinion and Order*, however, the Court agreed to revisit that procedural default determination, specifically to determine whether petitioner could establish ineffective assistance of appellate counsel as cause and prejudice sufficient to excuse the default of ground two, sub-part (g). The Court begins by setting forth ground two, sub-part (g).

Specifically, according to petitioner, trial counsel failed to contest the admissibility of a palm print allegedly matching petitioner's found at the crime scene on the basis of the validity or reliability of the underlying science. Petitioner points to the fact that the State's expert, Deputy Ed Holt, testified that he did not understand how the "super glue" procedure for lifting and identifying the palm print worked. Petitioner argues that although counsel objected to the evidence on the basis of Deputy Holt's lack of knowledge about the "super glue" method, counsel failed to raise the issue *in limine* and failed to present their own expert testimony regarding the validity or reliability of the process.

Respondent argues that this claim, in addition to being procedurally defaulted, is without merit. Respondent argues first that petitioner is challenging a state court evidentiary ruling and that state court evidentiary rulings are not reviewable in habeas corpus except for a denial of fundamental fairness. Respondent goes on to argue that trial counsel did in fact object at trial on the basis of the lack of understanding on the part of the state's expert, Deputy Ed Holt, as to the scientific theory underlying the "super glue" method for lifting and identifying prints, and that

the trial court correctly overruled the objection because Deputy Holt was a trained expert--not in the underlying scientific theory, about which he did not testify--but in the area about which he did testify, *i.e.*, the collection of fingerprints.  Respondent further argues, with respect to petitioner's argument that counsel were ineffective for failing to present their own expert on the "super glue" method, that petitioner cannot show a reasonable probability that such an expert would have changed the outcome of his trial because the "super glue" method is widely accepted with law enforcement and courts across the country.

Petitioner takes issue with respondent's argument that the "super glue" method of identifying latent prints is "widely accepted," calling the argument vague and unsupported. (Doc. # 42, at 54-56.)  Petitioner also disputes respondent's argument that ground two, sub-part (f) invites this Court to review state evidentiary law, reminding the Court that his claim alleges ineffective assistance of trial counsel, not the incorrectness of an evidentiary ruling by the state court.  Petitioner goes on to argue that in view of the fact that Deputy Holt testified that he did not understand how the "super glue" method worked and that petitioner was printed on three separate occasions, defense counsel did not go far enough in merely objecting to Deputy Holt's testimony on the ground that he did not have the requisite expertise to testify.  Rather, according to petitioner, defense counsel should have challenged the evidence *in limine* and requested funds for an expert to question the validity and reliability of the identification of the partial palm print in this case.  Petitioner emphasizes that the palm print evidence was the only direct evidence in the trial and that it was absolutely crucial for defense counsel to ensure that the process by which the print was collected and identified was reliable.  Petitioner also mentions that he requested discovery during state postconviction, which the state courts summarily denied, and that he also

sought discovery in these proceedings.

As previously noted, the state courts did not reach the merits of petitioner's claim because they dismissed it on procedural grounds. Specifically, the state appellate court ruled in petitioner's postconviction appeal that because petitioner had submitted no evidence outside the trial record to support the claim, he had violated Ohio's *res judicata* doctrine by raising the claim in postconviction instead of on direct appeal. (J.A. Vol. V, Exh. 26, at 261.) This Court agreed, rejecting petitioner's argument that the only reason he failed to submit evidence outside the record was because the state courts had denied his requests for funds to employ a fingerprint expert. Also as noted above, the Court agreed in its September 12, 2006 *Opinion and Order* to revisit that procedural default determination in order to determine whether petitioner could establish ineffective assistance of appellate counsel as cause and prejudice sufficient to excuse the default of ground two, sub-part (g). The Court now answers that inquiry in the negative.

Initially, petitioner has produced no evidence to date--neither in the state courts nor in this habeas proceeding--questioning the reliability of the "super glue" process for locating or identifying fingerprints. This Court could not grant petitioner's request for discovery on this issue because it could not find that petitioner had demonstrated good cause for the request. Specifically, the Court noted that petitioner had not alleged, much less demonstrated or pointed to facts that might demonstrate, that any of the documents he had requested would call into question the reliability of the "super glue" method for obtaining latent prints or the qualifications of Deputy Holt or examiner Ron Hueston. (Doc. # 48 at 12-14.) In so doing, the Court also noted that although Deputy Holt had testified that he could not explain exactly how the "super glue" method works, only that it did work, he also had testified that he was trained how to use it

and that it was a widely accepted, more successful method for obtaining latent prints than using black powder. This Court also denied a subsequent request by petitioner for additional discovery and reconsideration of determination that this ineffective assistance claim was procedurally defaulted. (Doc. # 56.) In light of the foregoing, there is absolutely no evidence from which this Court could conclude either that defense counsel performed deficiently or that petitioner was prejudiced by counsel's failure to challenge the palm print evidence *in limine* and/or present their own expert to challenge the reliability of the "super glue" process.

Further, as was the case with respect to sub-part (f) of ground two, to the extent that the instant claim by its very nature required evidence outside the trial record, appellate counsel cannot be said to have performed deficiently or to petitioner's prejudice by failing to raise the claim on direct appeal, where review is confined to the trial record. *See State v. Burke, supra*, 97 Ohio St. 3d at 57 ("Clearly, declining to raise claims without record support cannot constitute ineffective assistance of appellate counsel.") For that reason, this Court is constrained to conclude, independent of the lack of merit, that appellate counsel ineffectiveness cannot possibly constitute cause and prejudice sufficient to excuse the default of this claim.

Accordingly, the Court stands by its September 30, 2002 *Opinion and Order* finding that this claim was procedurally defaulted. The Court hereby **DENIES** claim two, sub-part (g) as procedurally defaulted and without merit.

### Ground 2(h): Failure to request funds to employ experts.

Petitioner argues in sub-part (h) of his second ground for relief that his trial counsel should have but failed to request funds to employ experts to assist them (trial counsel) in investigating, presenting, and challenging certain evidence. (Doc. # 15, at ¶ 20.) Specifically,

petitioner contends that counsel should have requested funds to employ experts relating to the biological evidence, the "super glue" palm print evidence, the "tracking dog videotape" evidence, and testimony establishing the time of death.

Respondent notes that the state courts rejected this claim on the merits during petitioner's postconviction proceedings and argues that this Court should do the same. (Doc. # 36, at 58-59.) Respondent complains that petitioner failed to explain how, with the benefit of experts, he would have rebutted any of the evidence set forth above. Respondent argues that petitioner further failed to suggest what types of experts he required or what evidence these unknown experts could have offered. Respondent argues that petitioner's blanket assertion of the need for experts is insufficient to support this claim of ineffective assistance. In this regard, respondent cites several cases in support of the position that under *Ake v. Oklahoma*, 470 U.S. 68 (1985), where the Supreme Court held that an indigent defendant was denied due process when the trial court denied his request for psychiatric assistance, defendants must demonstrate something more than a mere possibility of assistance from the requested expert before they are entitled under *Ake* to funds to employ that expert.[6]  Respondent argues that petitioner has made no such showing.

There is no doubt, petitioner argues, that had counsel requested funds to employ experts to investigate other possible suspects, to challenge the blood and fingerprint evidence, to determine the time of death, and to rebut the bloodhound tracking videotape, Supreme Court precedent would have required the trial court to provide those funds. (Doc. # 42, at 56-61.) As to the bloodstain evidence, petitioner continues to argue, as he did in connection with sub-part (f) of his second ground for relief, that counsel's failure to request expert funds resulted in counsel's

---

[6]        Respondent cites *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir. 1987); and *Thacker v. Rees*, 841 F.2d 1127 (6th Cir. 1988). (Doc. # 36, at 59.)

failure to establish at trial that blood found on the victim's kitchen floor and on the victim's

housecoat did not match petitioner, and that another DNA sample recovered from the victim's

housecoat, containing female DNA that did not likely originate from the victim and male DNA

that did not originate from petitioner, permitted a reasonable inference that someone else had

been at the crime scene and could have been responsible for the murder.

Petitioner further argues that counsel performed deficiently and to his prejudice by failing

to request funds to employ an expert to determine the time of death. Noting that he had

consistently maintained his innocence and had advised counsel of his whereabouts on the day

that the victim was murdered, petitioner points out that the prosecution, upon learning of the

alibi evidence that the defense team intended to present, changed their original conclusion

regarding the time of death and offered a more "fluid" time of death. Petitioner argues that

counsel should have employed an expert to challenge that "fluid" time of death and to determine

a more precise time of death. Citing *Helton v. Secretary for the Department of Corrections*, 233

F.3d 1322 (11th Cir. 2000), where the court found ineffective assistance of counsel for the

failure to use gastric contents to determine time of death, petitioner notes that the coroner in this

case found gastric contents in the victim's stomach that included identifiable green vegetable

matter and that an expert could have determined the time of death based on how long such

contents would have remained in the victim's stomach before digestion. In this regard, petitioner

appears to suggest that the victim died either the evening before, or the evening of, the day that

the prosecution argued, opining that "identifiable green vegetable matter" would have been more

consistent with an evening meal rather than a morning meal. (Doc. # 42, at 58-59.)

Finally, petitioner argues that counsel performed deficiently and to his prejudice by

failing to employ an expert to identify additional prints that were located at the crime scene but never identified. Petitioner argues that such evidence was even more critical in light of recent DNA evidence establishing that an unknown person had been in contact with the housecoat that the victim was wearing at the time she was murdered.

Respondent argues in her reply to petitioner's traverse that petitioner still fails to suggest what evidence experts could have offered to rebut evidence that the State presented and that petitioner's blanket assertion of the need for experts is simply insufficient to support a claim of ineffective assistance for the failure to request funds for those experts. (Doc. # 43, at 13-15.)

Petitioner presented this claim to the state courts during his postconviction proceedings and the state courts rejected it on the merits. The last state court to issue a reasoned decision, the state appellate court, held as follows:

> In the fifteenth claim for relief, appellant argues that his trial counsel was ineffective by failing to refute certain incriminating evidence with expert witnesses. Specifically, appellant claims his trial counsel failed to sufficiently investigate other possible suspects, and failed to request funds to hire an expert to establish a time of death and a bloodhound expert. In support of this claim, appellant presents three exhibits: his own affidavit, the affidavit of Steven Schlechty, the Chaplain of the Clermont County Jail, and the affidavit of Judy Robertson Cowans, appellant's wife.

> Having reviewed all of these exhibits, none of them present any evidence dehors the record sufficient to support this claim. The fact that appellant states a different version of the events in an affidavit and claims he did not kill the victim, without any independent evidence, does not justify an evidentiary hearing on this claim. The affidavits of Schlechty and Judy Robertson Cowans also do not include any evidence dehors the record which would justify an evidentiary hearing.

(J.A. Vol. V, Exh. 26, at 263.)

The Court concludes that petitioner is not entitled to habeas relief on this ineffective assistance claim because the Court concludes, for several reasons, that the state court's decision

rejecting the claim did not contravene or unreasonably apply controlling Supreme Court precedent.  In *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985), the Supreme Court held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."  The District Court for the Western District of Michigan, citing several decisions from federal courts across the country, recently held that although habeas corpus courts prior to the enactment of the AEDPA extended *Ake* to non-psychiatric experts, it is very much an open question as to habeas corpus decisions post-AEDPA whether *Ake* applies to requests for experts outside the field of psychiatry, in view of the fact that the Supreme Court has never explicitly extended *Ake* to non-psychiatric experts.  *Babick v. Berghuis*, No. 1:03-cv-20, 2008 WL 282166 (W.D. Mich. Jan. 29, 2008), at * 41.  Although the precise issue before this Court is not whether the trial court erred in failing to provide funds for non-psychiatric experts, but whether trial counsel were ineffective for failing to request funds for non-psychiatric experts, it certainly diminishes petitioner's argument that counsel performed deficiently or to petitioner's prejudice when it cannot be said that Supreme Court precedent clearly dictates that he had a due process right to such funds.

More fundamentally, respondent is correct that, absent any showing or suggestion by petitioner of the evidence that any of suggested experts would have provided to challenge or rebut the prosecution's blood and fingerprint evidence, bloodhound tracking videotape, and testimony concerning a "fluid" time of death, it is impossible for this Court to find that petitioner was prejudiced by counsel's failure to request funds for experts in those fields.  Stated another

114

way, the record does not enable the Court to conclude that had counsel requested funds for those experts, there is a reasonable probability that the outcome of petitioner's trial would have been different.

The most that petitioner has demonstrated is that counsel could have done more. But that will almost always be the case. It bears reminding that under *Strickland*, courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, *Strickland*, 466 U.S. at 689, and that the Sixth Amendment entitles criminal defendants to effective assistance of counsel, not a perfect defense. *See e.g., Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001) ("Instead of requiring perfect performance, then, we must permit a wide range of professionally competent assistance") (internal quotation marks and citation omitted); *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (*en banc*) ("The test for ineffectiveness is not whether counsel could have done more; perfection is not required."); *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) ("there are countless ways to provide effective assistance in any given case and [] even the best criminal defense attorneys would not defend a particular client in the same way") (internal quotation marks and citations omitted); *Marshall v. Hendricks*, 313 F. Supp. 2d 423, 439 (D.N.J. 2004) ("[The first prong of the *Strickland* standard] does not require that a defendant receive perfect representation, but it does require that counsel act with the wide range of reasonable professional assistance.") (internal quotation marks and citations omitted). In sum, petitioner has not demonstrated that counsel performed unreasonably or to his prejudice by failing to request funds to employ experts to challenge various pieces of incriminating evidence. The appellate court's decision rejecting this claim did not contravene or unreasonably apply clearly established Supreme Court precedent.

115

Thus, this Court **DENIES** sub-part (h) of petitioner's second ground for relief as without merit.

**Ground 2(i): Failure to properly investigate and present motion to suppress.**

Petitioner argues in sub-part (i) of his second ground for relief that trial counsel were ineffective in connection with their investigation and presentation of the motion to suppress evidence. (Doc. # 15 at ¶ 21.) Petitioner references the evidence that was recovered from his bedroom closet, noting that although police possessed neither probable cause nor a warrant, their search and the trial court's admission of the evidence were upheld on the basis of the permission given by petitioner's wife, Judy Cowans, to conduct the search. Petitioner argues that proper investigation and legal research would have revealed that petitioner and his wife were divorcing and had separate bedrooms, and that petitioner's wife accordingly did not have authority to consent to a search of petitioner's bedroom.

Respondent concedes that petitioner's claim is properly before the court for habeas review but argues that the claim is without merit. (Doc. # 36, at 60-62.)[7] Respondent points out that counsel did file a motion to suppress, among other things, the evidence that police recovered from petitioner's bedroom closet and that the trial court did conduct a full hearing on the motion. Respondent argues that the state courts correctly determined that the search and seizure was proper not only because it was initially conducted by Parole Officer Sandra Higgins as an agreed upon condition of petitioner's parole, but also because it was conducted pursuant to consent given by petitioner's wife, Judy Cowans. With respect to petitioner's argument that additional investigation and research would have revealed that petitioner and his wife were in the process

_____

[7]    The Court notes that page 60 of the original copy of respondent's return of writ is missing.

116

of divorcing, respondent argues that a review of the transcript reveals that trial counsel were well aware of that fact and even questioned Parole Officer Higgins about the Cowans' pending divorce.  Respondent further argues, with respect to petitioner's argument that the Cowans' pending divorce stripped Mrs. Cowans of any authority to consent to a search of petitioner's bedroom, that the trial court, in upholding the search and declining to suppress the evidence, properly relied on *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990).  There, according to respondent, the Supreme Court held that a consent-based search was proper where police had a "reasonable belief" that the suspect's spouse possessed authority to consent to a search of the marital residence.  In that regard, respondent argues that because petitioner and Mrs. Cowans were amicably sharing the same trailer at the time of the search, police had an "eminently reasonable belief that Mrs. Cowans possessed the authority to authorize a search of her own residence."  (Doc. # 36, at 62.)  Thus, respondent argues, counsel were not ineffective in connection with their investigation or presentation of the suppression issues.

Petitioner argues that because he and his wife were in the process of divorcing and living under the same roof but in separate bedrooms, they were effectively co-tenants, or common residents, or joint occupants.  The essence of petitioner's argument in rebuttal is that because he and his wife were co-tenants, under controlling Supreme Court law and precedent virtually universal in most states, a co-tenant does not have the authority to consent to a search of another co-tenant's private area of the shared residence.  (Doc. # 42, at 61-66.)  Noting that trial counsel failed to raise this precise issue to the trial court and that it was not until his postconviction proceedings that the issue was identified and presented, petitioner insists that "[h]ad the issue been identified, the evidence would have been suppressed."  (*Id*. at 61.)

117

Petitioner presented this claim of ineffective assistance to the state courts in his postconviction action and the state courts rejected it on the merits.  The last state court to issue a reasoned decision, the state appellate court, rejected the claim as follows:

> In his thirteenth claim for relief, appellant argues that his trial counsel was ineffective by failing to sufficiently challenge the validity of the warrantless search.  Specifically, he argues counsel failed to raise whether the consent given by his wife to search their residence was valid.  Appellant presents, by his affidavit, evidence dehors the record that he would not have consented to a search of his separate bedroom.  The trial court, in dismissing claim thirteen, concluded that the search was based on the reasonable belief that appellant's wife had the authority to consent to the search.  Illinois v. Rodriguez (1990), 497 U.S. 177, 188-89, 119 S.Ct. 2793, 2801.  We agree with the reasoning and conclusion of the trial court.  Appellant's trial counsel filed a motion to suppress and we cannot conclude their actions fell below any objective standard of reasonableness.  Thus, the thirteenth claim for relief is not well-taken.

(J.A. Vol. V, Exh. 26, at 262.)

The Court concludes that petitioner is not entitled to habeas relief on this ineffective assistance claim because the Court is not persuaded that the state appellate court's decision rejecting the claim contravened or unreasonably applied controlling Supreme Court precedent. Controlling precedent for this ineffective assistance claim is *Strickland v. Washington*.  But it is also relevant to take stock of Fourth Amendment jurisprudence and, in that regard, the Court notes that the Fourth Amendment prohibition against warrantless searches generally "does not apply to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises."  *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).)  The Sixth Circuit went on to explain that, under *Illinois v. Rodriguez*, "[a] search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the

118

third party had authority to consent to the search." *Id*. at 390-91.  The transcript in this case, both from the suppression hearing and from the trial, demonstrates that petitioner and his wife Judy were in the process of divorcing and had separate bedrooms, but shared the marital residence amicably in the process.  (Tr. Vol. IV, Exh. 46, at 2160-61.)  It further appears that Judy Cowans was solely responsible for paying the mortgage on the residence.  (Tr. Vol. I, Exh. 34, at 41.)

Regarding the first prong of *Strickland*, *i.e.*, the performance prong, it is evident from questions that counsel asked Parole Officer Sandra Higgins during the hearing on counsel's motion to suppress evidence that defense counsel were aware that petitioner and his wife were divorcing.  (Tr. Vol. I, Exh. 34, at 40-41.)  Thus, petitioner will not be heard to argue that counsel were deficient in their investigation of those facts; the record offers no support for that argument.

Further, in assessing the adequacy of counsel's performance, to the extent that defense counsel focused their challenge on the initial search by the parole officer as opposed to the subsequent search pursuant to Mrs. Cowans' consent, the Court concludes that that was a reasonable strategic decision.  It was the initial search by Parole Officer Higgins that yielded the first piece of incriminating evidence linking petitioner to the Swart murder, *i.e.*, an Emmett Kelly clown figurine that had been stolen from the Swart home.  Thus, the Court cannot find that, to the extent counsel focused their challenge on the search by Parole Officer Higgins, rather than the search pursuant to Judy Cowans' consent, counsel's performance fell outside the wide range of prevailing professional norms.

The essence of petitioner's argument is that his trial attorneys were ineffective for failing

to brief and argue the proposition that Judy Cowans, as an estranged spouse who possessed no mutual authority over petitioner's separate bedroom, was essentially a co-tenant who did not have the authority to consent to the search of petitioner's separate bedroom. The Court is not persuaded that counsel were deficient for failing to make that argument, not only because the facts did not readily support such an argument, but more fundamentally because the Court is not persuaded that such an argument would have prevailed. The annals of federal case law are rife with cases upholding a consent to search given by an estranged spouse or significant other. *See e.g., United States v. Gillis*, 358 F.3d 386 (6th Cir. 2004) (insert language); *see also United States v. Shelton*, 337 F.3d 529, 534 n.19 (5th Cir. 2003) (collecting cases of third party consent by estranged spouse or estranged significant other). Further, the trial court signaled by its reliance on *Illinois v. Rodriguez* in postconviction that it was inclined to reject any argument that Judy Cowans, even in light of the fact she and petitioner were divorcing and had separate bedrooms, did not *reasonably appear* to possess authority to consent to a search of petitioner's bedroom. Finally, petitioner cannot escape the fact that the trial court upheld the  initial search by Parole Officer Higgins--the search that yielded the first piece of incriminating evidence. The state courts determined, and this Court agrees, that Parole Officer Higgins conducted a lawful search of petitioner's residence in accordance with the terms and conditions of his parole. That being so, even assuming the trial court might have been persuaded to invalidate the subsequent search based on Judy Cowans' consent, petitioner cannot show demonstrate prejudice from counsel's failure to challenge that consent. Petitioner therefore has not demonstrated that there is a reasonable probability that the outcome of counsel's efforts to suppress the evidence recovered from his bedroom would have been different, but for counsel's failure to brief and

120

argue the issue precisely as petitioner now asserts they should have.

In sum, petitioner has not demonstrated that counsel performed unreasonably or to his prejudice by failing to challenge the validity of the search conducted pursuant to Judy Cowans' consent. The state court decisions rejecting this claim in postconviction did not contravene or unreasonably apply clearly established Supreme Court precedent.

Thus, this Court **DENIES** sub-part (i) of petitioner's second ground for relief as without merit.

**Ground 2(j): Failure to properly challenge "dog track video."**

Petitioner argues in sub-part (j) of his second ground for relief that counsel should have been prepared to challenge the dog track videotape. (Doc. # 15, at ¶ 22.) Petitioner argues that the evidence was unreliable, misleading, and unfairly prejudicial not only because the science underlying dog tracking is suspect, but also because the videotape in this case was a "re-enactment" of a track allegedly mapped by a dog that had traced petitioner's scent from the victim's home to petitioner's home.

Respondent concedes that this ineffective assistance claim is properly before the Court for habeas review, but argues that the claim is without merit. (Doc. # 36, at 62-63.) Respondent reiterates that petitioner's contention that a bloodhound expert was necessary to explain alleged problems with the re-enactment video of the bloodhound's path from the victim's home to petitioner's home is, without more specificity, insufficient to support a claim that counsel were ineffective for failing to present such an expert. Respondent points out that petitioner fails to identify what insight, if any, an expert could have provided concerning dog tracking that the jury would have found helpful. In this regard, respondent notes that an expert can testify only as to

121

his or her area of expertise, not as to the admissibility of a piece of evidence.

Petitioner argues that counsel were ineffective for failing to present a dog-tracking expert because such an expert could have been presented *in limine* to prevent the presentation of the wholly circumstantial and highly prejudicial video taped re-enactment.  (Doc. # 42, at 66-67.) Petitioner further argues that an expert also could have been presented in a motion hearing or to the jury to explain the significance of the fact that the dog's handler in this case had to re-scent the dog several times along the trail, the significance of the error rate of tracking dogs in general, and the significance of this particular dog's error rate.  Petitioner argues that he was prejudiced by counsel's failure to present such an expert because that failure allowed the State to establish with a wholly inconclusive and circumspect method that petitioner traveled from the victim's home to his own residence near the time that the victim was found.

In her reply to the traverse, respondent reiterates again that petitioner has failed to identify what insight, if any, a dog tracking expert would have provided that the jury would have found helpful.  (Doc. # 43, at 16.)  Specifically, respondent argues that the fact that the bloodhound in this case had to be re-scented twice along the route, as well as the overall success rate for tracking dogs (62%) and the dog's route in this particular case, were adequately illustrated to the jury through the testimony of Clermont County Investigator Mike Robinson, the individual who made the video-taped re-enactment.  Respondent concludes by arguing that one simply cannot conclude now, on the basis of these allegations, that the allegedly deficient performance of petitioner's defense attorneys somehow rendered the result of petitioner's trial unreliable or fundamentally unfair.  The record, according to respondent, demonstrates that counsel adequately investigated the facts and defended petitioner against the charges.

122

As respondent noted, the state courts considered and rejected this claim on the merits during petitioner's postconviction proceeding.  The last state court to issue a reasoned decision, the state appellate court, rejected the claim as follows:

> In the fifteenth claim for relief, appellant argues that his trial counsel was ineffective by failing to refute certain incriminating evidence with expert witnesses.  Specifically, appellant claims his trial counsel failed to sufficiently investigate other possible suspects, and failed to request funds to hire an expert to establish a time of death and a bloodhound expert.  In support of this claim, appellant presents three exhibits: his own affidavit, the affidavit of Steven Schlechty, the Chaplain of the Clermont County Jail, and the affidavit of Judy Robertson Cowans, appellant's wife.

> Having reviewed all of these exhibits, none of them present any evidence dehors the record sufficient to support this claim.  The fact that appellant states a different version of the events in an affidavit and claims he did not kill the victim, without any independent evidence, does not justify an evidentiary hearing on this claim.  The affidavits of Schlechty and Judy Robertson Cowans also do not include any evidence dehors the record which would justify an evidentiary hearing.

(J.A. Vol. V, Exh. 26, at 263.)

The Court concludes that petitioner is not entitled to habeas relief on this ineffective assistance claim because the Court is not persuaded that the state appellate court's decision rejecting the claim contravened or unreasonably applied controlling Supreme Court precedent.[8]  First, the Court is not at all persuaded that counsel performed deficiently.  The record demonstrates that counsel investigated this evidence thoroughly and attacked it aggressively.  Counsel remarked during cross-examination of dog-handler Ben Lundsford that, in preparing for trial, he (counsel) had "read a lot about human scent and know a lot more about it than I ever thought I would."  (Tr. Vol. V, Exh. 47, at 1970.)  This belies any suggestion by petitioner that

---

[8]    The Court sets forth the facts concering the dog tracking evidence more fully below in its discussion of petitioner's fourth ground for relief.

counsel failed to investigate the science underlying dog tracking. Further, counsel requested a special instruction from the trial court admonishing the jury to view the dog tracking re-enactment video with caution (*Id*. at 1944), objected during Lundsford's testimony about the dog's error rate (*Id*. at 1984), objected to the reliability of the video re-enactment (*Id*. at 2010), and renewed their overall objection to the video before the tape itself was played (*Id*. at 2025).

Further, petitioner cannot demonstrate that he was prejudiced by counsel's failure to challenge the dog tracking science or re-enactment with a motion *in limine* and an expert. For one thing, the dog-tracking evidence was not exactly a linchpin in the prosecution's case against petitioner. The trial court gave a limiting instruction admonishing the jury to view the evidence with caution (Tr. Vol. V, Exh. 48, at 2420), and the prosecution conceded several times during its closing arguments that the evidence was of marginal value (*Id*. at 2316, 2321). Thus, it is difficult to say that even assuming defense counsel had managed to effectively nullify the evidence with a motion *in limine* or expert testimony in rebuttal, there is a reasonable probability that the jury would have acquitted petitioner. Further, it bears reminding that petitioner has not offered a single piece of evidence calling into question dog tracking science or the reliability of a video re-enactment--not an academic article or an affidavit from an expert. That being so, this Court cannot find that but for counsel's failure to challenge the underlying science and re-enactment with a motion *in limine* and an expert, there is a reasonable probability that the outcome of petitioner's trial would have been different.

In sum, petitioner has not demonstrated that counsel performed unreasonably or to his prejudice by failing to present an expert to challenge the dog-tracking evidence. The state court decisions rejecting this claim in postconviction did not contravene or unreasonably apply clearly

124

established Supreme Court precedent.

Thus, this Court **DENIES** sub-part (j) of petitioner's second ground for relief as without

merit.

### **Ground 2(k): Failure to challenge testimony concerning time of death.**

Petitioner argues here that his attorneys were ineffective for failing to challenge the

State's testimony concerning time of death.  (Doc. # 15, at ¶ 23.)  Petitioner argues, as he did in

support of sub-part (h) of his second ground for relief, that he at all times maintained his

innocence, and informed his attorneys as to his whereabouts on the day of the offense and at the

time of the victim's death.  Upon learning of his planned alibi, petitioner argues, the prosecution

developed evidence that changed the original conclusion regarding the time of death so as to

accommodate for petitioner's alibi evidence.  Petitioner argues that trial counsel should have, but

did not, investigate and prepare expert testimony to challenge the State's changed time of death

testimony.

Respondent argues that petitioner's claim, which was rejected by the state courts during

postconviction, is without merit.  (Doc. # 36, at 63-64.)  Respondent sounds a familiar refrain--

namely, that petitioner makes only a vague reference to counsel's failure to present an expert to

challenge the time of death, while failing to allege how the time of death determination in this

case was incorrect or how an expert could have reached a different conclusion based on the

evidence in this case.

Petitioner incorporates by reference the arguments he set forth in support of sub-part (h)

of his second ground for relief--ineffective assistance of counsel for the failure to obtain experts.

(Doc. # 42, at 67, 58-59.)  Regarding the time of death testimony, petitioner argues that counsel

should have employed an expert to challenge that "fluid" time of death and to determine a more precise time of death.  Citing *Helton v. Secretary for the Department of Corrections*, 233 F.3d 1322 (11th Cir. 2000), where the court found ineffective assistance of counsel for the failure to use gastric contents to determine time of death, petitioner notes that the coroner in this case found gastric contents in the victim's stomach that included identifiable green vegetable matter and that an expert could have determined the time of death based on how long such contents would have remained in the victim's stomach before digestion.  In this regard, petitioner appears to suggest that the victim died either the evening before, or the evening of, the day that the prosecution argued, opining that "identifiable green vegetable matter" would have been more consistent with an evening meal rather than a morning meal.  (Doc. # 42, at 58-59.)

As noted above, the state courts rejected this claim on the merits in postconviction, concluding that petitioner had failed to produce evidence *dehors* the record demonstrating that counsel were ineffective for failing to obtain experts to investigate other possible suspects or challenge certain pieces of the State's evidence against petitioner.  (J.A. Vol. V, Exh. 26, at 263.)

The Court concludes as it did in connection with sub-part (h) of ground two that, absent any showing or suggestion by petitioner of the evidence that an expert might have provided to challenge or rebut the prosecution's theory of a "fluid" time of death, it is impossible for this Court to find that petitioner was prejudiced by counsel's failure to present such an expert.  Stated another way, the record does not enable the Court to conclude that had counsel presented an expert to determine the time of death, there is a reasonable probability that the outcome of petitioner's trial would have been different.

The evidence demonstrates that Clara Swart was killed on August 29, 1996 some time

between 7:00 a.m., when a neighbor (Jean Zeller) saw Mrs. Swart walking up her driveway from the street toward her house, and 6:30 that evening, when Mrs. Swart's son, Timothy Swart, found her body. More specifically, the prosecution argued that petitioner killed Mrs. Swart around or shortly after 8:00 a.m., when a senior services bus arrived to pick up Mrs. Swart for a day trip, that petitioner thereafter ran through fields and woods behind the victim's home to his own home, and that petitioner immediately upon arriving home spoke to his wife on the telephone shortly after 9:30 a.m. (Tr. Vol. IV, Exh. 44, at 1443-45.) Defense counsel's theory of the case was that petitioner was home that entire morning, that his wife woke him right around 8:00 a.m. before she left for work and then spoke to him on the phone a little bit later that morning. (Tr. Vol. IV, Exh. 44, at 1451-52.) Thus, the defense theorized that by the prosecution's own time line, Mrs. Swart was being killed right around 8:00 a.m., when petitioner was at home in bed.

Petitioner, without producing a shred of evidence in support, is asking this Court to conclude that his trial attorneys performed deficiently and to his prejudice by failing to obtain an expert who could have determined a more precise time of death. Based on the evidence that was presented at trial, as well as the lack of evidence supporting petitioner's argument, this Court cannot possibly conclude that counsel performed deficiently or to petitioner's prejudice in failing to present an expert to challenge the State's time of death theory. Beyond a reference to gastric contents found in the victim that included undigested green vegetable matter and a suggestion that such contents were more consistent with a recently-eaten evening meal than a recently-eaten morning meal, petitioner has not demonstrated or even suggested how an expert could have determined a time of death that was more precise than what the lay evidence demonstrated and

that would have been more supportive of petitioner's alibi evidence.

For the foregoing reasons, the Court concludes that petitioner has not demonstrated that counsel performed unreasonably or to his prejudice by failing to present an expert to challenge the prosecution's time of death theory. The appellate court's decision rejecting this claim did not contravene or unreasonably apply clearly established Supreme Court precedent.

Thus, this Court **DENIES** sub-part (k) of petitioner's second ground for relief as without merit.

Because of the fact-intensive nature of ineffective assistance claims, the importance of counsel's performance to the fairness and outcome of petitioner's trial, and the need to examine counsel's performance in its entirety, the Court hereby certifies petitioner's entire second ground for relief for appeal.

> **<u>Third Ground for Relief</u>: Petitioner was denied his Fourth Amendment rights when a parole officer was used as a "stalking horse" on behalf of the police to assist police in evading the Fourth Amendment's warrant requirement. The search was illegal and all fruits of the search should have been suppressed.**

In his third argument, petitioner claims that his home was illegally searched in violation of the Fourth Amendment. (Doc. # 15, at ¶¶ 24-25.) The record reflects that several days following the murder, when law enforcement officers began to suspect that petitioner may have been involved in the murder, the Clermont County Sheriff's Department contacted petitioner's parole officer, Sandra Higgins, in an effort to obtain a copy of his fingerprints. Although she did not have petitioner's prints on file, Higgins reported to the crime scene to learn more about the investigation, and she eventually learned from officers who had spoken to petitioner's wife that petitioner had not been home in a day or so, and that petitioner was planning to move to

Kentucky.  Concerned that petitioner's wife did not know his whereabouts, Higgins went to the
Cowans residence to conduct a search, which she was permitted to do as a condition of
petitioner's parole.  Two sheriff's deputies accompanied Higgins, and during her search of
petitioner's room, those deputies noticed a clown figurine that resembled a figurine that had been
stolen from the victim's home.  Eventually, petitioner's wife signed a form consenting to a
search by law enforcement officers.

Prior to trial, petitioner's counsel filed a motion to suppress all of the evidence
discovered in the search.  On February 5, 1997, the trial court held a hearing on the matter.  At
that hearing, the state presented Higgins as a witness.  (Tr. Vol. I, Ex. 34 at 19.)  Higgins
testified that after speaking with the deputies for several hours, she decided "on her own" to
conduct a search.  (*Id*. at 31.)  She further testified that the deputies did not tell her or ask her to
conduct a search.  (*Id*. at 31.)

The trial court overruled the motion to suppress, finding that Higgins worked with the
police in conducting the search, rather than on their behalf.  The trial court also determined that
Mrs. Cowans' consent to search broke the chain of any asserted illegality of the search.
Petitioner challenged the trial court's ruling on direct appeal to the Ohio Supreme Court as his
second proposition of law.  The Ohio Supreme Court rejected petitioner's claim, noting that
"collaboration between a parole or probation officer and police does not in itself render a parole
or probation search unlawful."  *State v. Cowans*, 87 Ohio St.3d 68, 76 (1999).  The Ohio
Supreme Court concluded that the record contained sufficient evidence supporting the trial
court's finding that Higgins was not acting as a stalking horse for the deputies, but had "her own
objective in conducting the search."  *Id*. at 76.  During his state postconviction proceedings,

petitioner presented this claim as his fourteenth claim for relief, and the state courts refused to consider it on the merits on the basis of *res judicata*.

Petitioner argues that the factual determinations made by the state courts are plainly unreasonable in light of the record evidence, and that the trial court erred in finding that Higgins was merely assisted by the sheriff's deputies. Law enforcement officers violated his Fourth Amendment rights, petitioner contends, by using his parole officer to conduct a search for which they could not have obtained a warrant. Petitioner argues that a parole officer cannot act as a stalking horse on behalf of the police in order to evade the Fourth Amendment's warrant requirement, and he complains that "the police brought Higgins to the scene of the crime, and used her as their proxy to avoid the requirement of a warrant because they lacked probable cause." (Doc. # 42, at 75.)

Respondent asserts that petitioner's third ground for relief is not cognizable in federal habeas corpus. Citing *Stone v. Powell*, 428 U.S. 465, 474-95 (1976), respondent contends that where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted habeas corpus relief on the ground that evidence obtained through an unconstitutional search and seizure was introduced into evidence at his trial. (Doc. # 36, at 69.)

A federal habeas court cannot review a habeas petitioner's claim that evidence obtained in violation of the Fourth Amendment should have been excluded at his trial if the prisoner had an opportunity for full and fair litigation of that claim in the state courts. *Stone*, 428 U.S. at 489-90. In determining whether a habeas petitioner is entitled to habeas review of a Fourth Amendment claim, this Court must first determine whether the state has a procedural mechanism

130

"which in the abstract presents an adequate opportunity to raise a Fourth Amendment claim." *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982).  The Court must then consider whether presentation of that claim was frustrated because of the failure of the procedural mechanism.  *Id*. "All that *Stone v. Powell* requires is an 'opportunity' for full and fair consideration of the claim for suppression; it is up to the claimant and his counsel to decide what use, if any, is to be made of the opportunity."  *Jennings v. Rees*, 800 F.2d 72, 77 (6th Cir. 1986).

In the present case, petitioner does not contest either the existence or the functioning of Ohio's procedural mechanisms, and he does not allege that the State of Ohio failed to provide him with a full and fair opportunity to litigate the constitutionality of the search of his home. Instead, petitioner argues that *Stone v. Powell* does not apply to capital cases because "death is different."  (Doc. # 42, at 67.)  Further, petitioner claims that his Fourth Amendment claim is "an unusual one," because "[subterfuge, pretext and intentional police misconduct lie at its heart." (*Id*. at 69.)  Petitioner argues that this is the type of claim that "requires exception from *Stone* in the context of a capital case."  (*Id*.)

The Court finds that petitioner's Fourth Amendment claim is not cognizable on habeas corpus review, because *Stone v. Powell* applies to both capital and non-capital habeas cases.  In *McQueen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir. 1996), the Court of Appeals for the Sixth Circuit held that the *Stone* restriction on review of Fourth Amendment claims in federal habeas corpus applies equally in death penalty cases:

> Legally, it is well settled that McQueen is precluded from presenting a Fourth Amendment claim . . . in a habeas action, under the Supreme Court's clear holding in *Stone v. Powell*, 428 U.S. 465 (1976).  There is no precedent for McQueen's claim that a different rule should apply because this is a death penalty case.  In fact, the Supreme Court has specifically rejected the idea that procedural bars that apply in other cases do not apply in capital cases.  *See, e.g., Smith v.*

131

*Murray*, 477 U.S. 527, 538-39 (1986).

*Id*.; *see also Slaughter v. Parker*, 187 F.Supp.2d 755, 789 (W.D. Ky. 2001) (reversed in part on other grounds) (recognizing that *Stone* "applies even in the context of those habeas corpus petitions involving death-penalty convictions"); *Jamison v. Collins*, 100 F.Supp.2d 521, 570 (S.D. Oh. 1998) (finding Fourth Amendment claim not cognizable on habeas corpus review of capital case); *Cooey v. Anderson*, 988 F.Supp. 1066 (N.D. Oh. 1997) (same).

Furthermore, it is evident from the record that petitioner had a full and fair opportunity to litigate this Fourth Amendment claim at the state court level. The trial court held a pretrial suppression hearing during which Higgins testified at length about her reasons for deciding to search petitioner's residence, and trial counsel extensively cross-examined Higgins concerning the circumstances surrounding the search. Additionally, petitioner presented this claim on direct appeal and the Ohio Supreme Court considered and rejected it on the merits. Accordingly, because petitioner's claim alleges a Fourth Amendment search and seizure violation, and petitioner had a full and fair opportunity to litigate the issue in state court, federal habeas review is precluded.

The Court hereby **DENIES** petitioner's third ground for relief as not cognizable in federal habeas corpus.

In light of the body of case law applying *Stone v. Powell* to capital habeas cases, and considering that petitioner's counsel utilized all of the state procedures available to challenge the search of his residence, it is unlikely that reasonable jurists would find the Court's resolution of this matter debatable or wrong. Therefore, the Court declines to certify this ground for relief for appeal.

132

**Fourth Ground for Relief**: **Petitioner was prejudiced by the admission and narration of a tape made by the state reenacting a blood hound tracking an alleged trail as the tape is irrelevant, self-serving, lacking any probative value, and highly prejudicial.  Admission of such evidence violated petitioner's right to due process of law and a fair trial.**

Petitioner argues in his fourth ground for relief that the trial court erred in admitting a videotape made by the state that purported to show a reenactment of a blood hound tracking petitioner's scent.  (Doc. # 15, at ¶¶ 26-30.)  During petitioner's trial, the state presented evidence that a bloodhound named Molly had been scented to petitioner by the shirt petitioner was wearing when he was arrested.  The dog detected petitioner's scent along a track stretching from the back of the victim's home through woods to an area at the edge of petitioner's property line where several items taken from the victim's home were found.  The bloodhound evidence was first presented to the jury through testimony by a dog handler, Ben Lundsford, who had assisted in the training of Molly and had accompanied law enforcement officers and the bloodhound during the tracking.  The State also presented a videotape purporting to depict a re-enactment of the bloodhound's track. The investigator who prepared the tape had been present during the bloodhound's track, but he did not make the video until a few days later.

In his fourth ground for relief, petitioner argues that the trial court erred by admitting the video because the tape constituted inadmissible hearsay, and was only marginally relevant and highly prejudicial.  Petitioner expands his argument in the Traverse, claiming that the tape should not have been admitted by the trial court because it was made several days after the dog had scented the track, because the tape was not an accurate illustration of the dog's actual path, and because no witness testified at trial as to the accuracy of the re-creation.  (Doc. # 42, at 78.)  Further, petitioner maintains that the admission of the tape was highly prejudicial because it

133

permitted the state to bolster the dog track evidence, which had questionable value. (*Id.* at 76.) It is important to note that in his fourth ground for relief, petitioner challenges only the admission of the videotape recreation of the dog track. Petitioner does not challenge the admissibility of the dog track evidence as a whole.

Respondent argues that petitioner is not entitled to habeas corpus relief on this claim because neither the trial court's decision to admit the videotape depiction of the bloodhound tracking petitioner's scent from the victim's home back to the Cowans residence, nor the Ohio Supreme Court's decision rejecting petitioner's claim challenging the trial court's decision, contravened or unreasonably applied clearly established United States Supreme Court precedent. (Doc. # 36, at 71.) Specifically, respondent argues that the state courts did not act contrary to or unreasonably apply *Estelle v. McGuire*, 502 U.S. 62 (1991), because the admission of the dog tracking tape did not deprive petitioner of a fundamentally fair trial, and without such a showing, state court evidentiary rulings are not reviewable in habeas corpus proceedings.

The Ohio Supreme Court rejected petitioner's claim on direct appeal. Citing *State v. Palmer*, 80 Ohio St.3d 543, 566 (1997) and *Cleveland Provision Co. v. Hague*, 20 Ohio C.C. (1912), the Ohio Supreme Court stated that "[w]hen an exhibit is offered for purposes of illustration, the trial court has discretion to determine whether it is helpful or misleading to the trier of fact," and "an exhibit is not necessarily incompetent because it fails to show some exact thing in connection with the subject under investigation, provided it shows some matter bearing directly upon the matter under investigation, with an explanation of how it differs from that which is being investigated." *Cowans*, 87 Ohio St.3d at 77. Applying that standard, the Ohio Supreme Court concluded that petitioner could not establish that the trial court's decision to

134

admit the videotape was an abuse of discretion.  The court noted that the witness, Investigator

Robinson, "readily admitted" that the video "showed only the general contours of the dog's

path," and the witness "fully explained to the jury that the video did not precisely show each

deviation in the dog's path."  *Id*.

　　　This Court may not grant relief on a claim that was adjudicated on the merits by the state

courts unless the state court's adjudication contravened or unreasonably applied clearly

established federal law as determined by the United States Supreme Court.  This, petitioner has

not shown.  Petitioner has alleged that the trial court violated a state procedure and/or

evidentiary law by admitting the videotape into evidence.  However, as a general matter, errors

of state law, such as the improper admission of evidence, do not support a writ of habeas corpus.

*See Estelle v. McGuire*, 502 U.S. 62 (1991); *see also Giles v. Schotten*, 449 F.3d 698, 704 (6th

Cir. 2006).  To be entitled to habeas relief, a petitioner must demonstrate that an evidentiary

ruling violated more than a state rule of evidence or procedure.  Rather, in order to prevail, a

petitioner must show that the evidentiary ruling was "so egregious that it resulted in a denial of

fundamental fairness."  *Giles*, 449 F.3d at 704 (citing *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir.

2004)).  Stated differently, "'[e]rrors by a state court in the admission of evidence are not

cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal

case as to deny the defendant the fundamental right to a fair trial.'"  *Biros v. Bagley*, 422 F.3d

379, 391 (6th Cir. 2006) (citing  *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir.2002)).  A state court

evidentiary ruling does not violate due process unless it "offend[s] some principle of justice so

rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Giles*,

449 F.3d at 704 (citing *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir.2001)).

In this case, petitioner has not demonstrated that the trial court erred in admitting the videotape, much less that the alleged error rose to the level of fundamental unfairness depriving him of due process and a fair trial. There are some aspects of the videotape that call into question the probative value of that evidence. The tape was not made contemporaneously to the track, it does not reflect that the dog had to be rescented at least two times during the track, it does not follow the exact path that Molly took, and it does not show Molly or the spots where she was the most hot on the trail or the times where she appeared to be less certain of the scent, which according to her handler, was readily apparent from her body language. (Tr. Trans. at 1963-65, 1992.) However, the tape does show the general contours of the track, and the tape was relevant to illustrate the testimony of the dog handlers, Deputies Lunsford and DeCamp. Unlike the aerial tax map that petitioner argued should have been sufficient to demonstrate Molly's path, the video showed the actual area where the track occurred. The tape was relevant to show the general landscape and terrain, including the nature of the trees, the creek, the briers and brush, the fact that the terrain was flat, and that there were many paths the dog could have taken. (Tr. Trans. at 2011-12.) The videotape merely served as a visual aid to help illustrate the testimony of the dog handlers who described the area where the track occurred. In fact, defense counsel relied on the videotape during closing arguments, arguing that the briers and brambles were so thick that if petitioner had actually followed the path depicted on the tape, he would have had far more scratches than he had when he was arrested. (Tr. Trans. at 2373-74.)

Furthermore, after reviewing the trial transcript and state court record, the Court is not persuaded that the videotape at issue constituted such compelling evidence, the absence of which would cause a reviewing court to question the fairness of petitioner's trial or reliability of the

conviction and sentence.  During cross-examination, defense counsel aptly demonstrated the perceived problems with the videotape in question.  Investigator Robinson explained how the tape differed from the actual track, and the Court is convinced that the jury was well aware that the tape served as an illustration only, and that it was not intended or offered as an exact depiction of the track.  The jury learned that Molly had lost the scent at least twice during the track and had to be rescented off of petitioner's shirt on at least two occasions, events not depicted on the tape.  With respect to the path that Molly followed, the following exchange occurred during cross-examination:

> Q.   So we don't have video of the actual track; what we have is a summary, I guess, of the area, of the way –
>
> A.   (Witness nodded.)
>
> Q.   So the jury understands, that video we just saw does not depict exactly the track the dog took, does it?
>
> A.   Well, that's not exactly true.  The way in which that I narrated it depicts the trail in which the dog took.
>
> Q.   Listen to my question, not talking about your narration.  The video, forget the sound, muted, don't explain it, the video, the visual representation does not depict the actual track the dog took, does it?
>
> A.   The track or the way I walked does not depict the way the dog exactly walked.
>
> Q.   All right.  In fact, the dog was down in the bushes, and that day you tracked took much longer than the day you videotaped?
>
> A.   Yes, I believe it probably would have taken a little longer, yes.

(Tr. Vol. V, Exh. 47, at 2051-52.)  In addition, the jury was instructed to view the dog track evidence as a whole with utmost caution.  During closing arguments, the state told the jury that the track alone was insufficient to convict.  (*Id*., at Exh. 48, 2316-17.)   At the close of the

evidence, the trial court instructed the jury that the dog track evidence had "slight probative value" and should be viewed "with the utmost caution." (*Id*. at 2420.)

For the foregoing reasons, the Court cannot conclude that the trial court's decision to admit the videotape into evidence, or the Ohio Supreme Court's decision finding no error therein, contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court. Petitioner has not demonstrated that the admission of the videotape so infected his trial with unfairness as to make the resulting conviction or sentence a denial of due process. *Romano v. Oklahoma,* 512 U.S. at 12. As such, the Court **DENIES** petitioner's fourth ground for relief as without merit.

The Court is satisfied, however, that reasonable jurists could find its decision in this regard debatable or wrong. Given the fact-intensive nature of this claim, the importance of the dog track evidence to the state's case, the perceived questionableness of filming a belated reinactment that does not precisely follow the path taken by the tracking dog, and the fact that the Court has already certified the corresponding ineffective assistance of counsel claim for appeal, the Court is satisfied that petitioner's fourth ground for relief is deserving of further litigation on appeal. Accordingly, the Court hereby certifies ground four for appeal.

> **Fifth Ground for Relief: Petitioner was denied his right to a fair trial and due process and the Eighth Amendment was violated where petitioner's status as a parolee was published to the jury but was irrelevant to any fact at issue in the trial.**

In his fifth ground for relief, petitioner argues that he was denied a fair trial and due process of law because the jury learned that he was on parole. (Doc. # 15, at ¶¶ 31-34.) The record reflects that at the time of the aggravated murder in this case, petitioner was on parole for a previous murder. The defense filed a motion *in limine* to preclude the state from introducing

138

evidence of the prior murder as a "similar act" under Rule 404(b) of the Ohio Rules of Evidence. The trial court granted the motion, and took strides during voir dire to ensure that petitioner received a jury that did not know that he had a prior murder conviction. (Tr. Vol. I, Ex. 37, at 13-15, 164, 169, 263.) The trial court did permit Sandra Higgins to testify that she was petitioner's parole officer, but the court precluded the state from introducing any evidence or making any reference to the underlying offense for which he was on parole. As a result, there was no reference during the culpability phase of the trial to petitioner's previous murder conviction. Although the jury learned that petitioner was on parole, they did not learn that he had a prior murder conviction – or even a felony conviction – until the sentencing phase of the trial.

Petitioner argues that references to his status as a parolee undercut the trial court's pre-trial ruling excluding evidence relating to his prior murder conviction. Petitioner insists that the fact that he was on parole was not relevant to any issue before the jury, and that "[t]he only purpose of this 'evidence' was to establish petitioner's bad character and to create a subtle but powerful inference that he [sic] acted in conformity with his bad character." (Doc. # 15, at ¶ 16.) In short, petitioner argues that the state court admitted impermissible propensity evidence in the form of his status as a parolee, and that the risk of unfair prejudice was so great that it denied him a fundamentally fair trial.

Respondent argues that references to petitioner being on parole did not deny him a fundamentally fair trial. Respondent contends that "the mere fact Cowans' status as a parolee was made known to the jury did not undercut the trial court's pre-trial ruling excluding evidence relating to Cowans' prior murder conviction for strangling a crippled man." (Doc. # 36, at 76.)

139

Respondent maintains that no witness revealed the reason that petitioner was on parole, and his status as a parolee was relevant to explain the testimony of Sandra Higgins, petitioner's parole officer.  (*Id*.)

The Ohio Supreme Court rejected petitioner's claim on direct appeal, determining that petitioner's status as a parolee was relevant evidence during the guilt phase of the trial, even though the nature of the underlying crime was not.  Higgins was permitted to search petitioner's residence because he was on parole, and the Ohio Supreme Court concluded that the jury could not have understood why Higgins was searching petitioner's house if they were not informed that he was on parole.  According to the Ohio Supreme Court, "Higgins's position as Cowans's parole officer was, as the trial court put it, 'inextricably intertwined' with her testimony about the search."  *Cowans*, 87 Ohio St.3d at 78.

Petitioner claims that the admission of other acts evidence, *i.e.* his status as a parolee, violated his right to a fundamentally fair trial under the Due Process Clause.  Under the AEDPA, this Court's review is limited to whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  In addition, this Court is bound by the law of this Circuit, and the Sixth Circuit has held that a state court's admission of other acts evidence cannot be deemed contrary to clearly established federal law.

It is well settled that state court evidentiary rulings may violate due process when they render a trial fundamentally unfair.  However, the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly."  *Sowling v. United States*, 493 U.S. 342, 352 (1989).  The Sixth Circuit has held that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence

140

in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see also Alberni v. McDaniel*, 458 F.3d 860, 867 (9th Cir. 2006); *Paige v. Bradshaw*, 2007 WL 4323785, *12 (N.D. Oh. Apr. 4, 2007).

In *Bugh,* the petitioner sought habeas relief, claiming that he was denied his right to due process because the state court admitted evidence concerning similar, uncharged acts of child molestation. Citing footnote five of the Supreme Court's decision in *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991), the Sixth Circuit held that there is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. *Bugh*, 329 F.3d at 512. In *Estelle*, the United States Supreme Court expressly declined to rule on the issue of "whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." 502 U.S. 62, 75 n.5 (1991). The Sixth Circuit reasoned that because the Supreme Court has left the issue open, federal habeas courts cannot find that state court rulings allowing propensity use of other acts evidence are contrary to, or involve an objectively unreasonable application of, clearly established federal law. *Bugh*, 329 F.3d at 512. *See also Paige v. Bradshaw*, 2007 WL 4323785, *12 (N.D. Oh. Apr. 4, 2007) (applying Bugh to reject prior bad acts claim).

Applying that analysis to this case, the Court must conclude that even if references to petitioner's status as a parolee were made in order to show propensity–a finding the Court is not making, based on the relevance of evidence of petitioner's parole status to the testimony of Sandra Higgins–the decision of the trial court to permit limited reference to petitioner being on parole, and the Ohio Supreme Court's decision rejecting petitioner's claim of error, did not

contravene or unreasonably apply clearly established federal law as determined by the United States Supreme Court.  The Court accordingly **DENIES** ground five as without merit.

In view of the fact that this issue appears to be so completely foreclosed by controlling precent, as well as the fact that evidence of petitioner's status as parolee was relevant (if not essential) to explain the testimony of Sandra Higgins concerning the search of petitioner's residence, this Court cannot conclude that the issue warrants further review on appeal.  The Court hereby declines to certify ground five for appeal.

> **Sixth Ground for Relief: The Eighth Amendment was violated where a death sentence was imposed by a jury which had been prevented from hearing and considering relevant mitigating evidence in the absence of a constitutionally voluntary waiver by the defendant and record evidence of the defendant's competency to execute a voluntary waiver of constitutional rights.**

Petitioner argues in his sixth ground for relief that he was sentenced to death in violation of his Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment because the jury did not hear or consider relevant mitigating evidence.  (Doc. # 15, at ¶¶ 35-39.) The Court concluded in its September 30, 2002 *Opinion and Order* that petitioner's sixth ground for relief was procedurally defaulted.  In its September 12, 2006 *Opinion and Order*, however, the Court agreed to revisit that procedural default determination, specifically to determine whether petitioner could establish ineffective assistance of appellate counsel as cause and prejudice sufficient to excuse the default of his sixth ground for relief.  The Court begins by setting forth petitioner's sixth ground for relief.

Petitioner argues that there was no record evidence of his competency at the time he waived his right to present mitigating evidence and substantial record evidence giving rise to an inference that he was not competent, such as his frequent bouts of disruptive behavior and his

illogical choice to forgo the presentation of mitigating evidence despite an obvious desire to fight for his life.  Petitioner further argues that there was no record evidence of a voluntary waiver by him of his right to present mitigating evidence and no compliance with the waiver procedure set forth in *State v. Ashworth, supra*, 85 Ohio St. 3d 56.  Finally, petitioner argues that substantial mitigating evidence existed that was neither presented to the jury nor proffered for the record, and that the failure of the jury to hear or consider that evidence gave rise to an unacceptable risk of an arbitrary and capricious imposition of the death penalty in violation of his Eighth and Fourteenth Amendment rights.

Respondent argues that petitioner is not entitled to relief on this claim not only because it was procedurally defaultd but also because the Ohio Supreme Court's decision on direct appeal concluding that petitioner was competent and that petitioner executed a knowing and voluntary waiver of the right to present mitigating evidence did not contravene or unreasonably apply clearly established federal law as determined by the United States Supreme Court.  (Doc. # 36, at 77-84.)

In his traverse, petitioner argues that the right to present mitigating evidence is a substantial, fundamental right subsumed within the Due Process Clause and required by the Eighth Amendment.  (Doc. # 42, at 82-88.)  Thus, petitioner argues, the right is at least as significant as the other fundamental rights subject to heightened waiver standards: the right to trial, confrontation, and cross examination.  Petitioner argues that his decision to forgo the presentation of mitigating evidence required to the jury to recommend death, and that neither trial counsel nor the trial court undertook an inquiry sufficient to ensure that petitioner actually understood the ramifications of his decision or had the capacity to make a knowing and

143

voluntary decision to waive mitigation.  Citing *State v. Berry*, 80 Ohio St. 3d 371 (1997) and *State v. Ashworth*, 85 Ohio St. 3d 56, petitioner complains that the Ohio Supreme Court's application of relevant waiver law was objectively unreasonable because the court failed to consider all of the relevant facts.  Petitioner points out that the Ohio Supreme Court specifically found that the trial court had failed to inform petitioner of the nature of the right to present mitigation evidence and the consequences of waiving it, and failed to make a finding on the record that petitioner actually desired to waive his rights.  That finding alone, petitioner argues, indicates that his waiver was not knowing, intelligent, and voluntary.  Reasoning that his actions, comments, and demands constitute strong evidence that he was not competent to waive mitigation, petitioner argues that the trial court's finding that his behavior had been "pique" rather than evidence of "mental instability" was objectively unreasonable because no competency evaluation was ever performed and there is no evidence that the trial court was a trained mental health professional or was otherwise situated to determine, in the absence of a competency evaluation, that petitioner was competent.  Petitioner concludes that his death sentence must be vacated.

The Court has already considered and rejected these arguments.  In rejecting petitioner's first ground for relief, this Court concluded that the Ohio Supreme Court's decision determining that petitioner made a knowing, intelligent, and voluntary waiver of his right to present mitigating evidence and that petitioner was competent to execute such a waiver did not contravene or unreasonably apply clearly established federal law as determined by the United States Supreme Court.  Because, for the reasons discussed more fully in connection with petitioner's first ground for relief, this Court concludes that the arguments set forth in

petitioner's sixth ground for relief are without merit, the Court further concludes that appellate counsel did not perform deficiently or to petitioner's prejudice in failing to raise this claim on direct appeal.  That being so, the Court abides by its September 30, 2002 *Opinion and Order* finding that this claim was procedurally defaulted.

Petitioner's sixth ground for relief is **DENIED** as procedurally defaulted and without merit.

Given the importance of this issue to petitioner's case, as well as the apparent novelty of this claim, the Court hereby certifies ground six, including its procedural default determination, for appeal.

> **Seventh Ground for Relief: The Eighth Amendment to the United States Constitution precludes a state from imposing a sentence of death unless the sentencing authority actually considers all relevant evidence of mitigation. Consequently, a capital defendant cannot interpose his Sixth Amendment right to self representation as a bar to introduction of mitigating evidence.**

Petitioner argues in his seventh ground for relief that decisions by the Ohio Supreme Court finding that a defendant may waive the presentation of mitigation run afoul of the Constitution in the context of Ohio's "quasi-mandatory capital sentencing scheme."  (Doc. # 15, at ¶¶ 40-44.)  The gravamen of petitioner's argument appears to be that the right of *pro se* representation embodied in the Sixth Amendment is not an open invitation to evade the requirements of a statutory sentencing scheme and pronouncements by the United States Supreme Court, rooted in the Eighth Amendment, which mandate that a sentencing tribunal should consider all relevant mitigating circumstances.  Petitioner argues that the right of self-representation was never intended as means to allow a criminal defendant to choose his own penalty and that the manner in which the exercise of his Sixth Amendment right to self-

representation undermined his Eighth Amendment right to be free of cruel and unusual punishment resulted in imposition of a death sentence that can be reviewed for neither proportionality nor appropriateness. The right of self-representation, petitioner argues, cannot be exalted to so lofty a position as to require the courts to blind themselves to the "real issue"-- namely, the propriety of allowing the State to execute a citizen. Petitioner also appears to argue that standby counsel could or should have been appointed in this case, relative to petitioner's decision to waive the presentation of mitigation evidence, and that a defendant's right of self-representation may be revoked if the defendant obstructs the course of the trial, (in this case, presumably, by preventing the jury from considering all relevant mitigating circumstances). Thus, petitioner concludes, his decision to waive the presentation of mitigation evidence, rooted in his Sixth Amendment right to self-representation, created an unacceptable risk of the arbitrary and capricious imposition of the death penalty in violation of his Eighth Amendment rights.

Respondent argues that petitioner's claim is not actionable in habeas corpus and is without merit. (Doc. # 36, at 85-94.) Respondent argues first that the Eighth Amendment does not compel a defendant to present mitigation evidence against his will and that not one federal case supports petitioner's proposition that the Constitution prohibits a criminal defendant from knowingly and voluntarily waiving the opportunity to present mitigation evidence. Pointing to the similarities between petitioner's case and *State v. Keith*, 79 Ohio St. 3d 514 (1997), respondent argues that the Ohio Supreme Court's decision rejecting petitioner's claim did not contravene or unreasonably apply controlling Supreme Court precedent, and was not based on an unreasonable determination of the facts, because there is no United Supreme Court decision directly on point.

146

In a related point, respondent further argues that because there is no clearly established United States Supreme Court decision directly on point, this Court may not grant relief on this claim because of the holding in *Teague v. Lane*, 489 U.S. 288, 297-98 (1989), barring habeas courts from granting habeas relief on a claim that is based on a "new rule." In support of this argument, respondent cites *Stewart v. LaGrand*, 119 S.Ct. 1018 (1999) (per curiam), in which, according to respondent, the Supreme Court reversed a Ninth Circuit decision holding that Eighth Amendment protections could not be waived because that holding was a "new rule" and granting relief on it was in violation of *Teague v. Lane*. Respondent concludes by noting that the proposition that the Constitution prohibits waiver of the opportunity to present mitigation evidence has been soundly rejected by federal courts in habeas[9] and state courts, including Ohio's[10].

In his traverse, petitioner disputes respondent's position that there is no clearly established Supreme Court precedent directly on point. Rather, according to petitioner, "[t]he controlling precedent of the Supreme Court is the principle found in a host of capital cases ... that the presentation of both aggravating and mitigating circumstances is constitutionally required before a judge or jury may make an individualized determination that the death penalty is appropriate."[11] (Doc. # 42, at 89.) The gravamen of the arguments that petitioner lays out in his traverse is that the Sixth Amendment right to self-representation or to control one's own defense

---

[9]    Respondent cites *Singleton v. Lockhart*, 962 F.2d 1315, 1322 (8th Cir. 1992); *Wallace v. Ward*, 191 F.3d 1235, 1246-47 (10th Cir. 1999); *Brecheen v. Reynolds*, 41 F.3d 1343, 1364; 1366-67 (10th Cir. 1994); and *Shell v. Lockhart*, 14 F.3d 1289, 1302-03 (8th Cir. 1994).

[10]    Respondent cites *State v. Ashworth, supra*, 85 Ohio St. 3d at 61-66; *People v. Jackson*, 28 Cal.3d 264, 313-14 (1980); *State v. Tyler*, 50 Ohio St. 3d 24, 29 (1990); and *State v. Spirko*, 59 Ohio St. 3d 10, 17 (1991).

[11]    Petitioner cites *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Hitchcock v. Dugger*, 481 U.S. 393 (1986); *Lockett v. Ohio*, 438 U.S. 586 (1978); and *Trop v. Dulles*, 356 U.S. 86 (1958).

147

cannot trump the Eighth Amendment requirement of an individualized reliable death sentence, which requirement necessitates that the sentencer hear and consider all relevant mitigating circumstances. (Doc. # 42, at 89-108.) In this regard, petitioner argues that although historically, the Sixth Amendment right to self-representation has not been absolute, the Eighth Amendment prohibition against unlawful executions, by comparison, is absolute. Petitioner argues that the Sixth Amendment right to self-representation recognized in *Faretta v. California*, 422 U.S. 806 (1974) cannot be read as extending to the penalty phase of a capital trial when a defendant's choice to direct his defense and forgo the presentation of mitigating evidence would effectively thwart the affirmative duty of the trial court, imposed by Ohio's statutes and the Eighth Amendment, to make a reliable individualized sentencing determination.

Citing *Lockett v. Ohio*, and its progeny as clearly established U.S. Supreme Court precedent, petitioner argues that his claim does not violate the bar set forth in *Teague v. Lane*, 489 U.S. at 297-98 against granting relief on the basis of "new procedural rules" because the Eighth Amendment principles set forth above are "hardly a new rule of law." (Doc. # 42, at 102.) For the same reason, according to petitioner, the Ohio Supreme Court's decisions in *State v. Keith*, 79 Ohio st. 3d 514, 530 (1997), and *State v. Tyler*, 50 Ohio St. 3d 24, 27-29 (199), finding that defendants could waive presentation of mitigating evidence were objective unreasonable. Put another way, petitioner argues, because presentation of mitigating evidence is essential to a constitutional death sentence, a sentence of death imposed without consideration of mitigating evidence, even if it was due to the defendant's express wishes, violates the federal Constitution. Finally, petitioner argues that, although there is a split in authority, contrary to respondent's position, other courts have recognized that the requirements of the Eighth

148

Amendment prohibit a defendant from precluding presentation of all mitigating evidence.[12]

Petitioner raised this claim on direct appeal to the Ohio Supreme Court, arguing in his sixth proposition of law that the Eighth Amendment forbids the imposition of a death sentence by a sentencer who has not been apprised of possible mitigating factors, even where it was the defendant himself who opposed their presentation.  The Ohio Supreme Court flatly rejected petitioner's claim, holding that "[t]he Eighth Amendment compels no one to present mitigation against his will."  *Cowans*, 87 Ohio St. 3d at 80 (citing *State v. Tyler*, 50 Ohio St. 3d 24, 27-29 (1990), and *State v. Ashworth*, 85 Ohio St. 3d 56, 61-66 (1999).)  The Ohio Supreme Court went on to explain:

> [W]e recently noted in *Ashworth*, 85 Ohio St. 3d at 63, 706 N.E.2d at 1237-1238, that "a rule requiring the presentation of mitigating evidence would be impossible to enforce," because no court could compel a defendant to cooperate with his counsel in gathering and presenting such evidence.  This case aptly illustrates the point: Cowans not only refused to present mitigating evidence, he actually blocked his counsel's acquisition of such evidence by instructing his family and friends not to cooperate with counsel.

*Cowans*, 87 Ohio St. 3d at 80.

The question before the Court, as framed by petitioner, is whether petitioner's death sentence violates the federal constitution because, in exercising his Sixth Amendment right to self-representation, petitioner thwarted the Eighth Amendment requirement that the sentencer impose an individualized, appropriate sentence, which requirement necessitates that the sentencer hear and consider all relevant mitigating evidence.  To answer that question in the affirmative, the Court would have to find that the Ohio Supreme Court's decision answering it in

---

[12]     Petitioner cites *Muhammed v. Florida*, 782 So. 2d 343 (Fla. 2001); *State v. Koedatich*, 112 N.J. 225, 548 A.2d 939, 992 (1988); *Morrison v. State*, 258 Ga. 683, 373 S.E.2d 506, 509 (1988); and *California v. Deere*, 710 P.2d 925, 929-30 (1985) (Broussard, J., concurring).

the negative contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court. This the Court cannot do.

This Court has reviewed all of the decisions relied upon by petitioner and it is true that all of them stand, in some way or another, for the proposition that the Eighth Amendment requires that the sentencer not be precluded from hearing, considering, or giving weight to evidence of relevant mitigating circumstances. But none of those cases, singularly or collectively, extend for the proposition that the Eighth Amendment requires the sentencer to hear, consider, and give effect to mitigation evidence against the express wishes of a death-eligible defendant. In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), which held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death[,]" the Supreme Court struck down a statute that limited the range of mitigating circumstances the defendant could proffer. In *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court expressly extended *Lockett*'s rule to a case where the trial judge refused to consider, as a matter of law, evidence concerning the petitioner's unhappy upbringing and emotional disturbance, holding that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." (*Id*. at 113-14 (emphasis in original.)) In *Hitchcock v. Dugger*, 481 U.S. 393 (1987), the Supreme Court extended the *Lockett* rule to a case in which the sentencing judge had assumed that state law prohibited the consideration of any mitigating circumstances not enumerated in the statute. The Supreme Court held that the proceedings did

150

not comport with *Lockett* and its progeny and invalidated the petitioner's death sentence because "the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances...." (*Id*. at 398-99.)[13]  This Court cannot agree that any of these cases, singularly or collectively, amount to clearly established federal law for the proposition that the Eighth Amendment requires the sentencer to hear, consider, and give effect to mitigation evidence against the express wishes of a death-eligible defendant.

It is true that "clearly established Federal law as determined by the Supreme Court of the United States," within the meaning of § 2254(d), does not require the existence of a Supreme Court case or cases involving a fact pattern identical to the case at bar before the legal rule from that Supreme Court case or cases may be applied.  *See, e.g., Spisak v. Hudson*, 512 F.3d 852, 854 (6th Cir. 2008) ("we may find the application of a *principle* of federal law unreasonable despite the 'involve[ment of] a set of facts different from those of the case in which the principle was announced.") (citations and internal quotation marks omitted).)  Thus, "[a]lthough the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context."  *House v. Hatch, supra*, 527 F.3d at 1016-17 (citing *Wright v. Van Patten*, --- U.S. ---, 128 S.Ct. 743, 746 (2008) (per curiam).)  Petitioner has not cited, and the court is not aware of, any Supreme Court case that has extended *Lockett* and its progeny to compel the presentation of mitigating evidence against defendant's express wishes to forgo presentation of mitigating evidence.

Put another way, in order to find that a case or legal rule emanating from a series of

---

[13]     Petitioner also cites *Trop v. Dulles*, 356 U.S. 86 (1958), in which the Supreme Court held that forfeiture of citizenship as punishment for wartime desertion violated the Eighth Amendment, which "stands to assure that [the power of the State to punish] be exercised within the limits of civilized standards."

cases, constitutes "clearly established Federal law as determined by the Supreme Court of the United States," § 2254(d), it is necessary for that precedent to have dictated the result advocated by petitioner. *See Williams v. Taylor*, 529 U.S. 362, 381 (2000); *see also Vasquez v. Strack*, 228 F.3d 143, 149-50 (2nd Cir. 2000) (citing *Teague v. Lane*, 489 U.S. at 301.) A review of *Lockett* and its progeny, as well as case law defining what constitutes "clearly established Federal law" for purposes of § 2254(d)'s standard of review, precludes this Court from finding that the Supreme Court's *Lockett* jurisprudence dictated in the instant case that the Eighth Amendment required the presentation of mitigating evidence against petitioner's express wishes. For that reason, this Court cannot find that the Ohio Supreme Court's decision rejecting this claim contravened or unreasonably applied clearly established federal law sufficient to warrant habeas corpus relief.

Petitioner's claim fails for another reason. Petitioner's argument, however persuasive at first glance, must fail because of what petitioner <u>does</u> <u>not</u> argue. Petitioner notably stops short of arguing that standby counsel absolutely <u>should</u> have been appointed without his consent and that relevant mitigating evidence absolutely <u>should</u> have been presented against his will so that the sentencer absolutely <u>could</u> have heard and considered all relevant mitigating circumstances in determining the appropriate, individualized sentence as the Eighth Amendment requires. Petitioner's argument, therefore, reasoned to its logical end would mean that any death-eligible defendant could evade imposition of a death sentence by simply exercising his Sixth Amendment right to represent himself and forgo the presentation of any mitigating evidence, thereby stripping the sentencer of its ability to hear and consider all relevant mitigating evidence, thereby precluding the sentencer from performing the weighing process dictated by Ohio's statute as the

means by which to ensure that a death sentence is appropriate, thereby precluding the sentencer from imposing a death sentence that would pass Eighth Amendment muster. That argument is untenable and certainly not mandated by the Eighth Amendment.

For the foregoing reasons, the Court **DENIES** petitioner's seventh ground for relief as without merit.

Because this claim presents a novel issue and is intertwined with petitioner's first ground for relief, the Court hereby certifies ground seven for appeal.

> **Eighth Ground for Relief:** **Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated where the trial court allowed readmissions and re-presentation during the penalty phase of all exhibits previously admitted during the trial phase in this case.**

Petitioner argues in his eighth ground for relief that the trial court erred in readmitting during the mitigation phase, over defense counsel's objection, all of the evidence and exhibits from the culpability phase. (Doc. # 15, at ¶¶ 45-50.) Petitioner asserts that trial courts may readmit in the mitigation phase only culpability phase evidence that is relevant to sentencing issues and that the trial court in this case failed to even consider, much less make a determination, whether the culpability phase evidence and exhibits that it readmitted in toto was relevant to any sentencing issues. Asserting that the murder itself is not an aggravating circumstance and may not be considered by the jury as one, petitioner argues that the culpability phase evidence was not relevant to any sentencing issues in his case and that the readmission of that evidence did nothing more than inflame the passions of the jury. Petitioner further argues that, even assuming any of the culpability phase evidence was relevant to mitigation, its probative value was substantially outweighed by the risks of unfair prejudice and confusion of the issues. In his traverse, petitioner expands on his argument that the culpability phase evidence

153

was not relevant to any sentencing issues by pointing out that the evidence included photographs of the decedent, while she was alive and dead, as well as certain autopsy photos.  (Doc. # 42, at 108-111.)  Such evidence, petitioner argues, was unrelated to any aggravating circumstance charged and prejudicially focused the jury's attention on the murder rather than the aggravating circumstances and mitigating factors.

Respondent argues that petitioner is not entitled to habeas corpus relief on this claim because neither the trial court's decision to readmit all of the culpability phase evidence during mitigation, nor the Ohio Supreme Court's decision rejecting petitioner's claim challenging the trial court's action, contravened or unreasonably applied clearly established United States Supreme Court precedent.  (Doc. # 36, at 95, citing 28 U.S.C. § 2254(d)(1).)  In fact, respondent argues, "Cowans cites no relevant U.S. Supreme Court cases in support of his argument."  *Id.* at 95.  Citing *Davis v. Mitchell*, 110 F. Supp. 2d 607, and *Zant v. Stephens*, 462 U.S. 862, 878 (1983), respondent argues that "the United States Supreme Court has never construed the Constitution as prohibiting jurors from considering aggravating factors other than those set forth in a state statute." (Doc. # 36, at 96.)  Respondent further argues against the grant of habeas corpus relief on this claim because violations of state law are not cognizable in federal habeas corpus.

The Ohio Supreme Court rejected petitioner's claim on direct appeal.  Citing *State v. Depew*, 38 Ohio St. 3d 275, paragraph one of the syllabus (1988), *State v. Mason*, 82 Ohio St. 3d 144, 165 (1998), and *State v. Woodard*, 68 Ohio St. 3d 70, 78 (1993), the Ohio Supreme Court stated "the trial court may admit evidence raised at trial that is relevant to the nature and circumstances of the aggravating circumstances in the penalty phase."  *Cowans*, 87 Ohio St. 3d

154

at 87.  The only observation that the Ohio Supreme Court made as to the relevancy of the

culpability phase evidence was that because petitioner had not identified any specific evidence to

which he objected, "he has waived any objection relating to the relevancy of specific items."  *Id.*

This Court may not grant relief on a claim that was adjudicated on the merits by the state

courts unless the state court's adjudication contravened or unreasonably applied clearly

established federal law as determined by the United States Supreme Court.  This, petitioner has

not shown.  Petitioner has alleged that the trial court violated a state procedure and/or

evidentiary law.  However, the Court finds for the following reasons that petitioner has not

demonstrated that the trial court so erred, much less that the alleged error rose to the level of

fundamental unfairness depriving him of due process, to which level alleged trial court errors in

state procedure or evidentiary law must rise in order to warrant federal habeas corpus relief.

Thus, petitioner's eighth ground does not warrant habeas corpus relief.

The Court takes stock at the outset of the well-settled principle "that it is not the province

of a federal habeas court to reexamine state-court determinations on state-law questions."

*Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Sixth

Circuit has held that federal habeas courts "'must defer to a state court's interpretation of its own

rules of evidence and procedure' when assessing a habeas petition."  *Miskel v. Karnes*, 397 F.3d

446, 453 (6th Cir. 2005) (quoting *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)).  In the

instant case, the trial court decided to readmit in the penalty phase all of the evidence from the

culpability phase.  Although it is not the province of this Court to substitute its judgment for that

of the state trial court on this state-law evidentiary determination, out of an abundance of

caution, the Court will examine that decision for purposes of explaining why petitioner is not

entitled to relief on this claim.

Pursuant to O.R.C. § 2929.03(D)(1) and (2), the sentencer in a capital case is required to consider, among other things, any evidence or testimony from the trial that is relevant to the aggravating circumstances, any factors in mitigation, and the nature and circumstances of the aggravating circumstances. In *DePew*, the Ohio Supreme Court said of § 2929.03(D)(1):

> We now hold that, pursuant to R.C. 2929.03(D)(1), the prosecutor, at the penalty stage of a capital proceeding, may introduce " *** any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing ***." While this appears to permit repetition of much or all that occurred during the guilt stage, nevertheless, a literal reading of the statute given to us by the General Assembly mandates such a result, especially in light of the prosecution's obligation to demonstrate, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation. R.C. 2929.03(D)(1).

*DePew*, 38 Ohio St. 3d at 282-83. In *State v. Gumm*, 73 Ohio St. 3d 413, syllabus (1994), the Ohio Supreme Court set forth the categories of evidence that the prosecution may introduce during the mitigation phase of a capital trial pursuant to R.C. § 2929.03(D)(1) and (2):

> (1) any evidence raised at trial that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty, (2) any other testimony or evidence relevant to the nature and circumstances of those aggravating circumstances, (3) evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant, (4) the presentence investigation report, and (5) the mental examination report.

*Id.*

In light of the foregoing, trial courts have considerable discretion in determining what evidence is relevant to the penalty phase and reviewing courts are loath to interfere with the exercise of that discretion. *Cf. State v. Hancock*, 108 Ohio St. 3d 57, 76 (2006) (noting that trial judges are "clothed with a broad discretion" in determining the relevancy of trial phase evidence to the penalty phase); *see also State v. Jackson*, 107 Ohio St. 3d 53, 71-72 (2005) (finding no

error in readmission of guilt phase testimony from surviving victims because testimony was relevant to course-of-conduct aggravating circumstance); *State v. Ahmed*, 103 Ohio St. 3d 27, 43 (2004) (finding no error in readmission of seven crime-scene photographs because the evidence assisted in demonstrating aggravating circumstances); *State v. LaMar*, 95 Ohio St. 3d 181, 203-204 (2002) (finding no error in readmission of photographs or demonstrative exhibits demonstrating the weapons used because evidence "bore some relevance to" the nature and circumstances of the course-of-conduct aggravating circumstance); *State v. Fears*, 86 Ohio St. 3d 329, 345-45 (1999) (holding that even though a trial court should exclude evidence irrelevant to the penalty phase, the trial court in this case was not required to exclude the evidence of the killings, including gruesome photographs, because § 2929.03(D)(1) requires the trial court to consider the nature and circumstances of the offense and permits repetition of much or all that occurred during the guilty stage (citing *DePew*, 38 Ohio St. 3d at 282-83)).

The Ohio Supreme Court has clarified, however, that even though R.C. § 2929.03(D)(1) and (2) permit repetition of much or all of what happened during the culpability phase, trial courts are not relieved their duty to determine which culpability phase evidence is relevant to sentencing issues. *See State v. Getsy*, 84 Ohio St. 3d 180, 201 (1998) (holding that *State v. Gumm*, 73 Ohio St. 3d 413, syllabus (1994) "appears to require the trial court to determine what evidence is relevant"); *see also State v. Lindsey*, 87 Ohio St. 3d 479, 484-85 (2000) (holding that it was error for trial court to readmit guilt-phase evidence in toto without determining which evidence was relevant to penalty phase issues).

Although this latter line of cases appears to militate in petitioner's favor, the Court takes notice of the fact that even in *Getsy*, where the Ohio Supreme Court held that a trial court was

required to determine what culpability phase evidence was relevant in the penalty phase and that the trial court in that case had admitted evidence that was not relevant, the Ohio Supreme Court nonetheless held in conclusory fashion that the admission of that irrelevant evidence had not prejudiced the outcome of the appellant's case. *Getsy*, 108 Ohio St. 3d at 201. Similarly, the Ohio Supreme Court concluded in *Lindsey* that the trial court's error in readmitting all of the culpability phase evidence without making a determination as to which evidence was relevant to the penalty phase issues did not prejudice the outcome of petitioner's sentencing hearing because evidence of bloody photographs of the victim, bloodstains in the appellant's vehicle, and bloodstains at a bar was relevant to the element of serious physical harm to the victim in the aggravated robbery death specification. *Lindsey*, 87 Ohio St. 3d at 485. *See also State v. LaMar*, 181 Ohio St. 3d at 203 (deeming harmless the trial court's readmission of the victim's walker, even though that evidence had tenuous connection, if any, to the aggravating circumstances). Thus, even assuming in the instant case that the trial court erred as a matter of state law in not determining the relevancy of culpability phase evidence before readmitting it in the mitigation phase, it does not stand to follow, and in fact seems highly unlikely, that such error would warrant reversal under state law.

Beyond that, this Court is also aware of at least two district court cases holding that any possible error in readmitting culpability phase evidence in the penalty phase, assuming it is error, was insufficient to warrant habeas corpus relief. *Davis v. Mitchell*, 110 F. Supp. 2d 607, 626 (N.D. Ohio 2000) (finding no violation of clearly established federal law in the trial court readmitting in the penalty phase all evidence from the culpability phase), *rev'd on other grounds*, 318 F.3d 682 (6th Cir. 2003); *Morales v. Coyle*, 98 F. Supp. 2d 849, 885 (N.D. Ohio 2000)

158

(holding that any possible violation of state law in admitting into evidence at the penalty phase all exhibits from the culpability phase was insufficient to warrant habeas corpus relief).

The Court is not persuaded that petitioner's eighth ground warrants habeas corpus relief because the Court cannot find that the trial court's readmission in the penalty phase of all of the culpability phase evidence, or that the Ohio Supreme Court's decision finding no error therein, contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). In the instant case, even if the trial court committed error as a matter of state law when it failed to determine or even consider, prior to readmitting at the penalty phase all of culpability phase evidence, whether that evidence was relevant to any penalty phase issues, *see, e.g., Getsy*, 84 Ohio St. 3d at 201; *Lindsey*, 87 Ohio St. 3d at 484-85, state law likewise dictates that the error could not possibly have prejudiced the outcome of petitioner's sentencing hearing and was therefore harmless. If the trial court did not commit an error in state procedure and/or evidentiary law, much less one so egregious as to deny petitioner fundamental fairness in violation of his right to due process, then the Ohio Supreme Court's decision rejecting this claim did not contravene or unreasonably apply controlling federal law and petitioner is not entitled to habeas corpus relief.

A review of relevant Ohio law demonstrates to this Court that the categories of culpability phase evidence that prosecutors are permitted to reintroduce is broad and the discretion that trial courts have in determining what culpability phase evidence is relevant is wide. Against that landscape, this Court is of the view that the culpability phase evidence that was readmitted for the mitigation phase, even if it included the likes of gruesome photographs and the electrical cord and purse strap that were at some point used in the killing of the victim,

159

was relevant to sentencing issues such as the nature and circumstances of the aggravating circumstance. Further, to the extent that any culpability phase evidence, such as a photograph of the victim while she was alive, had a tenuous connection, if that, to any sentencing issues, the Court is not persuaded--again, based on a review of relevant Ohio law--that any error in admitting such evidence was prejudicial to the outcome of petitioner's sentencing hearing. The fact remains that petitioner elected to present no evidence in mitigation. That being so, the Court cannot conclude that the jury erred in finding that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt, or, more particularly, that the trial court's admission of irrelevant culpability phase evidence played an improper role in the jury's sentencing decision.

As noted above, petitioner is not entitled to habeas corpus relief on any claim that the state courts adjudicated on the merits unless the state courts' adjudication contravened or unreasonably applied clearly established Supreme Court precedent. Petitioner has made no such showing and, as respondent points out, has not even identified what clearly established federal law is applicable. Claims alleging trial court errors in state procedure or evidentiary law do not warrant habeas corpus relief unless the error is so egregious as to render the proceeding unfair, thereby denying the petitioner his Fourteenth Amendment right to due process. *See, e.g., McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). Based on the foregoing, the Court cannot find that petitioner has demonstrated a trial court error in state evidentiary law, much less an error so egregious as to deny petitioner fundamental fairness in violation of his right to due process under the Fourteenth Amendment. *See also Davis v. Mitchell, supra*, 110 F. Supp. 2d at 626 (finding no violation of clearly

160

established federal law in the trial court readmitting in the penalty phase all evidence from the culpability phase and citing *Zant v. Stephens*, 462 U.S. 862, 878 (1983)).

For the foregoing reasons, the Court **DENIES** petitioner's eighth ground for relief as without merit.

Because this state law evidentiary claim does not appear to cross the theshold of cogency necessary to even warrant habeas review pursuant to *Estelle v. McGuire*, 502 U.S. 62 (1991), this Court cannot find, even indulging petitioner every benefit of the doubt, that reasonable jurists could find this Court's decision debatable.  That being so, the Court is constrained to decline to certify ground eight for appeal.

> **Ninth Ground for Relief: Petitioner was denied his rights to due process and a fair trial when the trial court failed to order a psychiatric evaluation to determine if he was competent to stand trial and competent to waive presentation of all mitigation evidence in violation of the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Citing *Dusky v. United States*, 362 U.S. 402 (1960), *Drope v. Missouri*, 420 U.S. 162 (1975), and *Pate v. Robinson*, 383 U.S. 375 (1966), petitioner asserts in his ninth ground for relief that due process prohibits the trial of one who is incompetent and that the trial court has a duty to inquire into a defendant's competency, and order a psychiatric evaluation, if there exists indicia of the defendant's incompetency.  (Doc. # 15, at ¶¶ 51-57.)  Petitioner argues that his behavior prior to and during trial created substantial doubt as to his competency.

Petitioner points first to February 19, 1997, when he requested that his second set of attorneys be replaced and thereafter stood up as if to leave and became unresponsive to questions from the trial court.  Petitioner then points to his behavior on April 1, 1997, following the reading of the verdicts, when he spoke angrily, swore at the jury, was removed from the

courtroom, destroyed a television in the holding cell, refused to return to the courtroom, and thereafter returned only to state that he no longer wished to be present for any further proceedings. Upon returning to the courtroom, according to petitioner, his disruptive behavior continued, as he swore, became unresponsive, swore at the prosecutor, was again removed from the courtroom, and had to be restrained on the floor of the holding cell while insisting on being returned to the jail. Petitioner then points to April 10, 1997, when he returned to the courtroom to reiterate that he wanted no mitigation evidence presented on his behalf and did not wish to be present for sentencing. Upon learning that he would be required to appear in court for the mitigation hearing, petitioner rejected the opportunity to be appear in civilian clothes and without shackles. These actions, petitioner now argues, demonstrate that he lacked the ability to assist counsel in his defense and created doubt sufficient to require the trial court to inquire as to his competency. Petitioner thus argues that the trial court's failure to *sua sponte* direct that petitioner be evaluated for a mental disease or deficiency that would substantially impair his ability to aid in his defense deprived him of his due process right to fair trial.

Respondent argues that petitioner is not entitled to relief because the Ohio Supreme Court's decision rejecting this claim did not contravene or unreasonably apply clearly established federal law. Respondent argues that the standard set forth in *Dusky* for determining a defendant's competency to stand trial is the same for determining a defendant's competency to waive mitigation: a defendant is competent if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and if] he has a rational as well as factual understanding of the proceedings against him." (Doc. # 36, at 99 (quoting *Dusky, supra*, 362 U.S. at 402.) Citing *Van Woudenberg v. Gibson*, 211 F.3d 560 (10th Cir. 2000), respondent

argues that in order to prevail on this claim, petitioner must demonstrate by clear and convincing evidence a real, substantial, and legitimate doubt as to his competency to stand trial.  In this regard, respondent argues, no habeas relief may issue unless the competency decisions made by the state courts were based on an unreasonable determination of the facts based on the evidence presented.  Respondent argues that the Ohio Supreme Court's decision that petitioner was competent was fairly supported by the record and thus is entitled to a presumption of correctness.

Respondent points to the trial court's finding, set forth in its sentencing decision, that, "'While disruptive, the Defendant evidenced no mental instability but rather acted out his pique.'" (Doc. # 36, at 100 (quoting Exh. 14, at 69).)  Further supporting the trial court's finding, respondent argues, was the fact that even defense counsel did not feel or suggest that petitioner might be incompetent.  Respondent argues that petitioner clearly understood the ramifications of his decision to waive mitigation, and refused to alter that decision even though the trial court and defense counsel explained in detail the probable outcome if he stayed that course.  Respondent further points out that at no time during the culpability phase of the trial did petitioner act in a disruptive manner or clash with his counsel.  That petitioner lashed out only after he was found guilty, respondent argues, supports the trial court's finding that it was anger, not mental instability, that fueled his disruptive outbursts.  Respondent asserts that petitioner has presented no evidence that he was incompetent to stand trial or to waive mitigation.  Pre-trial dissatisfaction with defense counsel, respondent points out, is not a rare occurrence.  And anger at having been convicted of indicted offenses, respondent concludes, is insufficient to challenge years after the fact the trial court's finding that petitioner was competent.

Petitioner replies in his traverse that the decisions of both the trial court and the Ohio

Supreme Court were based on unreasonable determinations of the facts in light of the record.
(Doc. # 42, at 110-14.)  Petitioner further argues that those determinations were based on
incomplete facts, which deficiency he attempted, without success, to remedy in postconviction.
Citing *McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001), petitioner argues that he bears a
lower burden of proof for demonstrating that the trial court erred in not *sua sponte* holding a
competency hearing than for demonstrating that he was, in fact, tried and convicted while
incompetent.  Continuing his reliance on *McGregor* and other cases cited therein, petitioner
argues that the proper inquiry is whether a reasonable judge, situated as was the trial court judge
whose failure to conduct an evidentiary hearing is being reviewed, should have experienced
doubt with respect to competency to stand trial and that a bona fide doubt exists if a reasonable
judge should have doubted whether the defendant had sufficient present ability to consult with
his counsel and a reasonable degree of rational understanding and whether the defendant had a
rational as well as factual understanding of the proceedings against him.  In this regard,
petitioner argues that the record reflects far more than mere dissatisfaction with counsel and
anger about being convicted.  Specifically, as petitioner argues, the record reflects on his part
repeated complaints about the system approaching paranoia, an inflexible belief that his
attorneys believed him to be guilty, being removed from the courtroom on several occasions, and
being physically restrained in a holding cell after destroying a television.  Petitioner points to
Chief Justice Moyer's dissenting opinion that those actions should have alerted the trial court
that there was at least a possibility that petitioner was incompetent.  Petitioner concludes by
arguing that the very fact that the trial court felt compelled to address this issue in its sentencing
opinion, though neither defense counsel nor the prosecution had raised it, demonstrates that the

trial court must have had concerns about petitioner's competency.

The Court has already considered and rejected these arguments.  In rejecting petitioner's first ground for relief, this Court concluded that the Ohio Supreme Court's decision, as well as the state courts' postconviction decisions, determining not only that petitioner was competent, but also that the trial court did not err in not *sua sponte* conducting a competency hearing, did not contravene or unreasonably apply clearly established federal law as determined by the United States Supreme Court, and did not involve unreasonable determinations of the facts based on the evidence presented.  Petitioner argues nothing in support of his ninth ground for relief that htis Court has not already considered and rejected.

Thus, for the reasons discussed more fully in connection with petitioner's first ground for relief, this Court **DENIES** petitioner's ninth ground for relief as without merit.

Because of the fact-intensive nature of this claim, as well as the fact that it is intertwined with petitioner's first ground for relief and is an important linchpin in petitioner's death sentence, the Court hereby certifies ground nine for appeal.

> **Twelfth Ground for Relief: The death penalty authorized by the Ohio Revised Code deprives capitally-charged defendants of their lives without due process of law, denies equal protection and imposes cruel and unusual punishment in violation of the United States Constitution.**

In sub-parts A through L of his twelfth ground for relief, petitioner raises a number of constitutional challenges to Ohio's capital punishment scheme.  However, the Court of Appeals for the Sixth Circuit has consistently upheld the constitutionality of Ohio's death penalty statutes and squarely rejected each of the constitutional challenges raised or alluded to by petitioner. *See, e.g.*, *Williams v. Bagley*, 380 F.3d 932, 961-66 (6th Cir. 2004); *Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir. 2003); *Buell v. Mitchell*, 274 F.3d 337, 367-70 (6th Cir. 2001); *Byrd v. Collins*,

209 F.3d 486, 539 (6th Cir. 2000). Of Ohio's capital punishment scheme, the Sixth Circuit has remarked:

> We note that the Ohio death penalty statute includes a number of capital sentencing procedures that the United States Supreme Court held in *Gregg v. Georgia*, 428 U.S. 153, 188-95 (1976), specifically to reduce the likelihood of arbitrary and capricious imposition of the death penalty. These procedures include: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review.

*Buell*, 274 F.3d at 367. Recently, the Sixth Circuit noted that constitutional challenges to Ohio's death penalty scheme "are entirely meritless and have been rejected by this court on numerous occasions." *Beuke v. Houk*, 2008 WL 3351168, * 23 (6th Cir. Aug. 13, 2008). Petitioner has not directed this Court to any additional authority–in particular, any United States Supreme Court decisions–mandating reconsideration of these decisions.

    A.    R.C. 2929.022, 2929.03, AND 2929.04 VIOLATE THE DEFENDANT'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND TO A TRIAL BEFORE AN IMPARTIAL JURY, AS GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SEC. 9, 10, AND 16 OF THE OHIO CONSTITUTION.

Petitioner sets forth two arguments in his first sub-part. First, petitioner argues that the bifurcated trial procedure used in Ohio, wherein a single jury hears and decides both the guilt and penalty phases of the trial, violates a defendant's right to an impartial jury at the penalty phase. According to petitioner, "[o]nce a jury has found an accused guilty of aggravated murder, a very high probability exists that jury bias and animosity towards the accused will exist at the sentencing hearing," and "an intolerable risk exists that the defendant's life may be put in the

hands of a hostile venire . . . ." (Am. Pet. ¶ 82-83.)  Petitioner's claim challenging the bifurcated

trial procedure used in Ohio is wholly without merit.  *See Lockhart v. McCree*, 476 U.S. 162,

180 (1986) (noting that the state had "an entirely proper interest in obtaining a single jury that

could impartially decide all of the issues in McCree's case");  *Gregg v. Georgia*, 428 U.S. 153,

179-95 (1976) (upholding Georgia capital sentencing scheme which required that the same jury

sit for both phases of the bifurcated capital trial); *Buell*, 274 F.3d at 367 (noting that bifurcated

trials with same jury was upheld in Gregg v. Georgia); *Jackson v. Houk*, 2008 WL 1946790, *75

(N.D. Oh. May 1, 2008) (rejecting argument that bifurcated proceedings using the same jury for

both phases is unconstitutional).

Second, petitioner argues that R.C. 2929.03(D)(1) violates a defendant's right to the

effective assistance of counsel because it requires submission to the jury of any pre-sentence

investigation reports and mental examinations requested by a defendant.  The Sixth Circuit has

consistently rejected constitutional challenges to this provision.  *See Williams v. Bagley*, 380

F.3d 932, 963-64 (6th Cir. 2004) (rejecting argument that Ohio's capital punishment scheme

violates a defendant's rights to due process and effective assistance of counsel by allowing a PSI

or mental examinations requested by a defendant to be provided to the jury);  *see also Cooey v.

Coyle*, 289 F.3d 882, 925-26 (6th Cir. 2002) (dismissing  petitioner's argument that the

submission requirement "prevents defense counsel from giving effective assistance and prevents

the defendant from effectively presenting his case");  *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir.

2000) (same); *Moore v. Mitchell*, 531 F.Supp.2d 845 (S.D. Oh. 2008) (same).

    B.     R.C. 2929.03, 2929.04, 2929.022 VIOLATE THE EIGHTH AND
           FOURTEENTH AMENDMENTS TO THE UNITED STATES
           CONSTITUTION AND ARTICLE I, SEC. 9 AND 16 OF THE OHIO
           CONSTITUTION BY FAILING TO PROVIDE ADEQUATE GUIDELINES

FOR DELIBERATION, LEAVING THE JURY WITHOUT PROPER
GUIDELINES IN BALANCING THE AGGRAVATING AND MITIGATING
CIRCUMSTANCES.

In sub-part B, petitioner argues that Ohio's death penalty scheme is vague, does not give the jury specific and detailed guidance, and does not provide "clear and objective standards" that channel the discretion of the jury in determining mitigating factors and weighing the aggravating circumstances against the mitigating factors.  (Am. Pet. ¶ 85.)  This argument is without merit, because the Constitution does not require that "numeric weights" be assigned to aggravating circumstances and mitigating factors, but requires only that the sentencer's discretion be directed and limited enough to prevent wholly arbitrary and capricious action.  "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 979 (1994); *see also California v. Ramos*, 463 U.S. 992, 1008-1009 n.22 (1983); *Zant v. Stevens*, 462 U.S. 862, 875 (1983); *Proffitt v. Florida*, 428 U.S. 242, 258 (1976).  Ohio's scheme sufficiently enumerates specific factors that the sentencer must evaluate, and a general framework for that evaluation.

The Sixth Circuit rejected similar arguments in *Buell v. Mitchell, supra*.  There, the Sixth Circuit noted that the United States Supreme Court has upheld a capital punishment scheme "that did not enunciate specific factors to consider or a specific method of balancing the competing considerations."  *Buell*, 274 F.3d at 368 (citing *Franklin v. Lynaugh*, 487 U.S. 164, 172-73 (1988); *Zant v. Stephens*, 462 U.S. 862, 875 (1983)).  With respect to petitioner's argument that Ohio's scheme gives the sentencer too much discretion and fails to define terms such as "weighing" and "mitigating," the Sixth Circuit has held that "[t]he Constitution contains no such requirements."  *Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir.2003); *see also Coleman v.*

168

*Mitchell*, 268 F.3d at 442-43 (finding that Ohio's scheme provides sufficient guidance to the sentencer).

C.      R.C. 2929.022, 2929.03 AND 2929.04 AND OHIO R. CRIM. P. 11 (C)(3) PLACE AN UNCONSTITUTIONAL BURDEN ON THE DEFENDANT'S RIGHT TO A JURY TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SEC. 10 OF THE OHIO CONSTITUTION AND HIS RIGHTS TO BE FREE FROM COMPULSORY SELF-INCRIMINATION UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1 SEC. 10 OF THE OHIO CONSTITUTION.

In sub-part C, petitioner claims that Ohio's death penalty scheme unconstitutionally encourages guilty pleas.  In particular, petitioner cites Rule 11(c)(3) of the Ohio Rules of Criminal Procedure, which provides that if an accused pleads guilty or no contest to the charge of aggravated murder, the trial court may dismiss the death penalty specifications "in the interests of justice."  In contrast, this benefit is not available to a defendant who chooses to proceed to trial.

Although the Supreme Court struck down a statutory provision where a guilty plea *automatically* left the defendant ineligible for the death penalty, *United States v. Jackson*, 390 U.S. 570 (1968), the Supreme Court has never held that it is impermissible to structure a statute where the defendant might plead guilty to avoid the *possibility* of a death sentence, inasmuch as there is no *per se* rule against encouraging guilty pleas.  *See Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978); *Spinkellink v. Wainwright*, 578 F.2d 582, 608-609 (5th Cir. 1978) (citing *Brady v. United States*, 397 U.S. 742, 747 (1970)).  Under Ohio's rules, unlike the statutory provision at issue in *Jackson*, one who pleads guilty to an indictment containing a death penalty specification is still *eligible* for the death penalty.  *See Spinkellink*, 578 F.2d at 608.  Furthermore, the Sixth

169

Circuit has rejected the argument that the provisions of Crim. R. 11 impermissibly encourage guilty pleas in capital cases.  *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (Ohio's scheme does not impermissibly encourage guilty pleas); *Cooey v. Coyle*, 289 F.3d 882, 924-25 (6th Cir. 2002) (noting that petitioner offered no constitutional authority to support claim that Crim. R. 11 impermissibly encouraged guilty pleas in capital cases); *see also Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003).  For these reasons, the Court is not persuaded that Ohio R. Crim. P. 11(c)(3) chills a capital defendant's exercise of his right to a jury trial, and the Court finds that Ohio's scheme is not rendered unconstitutional by the fact that the sentencing judge has the option of dismissing the death penalty specification when a capitally charged defendant pleads guilty.  The Court further notes that this provision did not have a chilling affect on petitioner's right to a jury trial, as petitioner did not plead guilty and instead exercised his right to have a trial by jury.

> D.     R.C. 2929.03 FAILS TO PROVIDE A MEANINGFUL BASIS FOR DISTINGUISHING BETWEEN LIFE AND DEATH SENTENCES, AS IT DOES NOT EXPLICITLY REQUIRE THE JURY, WHEN IT RECOMMENDS LIFE IMPRISONMENT, TO SPECIFY THE MITIGATING CIRCUMSTANCES FOUND, OR TO IDENTIFY ITS REASONS FOR SUCH SENTENCE.  THIS DENIES THE ACCUSED HIS RIGHTS UNDER R.C. 2929.03(A), THE OHIO CONSTITUTION AND THE FEDERAL CONSTITUTION.

In sub-part D, petitioner argues that Ohio's capital punishment scheme is unconstitutional because it does not require a jury recommending life imprisonment to identify the mitigating factors found to exist so that there is a basis for comparison between death and life sentences. However, petitioner cites no controlling Supreme Court precedent to support this position, and the Sixth Circuit has determined that there is no constitutional requirement that the trial judge or jury identify and articulate the specific factors used to arrive at the decision whether or not to

170

impose or reject the death penalty.  *See, e.g.*, *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001)

(rejecting argument that the Ohio capital punishment scheme is unconstitutional because it does

not require identification of mitigating factors when a life sentence is imposed).

> E.     R.C. 2929.021, 2929.03 AND 2929.05 FAIL TO ASSURE ADEQUATE
>         APPELLATE ANALYSIS OF ARBITRARINESS, EXCESSIVENESS AND
>         DISPROPORTIONALITY OF DEATH SENTENCES AND THE SUPREME
>         COURT OF OHIO FAILS TO ENGAGE IN A LEVEL OF ANALYSIS THAT
>         ENSURES AGAINST ARBITRARY DEATH SENTENCING.

In sub-part E, petitioner argues that meaningful appellate review of the appropriateness

of death sentences in Ohio is lacking because reviewing courts do not consider death eligible

cases that resulted in life sentences when reviewing the appropriateness of death sentences.

Additionally, petitioner claims that the Ohio death penalty scheme is impermissible because it

does not provide for appellate review by the intermediate court of appeals and only permits one

level of review at the Ohio Supreme Court.

Petitioner argues, in essence, that a tracking system that contains only death verdicts

results in a system that is tilted towards death.  Petitioner claims that his death sentence should

be compared to all cases where death was a possible penalty, including those cases that resulted

in a life sentence, as opposed to only the cases where the death penalty was actually imposed.

Petitioner's argument is foreclosed by Sixth Circuit and United States Supreme Court precedent.

Stated simply, there is no constitutional right to proportionality review.  *See Pulley v.

Harris*, 465 U.S. 37, 43-44 (1984) (noting that while its previous decision in *Gregg v. Georgia*

regarded favorably proportionality review by appellate courts, its decision did not require such

review).  The Sixth Circuit has held that a defendant cannot prove a constitutional violation "by

demonstrating that other defendants who may be similarly situated did *not* receive the death

penalty." *Getsy v. Mitchell*, 495 F.3d 295, 305 (6th Cir. 2007). *See also Beuke v. Houk*, 2008 WL 3351168, *23 (6th Cir. Aug. 13, 2008) ("This Circuit has consistently interpreted the Supreme Court precedents to hold that comparative proportionality review is not required by the Constitution."); *Smith v. Mitchell*, 348 F.3d 177 (6th Cir. 2003) (comparative proportionality review is not constitutionally required); *Greer v. Mitchell*, 264 F.3d 663, 691 (6th Cir. 2001) (same). Therefore, the Court finds that petitioner has not demonstrated, and the Court is not otherwise persuaded, that the "appropriateness" review employed by the Ohio Supreme Court is constitutionally infirm.

Finally, petitioner has not cited, and this Court is unaware, of any controlling United States Supreme Court precedent precluding states from eliminating review by an intermediate court of appeals and directing all death penalty appeals to the state's highest court. Accordingly, the Court cannot find that the decision of the state court in this regard was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

> F.   THE APPELLATE REVIEW PROVISION OF R.C. 2929.05 FAILS TO SPECIFICALLY REQUIRE INQUIRY AND FINDINGS REGARDING ARBITRARINESS, PASSION, OR PREJUDICE, AND THUS IS CONSTITUTIONALLY INADEQUATE UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SEC. 9 AND 16 OF THE OHIO CONSTITUTION.

In sub-part F, petitioner claims that Ohio's death penalty scheme is unconstitutional because it does not require appellate courts to determine whether the trier of fact recommended or imposed a sentence of death while under the influence of passion, prejudice or any other arbitrary factor. However, petitioner has not cited any controlling United States Supreme Court precedent requiring state appellate courts to make specific findings regarding whether the jury's

172

verdict was based on passion, prejudice or arbitrary factors.  Furthermore, the death penalty

scheme in Ohio has a mechanism to ensure that the death penalty is not imposed in an arbitrary

or discriminatory manner, because the trial court and the Ohio Supreme Court are required to

conduct an independent weighing of the aggravating and mitigating factors in each death penalty

case in order to determine whether death is the appropriate punishment.  Accordingly,

petitioner's argument must fail.

> G.     THE OHIO DEATH PENALTY STATUTE IMPERMISSIBLY MANDATES
>        IMPOSITION OF THE DEATH PENALTY AND PRECLUDES A MERCY
>        OPTION IN THE ABSENCE OF MITIGATING EVIDENCE OR WHEN THE
>        AGGRAVATING CIRCUMSTANCES OUTWEIGH MITIGATING FACTORS.
>        THE STATUTE ALSO FAILS TO REQUIRE A DETERMINATION THAT
>        DEATH IS THE APPROPRIATE PUNISHMENT.
>
> H.     R.C. 2929.03, 2929.04 AND 2929.05 VIOLATE THE EIGHTH AND
>        FOURTEENTH AMENDMENTS TO THE UNITED STATES
>        CONSTITUTION AND ARTICLE 1, SEC. 9 OF THE OHIO CONSTITUTION
>        BY FAILING TO REQUIRE THE JURY TO DECIDE THE
>        APPROPRIATENESS OF THE DEATH PENALTY.

In sub-part G, petitioner argues that the death penalty scheme in Ohio is unconstitutional

because it does not permit the jury to consider mercy when there is no mitigating evidence

presented or when the aggravating circumstances outweigh the mitigating factors, and instead

mandates that death be imposed in such circumstances.  Petitioner argues that "[a]n

individualized sentencing decision requires that the sentencer possess the power to choose mercy

and to determine that death is not the appropriate penalty for this defendant for this crime."

(Am. Pet. ¶ 110.)

In sub-part H, petitioner argues that Ohio's statutory scheme is unconstitutional because

it does not require the trier of fact to make a determination of the appropriateness of the death

penalty once it determines that the aggravating factors outweigh the mitigating factors beyond a

reasonable doubt.  According to petitioner, "[m]erely concluding that the aggravating

circumstances outweigh those in mitigation is inadequate, because a jury might still conclude

that a comparison of the aggravating factors with the totality of the mitigating factors leaves it in

doubt as to the proper penalty."  (Am. Pet. ¶ 115.)

    Petitioner's arguments are foreclosed by Sixth Circuit and United States Supreme Court

precedent.  In *Boyde v. California*, 494 U.S. 370 (1990), the petitioner challenged the trial

court's penalty phase instruction to the jury that, "[i]f you conclude that the aggravating

circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." *Id.*

at 374.  The petitioner reasoned that the mandatory nature of that instruction prevented the jury

from making an individualized assessment of the appropriateness of the death penalty.  The

Supreme Court flatly rejected that argument:

> Petitioner suggests that the jury must have freedom to decline to impose the death
> penalty even if the jury decides that the aggravating circumstances "outweigh"
> the mitigating circumstances.  But there is no such constitutional requirement of
> unfettered sentencing discretion in the jury, and States are free to structure and
> shape consideration of mitigating evidence 'in an effort to achieve a more rational
> and equitable administration of the death penalty.'

*Id.* at 377 (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 181 (1988)).  Likewise, in *Blystone v.*

*Pennsylvania,* 494 U.S. 299 (1990), the Supreme Court rejected the petitioner's challenge to a

provision in Pennsylvania's death penalty statute requiring the jury to impose death if it found at

least one aggravating circumstance and no mitigating circumstances, holding that the statute

satisfied the requirement that a capital sentencing jury be allowed to consider and give effect to

all relevant mitigating evidence, and that the statute was not "mandatory" insofar as it did not

automatically impose death upon conviction for certain types of murder.  *Id.* at 305.

    The Sixth Circuit has consistently relied upon Supreme Court precedent to reject

arguments similar to those raised by petitioner herein.  In *Buell v. Mitchell*, the Sixth Circuit rejected the petitioner's argument that Ohio's scheme is constitutionally infirm for failing to provide the sentencing authority with an option to recommend a life sentence when aggravating circumstances outweigh mitigating factors or where no mitigating factors have been established. 274 F.3d at 367-68;  *see also Coleman v. Mitchell*, 268 F.3d at 442 (holding that Ohio's scheme is not a mandatory death penalty statute in violation of the Eighth Amendment).

Based on the above precedent, the Court must reject petitioner's argument.  Allowing a sentencer to impose a life sentence even when the aggravating circumstances outweigh the mitigating factors would allow for the very arbitrariness and capriciousness that petitioner purports to condemn, by inviting the sentencer to disregard the sentencing procedures mandated by the state legislature within the confines of the Constitution.

> I.    THE OHIO DEATH PENALTY SCHEME PERMITS IMPOSITION OF THE DEATH PENALTY ON A LESS THAN ADEQUATE SHOWING OF CULPABILITY BY FAILING TO REQUIRE A CONSCIOUS DESIRE TO KILL, PREMEDITATION OR DELIBERATION AS THE CULPABLE MENTAL STATE, BY DENYING LESSER OFFENSE INSTRUCTIONS AND BY ALLOWING AFFIRMANCE OF CAPITAL CONVICTIONS ON THE BASIS OF UNCONSTITUTIONAL PRESUMPTIONS RESPECTING THE PRESENCE OF AN INTENT TO KILL.

Petitioner's argument challenging the failure of the Ohio death penalty scheme to require premeditation or deliberation as the culpable mental state for all capital defendants is foreclosed by Sixth Circuit precedent.  Citing *Tison v. Arizona*, 481 U.S. 137, 158 (1987), the Sixth Circuit held in *Greer v. Mitchell, supra*, 264 F.3d at 691, that "such a conscious desire to kill is not required in order to impose the death penalty."  *See also Coleman*, 268 F.3d at 442 (holding that imposing death for felony murder, even in the absence of proof of premeditation or deliberation, is consistent with the Eighth Amendment).  Accordingly, petitioner's argument is without merit.

175

J.    THE OHIO 'BEYOND A REASONABLE DOUBT' STANDARD OF PROOF
      FAILS TO MEET THE REQUIREMENT OF HIGHER RELIABILITY FOR
      THE GUILT DETERMINATION PHASE OF A CAPITAL CASE.

In sub-part J, petitioner claims that Ohio's definition of reasonable doubt fails to meet the

requirement of a higher degree of reliability in capital cases.  In essence, petitioner argues that

proof beyond all doubt should be required in capital cases.  However, petitioner has not cited,

and this Court is unaware of, any controlling United States Supreme Court authority requiring

proof beyond all doubt in capital cases.  Accordingly, petitioner's claim is without merit.

K.    THE AGGRAVATING CIRCUMSTANCE THE ACCUSED IS CHARGED
      WITH COMMITTING, R.C. 2929.04(A)(7), IS CONSTITUTIONALLY
      INVALID WHEN USED TO AGGRAVATE R.C. 2903.01(B) AGGRAVATED
      MURDER.

In sub-part K, petitioner argues that the death penalty scheme in Ohio fails to narrow the

class of offenders deserving of the death penalty by allowing a death sentence to be imposed in a

"felony murder" case upon less proof than would be required for murders committed with prior

calculation.  Petitioner argues that, in effect, every defendant who is convicted of a felony

murder is automatically eligible to receive a death sentence, and the aggravating circumstance

merely repeats what the jury would have necessarily found in order to convict the defendant of

the underlying felony.  Stated differently, petitioner contends that Ohio's felony murder statutory

provisions fail to narrow the class of death-eligible offenders by allowing an aggravating

circumstance merely to repeat an element of the underlying offense of aggravated murder.

To the extent that petitioner is arguing that Ohio's felony-murder statute fails to provide

the narrowing function required by the Eighth Amendment, his argument is foreclosed by Sixth

Circuit precedent.  In *Roe v. Baker*, 316 F.3d 557 (6th Cir. 2002), the Sixth Circuit addressed this

176

very issue.  In rejecting the petitioner's claim, the Court held that "the Ohio Legislature narrow[ed] the class of felony murders subject to the death penalty by excluding those who commit [murder in the course of an] arson, robbery, burglary or escape, unless they are charged with a different aggravating circumstance."  *Id.* at 570 (citing *Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000)); *see also Montgomery v. Bagley*, 482 F.Supp.2d 919, 998 (N.D. Oh. 2007) (noting that this claim has been "repeatedly raised and found wanting").  Petitioner cannot establish that the decision of the state courts in this regard is contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

> L.    R.C. 2929.03, 2929.04 AND 2929.05 VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SEC. 9 AND 16 OF THE OHIO CONSTITUTION IN FAILING TO PROPERLY ALLOCATE THE BURDEN OF PROOF DURING THE MITIGATION PHASE OF TRIAL.

In the last sub-part, petitioner argues that the State of Ohio should have the burden of proving the absence of mitigating factors beyond a reasonable doubt, but instead puts the burden of going forward with evidence of mitigating factors on the accused.  However, a state law which places the burden of proving mitigating factors on the defendant is not *per se* unconstitutional as long as a state's methods of allocating the burdens of proof does not lessen the state's burden to prove every element of the offense charged, or to prove the existence of aggravating circumstances.  In Ohio, the state still has the burden to prove, beyond a reasonable doubt, that the aggravating circumstances outweigh any mitigating factors.  Therefore, petitioner's argument is without merit.  *See Jackson v. Houk*, 2008 WL 1946790, * 73 (N.D. Oh. May 1, 2008).

In summary, the Ohio courts did not act contrary to, or unreasonably apply, clearly

established federal law as determined by the United States Supreme Court in dismissing petitioner's constitutional challenges to Ohio's capital punishment scheme.  Furthermore, because challenges to the constitutionality of the death penalty scheme in Ohio have been repeatedly considered and rejected by the Sixth Circuit, the Court concludes that reasonable jurists would not find the Court's assessment of petitioner's twelfth ground for relief to be debatable or wrong.  As such, the Court declines to certify this ground for relief for appeal.

> **Thirteenth Ground for Relief: Petitioner was denied the effective assistance of counsel in violation of the U.S. Constitution as there was a breakdown in communication between the attorney and client that prevented the attorney from adequately preparing and presenting a defense.  This breakdown resulted in a denial of petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Petitioner argues in his thirteenth ground for relief that his right under the Sixth and Fourteenth Amendments to the effective assistance of counsel was violated when the trial court denied his motion for new counsel and, by inaction, denied his counsel's motion to withdraw. (Doc. # 45, at ¶¶ 146-153.)  In support of this claim, petitioner recounts his multiple attempts in February 1997, a month before his trial was scheduled to begin, to replace attorneys Michael Kelly and Bruce Wallace with new counsel.[14]  Petitioner focuses in particular on the final motion that Mr. Kelly and Mr. Wallace filed on March 6, 1997, after the trial court had twice before refused petitioner's requests to replace them, wherein counsel explained that they had had disputes with petitioner about certain evidence and methods for dealing with it, that new evidence had emerged concerning a jailhouse informant with which it was impossible to deal because petitioner would not speak to counsel.  Petitioner focuses on the motion because, as this

---

[14]     Mr. Kelly and Mr. Wallace replaced petitioner's first set of attorneys in November 1996 pursuant to a request by petitioner for new counsel.

Court also noted, it does not appear that the trial court ever ruled on that motion. Petitioner concedes that criminal defendants do not have a right to an easy rapport or meaningful relationship with appointed counsel, but argues that the right to professionally competent representation is jeopardized when there is a significant breakdown in the attorney-client relationship. Asserting that that was what happened, petitioner argues that the trial court, at a minimum, should have held another hearing on the March 6, 1997 motion to withdraw to inquire into the breakdown in the relationship between counsel and petitioner.

Respondent concedes that this claim is properly before the Court for habeas review, following petitioner's presentation of it to the state courts on direct appeal, but argues that the claim does not warrant habeas corpus relief because the Ohio Supreme Court's decision rejecting the claim did not contravene or unreasonably apply clearly established Supreme Court precedent and did not involve an unreasonable determination of the facts. (Doc. # 46, at 3-11.) Citing the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), and revisited in *Lockhart v. Fretwell*, 506 U.S. 364 (1993), respondent argues that the Ohio Supreme Court correctly determined that the trial court's refusal to replace Mr. Kelly and Mr. Wallace did not result in deficient performance on their part or prejudice to petitioner's case sufficient to undermine confidence in the outcome of petitioner's trial. Respondent argues that petitioner made no legitimate showing of good cause for new counsel one month before his trial was to begin. Respondent notes that the trial court had once before, following petitioner's arraignment, granted petitioner's request for new counsel--a request that was based on the same unsupported allegations that original counsel believed that he was guilty and were urging him to accept a plea bargain. Respondent argues that the trial court correctly denied the February 1997 motion for

179

new counsel because it was untimely, having been filed just a month before petitioner's trial was to begin.  Respondent further notes that the trial court expeditiously conducted a sufficient inquiry in determining that counsel were diligently representing petitioner, that petitioner's reasons for wanting new counsel were insufficient and unsupported, and that replacing counsel at that late date would serve neither the public's interest in the prompt and efficient administration of justice nor petitioner's best interests.  Finally, respondent notes that the Ohio Supreme Court correctly observed that whatever temporary breakdown in the attorney-client relationship existed at the time the motion was filed did not continue after the motion was denied, and that the record was replete with instances demonstrating that petitioner was participating in his defense and communicating with his attorneys.

In his traverse, petitioner recounts the facts surrounding his requests for counsel and the extent of the trial court's inquiries into those requests, and then argues that the Ohio Supreme Court's decision ignored facts in the record and that the trial court's inquiries into his motions for new counsel were insufficient.  (Doc. # 47, at 2-9.)  Petitioner points out that there were three separate requests for new counsel in February 1997--the first, an oral request by petitioner into which the trial court made only some inquiry before denying and having petitioner removed from the courtroom for being disruptive.  The second request was a motion to withdraw filed by defense counsel, per petitioner's demand, which came for a hearing on February 28, 1997. Though petitioner and counsel recounted petitioner's various refusals to communicate with counsel following a loud dispute at the jail about the palm print evidence, the trial court again overruled the motion, again threatened to have petitioner removed from the courtroom, and suggested that petitioner represent himself.  The third request was a motion to withdraw filed by

180

defense counsel on March 6, 1997, in which they explained that petitioner refused to speak to them and that this was complicating their efforts to deal with new evidence of a jailhouse informant that had just emerged. That motion, petitioner explains, never came for a hearing and was never ruled upon by the trial court.

Petitioner argues that any ruling by the Ohio Supreme Court that the temporary lack of communication between petitioner and defense counsel did not continue ignores facts in the record. Petitioner argues that when he became unresponsive and had to be removed from the courtroom on February 19, 1997, he certainly was not communicating with counsel. Petitioner goes on to argue that the Ohio Supreme Court's suggestion that, during trial, because defense counsel claimed they had gone over certain matters with petitioner, the breakdown was only temporary, ignores the fact that the breakdown occurred over certain evidentiary items and witnesses and ignores the fact that petitioner was entitled to counsel throughout the proceedings, not just during certain portions of the proceedings. Thus, petitioner reasons, even a temporary breakdown that results in a complete breakdown of the attorney-client relationship, effectively results in a denial of the right to effective assistance of counsel.

Petitioner goes on to argue that the trial court was intimidating and threatening to petitioner throughout the February 19 and February 28 inquiries. Petitioner further argues that the breakdown in communication was not a matter of petitioner not liking his attorneys, as the trial court suggested, and was not a matter of "the boy crying wolf," as suggested by the prosecution; rather, petitioner argues, it was about certain evidentiary items and witnesses that counsel subsequently, as a result of the breakdown, failed to effectively challenge--*i.e.*, the palm print evidence and the testimony of jailhouse informant Marvin Napier. Petitioner argues that

181

even if counsel's failure to rebut Napier's testimony was not completely the result of the breakdown in the attorney-client relationship, the fact that counsel subsequently failed to present any mitigation is clear evidence of the continued lack of cooperation between petitioner and defense counsel. Finally, petitioner argues that the trial court completely failed to inquire into (or rule upon) the March 6, 1997 motion to withdraw, in clear violation of basic federal and state law.

Petitioner raised this claim on direct appeal and the Ohio Supreme Court rejected it on the merits. The Court sets forth the Ohio Supreme Court's decision verbatim:

> In his first proposition of law, Cowans claims that a breakdown in communications between him and his court-appointed counsel was so serious as to entitle him to have new counsel appointed, and that the trial court's refusal to do so violated Cowans's Sixth Amendment right to counsel.

> The trial court appointed two attorneys, including the Clermont County Public Defender, to represent Cowans. Cowans requested new counsel, claiming that the public defender was pressing an unwanted plea bargain upon him. The trial court granted this first request for new counsel, discharged the appointees, and chose Bruce S. Wallace and Michael P. Kelly to represent Cowans.

> At a hearing on February 19, 1997 (about a month before voir dire began), Cowans asked the trial court to appoint new counsel to replace Wallace and Kelly. Cowans explained that he believed Wallace and Kelly thought he was guilty. Cowans also accused Wallace and Kelly of "wanting me to plead guilty and lie * * *." When the court inquired about this allegation, Kelly stated that he and Wallace had never told Cowans that they thought he was guilty, and never asked him to lie:

> "[N]ever once has Mr. Wallace or I or Larry [Handorf, the court-appointed defense investigator] advised Mr. Cowans that we think he is guilty. At no time did that phrase every pass between us. * * * [W]e did what all attorneys do with clients, discuss evidence and discuss theories. * * * We have given him theories of evidence. It is not unusual in theories--approaches to deal with evidence--it is not unusual for attorneys and clients to disagree on approaches, and we have had some differences on approaches. But we have not said those things, nor have we ever asked Mr. Cowans to tell an untruth under oath or any other wise [sic]."

The trial court found that Cowans's attorneys were representing him diligently, and refused to appoint new counsel "without more reasons" than Cowans had given. Cowans's attorneys informed the court during the hearing that Cowans had "demanded that we file" a motion to withdraw, and that therefore they would do so.

Defense counsel filed a "motion for new counsel" on Cowans's behalf, for the sole reason that Cowans lacked "confidence in his present counsel" and therefore could not "adequately communicate with counsel and assist in the presentation of his case." At a hearing, Kelly informed the court that he and Wallace had visited Cowans in jail to discuss the state's case against him and to propose a defense strategy. Kelly said, "[T]here was a very loudly expressed dispute over some of those items"; after that, Cowans refused to speak to his attorneys except to ask them to file a motion for new counsel.

Cowans told the court that he and his attorneys were "not getting along," and complained that Kelly "would come over to the jail * * * and talk to me about that palm print." Cowans refused to explain further. The trial judge again denied the motion and indicated that he found no substantive reason why counsel should be replaced. Cowans told the court, "I'm not going to cooperate with this man." When the court denied Cowans's request, Cowans asked for a new judge. Cowans also indicated that he could not proceed *pro se* because he knew nothing about the law.

On March 6, 1997, Kelly and Wallace filed a motion to withdraw on the ground that Cowans had refused to speak with them. This new motion stated that, although counsel had previously believed they could represent Cowans effectively, they could no longer do so. Having just learned of Cowans's incriminating statements to Napier, counsel now believed they could not adequately prepare to rebut that testimony without Cowans's cooperation.

Cowans contends that the trial court should have granted his motion for new counsel or the later motion of Wallace and Kelly to withdraw.

"An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." *United States v. Iles* (C.A. 6, 1990), 906 F.2d 1122, 1130. "[T]he trial judge may * * * [deny the requested substitution and] require the trial to proceed with assigned counsel participating if the complaint * * * is unreasonable." *State v. Deal* (1969), 17 Ohio St. d 17, 46 O.O.2d 154, 244 N.E.2d 742, syllabus. The trial court's decision is reviewed under an abuse-of-discretion standard. *Iles*, 906 F.2d at 1130, fn. 8.

Cowans's chief complaint was that his attorneys thought he was guilty.

183

However, counsel deny ever expressing such a belief to Cowans. Even if counsel had explored plea options based on a belief that Cowans might be guilty, counsel's belief in their client's guilt is not good cause for substitution. "'A lawyer has a duty to give the accused an honest appraisal of his case. * * * Counsel has a duty to be candid; he has no duty to be optimistic when the facts do not warrant optimism.'" *Brown v. United States* (C.A.D.C. 1959), 264 F.2d 363, 369 (en banc), quoted in *McKee v. Harris* (C.A. 2, 1981), 649 F.2d 927, 932. "'If the rule were otherwise, appointed counsel could be replaced for doing little more than giving their clients honest advice.'" *McKee*, 649 F.2d at 932, quoting *McKee v. Harris* (S.D.N.Y. 1980), 485 F.Supp. 866, 869.

For the same reasons, counsel's discussion of the palm print with Cowans was not good cause for substitution of counsel. Counsel would have rendered ineffective assistance had they *not* tried to discuss such important evidence with their client.

Cowans also contends that the trial court should have given him new counsel because his refusal to speak with Kelly and Wallace rendered them unable to properly prepare his defense. Authority exists for the proposition that a "complete breakdown in communication" between the defendant and appointed counsel can constitute "good cause" for substitution. See, *e.g., United States v. Calabro* (C.A. 2, 1972), 467 F.2d 973, 986; cf. *Iles*, 906 F.2d at 1130, fn. 8 ("total lack of communication" is a factor to be considered in determining whether the trial court abused its discretion by denying substitution).

While the court could have found that there had been a "*complete* breakdown" or "*total* lack of communication" between Cowans and his counsel at the time counsel filed their motion to withdraw on March 6, the record indicates that this temporary lack of communication did not continue after the motion to withdraw was denied. "[T]he record is replete with references to [counsel's] discussions with the defendant * * *." *Iles, supra*, at 1132. On March 24, 1997, when the jury was taken to view the crime scene, Cowans waived his right to be present in the following words: "Under the advice of my [c]ounsel, no, I waive that right, sir." This suggests that Cowans regarded his court-appointed attorneys as his counsel and shows that he considered their advice in making this decision.

When Cowans missed part of the voir dire, one of his attorneys later went over the transcript of the missed hearing with him. When Cowans decided not to be present during the adjudication of the prior-conviction specification, counsel told the court that Cowans "was very cooperative * * * and was willing to discuss the matter with [counsel]." On other occasions when Cowans waived his right to be present at hearings, the record indicates that he discussed this decision with counsel. The record also indicates that counsel reviewed the autopsy report with Cowans and discussed with him at length whether he should testify or remain

silent.  Finally, Cowans and his attorneys discussed "on several occasions" his decisions to waive mitigation, forgo an unsworn statement, and wear his jail uniform to court.

Under the circumstances of this case, we cannot find that the trial judge abused his discretion in denying substitution of counsel.  Cowans's first proposition of law is overruled.

*Cowans*, 87 Ohio St. 3d at 71-74.

In identifying clearly established federal law as determined by the Supreme Court, this Court notes that several concepts are in play.  First, any analysis of a claim of ineffective assistance of counsel must begin with the two-part analysis set forth in *Strickland v. Washington*. In the context of a claim that counsel performed deficiently and to petitioner's prejudice due to a breakdown in the attorney-client relationship, a reviewing court must determine whether counsel was able to serve the adversarial process to which the Sixth Amendment entitles criminal defendants.  As the Sixth Circuit recently explained:

The Sixth Amendment, however, protects the criminal defendant's right to "adversarial process"; that is, to "have counsel [,] acting in the role of advocate[,] ... require the prosecution's case to survive the crucible of meaningful adversarial testing."  *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (quotation marks and citations omitted).

[T]he appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.  If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance.  It is for this reason that we attach no weight to either respondent's expression of satisfaction with counsel's performance at the time of his trial, or to his later expression of dissatisfaction.

*Id.* at 657 n. 21, 104 S.Ct. 2039 (citations omitted).

*Fautenberry v. Mitchell*, 515 F.3d 614, 623-24 (6th Cir. 2008).

Also in play is the well-settled principle that an indigent criminal defendant does not

185

enjoy an absolute right to appointed counsel of his or her choosing. *See, e.g., United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990). That being so, a criminal defendant who asks a trial court to substitute new appointed counsel for his or her current appointed counsel must demonstrate good cause for such substitution and a court reviewing any decision not to grant such substitution must consider the following factors:

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*United States v. Sullivan*, 431 F.3d 976, 980 (6th Cir. 2005) (citing *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001); and *Iles*, 906 F.2d at 1130 n.8).)

Although the Ohio Supreme Court in this case reviewed petitioner's claim as challenging the trial court's refusal to grant his request for substitution of counsel as an abuse of discretion, this Court is satisfied that the Ohio Supreme Court fairly took into consideration all of the concepts set forth above. Thus, this Court cannot say that the Ohio Supreme Court's decision contravened or unreasonably applied clearly established Supreme Court precedent. The record in this case amply supports a conclusion that petitioner's attorneys, despite the off-and-on disputes they experienced with petitioner and despite the days and/or weeks when it appears that petitioner refused to speak to them, represented him diligently and subjected every facet of the prosecution's case to meaningful adversarial testing.

This Court further rejects any argument by petitioner that the Ohio Supreme Court's decision involved an unreasonable determination of facts in light of the evidence presented. Petitioner specifically assails the Ohio Supreme Court's finding that "the record indicates that

186

this temporary lack of communication did not continue after the motion to withdraw was

denied." *Cowans*, 87 Ohio St. 3d at 73.  But that finding was reasonably supported by the

record.  This Court independently reviewed each reference in the transcript to which Ohio

Supreme Court pointed as evidence that petitioner had resumed communication with counsel and

agrees fully with the Ohio Supreme Court in this regard.  Petitioner's reliance on the unresolved

motion to withdraw filed by defense counsel on March 6, 1997, explaining that petitioner's

refusals to speak to them at that time made it impossible for them to defend him, falls short of

constituting clear and convincing evidence sufficient to rebut the Ohio Supreme Court's factual

finding that petitioner had resumed communication with his attorneys.  Further, petitioner

produces no evidence that defense counsel's "wholly ineffective" rebuttal of Marvin Napier's

testimony was a result of petitioner not communicating with them.  And this Court has already

considered and rejected petitioner's suggestion that his refusal to present any mitigation

stemmed from or was at all related to a breakdown in the attorney-client relationship.  In short,

the Ohio Supreme Court's finding that petitioner had resumed communication with his counsel is

reasonably supported by the record.

　　　For the foregoing reasons, this Court **DENIES** petitioner's thirteenth ground for relief as

without merit.

　　　Because this claim is intertwined with petitioner's other claims of ineffective assistance

of counsel, and in view of the importance of this issue to petitioner's case, the Court finds that

reasonable jurists could find its decision debatable or wrong and accordingly certifies ground

thirteen for appeal.

**<u>Fourteenth Ground for Relief</u>: Petitioner was denied the effective assistance
of appellate counsel when appellate counsel failed to present meritorious**

**issues for review in petitioner's direct appeal thereby violating petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Petitioner argues in his fourteenth ground for relief that his appellate attorneys performed deficiently and to his prejudice by failing to raise certain meritorious claims on direct appeal. Specifically, petitioner contends that appellate counsel were ineffective for failing to raise the following issues:

(1) Trial counsel were constitutionally ineffective when they failed to ensure that Appellant's waiver of his right to present mitigation evidence was knowing, intelligent, and voluntary.

(2) Trial counsel were constitutionally ineffective when they failed to establish the blood type found on a swab of blood taken from the crime scene, and to determine whether it belonged to the victim, the defendant, or some unknown assailant.

(3) Trial counsel were constitutionally ineffective when they failed to challenge the state's evidence that a palm print, found in the victim's kitchen, allegedly matched Appellant's palm print.

(4) Appellant's death sentence was imposed in an arbitrary and capricious manner, in violation of the Eighth Amendment, when the jury was prevented from hearing relevant mitigation evidence due to Appellant's invalid waiver of mitigation without having his competency examination.

(Doc. # 68.)

Respondent, in addition to arguing that this claim was procedurally defaulted and time-barred, argues that this claim is without merit.[15]  (Doc. # 76, at 6-27.)  Respondent acknowledges that the Supreme Court recognizes a constitutional right to effective assistance of counsel on direct appeal.  Respondent argues, however, that controlling Supreme Court precedent does not

---

[15]    The Court's September 9, 2005 *Opinion and Order* (Doc. # 72) rejected respondent's statute of limitations argument; the Court's September 12, 2006 *Opinion and Order* (Doc. # 84) rejected respondent's procedural default argument.

impose on appellate counsel a duty to raise every conceivable non-frivolous issue.  Respondent

then goes on to re-visit its arguments against the merits of the underlying issues that appellate

counsel were allegedly ineffective for failing to raise, and concludes that because those

underlying claims are without merit, appellate counsel cannot be deemed ineffective for failing

to raise them on direct appeal.

In his reply, petitioner insists that had appellate counsel raised the three omitted instances

of trial counsel ineffectiveness set forth above, as well as the Eighth Amendment challenge to

petitioner's death sentence, there is a reasonable probability that the outcome of his direct appeal

would have been reversal of the convictions and an order for a new trial or vacation of the death

sentence and an order for a new sentencing hearing.  (Doc. # 79, at 9-21.)  In so arguing,

petitioner not only reiterates and incorporates by reference the arguments he originally set forth

in support of grounds two (c), (f), (h), and six, but also challenges the supplemental arguments

that respondent set forth in response (Doc. # 76.)

In the instant case, the last state court – the only state court – to address the appellate

counsel ineffectiveness claims set forth in petitioner's application for reopening was the

Supreme Court of Ohio.  That court resolved petitioner's claims as follows:

> This cause came on for further consideration upon the filing of an
> application for reopening under S. Ct. Prac. R. XI, Section 6.  Upon consideration
> thereof,
>
> IT IS ORDERED by the Court that the application for reopening be, and
> hereby is denied.

(Doc. # 74-2, Exh. C.)  Because the Ohio Supreme Court's entry summarily rejected petitioner's

claims provided no reasoning, the Court is left to determine only whether its decision rejecting

the claims contravened clearly established Supreme Court precedent.

The *Strickland* test applies to appellate counsel.  *Burger v. Kemp*, 483 U.S. 776, 781-82 (1987).  Counsel must provide reasonable professional judgment in presenting the appeal.  *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985).  " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  *But see Smith v. Anderson*, 104 F. Supp. 2d 773, 839 (S.D. Ohio 2000) ("This Court believes that, in capital cases, appellate counsel should approach the traditional process of winnowing out claims with extreme caution."); *Jamison v. Collins*, 100 F. Supp. 2d 647, 740-41 (S.D. Ohio 2000) ("[W]e believe that any 'winnowing' or narrowing of issues must be done very cautiously when a person's life is at stake.").  Of course, not every decision made by appellate counsel can be insulated from review merely by categorizing it as strategic.  The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

-i- Were the omitted issues "significant and obvious?"

-ii- Was there arguably contrary authority on the omitted issues?

-iii- Were the omitted issues clearly stronger than those presented?

-iv- Were the omitted issues objected to at trial?

-v- Were the trial court's rulings subject to deference on appeal?

-vi- Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

-vii- What was appellate counsel's level of experience and expertise?

-viii-    Did the Petitioner and appellate counsel meet and go over possible issues?

-ix-    Is there evidence that counsel reviewed all the facts?

-x-    Were the omitted issues dealt with in other assignments of error?

-xi-    Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999).  The Sixth Circuit cautioned, however, that this list is not exhaustive and need not produce a certain "score."  *Id.* at 428.

In short, to establish a claim of ineffective assistance of counsel sufficient to establish cause for the default of this claim for relief, Petitioner must show both deficient performance on the part of his appellate attorneys and prejudice from the deficient performance:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.  Reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*. at 689.  To establish the prejudice prong of the *Strickland* test, a Petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.

For the reasons that follow, the Court concludes that none of the underlying claims supporting the seven instances of appellate counsel ineffectiveness set forth above are meritorious.  Therefore, they are insufficient to sustain a claim of ineffective assistance of

191

appellate counsel for the failure to raise them.  Having reviewed appellate counsel's brief on direct appeal with a mind toward comparing the relative strength of the issues that counsel omitted to that of the ten propositions of law that counsel did raise, and fully mindful of all of the *Mapes* factors, this Court cannot conclude that petitioner's appellate counsel performed deficiently or to petitioner's prejudice in failing to raise the claims set forth above.  More accurately, this Court cannot find that the Ohio Supreme Court's one-line entry denying his claims of appellate counsel ineffectiveness was contrary to clearly established federal law.

Petitioner argues that his appellate counsel performed deficiently and to his prejudice in failing to challenge trial counsel's failure to ensure that petitioner's waiver of his right to present mitigation evidence was knowing, intelligent, and voluntary.  This Court considered and rejected that trial counsel ineffectiveness claim in rejecting petitioner's first ground for relief, as well as ground two, sub-part (c).  Because the underlying trial counsel ineffectiveness claim was not, in this Court's view, meritorious, appellate counsel cannot be deemed ineffective for failing to raise it.

Petitioner argues that his appellate counsel performed deficiently and to his prejudice in failing to challenge trial counsel's failure to establish the blood type of blood evidence recovered from the crime scene.  This Court considered and rejected that trial counsel ineffectiveness claim in rejecting ground two, sub-part (f).  Because the underlying trial counsel ineffectiveness claim was not, in this Court's view, meritorious, and because the claim inherently relied on evidence outside the trial record, appellate counsel cannot be deemed ineffective for failing to raise it on direct appeal.  *See State v. Burke, supra*, 97 Ohio St. 3d at 57 ("Clearly, declining to raise claims without record support cannot constitute ineffective assistance of appellate counsel.")

Petitioner argues that his appellate counsel performed deficiently and to his prejudice in failing to challenge trial counsel's failure to challenge the prosecution's evidence that a palm print found in the victim's kitchen allegedly matched petitioner's palm print. This Court considered and rejected that trial counsel ineffectiveness claim in rejecting ground two, sub-part (g). Because the underlying trial counsel ineffectiveness claim was not, in this Court's view, meritorious, and because the claim inherently relied on evidence outside the trial record, appellate counsel cannot be deemed ineffective for failing to raise it on direct appeal. *See State v. Burke, supra*, 97 Ohio St. 3d at 57.

Finally, petitioner argues that his appellate counsel performed deficiently and to his prejudice by failing to argue on direct appeal that petitioner's death sentence was imposed in an arbitrary and capricious manner in violation of his rights under the Eighth Amendment because the jury was prevented from hearing relevant mitigation evidence due to petitioner's invalid waiver of mitigation without having his competency examined. This Court considered and rejected that argument in rejecting petitioner's first and sixth grounds for relief. Because that claim was not, in this Court's view, meritorious, appellate counsel cannot be deemed ineffective for failing to raise it.

For the foregoing reasons, the Court concludes that petitioner has failed to demonstrate that his appellate counsel performed deficiently or to his prejudice in failing to raise the four issues set forth above. The Ohio Supreme Court's entry denying petitioner's appellate counsel ineffectiveness claims did not contravene clearly established federal law. Thus, the Court **DENIES** petitioner's fourteenth ground for relief as without merit.

Because the Court considered and rejected the four trial issues underlying petitioner's

193

appellate counsel ineffectiveness claim, this Court is constrained to find that petitioner's fourteenth claim for relief is so plainly without merit that reasonable jurists could not find this Court's decision debatable or wrong.  Accordingly, the Court declines to certify ground fourteen for appeal.

## IV.  Conclusion

For the foregoing reasons, the Court **DENIES** Petitioner's habeas corpus claims, **DISMISSES** this action, and **DIRECTS** the Clerk to enter judgment dismissing this action.

The Court further **CERTIFIES FOR APPEAL** grounds one, two, four, six, seven, nine, and thirteen.

**IT IS SO ORDERED.**


**September 30, 2008**                              /s/  *Edmund A. Sargus,  Jr.*
                                                   **EDMUND A. SARGUS, JR.**
                                                   **UNITED STATES DISTRICT JUDGE**